James E. Cecchi
Lindsey H. Taylor
**CARELLA BYRNE CECCHI**
**BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey  07068
(973) 994-1700

Daniel L. Berger
Caitlin M. Moyna
**GRANT & EISENHOFER, P.A.**
485 Lexington Avenue
New York, NY  10017
(646) 722-8501

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DEFINED BENEFIT PLAN OF THE MID-JERSEY TRUCKING INDUSTRY AND TEAMSTERS LOCAL 701 PENSION AND ANNUITY FUND, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> PAYPAL HOLDINGS, INC., DANIEL SCHULMAN, and JOHN RAINEY, <br><br> Defendants. | Civil Action No.: <br><br><br><br> **COMPLAINT and** <br> <u>**DEMAND FOR JURY TRIAL**</u> |

Plaintiff, Defined Benefit Plan of the Mid-Jersey Trucking Industry and Teamsters Local 701 Pension and Annuity Fund ("Mid-Jersey Trucking") or, ("Plaintiff"), by and through its attorneys, alleges the following upon information and belief, except as to allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief are based upon, among other things, its counsel's investigation, which includes, without limitation: (a) review and analysis of public filings made by PayPal Holdings, Inc. ("PayPal" or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants (defined below) and other parties; (c) review of news articles, shareholder communications, conference calls, and

1

postings on PayPal's website concerning the Company's public statements; and (d) review of other publicly available information concerning the Company and the Individual Defendants.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all persons or entities who purchased PayPal common stock between February 3, 2021, and February 1, 2022, inclusive (the "Class Period") against PayPal and certain of its officers (collectively "Defendants") seeking to pursue remedies under the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq*. (the "Exchange Act").

2.      PayPal operates one of the best-known digital payment platforms, enabling both merchants and consumers to make digital and mobile payments worldwide.  Over 90% of the Company's revenue is generated through fees on payment transactions.

3.      Throughout the Class Period, PayPal touted the massive growth in its Net New Active Accounts (NNAs) and instructed investors to value the high growth in this metric as one of the most important indicators of how the Company was performing.  That's because in theory, the more accounts on the platform, the more opportunity there will be to earn transaction fees from the ever-increasing number of accounts.

4.      Also, during this period, PayPal was continuing to lose a large portion of historical business with E-bay.  Thus, PayPal was under tremendous pressure to make up for that lost business and show investors it could grow despite the significant loss of its E-bay business.

5.      Indeed, PayPal was so focused on dazzling investors with hyper-growth in its NNA metric that it continually offered, and increasingly relied on, cash marketing incentives to customers for new account openings. In fact, in 2021, the company offered ten dollars to customers who opened new accounts on the platform.

6.       The Company continually discussed and emphasized the high growth in NNAs and provided short-term and medium target targets for the number of new accounts.  Tellingly, in February 2021, PayPal predicted that it would add 50 million new users in 2021 and that it would have 750 million total active customer accounts on its platform by 2025, essentially doubling the

number of active accounts in four years. NNAs was therefore unsurprisingly a highlighted and important component of the Company's performance measures.   In its most recent Proxy statement, it was explained that "[T]he Compensation Committee believes that NNAs reinforces *the critical importance of growing our customer base* to build for the future.  The number of *NNAs is also a key operational metric* that the Company uses internally to measure ongoing performance."

7.      Undisclosed to investors, however, and as Defendants have now admitted, while touting its NNA growth, the Company failed to disclose that many of the additional users acquired through its cash account creation incentive campaigns were illusory, because those incentive campaigns that were easily susceptible to fraud. Specifically, PayPal failed to disclose that its aggressive cash incentive campaigns significantly increased PayPal's susceptibility to bot farms, that were able to systematically take advantage of PayPal's $10.00 account opening by creating millions of illegitimate accounts, which ultimately generated no future revenue for the Company.

8.      In addition, investors were unaware of the lengths the Company was going to keep inactive customers and fake bot accounts on the platform to prevent churn and inflate its NNA guidance which would have provided a more realistic view of the true demand for the Company's platform.

9.      The truth was disclosed on February 1, 2022 when PayPal reported disappointing fourth quarter and full year 2021 results.  Specifically, PayPal reported that its NNAs were only 49 million for 2021, less than the guidance of 50 million it initially provided in February 2021. The Company admitted that "in connection with the increased use of cash incentive campaigns throughout 2021, [it] identified 4.5 million accounts that "it" believes(s) were illegitimately created," and that as a result the Company changed course on some of its customer acquisition strategies including incentive-led campaigns in the fourth quarter.  Further, because the Company was evolving its customer acquisition and engagement strategy, PayPal now expects only 15-20 million net new customer accounts for 2022 and that the Company "no longer believe(s) that the 750 million medium-term account aspiration [it] set last year, is appropriate."   To put that in

perspective, to reach the 750 million number by the end of 2025, PayPal would have needed to average about 75 million NNAs per year including in 2021.  Instead, only a year later, it was completely abandoning the 2025 goal and guiding to as low as 15 million NNAs in 2022.

10.     Further, the Company also admitted that in 2021 the Company pursued a strategy to retain those customers mostly likely to churn.  As was previously unbeknownst to investors, the Company now disclosed that "[W]e also leaned into incentivized customer acquisition tactics to a much greater extent than we ever have in our history" admitting that while "these programs are very successful in generating account creation, these customers have lower engagement and a higher propensity to churn, and have not met our required level of return.  This dynamic compounds over time as it requires increasing investment simply to keep minimally-engaged users on our platform."  Therefore, going forward, the Company will focus on driving engagement of active customers rather than trying to grow its NNAs.

11.     Essentially, the Company admitted it was inflating its NNA guidance number by manipulating the natural churn rate by incentivizing customers to stay on the platform who ordinarily would have been considered inactive i.e. accounts illegitimately created solely for the purpose of taking advantage the cash incentives associated with the creation of a PayPal account.

12.      So, in a complete about face, PayPal disclosed that it was  no longer focused on preventing churn or retaining inactive customers and is now focused on increasing the engagement of its more active customers which will significantly reduce its ability to maintain growth in NNAs.

13.     In sum, despite continually touting NNAs as an important indicative factor to the Company's financial success, PayPal admitted that its guidance regarding the NNA metric was in fact materially inflated by marketing campaigns that invited the creation of millions of illegitimate accounts.

14.      Unbeknownst to investors, the Company was only reporting the hyper-growth in NNAs the Company's unusually heavy reliance on marketing campaigns that were easily targeted by fraudulent actors who were not really active or profitable to the Company.

15.     On these shocking disclosures, PayPal's stock price fell $43.23, or 25% in one-day, to close at $132.57 per share on February 2, 2022 – representing a $62 billion drop in market capitalization.

16.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in market value of the Company's common stock when the truth was disclosed, Plaintiff and other Class members have suffered significant losses and damages.

## I.      JURISDICTION AND VENUE

17.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act (15 U.S.C. § 78aa).

19.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.

20.     In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. Mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

21.     Plaintiff, Mid-Jersey Trucking is a fund that supports the retirement, health and general welfare needs of the union participants of Mid-Jersey Trucking Local 701, located in New Brunswick, New Jersey.   Contributions to Mid-Jersey Trucking come primarily from compensation withholdings of the professional truck drivers, sanitation workers, law enforcement personnel, warehouse workers and municipal workers who comprise the union.  As set forth in the accompanying certification, incorporated by reference herein, Plaintiff purchased PayPal common stock during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

22.     Defendant PayPal is incorporated under the laws of Delaware and has its principal executive offices in San Jose, California.  PayPal's common stock trades on the Nasdaq Stock Market (the "NASDAQ") under the ticker symbol "PYPL."

23.     Defendant Daniel Schuman ("Schulman") has served as PayPal's CEO at all relevant times.

24.     Defendant John Rainey ("Rainey") has served as PayPal's CFO at all relevant times.

25.     Defendants Schulman and Rainey (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

26.     The Company and the Individual Defendants are collectively referred to as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

27.     PayPal operates one of the best-known digital payment platforms, enabling both merchants and consumers to make digital and mobile payments worldwide.  Over 90% of the Company's revenue is generated through fees on payment transactions.

28.     In response to the COVID-19 pandemic, the global economy was forced to move online to a great extent and that benefitted online payment platforms such as PayPal. For the fiscal

year ended December 31, 2020, PayPal reported a record 73 million new NNAs ending the year with 377 million active accounts.

29.     Analysts were encouraged by PayPal's explosive growth in the number of net new active accounts. Wolfe Research analyst Darrin Peller noted the expectation for 50 million net new active accounts came in significantly above his own prior projection for 35 million, and highlighted a "new norm" for the company. Peller specifically state that, "We see the [net-new active] guidance as key given concerns among some investors that the [over 70 million] added in 2020 was a pull-forward and would cause a material retrenchment in 2021," he wrote, while reiterating an outperform rating on the stock.

30.     In order to maintain pandemic level of NNA growth in 2021 and, PayPal turned to aggressive marketing campaigns which provided users with $10.00 (and sometimes as much as twenty dollars) when they opened an account with PayPal.

31.     These campaigns allowed fraudsters (largely bot farms) to create millions of fake accounts, in order to accumulate value through PayPal's cash incentive. Cash incentive-based marketing campaigns are particularly susceptible to fraud because the opportunity to particularly attractive to fraudsters, because they can accumulate a large number of fake accounts and receive cash quickly.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

32.     The Class Period begins on February 3, 2021, when PayPal stated in no uncertain terms that NNA growth would continue unabated and announced that it was expecting to add another 50 million NNAs in 2021.  PayPal predicted an increase of 50 million NNAs despite the fact that certain customers were pulled forward due to the pandemic, that the economy was normalizing, and that in 2018 and 2019, the Company added only 38 million net new accounts in each of those pre-pandemic years.

33.     During the corresponding conference call, Analyst Darrin Peller of Wolfe Research noted the "impressive number" of NNAs predicted for 2021 and asked Shulman if he could "walk

us through the different drivers, whether it's geography or products giving you the confidence in adding 50 million net new active in 2021 versus another pre-pandemic 35 million or so levels?" Schulman responded that when we look at the cohort of net new actives from last year, it's clearly incremental people coming on" and that the Company's "churn rates" are "coming down" because of "increased engagement."

34.     A week later during PayPal's February 11, 2021 Investor Day conference, CEO Dan Schulman also touted PayPal's NNA growth and declining churn rate, stating that:

> This is the first time we're going to talk about a metric, but I'm very excited that over the next five years, we believe we can grow this 377 million to 750 million active accounts on our platform. ***And the reason we feel so confident about that is that we are seeing engagement levels increase dramatically throughout our base***, especially with the new products that we've put out. Over the past five years, we've seen engagement levels grow by one and a half times, but given the success we've seen with the introduction of things like cryptocurrency, our offline or in-store strategies, our buy now, pay later capabilities, we are seeing historic engagement curves start to bend and accelerate. And that's especially important because those do two things. **One, they obviously increase the average revenue per user, and we expect that to grow substantially over the next five years. And at the same time, it also reduces our churn rate.** And as we get larger and larger, the more our churn rate reduces, the more our net new active cohorts can grow. And so that combination of scale and engagement is very exciting for us as we look forward. (Emphasis supplied).

35.     On May 5, 2021, just one quarter later, PayPal was already raising its guidance for 2021 NNAs to between 52-55 million from previous expectations of ~50 million.  Analysts called the quarter a "monster" quarter as the Company beat estimates with guidance raised across nearly all metrics.  The Barclays analyst specifically noted the growth in NNAs calling it "impressive." Piper Sandler stated that PayPal's recent growth shows the Company is not dependent on pandemic-related opportunities.  The guidance raise in NNAs was particularly important to allay any investor fears about a post-covid return to more traditional payments and was taken as an

indication of continued adoption by new entrants into the digital financial world.  In addition, the high growth in NNAs continued to allay fears over the loss of the E-bay business.

36.    On July 28, 2021, PayPal reported second quarter 2021 results.  The Company's results were considered mixed with E-bay business rolling off faster than analysts were anticipating.  However, and importantly, the Company reiterated guidance of 52 to 55 million NNAs indicating the Company expects to be "at the higher end" of that range.  In a Bloomberg article titled "PayPal Slumps as Loss of eBay Bites Harder Than Expected," the article noted that "Despite eBay's move away from PayPal, the payments giant said on Wednesday it still expects revenue for the year to climb roughly 18.5% when adjusting for fluctuations in currencies.  It also reaffirmed it would add as many as 55 million active users this year."

37.    During the corresponding conference call, in response to a question from an analyst concerning the Company's guidance regarding NNAs for the second half of the year, Rainey stated that:

> I think to understand what's happening with net new actives, it's really helpful to zoom out on the second quarter and think about the 11.4 million net new actives that we added this quarter. Appreciate that the most significant pressure from churn happened that quarter, right, because we added over 7 million net new actives in the quarter of the prior year. We've got huge pressure on churn there and even with that, we had 11.4 million net new actives, which by historical standards would have been fantastic, right? This is the low point of net new actives for the year. ***When we look at the level of activations and reactivations for the back half of the year, combined with the improved churn levels that we've seen pre COVID, that gives us a lot of conviction around being able to get to the numbers that we've targeted***. We've also, I think, really improved our capabilities around customer acquisition than where we were a couple years ago. Much better clarity with what cost of acquisition is, what the customer lifetime value is, and the ability to spend marketing dollars into that. But fundamental to your question around how do we think that we'll achieve those 750 million [active accounts] really comes down to user engagement.  As we add more experiences to the wallet, more ways for people to use us, different channels, being able to use us offline, we think that that is going to drive a lot of that increase in net new actives, and accordingly, user engagement. (Emphasis supplied)

38.    On November 8, 2021, PayPal reported third quarter 2021 results and stated it was still on track to deliver more than 52 million NNAs for the year, dropping the language about being towards the high-end of the 52-55 million range.  Revenues came in slower than expected and the Company blamed weak back-to-school sales and travel.  PayPal discussed the global supply chain

impact and called the issues it was facing "temporal" and stated that they remain confident in its medium-term guidance.

39.    In the corresponding conference call and in regard to NNAs, Schulman stated that:

> Unlike a lot of companies that experienced growth during the COVID time and then are unwinding ***our growth remains incredibly strong on the NNA side.*** I mean think about it in the minute that we've been talking so far, Darren, we've got – we put on about 100 consumers and nine new merchants, right?" Shulman reiterated the "750 million" 2025 target number and emphasized that a "reduction in churn becomes a really important element of our ability to get to the 750 million**." *Schulman even emphasized that NNAs would actually start to accelerate going forward because of the halo effects inside the business* such as introducing "buy now, pay later" that positively affects churn rate.** So, the CEO was stating that NNAs would continue to increase because the Company would be able to keep its churn rate low by continuing to keep customers on its platform by offering customers new offerings such as payment plans (note: the buy now, pay later industry is under regulatory investigation) and other offerings such as crypto. (Emphasis supplied).

40.  During the November 9, 2021 buy side call, Rainey falsely assured investors that Paypal was not interested in acquiring "low quality new actives" in response to a question from Jason Kupferberg concerning the addition of NNAs expected in the fourth quarter of 2021:

> *[Low quality new actives] is not something that we want to chase as a company*, and we can certainly go out and spend money on customer acquisition and get very low value net new actives to inflate or pump up that number, but that's not the right economic decision for us longer term. And I've got confidence in where we are longer term around net new actives. (Emphasis supplied).

41.    The above statements identified in ¶¶ 32-40 were materially false and/or misleading and failed to disclose material adverse factors about the Company's business, operations---specifically the Company's increased reliance on cash incentive campaigns for account creation that invited a deluge of illegitimate PayPal accounts that would boost PayPal's numbers but would generate no revenue for the Company. These facts were known to Defendants or recklessly disregarded by them.  Specifically, Defendants misled investors and/or failed to disclose that: (1) Defendants had inflated its vitally important NNA metric guidance through an usually large use of marketing campaigns that were easily susceptible to fraud; i.e. the creation of millions of

illegitimate accounts which were created for the sole purpose of taking advantage of cash incentives for account creation;  (2) Defendants used these marketing campaigns and other incentives to hide the Company's true churn rate and declining levels of engagement with the platform; (3) as a result, Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and /or lacked a reasonable basis at all relevant times.

## THE TRUTH IS REVEALED

42.     On February 1, 2022, PayPal shocked investors when it reported disappointing fourth quarter and full year 2021 results.  Specifically, PayPal reported that its NNAs was only 49 million for 2021, less than the guidance of 50 million it initially provided in February 2021 and lower than the raised guidance it reiterated just months prior.  The Company admitted that "in connection with the increased use of incentive campaigns throughout 2021, [it] identified 4.5 million accounts that "it" believes(s) were illegitimately created," in order to take advantage of cash account opening incentives, and that as a result the Company changed course on some of its customer acquisition strategies including incentive-led campaigns in the fourth quarter.  Further, because the Company was evolving its customer acquisition and engagement strategy, PayPal now expects only 15-20 million net new customer accounts for 2022 and that the Company "no longer believe(s) that the 750 million medium-term account aspiration [it] set last year, is appropriate."

43.     While the Company believed the "fake" account number was immaterial to its overall base of 426 million accounts, the Company admitted that it "affected its ability to achieve its guidance in the quarter."  PayPal described the "fake" accounts issue as the "most impactful to the quarter" and stated that it regularly assesses its active account base to ensure the accounts are legitimate.  The Company further noted that checking this is particularly important during incentive campaigns that can be targets for bad actors attempting to reap the benefit from these offers without ever having any intent to be a legitimate customer on its platform.

44.     PayPal also admitted that in 2021, given the strong user growth, the Company pursued a strategy to retain those customers mostly likely to churn, as well as attract many more

new customers.  Previously unbeknownst to investors, the company stated "We also leaned into incentivized customer acquisition tactics to a much greater extent than we ever have in our history."  The Company admitted that while "these programs are very successful in generating account creation, these customers have lower engagement and a higher propensity to churn, and have not met our required level of return.  This dynamic compounds over time as it requires increasing investment simply to keep minimally-engaged users on our platform."  Therefore, going forward, the Company will focus on driving engagement of active customers rather than trying to grow users at all costs.

45.     In a research report titled "Time to Face the Music" by SMBC Nikko Securities America, Inc., analyst Andrew Bauch stated that "The most troubling metric for bullish investors to digest was undoubtedly around NNAs (net new actives)" and that "management validated our belief that aspirations for 750mm active accounts by 2025 (outlined in February 2021) was inappropriate, which we suspect is the first domino to fall in a gradual lowering of all medium term expectations."

46.     On this news, PayPal's stock price fell $43.23, or 25% in one-day, to close at $132.57 per share on February 2, 2022 – representing a $62 billion drop in market capitalization.

47.     Tellingly, in late April 2022, PayPal again lowered guidance, and was estimating only 10 million in NNAs for the year.  MarketWatch reported that "the Payments giant cut its full-year outlook late Wednesday, while abandoning the medium-term forecasts that many had come to worry were ***disjointed from reality***."  In the article, Rosenblatt Securities analyst Sean Horgan was quoted as saying" We lost a degree of confidence in management's guidance and believe the company lacks a sense of clarity around its strategic direction." SMBC Nikko analyst stated the PayPal's explanations for the lowered outlook were not in-line with what fellow payments players were stating noting that "In light of another strong quarter from the networks, we believe that management did not effectively reconcile the differences between their commentary (as it relates

to macro) and the commentary of said peers, who are not seeing material macro headwinds as of yet."

## CLASS ACTION ALLEGATIONS

48.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class, consisting of all persons and entities that purchased PayPal common stock between February 23, 2021, and February 1, 2022, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

49.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Throughout the Class Period, PayPal common stock actively traded on NASDAQ (an open and efficient market) under the symbol "PYPL."  Millions of PayPal shares were traded publicly during the Class Period on the NASDAQ. As of April 22, 2022, the Company had more than one billion shares outstanding.  Record owners and other members of the Class may be identified from records maintained by PayPal or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

50.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

51.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests that conflict with those of the Class.

52.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

a.      Whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

b.      Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

c.      Whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, operations, and prospects of PayPal;

d.      Whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of PayPal;

e.      Whether the market price of PayPal common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f.      The extent to which the members of the Class have sustained damages and the proper measure of damages.

53.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this suit as a class action.

**UNDISCLOSED ADVERSE INFORMATION**

54.     The market for PayPal's common stock was an open, well-developed, and efficient market at all relevant times.   As a result of the materially false and/or misleading statements and/or

omissions particularized in this Complaint, PayPal's common stock traded at artificially inflated prices during the Class Period.  Plaintiff and the other members of the Class purchased PayPal's common stock relying upon the integrity of the market price of the Company's common stock and market information relating to PayPal and have been damaged thereby.

55.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of PayPal's common stock, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about PayPal's business, operations, and prospects as alleged herein. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its business, thus causing the Company's common stock to be overvalued and artificially inflated or maintained at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class who purchase the Company's common stock at artificially inflated prices and were harmed when the truth was revealed.

## SCIENTER ALLEGATIONS

56.     As alleged herein, Defendants acted with scienter in that Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

57.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding PayPal, their control over, receipt, and/or modification of PayPal's allegedly materially misleading statements and omissions, and/or their

positions with the Company which made them privy to confidential information concerning PayPal, participated in the fraudulent scheme alleged herein.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

58.     The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

59.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of PayPal who knew that the statement was false when made.

## LOSS CAUSATION

60.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Plaintiff and the Class.

61.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions and engaged in a scheme to deceive the market.  This artificially inflated the prices of PayPal's common stock and operated as a fraud or deceit on the Class.  When Defendants' prior misrepresentations, information alleged to have been concealed, fraudulent conduct, and/or the effect thereof were disclosed to the market, the price of PayPal's stock fell precipitously, as the prior artificial inflation came out of the price.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

62.     The market for PayPal stock was open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose particularized in this Complaint, PayPal common stock traded at artificially inflated and/or maintained prices during the Class Period.  Plaintiff and other members of the Class purchased the Company's common stock relying upon the integrity of the market price of PayPal common stock and market information relating to PayPal and have been damaged thereby.

63.     At all times relevant, the market for PayPal common stock was an efficient market for the following reasons, among others:

a.      PayPal was listed and actively traded on NASDAQ, a highly efficient and automated market;

b.      As a regulated issuer, PayPal filed periodic public reports with the SEC and/or the NASDAQ;

c.      PayPal regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d.      PayPal was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

64.     As a result of the foregoing, the market for PayPal common stock promptly digested current information regarding PayPal from all publicly available sources and reflected such information in PayPal's stock price.  Under these circumstances, all purchasers of PayPal stock during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices, and a presumption of reliance applies.

65.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Class's claims are, in large part, grounded in Defendants' material misstatements and/or omissions.   Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery.   All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions.   Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## II.     COUNTS AGAINST DEFENDANTS

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants**

66.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

67.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of PayPal common stock; and (iii) cause Plaintiff and other members of the Class to purchase PayPal stock at artificially inflated prices.   In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

68.     Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for PayPal common stock in violation of Section 10(b) of

the Exchange Act and Rule 10b-5 promulgated thereunder.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

69.     Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about PayPal's business, operations, and prospects, as specified herein.  Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of PayPal's business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about PayPal and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

70.     Each of the Individual Defendants' primary liability and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period and a member of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the

Individual Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

71.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing PayPal's operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its common stock.   As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

72.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of PayPal common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the market in which the stock trades, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class purchased PayPal common stock during the Class Period at artificially inflated prices and were damaged thereby.

73.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.   Had Plaintiff and the other members of the Class and the marketplace known of the truth regarding the problems that PayPal was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased their PayPal common stock, or, if they had purchased such

common stock during the Class Period, they would not have done so at the artificially inflated prices that they paid.

74.     By virtue of the foregoing, PayPal and the Individual Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

75.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## COUNT II

**For Violations of Section 20(a) of the Exchange Act
Against the Individual Defendants**

76.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

77.     The Individual Defendants acted as controlling persons of PayPal within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control,  directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  Further, the Individual Defendants signed the Company's 2020 and 2021 Annual Reports on Form 10-K and the Third Quarterly Report for 2020, the First, Second, and Third Quarterly Reports for 2021 and First Quarterly Report for 2022 on Form 10-Q.

78.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

79.     As set forth above, PayPal and the Individual Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief and judgment as follows:

a)     Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)     Awarding Plaintiff and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

c)     Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d)     Awarding such other relief as this Court deems appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury as to all issues so triable.

Dated: October 4, 2022

_____/s/ James E. Cecchi_____
**CARELLA  BYRNE  CECCHI  BRODY
AGNELLO, P.C.**

James E. Cecchi
Lindsey H. Taylor
5 Becker Farm Road
Roseland, NJ  07068
Tel.: (973) 994-1700
Fax:
Email: jcecchi@carellabyrne.com
Email: ltaylor@carellabyrne.com

**GRANT & EISENHOFER, P.A.**
Daniel L. Berger
Caitlin M. Moyna
485 Lexington Avenue
New York, NY  10017
Tel: (646) 722-8501
Fax:  (646) 722-8501
Email: dberger@gelaw.com
Email: cmoyna@gelaw.com

*Counsel for Plaintiff*