**LABATON SUCHAROW LLP**
Carol C. Villegas *(pro hac vice)*
Jake Bissell-Linsk *(pro hac vice)*
Lisa Strejlau *(pro hac vice)*
Danielle Izzo *(pro hac vice)*
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Fax: (212) 818-0477
cvillegas@labaton.com
jbissell-linsk@labaton.com
lstrejlau@labaton.com
dizzo@labaton.com

**LABATON SUCHAROW LLP**
Mark Willis (*pro hac vice* forthcoming)
1050 Connecticut Avenue NW
Suite 500
Washington, D.C. 20036
Telephone: (202) 772-1880
Fax: (212) 818-0477
mwillis@labaton.com

**ROBBINS GELLER RUDMAN
& DOWD LLP**
Tor Gronborg *(pro hac vice)*
Matthew I. Alpert *(pro hac vice)*
Patton L. Johnson *(pro hac vice)*
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
Fax: 619/231-7423
torg@rgrdlaw.com
malpert@rgrdlaw.com
pjohnson@rgrdlaw.com

**ROBBINS GELLER RUDMAN
& DOWD LLP**
Jacob G. Gelman *(pro hac vice)*
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
Fax: 415/288-4534
jgelman@rgrdlaw.com

*Co-Lead Counsel for the Class*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| IN RE PAYPAL HOLDINGS INC. SECURITIES LITIGATION | Case No.: 3:22-cv-05864 (GC) (LHG)<br><br>Hon. Georgette Castner, U.S.D.J.<br>Hon. Lois H. Goodman, U.S.M.J.<br><br>CLASS ACTION<br><br>**CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

**TABLE OF CONTENTS**

                                                                                            **Page**

I.    SUMMARY OF THE ACTION................................................................................2

      a.    Background on PayPal's Business and Its NNA Metric ...............................3

      b.    The Risks of PayPal's Incentives Were Known to Management and the
            "Minimally Engaged" NNAs Were Apparent to PayPal Executives.............5

      c.    Defendants Touted PayPal's NNA Growth Throughout 2021 Despite Only
            Achieving Guidance in 3Q2021 by Including Illegitimate Accounts............8

      d.    PayPal Finally Admits Its NNAs Consist of Low Value, "Minimally Engaged,"
            and Illegitimate Users.................................................................................9

II.   JURISDICTION AND VENUE.........................................................................13

III.  PARTIES AND WITNESSES ..........................................................................14

      a.    Parties.......................................................................................................14

      b.    Witnesses .................................................................................................16

IV.   BACKGROUND AND NARRATIVE STATEMENT OF ALLEGATIONS ....................18

      a.    Background on PayPal and the Importance of the NNA Key Performance
            Indicator to Its Prospects...........................................................................18

      b.    PayPal Promotes NNA Growth With Risky Promotions Which Were Quickly
            Exploited By Bot Farms Creating Massive Numbers of Illegitimate Accounts...........22

            i.     Chinese Websites Document that Abuse of PayPal's NNA Promotions
                   "Went Viral," Due to "Low Threshold" for Abuse ...........................22

            ii.    Defendants Knew or Recklessly Disregarded the Risks Posed by the
                   Promotions and Failed to Exclude the Illegitimate Accounts From
                   Reported NNA Results.........................................................................25

            iii.   PayPal's NNA Promotions Lead to a Rise in Minimally Engaged Users..........38

      c.    Throughout the Class Period, Defendants Falsely Represented PayPal's Growth
            and Failed to Disclose Known Risks to Investors........................................44

      d.    PayPal Narrowly Avoids Missing Guidance By Reporting NNA Figures That
            Were Inflated With "Illegitimate" and Minimally Engaged Accounts ........................47

      e.    PayPal Touts Its NNA Figures While Concealing Illegitimate Accounts
            Numbers from Investors .............................................................................50

      f.    Defendants Eventually Disclose the Truth and PayPal's Stock Price Collapses...........52

      g.    Subsequent Events......................................................................................61

i

V.  DEFENDANTS' CONDUCT GIVES RISE TO CLAIMS UNDER THE FEDERAL SECURITIES LAWS.................................................................................68

  a.  Defendants' False or Misleading Statements and Omissions During the Class Period...............................................................................................68

    i.  Materially False or Misleading Statements ......................................68

        1.  Fourth Quarter Fiscal 2020 Results – February 3, 2021 ..............72

        2.  Investor Day – February 11, 2021 ...............................................77

        3.  PayPal's Company Conference Presentation – March 2, 2021.....................................................................................79

        4.  Evercore ISI's Payments and Fintech Innovators Forum – March 4, 2021..................................................................80

        5.  Wolfe Fintech Forum – March 9, 2021........................................80

        6.  First Quarter Fiscal 2021 Results – May 5, 2021 ........................81

        7.  MoffettNathanson Analyst Call – May 10, 2021..........................87

        8.  J.P. Morgan's Payments and IT Services Sector Analyst Call – May 24, 2021....................................................................89

        9.  Bank of America Securities Keynote Session – June 9, 2021.....................................................................................92

        10. Second Quarter Fiscal 2021 Results – July 28, 2021...................93

        11. Deutsche Bank Fireside Chat – September 9, 2021......................97

        12. J.P. Morgan All Stars Conference – September 23, 2021.............98

        13. Third Quarter Fiscal 2021 Results – November 8, 2021 ..............98

        14. CNBC's *Mad Money with Jim Cramer* – November 30, 2021.....................................................................................105

        15. Goldman Sachs Conference – December 7, 2021 ......................106

    ii. Actionable Omissions in Violation of Disclosure Obligations .......107

        1.  Defendants Violated Duties Pursuant to Item 303 ....................107

        2.  Defendants Violated Duties Pursuant to Item 105 ....................109

  b.  Defendants Acted With Scienter ...............................................................110

  i.  The Individual Defendants' Motive and Opportunity....................................110

      1.  The Individual Defendants' Sale of More Than $170
          Million in PayPal Stock Raises a Strong Inference of
          Scienter..................................................................................................110

      2.  PayPal's Compensation Structure Created the Motive and
          Opportunity for the Individual Defendants to Commit
          Fraud .....................................................................................................117

  ii. Knowledge and Recklessness ....................................................................118

      1.  The NNA and TPV Metrics Were of Such Significance to
          PayPal That Defendants' Knowledge of Available
          Information Concerning TPV Composition and NNA
          Engagement Can Be Inferred .....................................................118

      2.  Defendants Personally Tracked Information Concerning
          NNAs and Engagement............................................................120

      3.  Defendants Were Directly Apprised of the Risks
          Concerning the NNA Promotions...............................................123

      4.  The Illegitimate Account Issue Was So Widely Known
          Within PayPal That Defendants' Knowledge of the Issue
          Was Overwhelmingly Likely ....................................................126

  c.  Loss Causation and Economic Loss ..........................................................127

  d.  Presumption of Reliance ...........................................................................129

  e.  No Safe Harbor.........................................................................................131

VI. CLASS ACTION ALLEGATIONS ....................................................................132

VII. COUNTS..........................................................................................................134

  a.  COUNT I: Violation of Section 10(b) of the Exchange Act and Rule 10b-5
      Promulgated Thereunder Against All Defendants .....................................134

  b.  COUNT II: Violation of Section 20(a) of the Exchange Act Against the
      Individual Defendants................................................................................135

  c.  COUNT III: Violation of Section 20A of the Exchange Act Against the
      Individual Defendants................................................................................137

VIII.     PRAYER FOR RELIEF ...............................................................................140

IX. JURY TRIAL DEMANDED ...............................................................................140

Lead Plaintiff Caisse de dépôt et placement du Québec ("Lead Plaintiff") and additional named Plaintiff Public Employees Retirement Association of New Mexico ("PERA") (collectively, "Plaintiffs"), bring this action against PayPal Holdings, Inc. ("PayPal," or the "Company"), and three of PayPal's current or former executives, Daniel Schulman, John Rainey, and Jonathan Auerbach (the "Individual Defendants," and together with PayPal, "Defendants").

Plaintiffs allege the following based upon personal knowledge as to Plaintiffs' own acts and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys. This included, among other things, review of: (i) U.S. Securities and Exchange Commission ("SEC") filings; (ii) press releases and conference call transcripts; (iii) information on PayPal's website; (iv) analyst and media reports; (v) public court filings; (vi) insiders' trades of PayPal stock; (vii) interviews of former PayPal employees; and (viii) other publicly available information. Plaintiffs believe that substantial additional evidentiary support exists for the allegations herein after a reasonable opportunity for discovery.

This case is brought individually by Plaintiffs and on behalf of all persons and entities that purchased PayPal Securities between February 3, 2021 and February 1, 2022, inclusive (the "Class Period"), and who were damaged thereby (the "Class"). *See* ¶380 (full class definition).

This action is brought pursuant to Sections 10(b) (and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, 20(a)), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b), 78t(a), and 78t-1. Plaintiffs allege that Defendants' fraudulent misrepresentations and omissions caused PayPal's stock to trade at artificially inflated and artificially maintained levels, that Plaintiffs and Class members purchased PayPal Securities at these inflated levels, and that Plaintiffs and Class members suffered losses when the truth was revealed and PayPal's stock price dramatically declined.

## I.    SUMMARY OF THE ACTION

1.    PayPal operates one of the largest digital payment platforms, enabling merchants and consumers to make digital and mobile payments.  Almost 90% of PayPal's revenue is generated through fees on transactions over its payment system.  The greater the number of active and engaged accounts, the greater the fees PayPal is likely to generate.  As a result, growing the number of active accounts, which is measured by Net New Actives ("NNA") metric, is relevant to investors and touted as one of PayPal's key performance indicators.  In addition to driving fee revenue, growing the number of engaged PayPal users was critical to PayPal's aspirations of becoming a "Super App," offering integrated financial services to a massive user base.

2.    During the Class Period, PayPal touted historically strong NNA growth and assured investors these NNAs were highly engaged.  Unbeknownst to investors, this supposed growth was largely fueled by promotions — which literally paid people for signing up PayPal accounts.  Due to relying on such promotional activity "to a much greater extent" than ever before, a large portion of the NNAs PayPal added in 2021 were "minimally engaged" users, who signed up for the promotional payment, without otherwise using PayPal's services.  Worse yet, "bot farms" automated the process of creating fake accounts to claim these promotional dollars.

3.    Numerous former PayPal employees describe Defendants' knowledge of, or at minimum, Defendants' reckless disregard for, the risks of these promotions and the resulting proliferation of minimally engaged and illegitimate accounts.  Despite this, throughout the Class Period, Defendants touted strong NNA growth and engagement, while fraudulently concealing the problems underlying PayPal's use of promotions.  It was misleading for Defendants to boast of strong NNA growth, when much (if not most) of that supposed growth counted users who signed up for promotions without otherwise engaging with PayPal.  And it was even more egregious for Defendants to include outright "illegitimate" accounts when reporting those growth numbers.

4.      Defendants' fraud reached its most outrageous heights when PayPal issued its 3Q2021 results.  At that time, Defendants knew both that PayPal was counting essentially dormant accounts as active users and that millions of illegitimate accounts had been created by bots — there had even been a 400+ person meeting on the bot accounts issue before the 3Q2021 results were issued.  Despite this, Defendants concealed what would have otherwise been a serious guidance miss, by publishing inflated numbers.

5.      When the truth was finally revealed in February 2022, PayPal experienced its biggest stock price decline ever — falling 24.6% over one day and 29.3% over two days — wiping out approximately $58.7 billion in market capitalization.  PayPal admitted to previously counting over 4.5 million illegitimate accounts, revealed a build-up of "minimally engaged" users due to promotional activity, guided lower growth for 2022 as these minimally engaged users would churn off platform due to inactivity, and completely abandoned its previously touted goal of 750 million active accounts by 2025.  While investors lost billions, the Individual Defendants profited from this fraud, each selling a majority of their PayPal stock during the Class Period for total proceeds of $170 million, and earning massive bonuses tied to the NNA metric.

     **a.  Background on PayPal's Business and Its NNA Metric**

6.      Previously part of eBay, PayPal spun off in July 2015 after which it operated as a standalone public company.  PayPal is a digital payments platform, most well-known for facilitating online purchases and person-to-person money transfers.  As with many digital platforms, 2020 was good to PayPal.  The COVID-19 pandemic pushed more consumer activity online, leading PayPal to achieve record user growth in 2020 — an average of 18.2 million quarterly NNAs, up 92% from the 2019 quarterly average of 9.4 million.  Over 2020, PayPal's stock price more than doubled.

7.     The NNA growth rate was promoted as one of PayPal's three "key performance indicators." PayPal did not charge users for accounts, and so merely signing up accounts did not directly earn PayPal revenue. However, adding to the number of active users was relevant to PayPal's valuation, insofar as those users contributed to the total payment volume ("TPV") on PayPal's systems, because PayPal earned most of its revenue from fees on these transactions.

8.     Additionally, in November 2020, PayPal laid out its plans for what CEO-Schulman would call the PayPal "Super App." The idea was to integrate a wide range of financial services (*e.g.*, budgeting tools, crypto trading, and shopping tools), with PayPal's existing mobile application. CEO Schulman said the Super App would be a "fundamental transformation," and if successful, it could radically change PayPal's value proposition — from one mainly based on extracting transaction fees — to one where PayPal could earn diversified revenue from many services on its Super App. This plan placed additional significance on driving NNAs, as adding engaged customers to PayPal would mean additional Super App users, and as CEO Schulman told *Bloomberg,* the Super App would need "massive scale" to succeed.

9.     Against this backdrop, the critical question for investors at the start of and throughout the Class Period, was whether PayPal could continue generating strong levels of NNA growth. To this end, on February 3, 2021, when delivering the Company's 4Q2020 financial results, Defendants claimed NNAs would grow by 50 million in 2021 (about 12.5 million NNAs per quarter, which was up 30% from 2019). Further, Defendant Rainey assured investors that PayPal's "core business continues to perform at unprecedented levels." At the same time, Schulman touted the engagement of PayPal's NNAs and asserted that "[t]here is plenty of demand to come on to our platform."

10.     Eight days later, at PayPal's "Investor Day" event on February 11, 2021, Schulman announced an ambitious five-year target to essentially double the number of active users by the end of 2025 (from 377 million at the end of 2020 to 750 million).  He justified this ambitious goal by claiming PayPal was seeing "engagement levels increase dramatically."  At that same event, Defendant Auerbach claimed the NNAs added over the past year were highly engaged, and that the growth was "not simply due to the pandemic," but because "[w]e've gotten much better as a company in generating and engaging high-quality net new actives."

11.     Contrary to the favorable impression created by these assurances — that PayPal would see high NNA growth in 2020 due to demand for its products from highly engaged customers, *i.e.*, "high quality" NNAs — Defendants embarked upon a scheme to superficially "meet" the goals they had set, with more incentivized customer acquisition tactics than PayPal had ever used before, paying people to generate accounts.

> **b.  The Risks of PayPal's Incentives Were Known to Management and the "Minimally Engaged" NNAs Were Apparent to PayPal Executives**

12.     Co-Lead Counsel's investigation revealed — and former PayPal employees[1] with knowledge of the Company's business confirmed — that (a) from their inception, it was well understood within PayPal that these promotions posed a risk of users simply signing up for the promotional money without ever actually using PayPal; and (b) PayPal's management knew (or at a minimum, recklessly disregarded) that PayPal's NNA growth in 2021 was generated in large part by "minimally engaged" or "illegitimate" users.  Specifically, Plaintiffs' investigation has established that:

---

[1] Individuals referenced herein as "CWs" or "Confidential Witnesses" refer to former PayPal employees interviewed as part of Co-Lead Counsel's investigation of Plaintiffs' claims.  The use of CWs in securities fraud cases is a common and well-accepted practice.  In order to protect their identities, the CWs are referred to with masculine pronouns regardless of their gender.

- **The Risks Were Known and Elevated to Management.**  PayPal had sophisticated systems, including the use of AI, to identify the creation of multiple accounts by a single user. (CW-6).  It was standard practice for PayPal to discuss risks associated with promotions, and the risk of the paid incentives attracting fraudulent accounts was discussed, including with members of PayPal's Strategy team. (CW-6).  Indeed, Company veterans expressed concern regarding the risks associated with the promotions. (CW-1).  Before the promotions were launched, PayPal assembled New Business Initiative Analyses ("NBIAs"), which were submitted to CFO Rainey before his approval of the program, and the NBIA for the paid incentives identified the risk of users signing up for the promotional payment without ever actually using PayPal's services. (CW-4).

- **Chinese Websites Document the Ease of Abusing PayPal's Promotions By Creating Fake Accounts.**  By June 2021, articles were published in Chinese on China-facing websites, with titles like "Make easy money with PayPal NNA promotions now," detailing step-by-step how to easily make countless fake PayPal accounts to repeatedly claim the promotion.  These articles noted the scheme "went viral," that the "threshold was low" for this "hot foreign money making project" and that people were running "scripts" to automate the abuse (*i.e.*, "bot farms").

- **The Mass Quantities of Fake Accounts Were Widely Known Within PayPal.**  By August 2021 an employee in PayPal's antifraud department used a database query that identified tens of thousands of illegitimate accounts.  This database query looked only to the most obvious fake accounts (*i.e.*, accounts with (1) suspicious emails; (2) more than three promotional payments; and (3) no other activity), and therefore was intentionally underinclusive, only capturing a portion of the fraudulent accounts.  By October 2021, this underinclusive query identified over a million illegitimate accounts.  Thereafter, the issue was presented at a 400+ person meeting with PayPal's Global Seller Risk and Strategy teams (attended by senior directors) in October 2021, complete with a PowerPoint explaining how the illegitimate accounts were detected and the scale of the issue. (CW-3, CW-7).  PayPal's policies required that any fraud with a loss threshold of over $50,000 was "always" elevated to CEO Schulman and CFO Rainey, and this included marketing loss. (CW-6).

- **PayPal's Compliance Systems Ensured Management Knew of the Illegitimate Accounts Upon Their Identification**.  Due to regulatory obligations, PayPal regularly had to report issues concerning illegitimate accounts to various regulators.  As a result of this obligation, reporting systems were in place that would have elevated the known illegitimate accounts to PayPal's management.  Specifically, CFO Rainey and PayPal's CRO (Chief Risk Officer) were required to review and sign off on reports to regulators documenting information on fake accounts before the report was sent to regulators, and PayPal's processes and these regulations also required that the CEO and CFO be updated weekly. (CW-4).

- **Management Was Exceptionally Focused on NNAs**.  Numerous former employees recount the intense focus throughout the Company on driving NNAs, including that there was a "huge urgency" placed on NNAs by CEO Schulman. (CW-1).  Schulman's focus on NNAs precipitated a "big push" in 2021 to pursue NNA growth (CW-2), and a "heavy" push on NNAs at all costs during the relevant period. (CW-3). One former employee described the NNA metric as "theater," due to the ways PayPal would inflate the number, such as by counting multiple accounts by a single user as multiple NNAs. He also noted that a small percentage of users made up the majority of TPV, such that adding NNAs that were not actually engaged would not add to PayPal's short-term revenue growth, but explained that CEO Schulman wanted to report high NNA numbers to tell a growth story for PayPal and to use NNAs as a "vanity metric" to support the Super App narrative, and position PayPal as an 800-lb. fintech gorilla. (CW-1).

- **Due to the Unique Focus on NNAs, an Unusual "NNA Rally" Team Reported to Senior Executives**.  As recounted directly by a member of the NNA Rally team, in early 2021, PayPal created an "NNA Rally" team fueled by CEO Schulman's and other executives' focus on NNAs. (CW-1).  That team included leaders from across PayPal's branded businesses and reported to senior executives.  The formation of the team was a "180-degree switch from how things usually worked at PayPal," and backed by "tremendous" leadership demand for growing NNAs.  This team was focused on meeting the "go-get" numbers Schulman had set, based on what he wanted to report, not strictly on any bottom-up analysis of NNA trends.  The NNA Rally meetings included discussions of the use of incentive programs to drive NNAs, and the related fraud rates, including that there were lots of fraud issues with referral programs, and that many accounts came from overseas "click farms."

- **Management Had Fulsome Visibility Into NNA Engagement**.  NNAs were measured daily and an automated report was generated and sent to PayPal's C-Suite, which tracked gross new additions, churn, and activity. (CW-2).  The NNA Rally team used data that was updated on a weekly basis regarding NNAs, account activity was tracked in PowerPoint presentations and Excel spreadsheets and pulled into a master spreadsheet that was sent to the NNA Rally team, and PayPal tracked users by product, how that user was acquired (*i.e.*, through paid incentives or other marketing program), and the users' level of engagement across PayPal's platforms. (CW-1).  Information from the NNA Rally meetings, including PowerPoints, were sent to PayPal's Senior Leadership Team ("SLT") that would have given senior executives visibility into NNAs and fraudulent account issues, as PayPal tracked users by product, how those users were acquired, and the users' level of engagement. (CW-1). PayPal's C-Suite also received periodic reports showing the activity of each cohort of accounts broken down by month. (CW-2).  Further, the Company told investors it runs hundreds of checks on each transaction and looks at over 200 indicators to eradicate bad users from its platform.

13.     Defendants' failure to disclose this information concealed risks related to the "illegitimate" and "minimally engaged" accounts, and misled the market about the factors that were driving PayPal's NNA growth.  Instead of disclosing this information, Defendants continued to tout strong growth and engagement.

### c.  Defendants Touted PayPal's NNA Growth Throughout 2021 Despite Only Achieving Guidance in 3Q2021 by Including Illegitimate Accounts

14.     Although it was known internally at PayPal that NNA growth in 2021 was driven by — and dependent on — low value NNAs acquired through PayPal's promotional activity, NNAs and NNA growth were at the forefront of each of PayPal's earnings announcements.

15.     On May 5, 2021, when PayPal reported its financial results for 1Q2021, it not only reported another quarter of NNA growth, but also told investors that this growth would continue. PayPal gave guidance that the Company expected to add 52-55 million NNAs in 2021.  One month later, on June 9, 2021, PayPal affirmed this NNA guidance.  What PayPal failed to disclose, however, was that its NNA growth included both illegitimate accounts and disengaged customers — despite the Company's specific tracking of engagement levels for its NNAs.

16.     Instead, PayPal touted its "high-quality net new actives."  The Company told investors its engagement levels were increasing dramatically and that its churn rate was coming down meaningfully, indicating that the majority of PayPal's user base was highly engaged, and as a result, would remain part of PayPal's growing user base.

17.     On July 28, 2021, PayPal announced its 2Q2021 results, reporting that its total active accounts had surpassed 400 million.  The Company again affirmed its guidance that it expected to add 52-55 million NNAs by year end, meaning PayPal would have to add at least 12.5 million NNAs in 3Q to remain on track to achieve this guidance.  Thus, by the middle of 2021,

PayPal's NNAs were purportedly rapidly growing, and the Company's Super App plan seemed promising.

18.     Then, on November 8, 2021, when reporting its 3Q2021 results, PayPal again touted its significant customer and engagement growth, and boasted "416 million active accounts," with 13.3 million NNAs added in the third quarter alone.  The Company reaffirmed its guidance again, stating that PayPal expects to add "~55 million NNAs" in 2021.  CFO Rainey explicitly told investors that the Company would not chase "***[low quality new actives]***" and acknowledged the Company could — but would not — "***go out and spend money on customer acquisition and get very low value net new actives to inflate or pump up that number, but that's not the right economic decision for us longer term***."

19.     From the perspective of investors, it appeared that PayPal was on track to achieve that growth, consistent with the Company's guidance.  What investors did not know, however, was that this growth was only achievable by including the "minimally engaged" and illegitimate accounts that had ***already been identified and discussed in a meeting of more than 400 PayPal employees in October 2021***.  Indeed, PayPal's NNA Rally team tracked NNA engagement on an at least bi-weekly basis and PayPal's C-Suite received daily NNA reports.  Absent PayPal's illegitimate NNAs — concealed from investors until a quarter later — PayPal would have dramatically missed guidance.  It was not until the following quarter, when PayPal publicly announced its 4Q2021 results, that investors learned the truth about PayPal's NNA growth.

###    d.   PayPal Finally Admits Its NNAs Consist of Low Value, "Minimally Engaged," and Illegitimate Users

20.     On February 1, 2022, the truth was finally revealed when Defendants reported PayPal's 4Q2021 results.  Defendants disclosed that in the first three quarters of 2021, at least 4.5 million "illegitimate" accounts had been created that had previously been reported as NNAs, and

these accounts were the result of "bots" that were "creating multiple accounts to avail themselves" of PayPal's incentive campaigns.  Having finally removed these illegitimate accounts from the NNA figures, PayPal substantially missed both its own guidance and analyst expectations.

21.    CFO Rainey also revealed that PayPal's user base was actually replete with "minimally engaged" users, and that the "vast majority" of PayPal's volume comes "from about 1/3 of our customer base."  CFO Rainey explicitly connected this trend to PayPal's aggressive promotional practices, acknowledging that: (i) PayPal had "leaned into incentivized customer acquisition tactics to a much greater extent than we ever have in our history;" (ii) PayPal monitored the promotions throughout the year; and (iii) the campaigns had generated accounts, but those accounts had "lower engagement and a higher propensity to churn."

22.    Without the boost from illegitimate accounts, and having finally come clean about the use of promotions that inflated the NNA numbers, PayPal stated that it would stop chasing low value accounts in 2022.  The Company also stated that, as a result, it would add a mere 15-20 million NNAs for the entirety of FY 2022 — far less than the prior expectation of 50 million — and would retract its guidance of 750 million active accounts by 2025 entirely.  Defendants explained that this abysmal guidance reflected the expectation that the customers it had brought on through promotions would "roll off" its platform, which would "materially reduce" its NNA figures in the coming quarters.

23.    The disclosures were made after markets closed on February 1, 2022.  On the next trading day, in reaction to these disclosures, PayPal shares suffered their worst selloff in the Company's history.  On February 2, 2022, PayPal's stock plummeted from a prior closing price of $175.80 to a closing price of $132.57, a 24.6% decline and a market capitalization loss of more than $49 billion.

24.    The stock price continued to fall on February 3, 2022, from a closing price of $132.57 on February 2, 2022, to a closing price of $124.30 on February 3, 2022 — which was a 6.2% decline and resulted in a market capitalization loss of nearly $9.5 billion.  This two-day decline amounted to a 29.3% price drop and a loss of $58.7 billion in PayPal's market capitalization.

25.    Analyst and news reactions demonstrate that this drop was the result of Defendants' disclosures, with the commentary focused on: (1) the 4.5 million illegitimate accounts causing PayPal to miss 4Q2021 NNA guidance; (2) the disclosures concerning the low level of engagement across PayPal's user base due to the promotional activity; and (3) the corresponding abysmal 2022 NNA guidance and retraction of the target of 750 million active accounts by 2025.

26.    During the first three quarters of 2022, PayPal's NNA numbers were even worse than implied by Defendants' reduced guidance, adding an average of only 1.9 million NNAs each quarter.  PayPal attributed those poor results to users churning off the platform.

27.    As more thoroughly explained herein, because accounts "churn" out of the NNA metric after one year of inactivity, it is possible to reasonably estimate the quantity of accounts that signed up for promotional payments, without additional engagement.  The following graph shows PayPal's reported NNA results from 2019 through 2022, but for 1Q2021-3Q2021 compares reported results to what would have been reported if PayPal had not counted "illegitimate" accounts made by bots and other "minimally engaged" accounts:



**e. The Individual Defendants Reaped Immense Profits Before PayPal's Stock Price — and Management — Tumbled**

28.    Concealing these issues from investors and continuing to tout supposed strong NNA results not only caused PayPal's stock to trade at inflated levels throughout the Class Period and led to massive investor losses, but it also served the Individual Defendants personal interests.

29.    During the Class Period, while PayPal's stock was fraudulently inflated, Individual Defendants Schulman, Rainey, and Auerbach sold 59%, 57%, and 69% of their PayPal stock, respectively, for proceeds totaling over $170 million.  None of the Individual Defendants purchased any PayPal stock during the Class Period, each of these insiders' Class Period sales were significantly greater than their respective 2020 sales (*e.g.*, 112% greater for CFO Rainey), and each of these Individual Defendants' Class Period sales were at least 74% greater than their sales in 2022.  Had the Individual Defendants waited and sold their stock on February 3, 2022, *after* the truth was revealed, their proceeds would have been at least $90 million *less* than what they collected from their insider sales during the Class Period.

30.    In addition to these substantial sales, the Individual Defendants were motivated to inflate NNA growth, because their performance-based compensation was tied to increasing reported NNAs (along with PayPal's revenue and margins).  Based on this 2021 compensation structure, CEO Schulman received about $30.5 million (more than 27x his base salary), CFO Rainey received about $11.5 million (more than 15x his base salary), and Auerbach received about $11.4 million (more than 16x his base salary).

31.    In the short thirteen months since the end of the Class Period, much of PayPal's senior leadership team has departed or been pushed out of the Company, including CFO Rainey on April 12, 2022, Chief Product Officer Mark Britto on September 8, 2022, Chief Accounting Officer Jeffrey Karbowski on February 10, 2023, and finally, after only a few months in the role, Chief Financial Officer Blake Jorgeson on March 7, 2023.

32.    PayPal's problems have continued into 2023.  On January 31, 2023, the Company announced it would lay-off 7% of its workforce.  Less than two weeks later, PayPal announced that CEO Schulman would retire at the end of FY 2023.

33.    This Action seeks to recover for the significant losses suffered by Plaintiffs and members of the Class due to Defendants' false or misleading statements and omissions during the Class Period, and resulting precipitous decline in the price of PayPal Securities upon the revelation of the truth.

## II.    JURISDICTION AND VENUE

34.    The claims asserted herein arise under (1) Section 10(b) of the Exchange Act (15 U.S.C. §78j(b)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5), (2) Section 20(a) of the Exchange Act (15 U.S.C. §78t(a)), and (3) Section 20A of the Exchange Act (15 U.S.C. §78t-1).

35.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. 1331, Section 27 of the Exchange Act (15 U.S.C. §78aa).

36.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)), as the alleged misstatements were publicly disseminated to investors within this Judicial District, affected the market price for PayPal Securities, and subsequently caused damages to investors within this Judicial District.  PayPal shareholders located in this Judicial District invested in PayPal at artificially inflated prices as a result of Defendants' misrepresentations and omissions. *See e.g.*, ECF No. 1 ¶21.

## III.    PARTIES AND WITNESSES

### a.    Parties

37.    Lead Plaintiff Caisse de dépôt et placement du Québec ("Caisse") is a global investment group with 329 billion Canadian dollars in assets under management.  Caisse purchased PayPal stock at artificially inflated prices during the Class Period and was damaged as a result of the conduct alleged herein.  ECF No. 12-3.  On January 11, 2023, the Court appointed Caisse to serve as Lead Plaintiff pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA").  ECF No. 18.

38.    Additional named Plaintiff Public Employees Retirement Association of New Mexico ("PERA"), established in 1947, manages thirty-one retirement plans for state, county, and municipal employees including police, firefighters, judges, magistrates, legislators, and volunteer firefighters and has $18 billion in assets under management.  PERA purchased PayPal stock at artificially inflated prices during the Class Period and was damaged as a result of the conduct alleged herein.  *See* Ex. A, attached hereto.

39.    Defendant PayPal is incorporated under the laws of Delaware and has its principal executive offices in San Jose, California.  PayPal's common stock trades on the Nasdaq Stock

14

Market (the "NASDAQ") under the ticker symbol "PYPL."  References herein to "PayPal's stock," "PayPal stock," "PayPal publicly traded common stock," and "PayPal's common stock" refer to the publicly traded PayPal common stock that traded on the NASDAQ under ticker symbol "PYPL."  During the Class Period, there was also a robust market for call options corresponding to PayPal stock.  References to "PayPal Securities" refer to both PayPal stock and any exchange-traded option to purchase PayPal publicly traded stock.

40.     Defendant Daniel Schulman ("Defendant Schulman," "CEO Schulman," or "Schulman") was, at all relevant times, the Chief Executive Officer ("CEO") of PayPal and a member of its Board of Directors.  During the Class Period, Schulman spoke publicly and extensively about PayPal's NNAs and their impact on PayPal's business.

41.     Defendant John Rainey ("Defendant Rainey," "CFO Rainey," or "Rainey") was, at all relevant times, the Chief Financial Officer ("CFO") of PayPal.  During the Class Period, Rainey spoke publicly and extensively about PayPal's NNAs and their impact on PayPal's business.

42.     Defendant Jonathan Auerbach ("Defendant Auerbach," or "Auerbach") was, at all relevant times, the Executive Vice President, Chief Strategy, Growth and Data Officer of PayPal. During the Class Period, Auerbach spoke publicly and extensively about PayPal's NNAs and their impact on PayPal's business.

43.     Defendants Schulman, Rainey, and Auerbach (collectively, the "Individual Defendants"), because of their positions within the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press

releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading. The Individual Defendants are liable for the false and/or misleading statements pleaded herein.

### b. Witnesses

44.     CW-1 was a Senior Director of Product at PayPal from before the start of 2021 until at least three months after the Class Period. CW-1 was a member of PayPal's "NNA Rally" team and participated in weekly calls focused on PayPal's performance around generating NNA throughout 2021. CW-1 was 3 reporting levels below the SLT, which included the Individual Defendants.

45.     CW-2 was formerly employed by PayPal from before 2018 through the end of the Class Period. Throughout 2021, CW-2 was a Director in the finance organization at PayPal and had held various other positions at PayPal over the many years of his tenure. In his final two roles at PayPal, CW-2 was 2-3 reporting levels below CFO Rainey.

46.     CW-3 worked for PayPal between February 2016 and May 2022, most recently within the Seller Fraud Operations Department. CW-3 worked out of the Chandler, Arizona office. CW-3 advised that the Seller Fraud Operations Department fell under the Seller Risk Services Department, which included about 30 people.

47.     CW-4 worked at PayPal during the relevant time period as an employee in the Risk Management Organization, a role that involved participating in status updates pertaining to

regulatory matters.  CW-4 worked and interacted with Senior Vice President – Chief Risk and

Compliance Officer Fiachre O'Neill, CFO John Rainey, and CEO Dan Schulman.

48.     CW-5 was employed by PayPal from early 2021 through early 2022 as a Senior

Manager of Finance.  CW-5 was responsible for planning and forecasting the Marketing team's

budget, or "spend," and worked with the leaders of the Marketing team to assist in their planning.

CW-5 reported to Neil DeSilva, currently VP of Finance at PayPal, who reported to Cosmin

Pitigoi, currently Senior VP, Global FP&A, Operational Finance and Pricing, at the Company.

CW-5 frequently worked with Michael Lamb, currently Vice President, Consumer Growth and

Operations, since Lamb was in charge of PayPal's incentive programs.

49.     CW-6 was formerly employed by PayPal from well before 2010 through the Class

Period, most recently as a Senior Manager, Risk and Compliance.  CW-6's responsibilities

included identifying potential risks associated with a launch at PayPal, such as the launch of a

new product or marketing campaign.  CW-6 also collaborated with the Risk Operations Teams

and Strategy Teams to develop automated and manual controls intended to prevent fraud.  CW-6

most recently reported to Christine Gonzalez, Vice President, Head of Global Risk and

Compliance.

50.     CW-7 was formerly employed by PayPal from before 2015 through at least the end

of the Class Period and spent the vast majority of his tenure working in the fraud department.

Throughout the Class Period, CW-7 was a Senior Risk Operations Team Leader.  CW-7 reported

to Aaron Lingle, who reported to Wei Jiang, who reported to Kelly Dickerson, who reported up to

Chief Enterprise Officer Aaron Karczmer.

## IV.   BACKGROUND AND NARRATIVE STATEMENT OF ALLEGATIONS

### a.   Background on PayPal and the Importance of the NNA Key Performance Indicator to Its Prospects

51.   One of the first major online payment platforms, PayPal was spun off from eBay as its own publicly traded Delaware-incorporated company in 2015.  PayPal describes itself as a leading technology platform that enables digital payments and simplifies commerce experiences on behalf of merchants and consumers worldwide.

52.   PayPal's products enable its consumers to transact with its merchants to purchase goods or services, whether online or in-person, and to transfer money between PayPal accounts. PayPal has a variety of products that serve this core business, including its branded "checkout" product, wherein merchants can receive payments from customers, and several person-to-person ("P2P") payment products (such as Venmo and Xoom), which enable individuals to transfer money to other individuals.  In addition to these core products, PayPal also offers a variety of additional services such as "Buy Now Pay Later" — which essentially enables individuals to make a purchase on credit to be paid over installments — and cryptocurrency trading products.

53.   PayPal primarily earns revenues by charging fees for completing payment transactions for its customers and other payment-related services.  This revenue is therefore largely dependent on the overall volume of payment activity over PayPal's systems.  An increase in payment volume will generally increase PayPal's revenue.

54.   Because PayPal primarily generates revenue through fees on transactions over its systems, PayPal reports "Total Payment Volume," or "TPV," as one of its key performance

indicators.  TPV is the total value of payments, net of payment reversals, successfully completed on its payments platform or enabled by PayPal via a partner payment solution.[2]

55.    PayPal discloses two other key performance indicators, which both also relate to the generation of TPV: (1) the total number of active accounts[3] — which is typically discussed in terms of net increases to the number of active accounts under the acronym "NNA" — and (2) the total number of payment transactions.  While TPV is the most directly related indicator of PayPal's present revenue, NNA and number of transactions are both critical indicators of PayPal's ability to continue generating transaction volume.  The idea is simple: adding legitimate and engaged accounts is expected to result in a greater TPV down the line.  Similarly, if those accounts engage in a greater number of transactions, that will also contribute to TPV.

56.    However, in addition to directly increasing TPV, adding active accounts to PayPal was a relevant performance indicator because the overall size of its engaged user base was relevant to its ability to earn revenue from other sources (aside from simple payment processing). Throughout the Class Period, PayPal earned revenue by providing other value-added services, including partnerships (e.g., Shopify, SalesForce, Squarespace), interest and fees from its merchant and consumer credit products, interest earned on certain assets underlying customer balances, referral fees, subscription fees, and gateway services.

57.    In November 2020, shortly before the Class Period, PayPal laid out its plans for what CEO Schulman would eventually call the PayPal "Super App."  The idea was to leverage PayPal's growing user base to offer a far more integrated set of financial offerings.  Specifically,

---

[2] A partner payment solution is a partner business that has signed up to be part of PayPal's free partner membership program and integrates with PayPal at some level (e.g., incorporates PayPal checkout on its website).

[3] An active account is an account registered directly with PayPal, or a partner using PayPal's services, that has completed a transaction on its platform within the past 12 months.

the Company claimed it would begin integrating a range of features, including enhanced direct deposit, check cashing, budgeting tools, bill pay, crypto support, subscription management, buy now/pay later functionality, and shopping tools. This integrated approach offered the potential to radically change PayPal's value proposition — from one primarily based on extracting transaction fees — to an integrated platform that would enable PayPal to sell a wide-variety of value-added services to a large and highly engaged user base.

58.     PayPal's rhetoric surrounding the potential Super App was especially promising in the context of its tremendous growth during the COVID-19 pandemic. During that time, the Company experienced record NNA growth, which in turn meant that it ostensibly had a rapidly expanding customer base to whom it could sell these Super App capabilities. CEO Schulman stated that PayPal's transition to the Super App would be a "fundamental transformation" for the Company.

59.     From the perspective of these Super App ambitions, maintaining strong NNA growth was of critical importance. In this context, the NNA metric went from playing an important, but supporting role — driving future TPV and corresponding revenue — to becoming the critical tool for developing the audience of PayPal's Super App offerings. For example, Defendant Schulman told *Bloomberg* in a May 10, 2021 interview that PayPal would need to achieve "massive scale," in order to realize the Super App ambitions.

60.     Thus, at the start of the Class Period, Defendants focused on PayPal's supposed success at generating strong NNA growth. During the Company's 4Q2020 earnings call on February 3, 2021, CEO Schulman attributed what he described as PayPal's "strongest year in [its] history" in part to "achieving record growth in net new active customers." Schulman similarly stated that "[m]erchants and consumers are turning to PayPal in record numbers." Indeed, in

every earnings call throughout the Class Period, PayPal's NNA metrics were prominently discussed by Defendants.

61.    During the February 3, 2021 earnings call for 4Q2020, Defendant Rainey highlighted NNAs as a priority for establishing PayPal's strength — reporting NNAs before other metrics like revenue, operating income, and earnings.  Specifically, Defendant Rainey stated: "*We've just completed the strongest year in our history, achieving record growth in net new accounts, volume, revenue, operating income, earnings and free cash flow*."

62.    During the same earnings call, Defendant Schulman emphasized the importance of NNAs in relation to PayPal merchants and their ability to interact with a large consumer base stating: "*For the year, we delivered a record 73 million net new actives, ending the year with 377 million active accounts, up 24%.  We now have over 29 million merchants interacting with nearly 350 million consumers.  In 2021, we expect to add another 50 million net new active accounts*."

63.    Internally, PayPal was equally focused on the NNA metric, as attested to by multiple former employees of the Company.

64.    For example, CW-1, a former Senior Director of Product at PayPal explained that there was a "big push" within PayPal to generate NNA numbers and that by May 2021, growing the NNA figures became a huge priority at the Company.  CW-1 explained that the NNA metric was so important that PayPal had assembled a team of individuals from throughout the Company to attend weekly "NNA Rally" meetings to discuss NNA growth, and stated that the assembly of this sort of team was unusual for PayPal but undertaken given the "tremendous" leadership demand for growing NNAs.  The NNA Rally team reported to PayPal's SLT, which included Defendant Schulman, Defendant Rainey, Defendant Auerbach, Chief Marketing Officer Leanne

Sheraton, Executive Vice President, Global Sales Peggy Alford, Executive Vice President and Chief Enterprise Services Officer Aaron Karczmer, Chief Risk and Compliance Officer Fiachre O'Neil, and Executive Vice President and Chief Product Officer Mark Britto.

65.     Several other CWs attest to the importance of the NNA metric during the Class Period.  CW-2, a former Director in the finance organization at PayPal, explained that the NNA metrics were measured daily and that an automated daily report was generated and sent to PayPal's C-suite, which tracked gross new additions, churn, and activity.  CW-2 also recalled the "big push" in 2021 to pursue NNA growth.  Similarly, CW-3 also recalled a "heavy" push on NNAs at all costs during the relevant time period.

**b.  PayPal Promotes NNA Growth With Risky Promotions Which Were Quickly Exploited By Bot Farms Creating Massive Numbers of Illegitimate Accounts**

66.     Throughout the Class Period, PayPal publicly emphasized its NNA growth to investors.  Yet, this growth was achieved in large part due to risky promotions that essentially paid people to sign up for PayPal accounts purely to earn cash that the Company was offering for new accounts.  PayPal's webpages for some of these promotions explicitly referenced "NNAs" in the page URL.  This is notable because the term NNA is an investor/business facing term and not one that would make any sense to use in marketing PayPal accounts to genuine users.  In other words, PayPal itself seemed to recognize that these promotions were geared at driving its NNA growth.

**i.  Chinese Websites Document that Abuse of PayPal's NNA Promotions "Went Viral," Due to "Low Threshold" for Abuse**

67.     Throughout 2021, postings on Chinese websites detailed how PayPal users took advantage of these promotions.  For example, PayPal ran a promotion where someone could simply go to a particular page on PayPal's website, create an account, and receive $5 in that account.  By June 2021, Chinese websites were openly discussing the potential to abuse this

promotion.[4]  One such post, published June 10, 2021, on the Chinese website Weixin with the title, "Make easy money with PayPal NNA promotions now," reported that it had "went viral" among "leads circle[s]."  The title of another posting on Weixin, published June 17, 2021, stated: "PayPal NNA promotions, a money-making program sweeping the Internet," and the article explained that "this program is so hot. . . . It's basically giving you money for free.  It's awesome!"  That text was followed by an image, which translates to "Make $500-1000/person/day out of PayPal NNA promotion program:"



68.    Many of these postings provided detailed set-by-step explanations on how to take advantage of the promotions, including detailed steps on how to use a virtual private network to make one's internet IP address appear to be in the United States, how to set up a virtual cell phone emulator, how to get a US phone number from a "virtual phone number platform," and then how to claim the promotional credit.  One such article explained: "It only requires a few clicks and the threshold is low."

69.    Once the accounts were created and the promotions claimed, the articles explained that the money could be immediately transferred out of PayPal to a bank account or transferred to another PayPal account — presumably so that users could pool proceeds and make fewer withdrawals from their bank.  The articles even explained how users could buy a bank card and

---

[4] The descriptions herein of the content of Chinese posts include quotations of the content of those articles from a reputable translation service.

transfer the money to that card rather than their own bank account and how fake credentials they would use to make these accounts could be "reused," making it easier to take advantage of the promotion countless times (while Defendants counted each fake account as a new NNA).

70.    On June 26, 2021, another posting on Weixin explained that by the end of the prior month (*i.e.*, in May) that "[m]any people" had bought tutorials on how to exploit the promotions and that "more and more people" were joining in.  The posting stated "[a]s long as you invite a new user successfully, you will get a cash reward of $5," and that "there was not so much compliance control over" the PayPal promotion.  The posting also explained that in addition to seeing tutorials being sold, there were "scripts doing the job."  This was a reference to computer software set up to run through the simple steps needed to take advantage of the promotions over and over again.  The author of that posting also stated that "compliance controls [were] . . . becoming stricter," which is notable because it strongly suggests that PayPal was aware of this activity, but not taking significant enough steps to deter its abuse.

71.    Internet postings in China documenting the ease of taking advantage of PayPal's 2021 NNA promotions continued to be published throughout the year.  For example, a September 14, 2021, posting on Mojingu.com titled, "How to make $500-1000/person/day with PayPal NNA promotion program," included a "[t]raining video on how to make $500-1000/person/day with PayPal NNA promotion program."  On November 18, 2021, a similar posting was published on WeChat promoting how to make money with the "PayPal NNA promotion program," calling it a "hot foreign money-making project online, the NNA (net new active account) promotion" that "offers a cash reward of $5 for each new account."  As late as January 3, 2022, another posting was published on Tuituita.com titled, "Join me in PayPal NNA promotion project," and detailed the steps to take advantage of the promotion.

72.     In order to boost reported NNA results, PayPal made these promotions especially easy to abuse and especially likely to be used by people who would never actually engage with PayPal outside of the promotion.  For example, several of PayPal's promotions ostensibly required the user to complete an "eligible transaction" to receive the promotional incentive.  However, rather than limiting "eligible transactions" to "an online PayPal checkout payment," which would be significantly harder to abuse at scale, PayPal also included "a person-to-person payment" in the definition of "eligible transactions."  This meant the reward could be claimed simply by signing up for an account, funding it with $5, and sending that $5 to an illegitimate account.  The new, illegitimate account could then send the same $5 to another illegitimate account, enabling people to take advantage of the promotion an infinite number of times without ever having to conduct any real transaction.  In return, PayPal was able to make it look like they were continuing to rapidly grow NNAs.

73.     As PayPal would eventually publicly disclose, these promotional programs resulted in millions of illegitimate accounts being counted in PayPal's NNA figures.  The issue inflated the numbers that PayPal reported in the first three quarters of 2021, and in particular, they inflated PayPal's 3Q2021 numbers by at least 4.5 million accounts.  However, well before the truth regarding these illegitimate and bot accounts was publicly reported, the risks associated with them were well understood within the Company.

**ii.   Defendants Knew or Recklessly Disregarded the Risks Posed by the Promotions and Failed to Exclude the Illegitimate Accounts From Reported NNA Results**

74.     In 2020, as PayPal was making decisions about its upcoming promotional campaigns, PayPal's leadership — specifically Defendant Rainey — was warned of the risks associated with running seemingly lucrative yet easy to abuse cash promotions.

75.    Specifically, CW-4 stated that he was in the "inner circle" at PayPal, which included CEO Schulman and CFO Rainey.  CW-4 recalled that before the start of 2021, he voiced concerns in a room of senior executives, including Senior Vice President, Chief Compliance Officer Fiachre O'Neill, regarding the risk that the promotion to pay people to open accounts would lead to people opening accounts without otherwise using PayPal's services.  CW-4 recalled that others in the room also expressed concerns about this risk, but that ultimately PayPal decided to proceed with the use of the incentive payments anyways.

76.    CW-4 advised that the risks he identified regarding the paid incentives were included in the NBIA (New Business Initiative), which was ultimately reviewed by CFO Rainey as part of his approval of the promotional campaigns.  CW-4 added that any new marketing campaign or promotion at PayPal has to have an NBIA, which he explained is a document that is "signed off on by everybody," including Vice President Regulatory Relations Andrea Donkor, PayPal's compliance department, and the CFO.  CW-4 advised that CEO Schulman and CFO Rainey were informed about the marketing practices and updated on its results, adding that "anything that had a dollar amount to it would need CFO approval."

77.    CW-5, former Senior Manager of Finance, explained that the Company was aware of the risk that new users acquired through this promotional activity would be lower quality.

78.    Thus, Defendants decided to proceed with the promotions despite being well aware of the potential risks.  That alone does not mean that the business decision was necessarily improper, but it does mean that: (1) Defendants were apprised of the need to monitor for abuse of the NNA promotions and correspondingly that it is reasonable to conclude they were aware of, or at least recklessly disregarded, the readily available information concerning the fraudulent accounts generated by the promotions; and (2) Defendants were aware of, or at least recklessly

disregarded, the risks concerning those NNA promotions, but did not disclose that information to investors.

79.     Another former PayPal employee corroborates CW-4's statements that the risks associated with the accounts generated by the NNA promotions were known and had been identified by PayPal.

80.     CW-6 was formerly employed by PayPal from well before 2010 through the Class Period, most recently as a Senior Manager, Risk and Compliance.  CW-6's responsibilities included identifying potential risks associated with a launch at PayPal, such as the launch of a new product or marketing campaign.  CW-6 also collaborated with the Risk Operations Teams and Strategy Teams to develop automated and manual controls intended to prevent fraud.  CW-6 most recently reported to Christine Gonzales, Vice President, Head of Global Risk and Compliance.

81.     CW-6 explained that the 4.5 million fraudulent accounts that PayPal disclosed in February likely would have been identified during PayPal's normal fraud review process. Specifically, CW-6 explained that PayPal used artificial intelligence to link similar activity — such as the same IP address, the same physical address, or any other personal identifying information — across different accounts.  CW-6 explained that even if someone didn't use their real name across accounts, if the accounts were created from the same computer login, the system would flag the accounts.  CW-6 explained that pursuant to PayPal's internal policies and requirements of regulatory agencies, any amount of loss or fraud above $50,000 was a "concern" and there was "always a roll up" to CEO Schulman and CFO Rainey.  CW-6 added that this $50,000 or more threshold of fraud would have a root cause investigation performed, and both the root cause investigation and results of that investigation were reported to Vice President, Head of

27

Global Fraud Arthi Rajan Makhija, who was part of the analysis group. CW-6 explained that the $50,000 threshold applied whether it was one instance of fraud or a trend of smaller instances that added up to $50,000, including fraud leading to marketing loss.

82.    These allegations — based on the information from someone with years of experience in PayPal's risk management function — are significant in two ways. First, they demonstrate the illegitimate accounts would likely have been discovered by PayPal's systems. That fact, combined with the allegations below that PayPal did, in fact, identify the illegitimate accounts, strongly supports the conclusion that Defendants knew of, or recklessly disregarded, the issue and simply chose to report inflated NNA numbers anyway. Second, these allegations show that PayPal was aware of, or recklessly disregarded, this exact sort of risk, insofar as it had built systems specifically designed to detect these sorts of fake or illegitimate accounts.

83.    Furthermore, CW-6 recalled that it's a standard process at PayPal to brief various departments about the risks of marketing campaigns. CW-6 explained that the risk of the paid incentive marketing campaign attracting fraudulent accounts was discussed. CW-6 recalled a conversation about ensuring that controls were in place to prevent accounts being opened solely for the sake of obtaining the promotion, and that that these conversations included members of PayPal's Strategy team including Senior Director, Risk Management Siddharth Zarapkar. CW-6 stated that PayPal's marketing team and fraud team — which he believed included the heads of each of those departments — were made aware of these concerns.

84.    CW-5 explained the Marketing team participated in weekly or bi-weekly conference calls with Michael Lamb, Vice President, Consumer Growth and Operations, and his "right-hand guy," Abhay Doshi, currently Senior Director of Global Consumer Growth Marketing, to discuss the progress of marketing spend and to track the numbers associated with

its campaigns.  CW-5 stated that the Marketing team tracked user engagement.  CW-5 explained that his team tracked high level ROI on incentive program spending.

85.    CW-5 added that at these meetings, the Marketing team weighed "buying" more active users in order to more closely track their goals, while balancing the risk that new users would inevitably be lower quality.  According to CW-5, Lamb and Doshi presented information from these meetings to the C-Suite.  CW-5 stated Lamb was very involved in Marketing's weekly meetings.

86.    CW-5 explained that Michael Lamb, as VP, participated in discussions regarding how to balance the need for NNA growth with the risk that promotional programs would attract "one and done" users.  CW-5 stated that Michael Lamb received weekly reports on incentive spend, noting the Company had "eyes on everything."  CW-5 stated that Michael Lamb worked closely with Chief Marketing Officer Leanne Sheraton and that conversations regarding the risk of low-quality new users were communicated to PayPal's C-Suite.

87.    Thus, consistent with the information provided by CW-4, executives at PayPal were well aware of the risks posed by the NNA promotions, as they were internally discussing that risk and whether to proceed with the promotions notwithstanding.

88.    In addition to being aware of, or recklessly disregarding, the risks posed by the promotional activity PayPal chose to engage in, Defendants were also aware that, or recklessly disregarded that, the NNA promotions were, in fact, generating a massive number of illegitimate accounts.

89.    CW-3 worked for PayPal between February 2016 and May 2022, most recently within the Seller Fraud Operations Department.  CW-3 worked out of the Chandler, Arizona

office.  CW-3 advised that the Seller Fraud Operations Department fell under the Seller Risk Services Department, which included about thirty (30) people.

90.     CW-3 stated that he first became aware of fraudulent accounts being created at a large scale to take advantage of PayPal's new account payment incentive in early August 2021. CW-3 explained that he was responsible for looking at accounts that were already flagged for potential fraud, as opposed to reviewing accounts for fraud before or upon their creation.  He then saw that these accounts were receiving transfers of the incentive payments given by PayPal. According to CW-3, many of the fraudulent accounts that he identified were coming from China through throwaway virtual private networks (VPNs) which mask IP addresses.

91.     CW-3 recalled that he first identified approximately 33,800 fraudulent accounts at that time but clarified that this number did not track all fraudulent accounts because his method for identifying fraudulent accounts was significantly underinclusive.  As discussed below, CW-3 ultimately found millions of fake accounts by October using the same underinclusive approach.

92.     Specifically, CW-3 reviewed accounts based on a database query, using SQL[5] that pulled in accounts that (1) had "non-ordinary emails," meaning emails that had a suspicious name and were not from a major email provider like Gmail; (2) had received at least three promotion credits; and (3) did not have other activity.  CW-3 further explained that this method meant that he was certainly undercounting the total number of fraudulent accounts.  He further explained that this figure only counted "PayPal Accounts," not accounts on the other platforms owned by PayPal, such as Xoom and Venmo.  CW-3 explained that the SQL analysis he performed in August 2021 was examining NNAs from May-July 2021.

_____

[5] SQL is a computer language used for interacting with, and pulling, data from databases.

93.    CW-3 explained that he conducted "penetration testing" to determine that the accounts his database query were pulling were fraudulent.  He explained that this penetration testing involved reviewing a sample of the accounts, and that this review confirmed that his query was working correctly and only identifying fake accounts.  He explained that his penetration testing needed to show the query was accurate at hundredths of a percent, or better, because bulk tagging accounts as fraudulent required near certainty before it could be implemented.

94.    CW-3 further explained that the promotions being abused were unique in that the fraudsters were able to get "instant" money by withdrawing the funds through Xoom or prepaid debit cards or gift cards given the lack of account vetting when those accounts are first created. He explained that prior promotions, many of which he explained also had major abuse issues, had usually been run in partnership with other companies, and imposed at least some obstacles to the continuous creation of fake accounts to take advantage of the incentive.

95.    After identifying the scale of the fraudulent accounts taking advantage of PayPal's promotion, CW-3 suggested that PayPal should shut down all of these accounts immediately, but he received pushback against his suggestion.  He continued to explain that PayPal had written "SOPs" concerning fraud detection, and that those policies were focused on violations of specific laws or frauds on PayPal's customers.  He explained that the pushback primarily focused on the fact that the fraud was taking money from PayPal, but not PayPal's customers, meaning it was not resulting in fraud complaints from customers.

96.    CW-3 explained that a large meeting was held in October 2021 over Microsoft Teams to discuss the trend he had identified.  By then, his underinclusive SQL query was identifying about a million fake accounts.  He explained that there were approximately 400 attendees at that meeting, including the Global Seller Risk teams and Strategy teams.  CW-3 also

explained that there were senior directors, who were two levels below CEO Schulman in the meeting.

97.    CW-3 explained that during that meeting, a PowerPoint presentation explained how the fake account trend had been identified, including data regarding its prevalence and data regarding the number of promotional incentive payments that were being transferred into individual accounts and then transferred out of PayPal.

98.    During the October meeting, CW-3 advocated for PayPal to shut down the fake accounts and his boss ultimately approved of "limiting"[6] these accounts.  CW-3 believes that the information about the fake accounts was escalated to the executive level because they would have needed executive approval to limit that many accounts.  CW-3 clarified that even if an account was "limited" it would still be able to withdraw the money eventually, meaning that applying that flag would not deter fraudsters from taking advantage of the promotion.

99.    Following the October group meeting, CW-3 continued to discuss the issue with a member of PayPal's Strategy team in Shanghai.  He explained that spreadsheets regarding the fake accounts were sent to this member of the Strategy team, and he repeatedly interacted with this member of the Strategy team about PayPal's follow-up into investigating the issue.  CW-3 advised that the team based in Shanghai collected all of his team's data and disseminated it to senior leadership.  CW-3 also explained that he communicated with others in various positions throughout PayPal about the fraudulent accounts he had identified.

100.    CW-3 advised that his SQL query ultimately identified about 2 million accounts that were engaging in incentive abuse.  CW-3 went on to say that there were likely more than the

---

[6] PayPal refers to applying flags to accounts, such as when those accounts are suspected of fraud, to limit their activity, as "limiting" accounts.

4.5 million accounts that PayPal disclosed that were engaging in incentive abuse, since he doubted that he had personally identified half of them and since his underinclusive query was unlikely to catch all of them as it was written.

101.    CW-3 recalled that NNA accounts were an important metric to PayPal and its investors, and CW-3 suggested that PayPal was using the incentive and this influx of accounts to "bullshit people" about its NNAs.  CW-3 explained that by giving away PayPal's money to customers, they were inflating the actual growth that PayPal was able to achieve.  CW-3 went on to say that this is why PayPal chose to limit their fraud vetting when an account was created, thus they could count that new account in the NNAs for the quarter.  According to CW-3, he believed that PayPal did this because COVID had been a boom for PayPal but as COVID-related restrictions subsided they needed to buy their growth since the market was so focused on the NNA metric.

102.    As discussed below, CW-3's information concerning PayPal's knowledge of the prevalence of fraudulent accounts and the October meeting where the issue was discussed, is directly corroborated by another former PayPal employee familiar with those facts.

103.    CW-7 was formerly employed by PayPal from before 2015 through at least the end of the Class Period and spent the vast majority of his tenure working in the fraud department. Throughout the Class Period, CW-7 was a Senior Risk Operations Team Leader.  CW-7 reported to Aaron Lingle, who reported to Wei Jiang, who reported to Kelly Dickerson, who reported up to Chief Enterprise Officer Aaron Karczmer.

104.    CW-7 described the October 2021 meeting during which the bot fraud trend was discussed with several hundred people present.  CW-7 explained that the presentation given at this meeting included a PowerPoint presentation with information about the identified fraud trend and

details on how the identified accounts could be placed into "limited" status to restrict their activity.  CW-7 advised that watching the money move from account to account was a huge red flag.

105.    CW-7 recalled communicating with Angela Blackstone (Senior Manager, Global Seller Risk Success Enablement) via Microsoft Teams during the meeting about the issue.  CW-7 also explained that call participants discussed whether to shutdown the accounts, flag them as limited, or take other action like requiring additional documentation from the holders of the fraudulent accounts.  CW-7 recalled members of PayPal's strategy team in China participating in that conversation, and that the Strategy team was responsible for "creating rules in automation" when fraud trends were identified.

106.    Around the October 2021 meeting, CW-7 discussed the fraud trend with Aaron Lingle (Manager, Seller Risk Services).  CW-7 was informed by Aaron Linge that he had communicated with Laura Beck (part of PayPal's Policy team), about the fraud trend.  CW-7 explained that executives at PayPal would have been updated on the fraud trend by the Policy team.

107.    In addition to these meetings where the illegitimate accounts associated with the NNA promotions were openly discussed, the regular reporting of information concerning NNA — which was of unique focus for PayPal's C-Suite in 2021 — strongly supports the conclusion that Defendants were aware of the issue.  The following former employees speak to the degree of focus on NNAs and flow of relevant information concerning NNAs to PayPal's senior executives, like Schulman, Rainey, and Auerbach.

108.    CW-2 was formerly employed by PayPal from before 2018 through the end of the Class Period.  Throughout 2021 he was a Director in the finance organization for PayPal and had

held various other positions at PayPal over the many years of his tenure.  In his final two roles at PayPal, he was 2-3 reporting levels below CFO Rainey.

109.    CW-2 explained the process of tracking and reporting NNAs.  He explained that the Business Analytics and SEC Reporting teams measured NNAs, using information filtered up to them from each of PayPal's business units, such as PayPal checkout or Venmo.  CW-2 advised that NNAs were measured daily and that an automated daily report was generated and sent to PayPal's C-Suite, which tracked gross new additions, churn, and activity.  He elaborated that PayPal's C-Suite also received periodic reports showing the activity of each cohort of accounts broken down by month.

110.    CW-4 explained that as a result of PayPal's regulatory obligations, among other reasons, information concerning new accounts and the activity from those accounts was reported to CEO Schulman, CFO Rainey, and PayPal's Board of Directors.  He explained that regulatory agencies required that PayPal meet this "level of governance" where the CEO, CFO, and the Board of Directors are kept informed on issues concerning new accounts, and that as a result, information on new accounts was "made transparent" to Schulman and Rainey, including with a "repository of data" from PayPal's Compliance Department presented through reports to Schulman and Rainey, on issues within the Company.  As a result, CW-4 explained that if PayPal had identified that a large number of bot accounts were being created, that information would have immediately been made known to Schulman and Rainey.

111.    CW-4 also explained that PayPal was required to, and did, update its regulators concerning new accounts, activity, and issues concerning the creation of illegitimate accounts, and that one purpose of these reports was to demonstrate that PayPal was taking appropriate steps to verify accounts.  CW-4 recalled that some regulators required monthly updates, which PayPal

provided.  CW-4 explained that the information for these reports was reported to Senior Vice President, Chief Compliance Officer Fiachre O'Neill, and Senior Director, Head of Global Credit Compliance Kevin Thomas, and that if issues concerning accounts created by bots had been discovered, information concerning those issues would be included in those reports.

112.    According to CW-4, regulatory compliance required CFO Rainey and PayPal's Chief Risk Officer to review and sign off on these reports, as they were "attested to by Chief Risk Officer."  CW-4 also explained that the governance regimes PayPal was required to comply with also required the CEO and CFO be updated on the information, and as a result, PayPal's CEO and CFO would discuss the report, and information within it, with the Chief Risk Officer, which CW-4 recalled occurred in weekly meetings.

113.    CW-4 also explained that PayPal was required by various U.S. and international regulations to analyze each new account within days of its creation to determine its authenticity, which PayPal's Compliance and Know Your Customer ("KYC") functions did through checking the information provided by the customer against various datapoints.  Due to this process, CW-4 did not understand how PayPal could not have immediately been aware of widespread activity to create fake accounts through bot farms.

114.    CW-4 also explained that PayPal was required by various state laws to track account activity and dormancy.  He added that PayPal was required to review and monitor accounts for dormancy on a regular basis, and that PayPal understood that under some state regulations an account would be deemed dormant if it had no activity for 30 days.  CW-4 explained that PayPal had systems for monitoring for account activity to comply with these regulations.  CW-4 recalled that reports on dormant accounts, account activity, and any

potentially improper fees and charges related to these accounts, went to the Chief Risk Officer and Head of Compliance, and then to CFO Rainey.

115. CW-4 explained that reports of fraud, including fake accounts, needed to be recorded in PayPal's system which captures loss events and incidents, as required by various jurisdictions. He added that if a discovery of fraud is disclosed by another employee, that it must be recorded in the system that captures loss events and incidents. CW-4 then explained that the system that captures loss events and incidents is a tool and that there are different levels of escalation. Given the magnitude of this discovery, per PayPal's internal loss event policy, these events would have been reported to senior leadership.

116. CW-4 recalled that the highest tier of escalation applied to any situation affecting or potentially affecting 250,000+ accounts, regardless of whether the issue was resolved or ongoing. CW-4 stated that any situation meeting that threshold would be automatically and immediately escalated to the CEO.

117. CW-4 advised that this recording and escalation was a component of the required governance structures PayPal followed in order to comply with regulations and the expectations of its regulators.

118. CW-2 recalled the disclosure in 4Q2021 restating NNA numbers for the year to correct for approximately 4.5 million illegitimate accounts created by bots. He explained that PayPal used risk analysis and data science to analyze whether accounts were legitimate and that this analysis looked at factors such as biometrics, time and place where the apps were used, transaction history, and other data points. He confirmed that this sort of analysis showed that "bot farms" and/or widespread promotional account creation were setting up illegitimate accounts to make use of the Company's incentive program.

119.    These facts demonstrate that PayPal's C-Suite, including Defendant Schulman and Defendant Rainey, was given daily access to information that would, at the very least, have raised a red flag concerning the illegitimate accounts.  This is supported by the fact that periodic updates of NNA activity of each cohort of accounts broken down by month would have shown a steep decline in engagement by new users due to the illegitimate accounts — which would not have been using PayPal's services aside from claiming the promotions.

### iii.    PayPal's NNA Promotions Lead to a Rise in Minimally Engaged Users

120.    In addition to the outright illegitimate accounts, the heavy use of promotional activity was leading to a high number of unengaged users signing up.  Although not outright "illegitimate" accounts, they raised similar risks for PayPal's performance.  For example, investors were under the impression that NNA growth would result in an increased number of transactions on PayPal's platform, which would drive PayPal's TPV metric upwards, and ultimately produce revenue for the Company.  However, users who merely signed up one or multiple times to claim the promotions were "minimally engaged," and thus would not translate to higher TPV or higher revenue for PayPal.

121.    The massive numbers of users who created accounts simply to claim promotional credit, without any subsequent engagement, is attested to by PayPal's public disclosures in conjunction with its 4Q2021 results.  *See* Section V(c).  There, Defendants publicly disclosed that PayPal accumulated a vast number of "minimally engaged" users, due to promotional activity, and that its TPV composition had become lopsided such that only "one third" of accounts generated "the vast majority" of TPV.  Additionally, as discussed in Section IV(g), PayPal's abysmal performance in 1Q2022-3Q2022 and the Company's explanation of that performance in terms of minimally engaged accounts churning off the platform, provides a realistic look at the

quantity of minimally engaged accounts during 1Q2021-3Q2021 (since inactive accounts roll off the NNA figures after one year of inactivity).

122.    Defendants clearly knew, or was reckless in not knowing, from the start of the year that it was going to depend heavily on promotional activity to generate NNAs. PayPal's 2021 marketing spending was $2.4 billion, a 33% increase from 2020 ($1.8 billion), a 71% increase from 2019 ($1.4 billion). Marketing budgets at PayPal were typically set annually, according to CW-1. This information is corroborated by CW-2, who stated that the marketing budget was set at the beginning of the year, with funds split according to various marketing channels or programs, such as members get members promotions, paid social media, credit card rewards programs, and other projects. CW-2 added the budget could be adjusted depending on performance, overspend and underspend, and the 2021 marketing budget was increased during the early part of 2021. As CW-4 explained, the marketing budget had to be directly approved by CFO Rainey. From these facts alone, it is clear that PayPal expected to be heavily dependent on promotional campaigns to drive NNA growth in 2021.

123.    Former employees of PayPal explain that senior executives at the Company carefully tracked the NNA issue. This highlights that the executives knew of (or at a minimum, recklessly ignored) the issue.

124.    CW-1 was a Senior Director of Product at PayPal from before the start of 2021 until at least three months after the Class Period.

125.    CW-1 further explained that there was a push coming from the top down throughout the Company to increase NNAs, and he explained that there was a "huge urgency" placed on NNAs by CEO Schulman. CW-1 added that CEO Schulman was pushing NNA

growth.  Similarly, CW-1 stated that NNA numbers were significant headline numbers to Schulman and senior executives to discuss during earnings calls.

126.    CW-1 saw the NNA metric as "theater," due to the ways PayPal would inflate the number, such as by counting multiple accounts by a single user as multiple NNAs.  CW-1 explained that a small percentage of users made up the majority of the transaction volume and that adding NNAs that were not actually engaged would not contribute to PayPal's short-term revenue growth.  Despite this, CW-1 believed that CEO Schulman wanted to report high NNA numbers to tell a growth story for PayPal and stated that CEO Schulman wanted to position the Company as a Super App which required a large user and consumer base.

127.    CW-1 described the use of NNA metrics as a vanity exercise gone wrong.  CW-1 explained that PayPal tried to use NNA as a vanity metric in order to promote itself to Wall Street as an 800-lb. fintech gorilla with a super-app, but clearly that was not reality.

128.    CW-1 explained that, as a result of CEO Schulman and other executive's focus on the NNA figure, a special NNA Rally team was created in early 2021.  CW-1 was a member of the NNA Rally team, which included leaders from across PayPal's branded businesses and reported to senior executives, including Jonathan Auerbach (Executive Vice President and Chief Strategy, Growth and Data Officer), Doug Bland (SVP and GM, Global Credit), and Michael Lamb (Vice President, Performance Marketing and Marketing Transformation).  CW-1 explained that other senior executives were also present during some NNA Rally meetings, including John Coons (SVP of Product for the Branded Business).  CW-1 stated that the team met on a monthly, or sometimes bi-weekly, basis with senior executives at the Company.

129.    CW-1 described the bi-weekly NNA Rally meetings as management's opportunity "to crack the whip" to get contributing teams to hit their new NNA numbers.  CW-1 further stated

that if he or anyone else had anything standing in the way of NNA growth, those issues were raised at this meeting to "surface any blockers."  CW-1 stated this was not the norm but a 180-degree switch from how things usually worked at PayPal.  CW-1 explained that there was "tremendous" leadership demand for growing NNAs by corporate-level employees, adding that when a member of the NNA Rally team raised any issue getting in the way of NNA growth it would immediately be addressed by senior executives.

130.    CW-1 explained that the numbers for NNA targets came from Schulman through Auerbach's, Coons' and Lamb's teams.  He explained that there were "extreme demands" coming down "like a hammer" from the top.  CW-1 further indicated that Schulman had set aggressive goals for growing NNAs, which were referred to as the "go-get numbers," meaning the numbers that the organization had to achieve.  CW-1 explained that the go-get numbers were "top-down," driven by what Schulman wanted to achieve, and were not strictly based on any bottom-up analysis of NNA trends.  CW-1 added, "Dan had a number and they had to hit their numbers."

131.    CW-1 reiterated that NNA numbers and roadblocks or issues were reported during the NNA Rally meetings.  CW-1 confirmed that increasing the marketing spend for these incentives was discussed at the NNA Rally meetings.  CW-1 indicated that the Performance Marketing Team ran the incentive programs, and that the incentive spending was ratcheted up in 2021.  CW-1 explained that the incentive programs were launched or ramped up in early 2021, driven by the Performance Marketing, P2P, and Venmo teams.  CW-1 explained that despite concern from Company veterans about its risks, the incentive programs were launched due to the strong business need as indicated by the SLT's demand to drive the NNA number up.

132.    CW-1 recalled discussions at the NNA Rally meetings regarding the use of incentive programs to drive NNAs and the related fraud rates, adding that those issues applied to

Venmo, Honey, and person-to-person transactions.  CW-1 noted that there were lots of fraud issues with referral programs (where PayPal users received money for getting another account signed up as a member), and many fraudulent accounts came from overseas "click farms."  CW-1 indicated that there were two individuals from PayPal's Risk team — the largest team at PayPal — involved in the NNA Rally team: product leader Ari van den Berg (currently Senior Director, Global Fraud Product Management and Decision Science) and his engineering counterpart, Kaushik Srinivasan (currently Senior Director, Software Development).

133.    CW-1 stated that the NNA metrics used by the NNA Rally team were updated weekly, with about a three-day lag as the numbers were analyzed by PayPal's data scientists.  He further indicated that these metrics were then discussed weekly in the various working teams with urgency.  CW-1 explained that the NNA Rally team produced weekly or bi-weekly reports that were inputted into PowerPoint slides and decks concerning NNA growth.  He also explained that there was a tremendous amount of pressure to capture and report data.

134.    CW-1 explained that PayPal calculated the Lifetime Value ("LTV") of accounts for the Company, the lifespan of an account was typically 18 to 24 months.  CW-1 further explained that the Company analyzed how these new accounts compared to other cohorts of accounts, and whether PayPal was receiving value from them, or whether the Company should focus on other areas to acquire users.  CW-1 noted that account activity was tracked in PowerPoints and Excel spreadsheets and pulled into a master spreadsheet, which included reports prepared by analysts at the product teams, and which was sent to the NNA Rally team, Performance Marketing, and other leaders.

135.    CW-1 explained that PayPal tracked users by product, how that user was acquired (*i.e.*, through paid incentives or other marketing program), and the users' level of engagement

across PayPal's platforms.  CW-1 added that these analyses were at a high level, focusing on each product, or total usage, or could pull in product teams for a deeper analysis.  CW-1 explained that there were tracking codes for the product being used and if a user qualified for an incentive, and if the incentive was paid by Marketing, it was tracked to see if it was successful.

136.    In addition to the NNA Rally team, CW-1 explained that there was also an SLT meeting, where the NNA numbers would have been discussed at least monthly.  CW-1 advised that the NNA Rally team forwarded information to the SLT and financials were reported up monthly.  CW-1 stated that PayPal's senior executives would have had visibility into NNAs and fraudulent account issues.  CW-1 confirmed that the SLT had access to the PowerPoint materials from the NNA Rallies, and that Lamb's team had access to all of the data.

137.    CW-1 reiterated that the incentive promotion came from PayPal's marketing budget.  He further stated that one of the promotions included the P2P business on PayPal and Venmo, where a customer sent $10 to someone who did not already have a PayPal or Venmo account, PayPal would credit both the referrer and the referee $10.  The incentive promotions also involved Honey, as they had a large cash back audience.  The promotion started at least three to six months before the NNA Rally team.  He did not recall a specific promotion but explained that PayPal was leaning more on promotions and making it richer for the customer.

138.    CW-1 recalled a lot of stress at the NNA Rally meetings throughout 3Q2021.  CW-1 explained that the NNA Rally meetings became increasingly tense throughout 4Q2021.  Specifically, CW-1 stated that in November 2021, Auerbach asked the most senior or "inside" people at the meeting, including Lamb, Coons, and Lamb's top finance analyst, to stay on the call afterwards to discuss earnings and NNA metrics for presentation to the Company's senior leadership.  CW-1 described the follow-up call — which he was not part of — as a confidential

meeting to prepare materials for the presentation to senior leadership/SLT and the upcoming earnings call.

139.    CW-2 was a Director in the finance organization at PayPal throughout 2021. CW-2 indicated that, in 2021, PayPal had a "big push" to pursue "paid acquisitions" of new accounts, meaning NNAs that were brought in through an incentive program, such as the $10 credit given to new accounts, in contrast to organically developed accounts.  According to CW-2, the Company's management was aware that it could not make its projected NNA numbers without the paid incentive marketing programs, even though management knew that these incentives could also potentially create issues such as low-quality accounts (that is, accounts that engage in few transactions), as well as other problems.  CW-2 explained that he had raised concerns regarding the high churn rate of "paid" NNAs, in contrast to organically developed accounts, with several more senior PayPal employees, including Doug Bland, who was the Head of Consumer at PayPal.

### c.    Throughout the Class Period, Defendants Falsely Represented PayPal's Growth and Failed to Disclose Known Risks to Investors

140.    On the heels of COVID-19, PayPal was — as Defendants told investors — poised for growth.  During the pandemic, the shift toward digitization accelerated PayPal's growth as consumers sought contactles payments options via QR codes and merchants made their traditionally in-store offerings available to consumers online.  This transition was transformative for PayPal's online presence and laid the foundation for Defendants' claim that PayPal would become a Super App.

141.    Throughout the Class Period, PayPal was critically focused on its NNA metric.  On February 3, 2021, when PayPal reported its financial results for fourth quarter and full fiscal year ended December 31, 2020 (4Q2020 and FY 2020), Defendants told investors to "*[e]xpect*

*ongoing momentum with strong TPV growth and NNAs*" and that PayPal expected to add approximately 50 million NNAs in FY 2021.  On growth, CFO Rainey described PayPal's core business as "*continu[ing] to perform at unprecedented levels.*"

142.    Not only were the number of NNAs purportedly on the rise, but PayPal touted the engagement metrics generated from its NNAs as crucial to PayPal's TPV.  CEO Schulman touted PayPal's growth and engagement, telling investors that not only were new demographics joining PayPal's platform, but "*the engagement metrics of that cohort are also up substantially.  We have double-digit increases in value for net new actives.*"  This, CEO Schulman explained, caused PayPal's churn rates to come down, noting: "*There is plenty of demand to come on to our platform.*"

143.    Both internally to employees and externally to investors and analysts, CEO Schulman championed NNA growth throughout the Class Period.  To investors, he noted PayPal had "*a lot of confidence to [its] 50 million [NNA] number,*" which it attributed to "*a lot of really encouraging trends.*"  In fact, at PayPal's Investor Day just after the Class Period began, during trading hours on February 11, 2021, Defendant Schulman announced PayPal's goal that "*over the next 5 years, we believe we can grow this 377 million to 750 million active accounts on our platform.*"  This account growth was repeatedly touted to investors as part of PayPal's aim towards becoming a Super App.

144.    Additionally, at the Investor Day call on February 11, 2021, Defendants told the market that the Company saw "*engagement levels increase dramatically throughout our base especially with the new products that we've put out,*" which, in turn, "*increase[s] the average revenue per user. And we expect that to grow substantially over the next 5 years. And at the same time, it also reduces our churn rate.  And as we get larger and larger, the more our churn*"

*rate reduces, the more our net new active cohorts can grow*.”  Thus, NNA growth and increased levels of engagement were central to PayPal's growth trajectory and, according to Defendants, showed no sign of slowing down.

145.    Much of PayPal's NNA "organic" growth stemmed from its person-to-person, or P2P business, which allows consumers to transfer money to each other.  PayPal's 10-K for FY 2020 touted the advantages of its P2P business: "***P2P is a significant customer acquisition channel that facilitates organic growth*** by enabling potential PayPal users to establish active accounts with us at the time they make or receive a P2P payment."

146.    On a May 24, 2021 conference call with JPMorgan Chase & Co., CFO Rainey described PayPal's P2P business as the "***single largest contributor to customer acquisition***."  And despite PayPal's increased promotional activity, CFO Rainey disclaimed "low value" net new actives, stating: "***What we've done over the last, call it, 18 months is put much more rigor into the CLV component of that rather than chasing a low-value, net new active that maybe pumps up numbers and the optics look good, really looking at how they're going to contribute to the PayPal platform over time***."

147.    Another one of PayPal's purported strengths was its technology infrastructure, which Defendants told investors in its Form 10-K for FY 2020 that the Company is backed by a "***comprehensive cybersecurity program designed to protect our technology infrastructure and Payments Platform against cybersecurity threats, which includes regularly testing of our systems to identify and address potential vulnerabilities.***"  As Defendant Schulman explained at PayPal's February 11, 2021 Investor Day, the Company made substantial investments in its business over the last five years, accreditting the fact that its "***risk management and our compliance teams are now world-class***" to be a "***competitive advantage***."

148.    With each passing quarter during the Class Period, PayPal doubled down on its NNA metrics.  During an earnings call after the market closed on May 5, 2021, CEO Schulman exclaimed that during 1Q2021, PayPal "***brought on in Q1, 2 new customers every second throughout the quarter,***" leading to "***392 million active accounts as of March 31, 2021 compared to 325 million as of March 31, 2020, an increase of 21%***" as reported in PayPal's May 5, 2021 Form 10-Q.

149.    By June 2021, Defendants had not only affirmed the Company's NNA guidance, but told investors it would reach the high end of that guidance.  On a June 9, 2021 conference call, Defendant Schulman stated: "***We said we were going to be 52 million to 55 million for the year.  I would bet that we're going to be closer to the high end of that range than we are to the low end of that range***."

150.    Leading into PayPal's 3Q2021, Defendants had stressed to investors that not only was the Company achieving its quarterly and yearly NNA growth, but that it was doing so organically, purportedly rejecting low-quality NNAs, and setting the Company on its path to becoming a Super App with 750 million active users over the next five years.

### d.  PayPal Narrowly Avoids Missing Guidance By Reporting NNA Figures That Were Inflated With "Illegitimate" and Minimally Engaged Accounts

151.    When PayPal reported its 2Q2021 results at market close on July 28, 2021, the Company reaffirmed its guidance of 52-55 million NNAs for the year.  To investors, this painted a picture of continued, healthy, organic NNA growth ramping up throughout the year at PayPal. In reality though, fraudulent NNAs had permeated the Company's NNA metric as a result of the promotional activity in 2021.

152.    A few months later, in October 2021, news outlets reported that PayPal was exploring an acquisition of Pinterest.  Citing "competitive pressure from e-commerce platform

Shopify," *CNBC* reported PayPal reached late-stage negotiations — agreeing on a purchase price for the acquisition.

153.    *Bloomberg* reported this acquisition and, in an article entitled, "PayPal Shows 'Super App' Ambitions With Pinterest Pursuit," described this $45 billion deal as the next step toward CEO Schulman's aspirations of making PayPal a Super App. *Bloomberg* recognized PayPal's recent "acquisition spree" — including its 2020 acquisition of Honey — as contributing toward PayPal's "broader ambitions."

154.    While Pinterest investors welcomed news of PayPal's interest, PayPal investors balked at news of the acquisition.  On October 20, 2021, after *Bloomberg* reported on PayPal's plans to acquire Pinterest, shares of PayPal dropped 4.9% to close at $258.36.

155.    Four days after *Bloomberg*, *CNBC*, and other news outlets reported on the potential acquisition, on October 24, 2021, PayPal issued a new release entitled "Response to Market Rumors of Discussions Between PayPal and Pinterest."  In the news release, PayPal stated that it was "not pursuing an acquisition of Pinterest at this time."

156.    Thus, heading into reporting its third quarter results, investors were already on edge with PayPal following the announcement — and then abandonment — of a plan to conduct the largest acquisition in its history.  Reporting positive third quarter results, including NNA growth and strong user engagement, would keep investor skepticism at bay, even if only temporarily.

157.    On November 8, 2021, the Company's 3Q2021 results for NNAs met Defendants' guidance range.  However, if PayPal properly excluded the NNAs it had accumulated through illegitimate accounts over the prior three quarters, it would have dramatically missed guidance.  If PayPal had excluded both the illegitimate accounts and minimally engaged accounts, this miss

would have been even greater.  The following chart shows the miss that would have been reported if PayPal excluded even just the illegitimate accounts.[7]



### Published NNA Results Compared to 3Q2021 NNA Guidance

---

[7] The following chart shows the illegitimate accounts as accumulated evenly across 1Q2021-3Q2021.  However, that assumption is irrelevant to the conclusion.  As the NNA number should be reduced by 4.5 million in 3Q2021 regardless of when those accounts were created (because the NNA figure tracks "net" additions, meaning removal of the illegitimate NNAs in 3Q2021 would reduce those quarterly results, regardless of when they were created) — and, as PayPal later admitted, there were at least 4.5 million illegitimate accounts reported in the 3Q2021 results.

### e. PayPal Touts Its NNA Figures While Concealing Illegitimate Accounts Numbers from Investors

158.     Throughout the first three quarters of 2021, Defendants continued to trumpet PayPal's NNA metric as a sign of the increasing strength and success of the Company even though Defendants knew this metric was artificially inflated.  The chart below, provided in PayPal's November 8, 2021 3Q2021 Investor Update, demonstrated the Company's continued efforts to highlight strong NNA growth through 3Q2021.



159.     Indeed, in a November 8, 2021 Investor Update, Defendants doubled-down on their efforts to mislead investors as to the true NNA metric.  With just over half a quarter left in the year, Defendants reaffirmed FY 2021 guidance that PayPal would add an estimated 52-55 million NNAs.

160.     At this late stage, Defendants knew of, or recklessly disregarded, the pervasive fraudulent accounts artificially bolstering the NNA metric, yet continued to pump their false narrative to the market.  During a November 8, 2021 earnings call, Defendant Schulman stated: "***we remain on track to deliver more than 52 million NNAs for the year***."

161.     Despite the prevalent problems posed by incentive-generated fake accounts, PayPal continued to pour money into customer acquisition spending.  Defendant Rainey

confirmed this in the November 8, 2021 earnings call during which he stated: "*we continue to invest aggressively in technology and development and sales and marketing, including increased spending on customer acquisition and engagement strategies*."

162.    However, Defendants concealed the true nature of this spending — paying to generate unengaged new accounts — from investors by continuing to publicly disseminate their false NNA growth narrative.  For example, Defendant Schulman stated "*[o]ur growth remains incredibly strong on the NNA side*."

163.    While touting its NNA growth, Defendants also told investors that "*when you do a transaction on PayPal, we obviously look at your user name and your password*" adding that the Company "*look[s] at 200-plus different indicators to decide instantaneously is it you or not*" suggesting to investors that PayPal had a system for verifying that its users were, in fact, legitimate.

164.    Defendant Schulman confirmed that "*the key to stopping people from leaving the platform is engagement*," and "*engagement has to do with us expanding our value proposition into new applications*."

165.    As late as November 30, 2021, with only one month left in the quarter, Defendant Schulman continued touting PayPal's NNA growth for the year, stating "*we're on track to do 55 million net new actives*," and "*we'll wind up the year north of 430 million, uh, [users] on the platform*."

166.    Thus, despite knowing, or recklessly disregarding, that PayPal's NNA metric was inflated by fake accounts and accounts with minimal engagement, Defendants continued touting PayPal's purported NNA growth and customer engagement.

### f.  Defendants Eventually Disclose the Truth and PayPal's Stock Price Collapses

167.    At market close on February 1, 2022, PayPal released its 4Q2021 results and held two corresponding analyst calls — one the same day and another on February 2, 2022.  During the calls, Defendants disclosed that PayPal's position was far weaker than previously stated, including because PayPal had counted "illegitimate" accounts as part of its publicly reported NNA figures and because the vast majority of even the legitimate accounts that PayPal had generated in 2021 were essentially unengaged with the platform, casting serious doubts about PayPal's growth prospects.

168.    When releasing its 3Q2021 results on November 8, 2021, Defendants said that PayPal would generate 55 million NNAs in FY 2021.  Because the results for the first three quarters of 2021 were reported at the time of that guidance — showing 39.2 million NNAs — this meant PayPal was guiding that it would have NNA of 15.8 million in 4Q2021.  The "street" expectation — *i.e.*, the general reported sentiment among analysts — was that PayPal would produce 15 million NNAs in the fourth quarter.

169.    However, the guidance given with the 3Q2021 results explicitly stated that 3 million of the 4Q2021 NNAs would be derived from PayPal's recent acquisition of the company Paidy, meaning that "organic" NNA guidance was really only 12.8 million.

170.    In delivering the 4Q2021 results, PayPal revealed total NNA numbers of 9.8 million, including the 3.2 million accounts coming from Paidy.  This meant that in reality PayPal had only generated 6.6 million organic NNAs against organic guidance of 12.8 million, meaning PayPal missed organic NNA guidance by a **whopping 48.4%**.

171.    In addition, on PayPal's February 1, 2022 earnings call for FY 2022, Defendant Rainey revealed that PayPal had previously counted a large number of "accounts that [] were

illegitimately created" in its previously reported NNA results.  Specifically, CFO Rainey revealed that PayPal had included these illegitimate accounts in its 1Q2021, 2Q2021, and 3Q2021 results, and most astoundingly its 3Q2021 year to date NNA figures included at least 4.5 million of these "illegitimate" accounts.  CFO Rainey also revealed that illegitimate accounts were also created in 4Q2021, but were not included in the published results.  Thus, as CFO Rainey explained, excluding the previously counted illegitimate accounts (essentially restating the prior results) "affected [PayPal's] ability to achieve [its] guidance in the quarter."

172.    In PayPal's February 2, 2022 buy side analyst call, J.P. Morgan analyst Tien-Tsin Huang stated that he had "a lot of questions" about the illegitimate accounts, and asked PayPal to clarify the issue, noting "it feels like that's the bulk of what drove the difference in NNAs."  CFO Rainey confirmed that the illegitimate accounts were the "primary driver of the miss."  Rainey then stated: "we're constantly assessing the legitimacy of new accounts that are created," admitting that **he** and PayPal's other executives were "constantly" assessing the issue, and thus knew or were reckless in not knowing of the illegitimate accounts when reporting results and guidance earlier in the year, and throughout the Class Period.  CFO Rainey then confirmed that the issue arose due to "bots" creating "multiple accounts to avail themselves" of PayPal's incentive campaigns.

173.    In addition to this startling revelation concerning the previously counted illegitimate accounts, PayPal also revealed deeply troubling new information concerning its user engagement and composition.

174.    PayPal had long touted its user growth as a major selling point, on the basis that continued acquisition of NNAs would both (1) drive TPV (and correspondingly drive earnings for PayPal) and (2) provide a compelling user base that PayPal could leverage in its Super App

ambitions.  However, in the February 1, 2022 4Q2021 earnings call, CFO Rainey revealed that PayPal's user base had actually become replete with "minimally engaged" users, and that the "vast majority" of PayPal's volume comes "from about 1/3 of our customer base."[8]

175.    CFO Rainey explicitly connected this trend to PayPal's aggressive marketing practices — the same NNA promotional practices that had led to the creation of over 4.5 million illegitimate accounts — by stating that:

(a)    PayPal "leaned into incentivized customer acquisition tactics to a much greater extent than we ever have in our history;"

(b)    PayPal monitored the effectiveness of these campaigns — specifically by looking at "the impact on customer behavior in the months that follow account creation" and the "ROI or return on that [promotional] investment spend from their expected contribution to TPV, revenue and operating income;"

(c)    As a result of that monitoring, PayPal knew that while its promotional campaigns were "successful at generating account creation," the customers being added to the user base had "lower engagement and a higher propensity to churn."

176.    Similarly, Defendant Schulman admitted that PayPal had known about the low engagement issue, had even designed incentive programs in response to that issue, and had found the users PayPal had been pulling in based on the promotions "would do one transaction and then fall dormant."  In other words, PayPal had long understood that its 2021 NNA growth was fictitious and these supposedly "active" accounts, merely harvested PayPal's promotion money

---

[8] As an analyst report from Truist commented on February 1, 2021: "We are also surprised by management's comments that a 'vast majority of TPV is generated by ~1/3 of users.'  This is new info, highlighting how narrow PayPal's eCommerce ubiquity is."

without any additional activity.  Schulman conceded that these accounts did "nothing for our revenue growth."

177.     Thus, Defendants effectively admitted that they had seen the trend of low engagement from promotional activity throughout the year — but nevertheless Defendants did not disclose this to investors at any time during the Class Period, just as Defendants had not disclosed to investors that the "vast majority" of PayPal's volume was generated by just a small percentage of users.

178.     In a massive pivot from its previously touted approach, Defendants also revealed that the issue with low engagement due to promotional activity had caused them to shift focus going into 2022 by no longer focusing on adding users to its platform.  Specifically, CFO Rainey disclosed that in 2022, "less engaged customers" would "roll off" its platform, which would "materially reduce" PayPal's NNA figures in the coming quarters.

179.     In a shift that demonstrates the astounding scale of the issue, CEO Schulman revealed that PayPal was cutting its FY 2022 guidance for NNAs to a mere 15-20 million.  This contrasted sharply with analyst expectations, based on Defendants' previous false or misleading statements throughout the Class Period.

180.     For example, J.P. Morgan had estimated that PayPal would generate more than 50 million NNAs in 2022, which would have been broadly in line with PayPal's guidance that it was on track to have 750 million active accounts by 2025, guidance that PayPal also revoked in February 2022.

181.     In reaction to these disclosures, PayPal shares suffered their worst selloff in the Company's history.  The disclosures were made after markets closed on February 1, 2022.  The next day, February 2, 2022, PayPal's stock spiraled from a prior closing price of $175.80 to a

closing price of $132.57, which was a 24.6% decline and resulted in a market capitalization loss of $49.3 billion.  The stock price continued to fall on February 3, 2022, from a closing price of $132.57 on February 2, 2022, to a closing price of $124.30 on February 3, 2022 — which was an additional 6.2% decline and resulted in an additional market capitalization loss of $9.4 billion. This two-day decline amounted to a 29.3% decline and a loss of $58.7 billion in PayPal's market capitalization.

182.    Analyst and news reactions demonstrate that this stock drop was the result of Defendants disclosures, with a focus on the 4.5 million illegitimate accounts causing PayPal to miss 4Q2021 NNA guidance, the disclosures concerning the low level of engagement across PayPal's user base due to the promotional activity, the corresponding abysmal 2022 NNA guidance, and PayPal's retraction of the guidance of 750 million active accounts by 2025.

183.    For example, focusing on these themes, analysts reported as follows:

(a)    A Barclays analyst report, published on February 1, 2022, stated: "Tonight's **disappointing report** and change of strategy around NNAs **caught investors by surprise**[.]"  The same report recounted the guidance miss "driven by the company disqualifying ~4.5M 'illegitimate' accounts[,]" as well as the fact that PayPal was "abandoning NNA targets" for 2025.

(b)    A Jeffries analyst report, published on February 2, 2022, stated: "The call shed more light on the startlingly low Net New Active Acct. guide for FY22 as mgmt. has pivoted towards driving more engagement from high-value custys, & pulled the target of 750mn actives by FY25.  **We view the after-hrs reaction (-18%) as justified**."  The same report stated: "Net New Actives **the biggest neg. surprise**; guide for 15-20mn NNAs in FY22 (Street +53mn) the result of pivot towards increasing engagement vs. growing the user base."  Jeffries also

56

commented on the 4.5 million "illegitimate" accounts that were "dropped from the user base" when explaining the weaker than expected 4Q2021 NNA figures.

(c)    A Wolfe Research analyst report, published on February 1, 2022, stated: "KPIs [Key Performance Indicators] such as a NNAs and TPV missed expectations and guidance for 2022 came in **well below** estimates."  It specifically noted that "NNA's of 9.8mn came in **well below** our 15.2mn and compared to last quarter's 13.3mn and included 3.2mn users from the acquisition of Paidy, meaning organic NNAs for the quarter were only 6.6mn."  The same report stated that "guidance for 1Q22 and FY 2022 came in well below expectations, highlighted by a 2022 NNA guide for 15-20mn, **well below** the Street's expectation for mid-50mn NNAs."

(d)    A Raymond James analyst report, published on February 2, 2022, stated: "**Net new actives raises eyebrows; strategic shift in focus.**  In addition to financial guidance, mgmt expects to add only 15-20 million net new actives (NNA) in FY22 and has removed its medium term target to reach 750 million NNA as it eyes a new strategy to drive engagement and APRU within its current user base.  Consider, ~1/3 of Paypal's user base accounts for a vast majority of its volume and maintaining lower value accounts through incentives can limit overall ROI on the user base."  (emphasis in original).

(e)    An Oppenheimer analyst report, published on February 2, 2022, stated: "Management announced significant strategy changes vs February 2021 Investor Day.  Entails less focus on NNA and more customer engagement, removed 750M NNA LT target.  Stock off ~18% after hours (~$144).  Investors likely **taken aback** by strategy shift, questioning growth prospects of the underlying business model."  Oppenheimer called the reduced 2022 NNA guidance a "**Canary in the Coal Mine**."  (emphasis in original).

(f)     Cowen published an analyst report on February 1, 2022 titled, "PYPL 4Q21: **The Hills Have Gotten a Lot Steeper**," reflecting on the Company's reduced prospects. The report recounted how PayPal's NNA results for 4Q2021 came in "**below our 15M estimat**e[,]" commenting on the adjustment for illegitimate accounts.  The same report commented on PayPal's retraction of the 750 million accounts guidance, noting that management no longer believed that target was "achievable."  Finally, the report commented on PayPal's expectation that "less engaged" users would be "rolling off" PayPal's user base.

(g)     A William Blair analyst report, published on February 1, 2022, stated: "management pulled its prior target of reaching 750 million active customers by 2025 as it pivots to focus on revenue per user (RPU) as opposed to total users[,]" noting that the "**strategy [shift] . . . was unexpected**."

(h)     An RBC analyst report, published on February 1, 2022, stated: "PayPal decided to shift its strategy to focus more on increasing engagement rather than simple net new account growth, noting that one-third of accounts generate a significant majority of TPV."  The same report commented on the 4Q2021 NNA guidance miss, the 4.5 million illegitimate accounts, and the retraction of 2025 NNA guidance.

(i)     A Wedbush analyst report, published on February 1, 2022, commented on PayPal's "[s]trategy shift" away from focusing on NNAs, since "roughly 1/3 of the company's 400MM+ active consumer accounts generate[] the majority of company volumes[.]"  The same report commented on how management had identified "non-legitimate accounts" and that it "now expects" to add only 15-20MM NNAs in 2022.

(j)     A Credit Suisse analyst report, published on February 2, 2022, stated: "PayPal revoked its guidance for 750mm active accounts by 2025 and guided to a lower

~15-20mm NNAs in 2022 and ~30-40mm per year thereafter (roughly in-line with pre-COVID levels) given lower ROI on customer acquisition cost[.]"  The same report recounted the 4Q2021 NNA guidance miss, and recognized that the most significant factor contributing to that miss was that "PayPal disqualified or excluded 'illegitimate accounts' (~4.5mm accounts) from NNAs that were abusing the incentives."  Finally, the report explained that PayPal's shift away from NNA growth was "justified with a comment that the 'vast majority' of volume comes from ~1/3rd of the customer base."

(k)    A Deutsche Bank analyst report, published on February 2, 2022 stated: "Risks to monitor – Lower FY22 guidance, net actives, OVAS, margins and tax Net adds of ~9.8m in the qtr were below expectations driven by a shift in the customer acquisition strategy and the exclusion of 4.5m illegitimate accounts."  The same report stated that PayPal had "set a lower guidance bar than expected for FY22" and "now expects only ~15-20m net account adds in FY22 vs our 55-60m expectation."

(l)    A J.P. Morgan analyst report, published on February 2, 2022 stated: "NNAs missed by 5M, due primarily to the pruning of illegitimate accounts[,]" and added that "what management communicated was **broadly disappointing**[.]"

184.    In addition to the formal analyst commentary, many news articles also focused on the same common issues following the release of PayPal's 4Q2021 results:

(a)    In a *Bloomberg TV* segment, aired on February 2, 2022, it was reported that "PayPal Holdings Inc. said it closed 4.5 million accounts and lowered its forecast for new customers after finding 'bad actors' were taking advantage of its incentives and rewards programs.  Shares of the company fell by the most on record."  During the segment, *Bloomberg*

*TV* displayed a graphic highlighting the price drop, stating: "**PAYPAL SHUTS 4.5M FALSE ACCOUNTS**."

(b)     A February 3, 2022 article, published by *Barron's*, stated: "PayPal's fourth-quarter earnings **were its tipping point**, <u>**eroding whatever credibility remained**</u>. PayPal scrapped its 2025 goal of reaching 750 million active users -- a target it had backed three months earlier."  The article concluded: "Wall Street analysts are now reassessing their models and cutting estimates.  At least 27 analysts have cut their price targets since the earnings report[.]"

(c)     On February 2, 2022, *Bloomberg* published an article titled, "**PayPal Gets Stung by 'Bad Actors,' Shuts 4.5 Million Accounts**."  The article stated that PayPal had "closed 4.5 million accounts and lowered its forecast for new customers after finding 'bad actors' were taking advantage of its incentives and rewards programs."  The article noted that "[s]hares of the company fell by the most on record."

(d)     Another article published by *Bloomberg* on February 1, 2022 and updated on February 2, 2022 was titled, "PayPal Plummets After 'Slower-Than-Expected' Finish to Year."  That article recounted how PayPal had abandoned its target of 750 million active accounts by 2025 "after a review of its business uncovered 4.5 million accounts it now believes were illegitimately created."

(e)     A February 2, 2022 article, published by the *Wall Street Journal*, stated: "PayPal Holdings Inc. shares suffered their worst selloff on record after the company lowered its 2022 profit outlook and scrapped an ambitious growth strategy it put in place last year."

(f)     A February 10, 2022 article, published by *American Banker*, stated: "PayPal's user growth has slowed to a crawl after unprecedented activity following the

pandemic-powered e-commerce boom, and the company's performance was further hampered by the recent eradication of 4.5 million accounts it deemed illegitimate."  The article continued: "**The dramatic scale-back doesn't bode well** for PayPal achieving its other lofty goal of gaining broad acceptance in stores, at least in the near future."

      (g)    A February 2, 2022 article, published on *Seeking Alpha*, commented on the importance of NNAs — stating that "you should follow the user growth rates more closely than any other metric" — and included a graph of PayPal's decelerating NNA growth, concluding "the graph above illustrates the core of the problem" and "[y]ou don't want to invest in a company where its ability to drive customer growth is struggling."

      (h)    *Finextra*, a publication focused on financial technology companies, published an article on February 3, 2022, titled, "PayPal reveals 4.5 million accounts were 'illegitimate,' shares plummet."

      (i)    *The Telegraph* published an article on February 2, 2022, titled, "PayPal shares plunge 25pc as it closes millions of accounts."  The article explained that PayPal had closed "4.5m accounts opened by 'bad actors' who it said were taking advantage of incentives and financial rewards."  The article summarized the situation, stating: "The closures, and changes to focus on existing customers rather than new ones, led it to abandon a goal of having 750m active accounts by 2025."

### g.  Subsequent Events

185.    In the period following Defendants' February 2022 corrective disclosure, PayPal continued to reveal terrible NNA results, because without the support of PayPal's aggressive promotional campaigns to essentially buy fake or "minimally engaged" users, it was unable to support NNA growth.  The following chart shows reported NNA numbers (excluding NNAs from M&A activity in 1Q2020 and 4Q2021) from the start of 2020 until the end of 2022:



186.    As this chart shows, PayPal's NNA growth completely fell off a proverbial cliff for the three quarters following the abysmal 4Q2021 results.  This decline in growth reflects the end of PayPal's rampant promotional activity that merely brought in "minimally engaged" users and the churn of those "minimally engaged" users brought in the prior year falling out of PayPal's active user base.  PayPal defines an NNA as an account that has completed at least one transaction within the past year and regularly explains that the NNA figures reflect new acquisitions (along with reactivation) minus accounts "churning" out of the "active" user base due to inactivity. Thus, the poor results in the first three quarters of 2022 directly correspond to the massive number of "minimally engaged" users acquired through promotions during the prior year churning after a year of inactivity.

187.    By way of illustration, if one assumes that PayPal's performance in the first three quarters of 2022 would have been roughly the same as its 2019 pre-pandemic NNA growth levels,

as supported by Defendants' statements in the 4Q2021 earnings call,[9] but for the increased churn due to the "minimally engaged" accounts added in 2021, it is possible to reach a reasonable conclusion as to the quantity of "minimally engaged" NNAs added in 2021 (*i.e.*, the accounts that simply signed up for promotions without any additional meaningful engagement).[10]  Using this approach, it would be reasonable to estimate that in 1Q2021 PayPal's reported NNA figures included 6.9 million "minimally engaged" users, accounting for 48% of the reported NNA total; in 2Q2021 PayPal's reported NNA figures included 8.6 million "minimally engaged" users, accounting for 75% of the reported NNA total; and in 3Q2021 PayPal's reported NNA figures included 6.9 million "minimally engaged" users, accounting for 52% of the reported NNA total.

188.    PayPal's reported accounts in each of those three quarters can be compared with the figures they would have reported if only counting engaged accounts:



---

[9] This assumption is reasonable in light of PayPal's guidance in its 4Q2021 earnings call that NNA growth would "normaliz[e]" and "revert more back to prepandemic levels," following substantial churn throughout 2022 — specifically that "we are going to experience a churn level that is tens of millions of customers" in 2022.  This is also supported by PayPal's subsequent explanation for the much worse performance in 1Q2022-3Q2022, which focused on increased churn due to the minimally engaged accounts rolling off.

[10] To conduct this calculation, one simply takes the non-M&A NNAs for each quarter of 2019 and subtracts from that the non-M&A NNAs for the corresponding quarter in 2022.

189.    The following chart shows PayPal's reported NNAs from 2019 through 2022, adjusting the results in 1Q2021-3Q2021 to show just the engaged NNAs.  This illustrates most clearly the status of PayPal's growth that investors would have understood if Defendants had been forthcoming in explaining that the NNAs they were securing through promotional activity were largely either illegitimate or "minimally engaged."



190.    On March 3, 2022, during trading hours, at the 2022 EverCore Payments & FinTech Innovators Forum, CFO Rainey reiterated that PayPal was focusing on "quality of the users versus the overall quantity."  The following week, at Morgan Stanley's Technology, Media, and Telecom Conference, CEO Schulman, trying to regain credibility, reiterated that under PayPal's new approach (in contrast to its approach throughout 2021) the Company was not going to "throw away money" on people who "clearly came in for 1 or 2 transactions," recognizing that doing so results in "hollow net new active on your base that's not adding revenue or bottom line impact."

191.    On April 12, 2022, the first in a string of high-level executive departures, PayPal announced CFO Rainey would be leaving PayPal effective end of May 2022.  PayPal did not announce a new permanent CFO at this time, suggesting that Rainey's departure was abrupt.

192.    When PayPal reported its financial results for 1Q2022, the Company lowered its FY 2022 guidance for revenue and NNAs.  On the April 27, 2022 earnings call, after the market closed, CEO Schulman stated he "take[s] full accountability" for the Company's track record over the past several quarters and told investors: "we know, this year, our churn rate will be somewhat higher because we're letting these low engaged consumers churn off the platform because the ROI to keep them isn't worth it."

193.    The next day, on PayPal's April 28, 2022 buyside analyst call, CEO Schulman acknowledged that PayPal would experience "increased churn this year pretty much throughout most of the year[.]"  Gabrielle Rabinovitch, PayPal's SVP, Corporate Finance and Investor Relations, added that 2Q2022 and 3Q2022 would also be under pressure "because of the churn, not because of the [reduced] growth."

194.    These remarks concerning churn by CEO Schulman and SVP Rabinovitch confirm that PayPal's poor performance (*i.e.*, performance worse than pre-pandemic levels) was the result of the "minimally engaged" accounts it had added the prior year churning off the active user base.

195.    On April 27, 2022, a Jeffries analyst report stated: "[t]he reset was necessary to making the stock investable," a conclusion that made sense given the risks involved in investing in a company that was blatantly reporting misleading numbers for one of its core key performance indicators.

196.    On May 11, 2022, when PayPal participated in MoffettNathanson's Payments, Processors, and IT Services Summit, CEO Schulman confirmed that a "vast majority" of PayPal's

"highly engaged customers come to [the Company] through product experiences as opposed to direct marketing attempts."  This again, admitted that PayPal's results over the prior year, driven by its aggressive promotional campaigns, had been accumulating disengaged customers, contrary to Defendants' assurances throughout 2021.

197.    On August 2, 2022, after the market closed, PayPal released its 2Q2022 results, which showed the lowest NNAs of any quarter throughout the relevant period of the case. Indeed, PayPal reported a shocking 400,000 NNAs, compared to its pre-pandemic performance of 9.5 million quarterly NNAs during 2019.  The results were, once again, the result of minimally engaged customers from 2Q2021 churning off the system upon being inactive for a year after claiming a promotion.  Thus, in PayPal's August 3, 2022 buyside analyst call for its 2Q2022 results, CEO Schulman acknowledged that "[j]ust focusing in on the things that we know drives value, NNAs [Net New Active Accounts], we don't have a top of the funnel issue.  We have a churn issue."

198.    In a further attempt to regain credibility after the fraud alleged herein, when PayPal's 2Q2022 results were publicly released, the Company announced a major new initiative to focus on costs — a clear effort to demonstrate the Company would be more cost conscious after throwing away enormous amounts of capital on promotional spending aimed at inflating its NNA numbers.

199.    On September 8, 2022, PayPal publicly announced that John Kim would become the Company's new Chief Product Officer, replacing its current CPO, Mark Britto.  Although its initial announcement stated Britto intended to retire, the Company later disclosed on February 16, 2023, that Britto's departure was "in connection with an internal management restructuring."

200.    By the time PayPal released its 3Q2022 results after the market closed on November 3, 2022, the Company had completely abandoned its focus on driving NNAs. CEO Schulman publicly admitted, during the November 3, 2022 analyst call, that the Company's growth directly depended on churn, specifically that "churn and how many people you lose out of the bottom of the funnel is the predominant driver" of PayPal's future growth.

201.    CEO Schulman added that the Company was no longer "spending marketing dollars on chasing NNAs" but rather, focusing on each account's engagement level and "mak[ing] sure that we calibrate our marketing dollars to that." These comments stood in stark contrast to Defendants' Class Period narrative that increased NNAs were the key to PayPal's growth.

202.    On January 9, 2023, after the market closed, PayPal announced Chief Accounting Officer ("CAO") Jeffrey Karbowski would resign effective February 10, 2023. PayPal appointed an interim principal accounting officer but does not currently have a replacement for its CAO.

203.    On January 31, 2023, PayPal announced it would lay off 2,000 full time employees, which constituted approximately 7% of their global workforce. According to a statement from Defendant Schulman, the layoffs came as part of PayPal's continued effort toward "right-sizing our cost structure, and focus[ing] our resources on our core strategic priorities[.]"

204.    On February 9, 2023, PayPal announced CEO Dan Schulman would retire at the end of 2023. Lastly, PayPal announced on March 7, 2023 that, after only a few months in the role, its CFO Blake Jorgeson would step down.

## V.     DEFENDANTS' CONDUCT GIVES RISE TO CLAIMS UNDER THE FEDERAL SECURITIES LAWS

### a.     Defendants' False or Misleading Statements and Omissions During the Class Period

#### i.     Materially False or Misleading Statements

205.     Plaintiffs allege that the statements highlighted in ***bold and italics*** within this Section were materially false, misleading, and omitted to disclose material information.  In some instances, graphical material is alleged to be false or misleading and no bold and/or italic text has been applied.  As alleged herein, the false or misleading statements artificially inflated or artificially maintained the price of PayPal Securities.

206.     Each statement attributed to Defendant Schulman during the Class Period was also made by Defendant PayPal because he was speaking on behalf of this entity as its CEO and a member of its Board.  Each statement attributed to Defendant Rainey was also made by Defendant PayPal because he was speaking on behalf of this entity as its CFO.  Each statement attributed to Defendant Auerbach was also made by Defendant PayPal because he was speaking on behalf of this entity as its Executive Vice President, Chief Strategy, Growth and Data Officer.  Each statement contained in a public filing, presentation, or press release issued by PayPal was made by PayPal.[11]  The reference to a statement being "misleading" includes statements that are misleading due to the omission of truthful information.

207.     Together with the allegations in Section IV, several of the reasons Defendants' statements were false or misleading are summarized below, and these specific reasons are referenced with respect to specific statements in ¶¶209-308.

---

[11] Throughout this section, the use of three asterisks in the middle of a quoted passage signifies the omission of a paragraph.  The absence of a statement in this section should not be interpreted as an indication that the statement is true.

(a)    **Statements Touting TPV.**  Several of the false or misleading statements identified below touted PayPal's supposed growing TPV figures.  By touting TPV growth, without disclosing that PayPal's TPV had become heavily concentrated, such that "one third" of accounts were generating "the vast majority" of TPV, these statements left investors with the misleading impression that PayPal's users, and in particular its NNAs, were engaging with PayPal and driving transaction volume.  This was material to investors because it misrepresented the prospect of PayPal successfully generating additional revenue and profit from its additional services (*i.e.*, of PayPal generating revenue and profit as a Super App).  Additionally, by touting TPV growth, without disclosing that PayPal's TPV had become heavily concentrated, such that "one third" of accounts were generating "the vast majority" of TPV, these statements understated the risks PayPal faced to continued TPV growth, because if only a small number of PayPal users were generating the majority of PayPal's TPV, the prospect of continued TPV growth (through the acquisition of new users) would be far more difficult than if PayPal's users contributed to TPV more evenly.  This was material to investors because it left investors with a misleading impression of the prospect of increased revenue and profit through future TPV growth.

(b)    **Statements Touting NNA Results.**  Several of the false or misleading statements identified below touted PayPal's supposed NNA growth.  Touting PayPal's NNA growth, without disclosing that PayPal's new users were low value "minimally engaged" accounts, left investors with the misleading impression that the growth in supposedly active users would contribute to future TPV growth (from these NNAs transacting at a meaningful level on PayPal's system) and future revenue and profit from PayPal's additional services (*i.e.*, of PayPal generating revenue and profit as a Super App).  Additionally, touting PayPal's NNA growth, without disclosing that this growth was largely dependent on promotional activity, left investors

with the misleading impression that PayPal was able to organically generate new users, when in reality, PayPal was essentially buying these users with promotional dollars.  Further, touting PayPal's NNA growth while telling investors that the Company was "investing heavily" in its marketing and customer acquisition and engagement strategies created the misleading impression that PayPal's NNAs would consist of legitimate and engaged users.  These misleading statements were material to investors because they overstated PayPal's prospects of generating future NNA growth, revenue, and profit.

(c)     **Statements Touting NNA Results That Included "Illegitimate Accounts."**  Several of the statements touting NNA growth identified below were false or misleading because they counted illegitimate bot-accounts as legitimate NNAs.  As Defendants would ultimately admit, this was improper because such accounts should not be counted toward the NNA figures, as these accounts were not actually net new active users.  The inclusion of illegitimate accounts inflated PayPal's NNA numbers, which was material to investors because the NNA figure was one of PayPal's key performance indicators, and inflating the NNA results left investors with the misleading impression that the growth in supposedly active users would contribute to future TPV growth (from these NNAs transacting at a meaningful level on PayPal's system) and future revenue and profit from PayPal's additional services (*i.e.*, of PayPal generating revenue and profit as a Super App).  Additionally, inflating the NNA results concealed the risk that PayPal would later disclose significantly worse NNA numbers — an occurrence that was sure to negatively affect PayPal's stock — when PayPal either came clean regarding the illegitimate NNAs (as it did in revealing the 4Q2021 results) or as these accounts "churned" after a year of inactivity, such that they would offset legitimate future NNA growth.

(d)    **Statements Touting NNA Future Growth and NNA Guidance**.  Several of the false or misleading statements identified below provided or confirmed PayPal's guidance as to future NNA growth.  These statements were misleading due to the omission of two different pieces of information.  First, these statements were misleading because they endorsed the significance of the guided NNA figures, without disclosing that the NNA growth was, and was expected to be, driven by promotional activity that generated "minimally engaged" users.  This undisclosed information was material to investors because it left investors with the misleading impression that the growth in supposedly active users would contribute to future TPV growth (from these NNAs transacting at a meaningful level on PayPal's system) and future revenue and profit from PayPal's additional services (*i.e.*, of PayPal generating revenue and profit as a Super App).  Second, many of the statements touting NNA guidance misleadingly represented that NNA guidance would be achievable, without disclosing either (1) the enormous risk that the illegitimate accounts included in PayPal's NNA results would need to be removed, such that PayPal would not meet the stated guidance, or (2) that PayPal's NNA guidance was dependent on promotional activity that generated enormous numbers of illegitimate accounts that could not properly be counted as part of the NNA figure, such that to meet the guidance, PayPal would need to defraud investors by misleadingly counting illegitimate accounts as part of its NNA results.

(e)    **Statements Touting Engagement or Churn**.  Several of the false or misleading statements identified below touted engagement with PayPal's services by NNAs and/or actual or expected reductions in churn due to such engagement.  These statements were false or misleading because PayPal's NNAs were not highly engaged, and indeed were "minimally engaged," and largely signed up for PayPal to secure promotional dollars, which

resulted in the "vast majority" of PayPal's TPV being derived from just "one third" of accounts.  Overstating the degree of engagement was material to investors because it both (1) misrepresented the prospect of PayPal's NNAs' contribution to future TPV growth (from these NNAs transacting at a meaningful level on PayPal's system) and future revenue and profit from PayPal's additional services (*i.e.*, of PayPal generating revenue and profit as a Super App), and (2) left investors with the misleading impression that PayPal was able to organically generate new users (because those users were interested in using PayPal's services) when, in reality, PayPal was essentially buying these users with promotional dollars.

208.    The false or misleading statements are described below in chronological order.

### 1.  Fourth Quarter Fiscal 2020 Results – February 3, 2021

209.    On February 3, 2021, after the market closed, PayPal reported its financial results on Form 8-K for the fourth quarter and full fiscal year ended December 31, 2020.  The 4Q2020 and Full Year 2020 8-K stated:

> *"FY'21: Expect ongoing momentum with strong TPV growth and NNAs . . . ~50 million NNAs expected to be added to PayPal's platform in FY'21."*

210.    The statements in the prior paragraph were misleading because they: (1) touted PayPal's TPV figures while omitting related information as described in ¶207(a); and (2) touted PayPal's future NNA growth while omitting related information as described in ¶207(d).

211.    On February 3, 2021, after the market closed, PayPal reported its financial results for the fourth quarter and full fiscal year ended December 31, 2020.  PayPal's Investor Update presentation reiterated its NNA guidance for 2021:

## FY-21 Guidance
### Expect ongoing momentum with strong TPV growth and NNAs

| Revenue (in billions) | ~$25.5 |
| --- | --- |
| Revenue Growth (Spot) | ~19% |
| Non-GAAP EPS Growth | ~17% |
| Free Cash Flow (in billions) | ~$6.0 |

- Non-GAAP effective tax rate of ~17-19%
- CAPEX ~3% of revenue
- GAAP EPS of ~$3.20

- **TPV:** Expect **TPV growth in the high 20's** on a percentage basis
- **NNAs:** Expect to add ~50 million NNAs in FY-21
- **Revenue:** Expect ~19% spot and ~17% FX-neutral revenue growth
  - Expect variability in revenue and earnings growth rates from quarter-to-quarter with Q1-21 representing the highest level of growth
  - Factors impacting the cadence of quarterly expectations include: lapping 2020 performance, cadence of investments/product introductions, travel & events recovery, credit
  - **eBay impact:** Revenue outlook includes expected ~4pts of headwind from eBay's managed payments transition
- **Op margins:** Expect **modest non-GAAP operating margin expansion** while balancing investment in organic growth with operating efficiencies
- Expect higher interest expense and a higher tax rate (relative to FY-20) to offset much of the non-GAAP earnings benefit from op margin expansion; expect OI&E to be a net expense through FY-21
- Expect Non-GAAP EPS growth of ~17% and GAAP EPS of ~$3.20, compared to $3.54 in FY-20, which benefitted from $1.24 in net gains on strategic investments

Non-GAAP EPS is a Non-GAAP financial measure. Please see the Supplemental Information for a reconciliation of this Non-GAAP financial measure to the most directly comparable GAAP financial measure

**PayPal**   ©2021 PayPal Holdings Inc.                                                                                                  Q4-20 Investor Update · 21

212.     The statements in the prior paragraph were misleading because they: (1) touted PayPal's TPV figures while omitting related information as described in ¶207(a); and (2) touted PayPal's future NNA growth while omitting related information as described in ¶207(d).

213.     On February 3, 2021, after the market closed, PayPal reported its financial results for the fourth quarter and full fiscal year ended December 31, 2020.  That same day, the Company hosted a conference call to discuss its quarterly results.  During the call, CEO Schulman stated:

> In the quarter, we added 16 million net new active customers, including an incremental 1.4 million new merchants. For the year, we delivered a record 73 million net new actives, ending the year with 377 million active accounts, up 24%. We now have over 29 million merchants interacting with nearly 350 million consumers. ***In 2021, we expect to add another 50 million net new active accounts.***
>
> Equally important, our daily active users remain elevated versus a year ago, up 29% from Q4 of 2019. Our expanding scale and increasing engagement drove a record 4.4 billion transactions in the quarter, up 27%. Our total payment volumes in Q4 were $277 billion, up 36% on an FXN basis.

214.     The statements in the prior paragraph were misleading because they touted PayPal's future NNA growth while omitting related information as described in ¶207(d).

215.    On February 3, 2021, before the market opened, PayPal reported its financial results for the fourth quarter and full fiscal year ended December 31, 2020.  That same day, the Company hosted a conference call to discuss its quarterly results.  During the call, CFO Rainey stated:

> I'd now like to discuss our guidance for the full year and the first quarter. We've just completed the strongest year in our history, achieving record growth in net new accounts, volume, revenue, operating income, earnings and free cash flow. We delivered these results while absorbing meaningful macroeconomic headwinds affecting our credit business, the revenue and income effects of lower interest rates, idiosyncratic pressure on the travel and events verticals and the initial step down of volumes from eBay post operating agreement.
>
> These headwinds persist as we move into 2021, and yet, ***our core business continues to perform at unprecedented levels. Our addressable opportunity has never been more expansive***, and we're confident we've never been better positioned to capture the benefits of this accelerated secular growth.

216.    The statements in the prior paragraph were misleading because Defendants touted the "unprecedented" performance of PayPal's "core business" and that PayPal's "addressable market" had "never been more expansive" without disclosing that PayPal's NNA growth was not derived from demand for its services, but from heavy promotional activity.  The statements were also misleading because Defendants failed to disclose that its addressable market was more limited than represented, since just "one third" of accounts accounted for the "vast majority" of TPV.  These statements were therefore misleading for the reasons stated in ¶207(a), ¶207(d), and ¶207(e).

217.    On February 3, 2021, after the market closed, PayPal reported its financial results for the fourth quarter and full fiscal year ended December 31, 2020.  That same day, the Company hosted a conference call to discuss its quarterly results.  During the call, in response to an analyst's question on the drivers of additional net new accounts, CEO Schulman stated:

74

Yes. Yes, Darrin, I think when we look at the cohort of net new actives from last year, it's clearly incremental people coming on. The -- over 50 demographic, 50 years old demographic, one of our strongest growth vectors that we've had. So you're really seeing new demographics come onto the platform. But what's really interesting to me is the engagement metrics of that cohort are also up substantially. *We have double-digit increases in value for net new actives. Our 90-day engagement rates are up 13% plus over traditional cohorts.*

218.    The statements in the prior paragraph were misleading because they touted strong engagement from new accounts, when PayPal was actually securing a high number of "minimally engaged" users due to its increased use of promotional activity, and therefore these statements were misleading for the reasons stated in ¶207(e).

219.    On February 3, 2021, after the market closed, PayPal reported its financial results for the fourth quarter and full fiscal year ended December 31, 2020.  That same day, the Company hosted a conference call to discuss its quarterly results.  During the call, in response to an analyst's question on the drivers of additional of net new accounts, CEO Schulman explained:

But our TPA, which is a real measure of engagement, normalized basis would have grown 11.5%, like that's above any trend line that we have up to about 45.1x a year. *And so our churn rates, in general, because of that, are coming down. And when you have a base as big as ours right now, it is as much, maybe even more about the churn rate than it is the new ads coming in. There is plenty of demand to come on to our platform.*

*But when we see churn reduction like we're seeing right now because of increased engagement, and that increased engagement is coming because people are just moving online and because we have these new products that are out right now* that people are just using a ton of more like crypto is a great example. Everyone who is signed on crypto is opening up their wallet app, 2x the level of what they did previous.

*And so I think that 50 million is a real good guide right now. We'll obviously update as we go on. But we're seeing a lot of really encouraging trends in the underlying cohorts that we're bringing on, which gives a lot of confidence to that 50 million number.*

220.    The statements in the prior paragraph were misleading because they: (1) touted PayPal's future NNA growth while omitting related information as described in ¶207(d); and (2)

touted supposed "increased engagement" and reduced churn, while omitting related information as described in ¶207(e).

221.    On February 3, 2021, after the market closed, PayPal reported its financial results for the fourth quarter and full fiscal year ended December 31, 2020.  That same day, the Company hosted a conference call to discuss its quarterly results.  During the Q&A portion of the call, in response to an analyst's question about PayPal's engagement and its aspirations of becoming a Super App, CEO Schulman stated:

> So let me just very quickly say that **we are seeing engagement levels already**. I talked about it. **If you normalize for Honey and all the incremental net new actives that we brought in that are bending our traditional curves.** We've never really been above 9% or 10%. **Normalized, we're at about 11.5% of growth**. Our churn rates are down. **All of the new functionality that we've put into place, whether that be crypto or that be buy now, pay later, the Venmo card, QR codes are adding to usage.**

222.    The statements in the prior paragraph were misleading because they touted supposed high engagement levels, and specifically high engagement numbers from NNAs, which was untrue and misleading as described in ¶207(e).

223.    On February 5, 2021, Defendants filed PayPal's 10-K for the fiscal year ended December 31, 2020.  CEO Schulman and CFO Rainey certified this filing.  PayPal's 2020 10-K stated:

> **P2P is a significant customer acquisition channel that facilitates organic growth** by enabling potential PayPal users to establish active accounts with us at the time they make or receive a P2P payment.

224.    The statements in the prior paragraph were misleading because the statement is referring to PayPal generating NNAs through person-to-person money transfers as a major source of "organic growth," without disclosing that the new accounts generated through P2P transactions were largely the result of promotional activity that generated low value "minimally engaged"

NNAs and were not legitimately generating "organic growth." Thus, these statements were

misleading for the reasons stated in ¶207(d)-(e).

### 2.  Investor Day – February 11, 2021

225.    On February 11, 2021, CEO Schulman, CFO Rainey, and Defendant Auerbach

presented at PayPal's Investor Day.  CEO Schulman stated:

> And so the first thing that I would point out is, obviously, we've grown our scale
> substantially. We've gone from 180 or so million active accounts in 2015 to 377
> million exiting 2020. This is the first time we're going to talk about a metric, but
> I'm very excited that *over the next 5 years, we believe we can grow this 377 million
> to 750 million active accounts on our platform.*
>
> And the reason we feel so confident about that is that *we are seeing engagement
> levels increase dramatically throughout our base especially with the new products
> that we've put out. Over the past 5 years, we've seen engagement levels grow by
> 1.5x. But given the success we've seen with the introduction of things like
> cryptocurrency, our off-line or in-store strategies, our buy now, pay later
> capabilities, we are seeing historic engagement curves start to bend and
> accelerate.*
>
> And that's especially important because those do 2 things. One, they obviously
> increase the average revenue per user. And we expect that to grow substantially
> over the next 5 years. *And at the same time, it also reduces our churn rate. And
> as we get larger and larger, the more our churn rate reduces, the more our net
> new active cohorts can grow.*

226.    The statements in the prior paragraph were misleading because they: (1) touted

PayPal's future NNA growth while omitting related information as described in ¶207(d); and (2)

touted supposed "dramati[c]" increases in engagement and reduced churn, which was untrue and

misleading as described in ¶207(e).

227.    On February 11, 2021, CEO Schulman, CFO Rainey, and Defendant Auerbach

presented at PayPal's Investor Day.  CEO Schulman stated:

> First of all, the average revenue per user goes up quite dramatically over the next 5
> years and our churn rate comes down. *We are already seeing our churn rate come
> down quite meaningfully, for instance, in Q4 of last year. And you think about
> that, when you're as big as we are, churn matters a time (sic). I mean, you reduce
> churn by 10, 20 basis points, you can reduce the number of people coming out of*

*the bottom of the funnel by 5 million, 10 million, 15 million, 20 million. And so as our churn starts to reduce and our engagement goes up, our cohorts start to go up as well, our net new active cohorts*. And so that's one place we'll get it.

228.    The statements in the prior paragraph were misleading because they touted supposed reductions in churn, while omitting related information as described in ¶207(e).

229.    On February 11, 2021, CEO Schulman, CFO Rainey, and Defendant Auerbach presented at PayPal's Investor Day.  Defendant Auerbach stated:

> And third, *we added roughly 73 million net new actives to PayPal in 12 months*. So we start 2021 with essentially 25% more customers than we started last year. *And these new cohorts are using PayPal more than the old cohorts did, which is a remarkable accomplishment. But it's not simply due to the pandemic. We've gotten much better as a company in generating and engaging high-quality net new actives.* So yes, 2020 was a phenomenal year for us. Some of it was due to the great tailwinds we saw, but *if we weren't really ready to capitalize on the massive shift to digital globally, you wouldn't be seeing the record number of product introductions, NNAs, customer engagement and volume coming on to our platform.*

230.    The statements in the prior paragraph were misleading because they: (1) touted PayPal's future NNA growth while omitting related information as described in ¶207(d); and (2) touted the "record number" of engagement and volume while omitting related information as described in ¶207(e).

231.    On February 11, 2021, CEO Schulman, CFO Rainey, and Defendant Auerbach presented at PayPal's Investor Day.  Defendant Auerbach also stated:

> *Fifth, we are much more programmatically driving new -- net new actives. And this is not simply a factor of -- COVID-19 is not simply a factor of marketing. We're getting much better at a company across PayPal through better user experiences, risk management, stronger ecosystem partnerships to drive NNAs on a sustainable basis.* And we're expanding our global reach in China, as we've talked about, in Japan, Mexico, Latin America. *We expect to double our current base of consumers or customers in the next 3 to 5 years, which brings us much closer to the goal of getting to 1 billion consumers on to our network.* And as Jim and Peggy shared earlier, having this amazing, global network and combining it with a fantastic merchant proposition enables us to actually approach merchants and help them increase their sales just by working with PayPal. *So what we're*

78

*doing on the consumer side, together with what we're doing on the merchant side, we think it's going to bring us to 1 billion consumers on the network and 100 million merchants.*

232.    The statements in the prior paragraph were misleading because they touted: (1) PayPal's future NNA growth while omitting related information as described in ¶207(e); and (2) touted PayPal's ability to "double [its] current base of consumers in the next 3 to 5 years," while omitting related information as described in ¶207(d).

### 3.  PayPal's Company Conference Presentation – March 2, 2021

233.    On March 2, 2021, during trading hours, PayPal hosted a "Company Conference." During that Conference, in response to an analyst question about "getting to [the] 750 million active user number," CFO Rainey stated:

> Yes. Yes. *Well, clearly, I think the plan that we laid out that doubles our customers over the next 5 years is something that we're very excited about. And it really comes through multiple forms.*
>
> *I'll start with one of the big efforts that we've made related to the increased engagement is to see a reduction in churn.* And so by extension of that, I mean some of the new customers that we're growing are where our core markets are today, where we have those customers. And so that's something that I think is going to drive or contribute to a lot of that growth.

234.    The statements in the prior paragraph were misleading because they: (1) touted PayPal's future NNA growth, and specifically claimed that growth would come through increased engagement and less churn, while omitting related information as described in ¶207(d); and (2) touted supposed increases in engagement and reductions in churn, while omitting related information as described in ¶207(e).

### 4. Evercore ISI's Payments and Fintech Innovators Forum – March 4, 2021

235.    On March 4, 2021, PayPal presented at the Evercore ISI's Payments and Fintech Innovators Forum.  During that conference, in response to an analyst question about "the biggest drivers of net new account growth," CFO Rainey stated:

> Sure. ***So we were excited to announce the plans over the next 5 years of doubling our net new actives. And a significant driver of that is actually reducing the churn of the existing customers that we have.*** In any given year, we do -- we have a significant customer, significant number of customers that churn. And part of the launching the new experiences of new products like buy now, pay later, crypto, getting into financial services, is to provide more means of engagement for that customer base so that they're interacting with us on a much more frequent basis, and then for -- more likely to use us in payments and not churn.
>
> ***So a big driver of that increase is reduced churn.*** I guess, secondarily to that, we've got some plans to grow in particular international markets, which also includes expanding Venmo internationally. ***So those are probably the 2 big drivers of the net new active growth.***

236.    The statements in the prior paragraph were misleading because they: (1) touted PayPal's future NNA growth, and specifically claimed that growth would come through increased engagement and less churn, while omitting related information as described in ¶207(d); and (2) touted supposed increases in engagement and reductions in churn, while omitting related information as described in ¶207(e).

### 5. Wolfe Fintech Forum – March 9, 2021

237.    On March 9, 2021, CEO Schulman presented at the Wolfe Fintech Forum.  During that conference, in response to an analyst question about user churn, engagement, and active user growth, Defendant Schulman stated:

> ***Well, when you're at 377-million-plus people on the platform, every basis point reduction in churn matters tremendously in terms of the number of net new actives that you can bring on to your platform. Obviously, we've got relatively consistent and even growing set of customers and merchants we want to come on to our platform at the top of the funnel.*** I think we brought on something like 5.3 million merchants last year. That was up over 100% year-over-year.

80

*And so we've got new demographics, new markets, new products that are attracting new customers at the top of that funnel.* But to me, what's really important is that we close down the bottom of the funnel where people drop out. *And there, there are a host of things that we're doing. And I'm really very encouraged by the results that we're seeing in terms of engagement. We've seen double-digit increases in our 2020 cohorts in terms of their customer lifetime value. Our 90-day engagement rates for last year's cohorts are up 13%.* Our daily active users are consistently up about 30% year-over-year. And if you adjust our transactions per active for Honey, which we don't include but it's in our denominator, and if you adjust like the number of net new access last year was 73 million. Typically, we're putting on about 35 million. If you said last year, we had done 35 million, and you looked at our transactions, if you adjust for those 2 things, our TPA was up 11.5%. *And so all of our kind of engagement curves are bending and accelerating.* And what I love is when they engage with our new products and services, like crypto, we are seeing people open the wallet 2x what they were previously our Buy Now, Pay Later, we're off to an incredibly rapid start there.

*But not only are we having all these first-time users coming on, but we're already seeing, like even in the first 3 months, like 40% reuse of Buy Now, Pay Later.* So -- and you've seen on things like in store, we have 50-plus incremental transactions when somebody starts using PayPal in store. *And so when you combine all those things together and you see kind of the reduction in churn and the increase in average revenue per user, those are pretty encouraging when I look at over what that will do over the next 1, 3, 5 years.*

238.    The statements in the prior paragraph are misleading because they (1) touted

PayPal's future NNA growth, and specifically claimed that growth would come from a "growing

set of customers," while omitting related information as described in ¶207(d); and (2) touted

supposed increases in engagement and reductions in churn, while omitting related information as

described in ¶207(e).

### 6.  First Quarter Fiscal 2021 Results – May 5, 2021

239.    On May 5, 2021, after the market closed, PayPal reported its financial results on

Form 8-K for 1Q2021.  The 1Q2021 8-K stated:

*Q1'21 Strongest first quarter results in PayPal's history. . . Added 14.5 million Net New Accounts (NNAs); ended the quarter with 392 million active accounts.*

\*\*\*

> ***FY'21: Raising NNAs, TPV, revenue, and earnings guidance . . . 52-55 million NNAs expected to be added in FY'21***.

PayPal attributed this to "***[s]ignificant customer growth and solid engagement . . .***

***14 million NNAs added, bringing total active accounts to 392 million, up 21%***."

240.    The statements in the prior paragraph were misleading because they: (1) touted PayPal's NNA Growth and PayPal's future NNA growth, while omitting related information as described in ¶207(b)-(d); and (2) touted "solid engagement," while omitting related information as described in ¶207(e).

241.    On May 5, 2021, after the market closed, PayPal reported its financial results for 1Q2021.  The corresponding Investor Presentation stated:

> "***Q1-21: Strongest Q1 in PayPal's History***" and "***+21% growth in active accounts to 329M; +14.5M net new actives (NNAs)***" and "***FY-21: Raising guidance on strong momentum . . . +52-55M NNAs expected in 2021; up from 50M at the start of 2021***."

242.    The statements in the prior paragraph were misleading because they touted PayPal's NNA growth and future NNA growth while omitting related information as described in ¶207(b)-(d).

243.    On May 5, 2021, after the market closed, PayPal reported its financial results for 1Q2021.  The following graphic was included in PayPal's corresponding Investor Presentation:



244.    The statements in the prior paragraph were misleading because they touted PayPal's NNA growth and future NNA growth while omitting related information as described in ¶207(b)-(d).

245.    On May 5, 2021, after the market closed, PayPal reported its financial results for 1Q2021.  The following graphic was included in PayPal's corresponding Investor Presentation:

## FY-21 Guidance

**Raising NNAs, TPV, revenue, and earnings on ongoing strength**

| Revenue ($B) | ~$25.75 |
| --- | --- |
| Revenue Growth (Spot) | ~20% |
| Non-GAAP EPS Growth | ~21% |
| Free Cash Flow ($B) | ~$6.0 |

*Percentages shown are year-on-year growth rates*

- Non-GAAP effective tax rate of ~14-16%
- Capex of ~3% of revenue
- GAAP EPS of ~$3.33

- **NNAs**: Expect to add 52-55 million NNAs in FY-21
- **TPV**: Expect TPV growth of ~+30% at spot and FXN
- **Revenue**: Expect revenue growth of ~+20% at spot and ~+18.5% FXN
  - **eBay impact**: Revenue guidance includes expected ~6pts of headwind from eBay's managed payments transition
- **Op Margins**: Expect to generate ~100bps of non-GAAP operating margin expansion
- **EPS**: Expect non-GAAP EPS growth of ~+21% to ~$4.70
  - GAAP and non-GAAP EPS guidance does not include any expectation of incremental adjustments to credit loss reserves
  - GAAP EPS guidance includes ~$0.09 of net realized and unrealized losses on PayPal's strategic investment portfolio
  - In 2020, GAAP EPS included a net unrealized gain of ~$1.24 on PayPal's strategic investment portfolio



Non-GAAP EPS, non-GAAP operating margin and free cash flow are non-GAAP financial measures. Please see the Supplemental Information for a reconciliation of these non-GAAP financial measures to the most directly comparable GAAP financial measures.

**PayPal** ©2021 PayPal Holdings Inc.                                                                                     Q1-21 Investor Update – 20

246.    The statements in the prior paragraph were misleading because they touted PayPal's NNA growth and future NNA growth while omitting related information as described in ¶207(b)-(d).

247.    On May 5, 2021, after the market closed, PayPal reported its financial results for 1Q2021.  That same day, the Company hosted a conference call to discuss its quarterly results. During this call, CEO Schulman stated:

> ***Our transactions in the quarter were approximately 4.4 billion, growing 34% year-over-year. We added 14.5 million net new active accounts, ending the quarter with 392 million active accounts, up 21% year-over-year. We added 1.4 million new merchants in the quarter, continuing the heightened pace from prior quarters***, and we now have 31 million merchant accounts on our platform. ***By the end of Q2, we expect to exceed 400 million active accounts. And for the year, we now believe our NNAs will be between 52 million to 55 million, up from our previous expectations of approximately 50 million last quarter.*** I'm particularly pleased to ***see our transactions per active account begin to accelerate due to increased engagement across our portfolio.***

\*\*\*

*We clearly have a lot of momentum as we exit Q1.* We will continue to accelerate new product innovation throughout the year. *Our increased expectations for 2021 reflect our conviction that we will continue to grow share and increase our addressable market by capitalizing on the accelerating shift to digital.*

248.     The statements in the prior paragraph were misleading because they touted PayPal's NNA growth and future NNA growth while omitting related information as described in ¶207(b)-(d).

249.     On May 5, 2021, after the market closed, PayPal reported its financial results for 1Q2021.  That same day, the Company hosted a conference call to discuss its quarterly results. During that call, CFO Rainey stated:

I'd also like to discuss our updated net new active outlook. We're raising our guidance for 2021 net new active accounts. *Based on the 14.5 million additional accounts in Q1 and our current trends, we now expect to add in the range of 52 million to 55 million net new users this year.* This is an increase from the 50 million net new actives that we guided to start the year. *On top of the approximately 73 million users added last year, at our current pace, we'll add more new users between last year and this year than we did in 2016, '17, '18 and '19 combined.*

250.     The statements in the prior paragraph were misleading because they touted PayPal's NNA growth and future NNA growth while omitting related information as described in ¶207(b)-(d).

251.     On May 5, 2021, after the market closed, PayPal reported its financial results for 1Q2021.  That same day, the Company hosted a conference call to discuss its quarterly results.  In the Q&A portion of the conference call, in response to a question from an analyst, CEO Schulman stated:

*And I think of the drivers, it's predominantly PayPal's, predominantly still in our core markets, still seeing great growth from Venmo. But my view on net new actives is I say without being too aggressive here, look, I think we have a lot of opportunity yet here. We have a lot of expansion into international markets. I think our marketing programs are really beginning to deliver excellent results. I think we're just scratching the surface there.*

252.    The statements in the prior paragraph were misleading because they touted the "excellent results" of PayPal's marketing programs, without disclosing that those marketing programs were bringing "minimally engaged" customers onto PayPal's platform, rather than generating engaged NNAs that were likely to contribute to future TPV and other sources of revenue.

253.    On May 5, 2021, after the market closed, PayPal reported its financial results for 1Q2021.  That same day, the Company hosted a conference call to discuss its quarterly results.  In the Q&A portion of the conference call, in response to a question from an analyst, CEO Schulman stated:

> *And so we're clearly beginning to see both at the top of the funnel, the potential for increases into the top of the funnel and really narrowing the bottom of the funnel, which is why I'm bullish on -- actually our NNA trends.*
>
> The one thing I'd point out, Darrin, that I think is really important is the cadence of those NNAs. Q1 was a good solid quarter for us. Q2 is always going to be the lowest quarter of the year because we did 21.4 million net new actives last year. Even though our churn rates are down, and that was one of the best cohorts we ever activated, it puts incremental pressure at the bottom of the funnel for Q2. *And then we see really increasing amounts of NNAs as we go through the year. So in general, really strong on the NNA front, really strong on the engagement front.* And hopefully, more of that to come.

254.    The statements in the prior paragraph were misleading because they: (1) touted PayPal's NNA growth and future NNA growth while omitting related information as described in ¶207(b)-(d); and (2) touted supposed increases in engagement and reductions in churn (*i.e.*, "narrowing the bottom of the funnel"), while omitting related information as described in ¶207(e).

255.    On May 5, 2021, after the market closed, PayPal reported its financial results for 1Q2021.  On May 6, 2021, after the market closed, Defendants filed PayPal's Form 10-Q for 1Q2021, which stated:

Transaction revenues grew by $1.4 billion, or 33%, for the three months ended March 31, 2021 compared to the same period of the prior year. *The increase was mainly attributable to our core PayPal products and services, and to a lesser extent Braintree products and services, due primarily to strong growth in TPV and the number of payment transactions, both of which resulted primarily from an increase in our active accounts.*

*\*\*\**

*We had 392 million active accounts as of March 31, 2021 compared to 325 million as of March 31, 2020, an increase of 21%. Number of payment transactions were 4.4 billion for the three months ended March 31, 2021 compared to 3.3 billion in the three months ended March 31, 2020, an increase of 34%. TPV was $285 billion for the three months ended March 31, 2021 compared to $191 billion in the three months ended March 31, 2020, an increase of 50%.*

256.    The statements in the prior paragraph were misleading because they: (1) touted PayPal's TPV figures, and in particular attributed that increase in TPV to an "increase in our active accounts," while omitting related information as described in ¶207(a); and (2) touted PayPal's NNA growth while omitting related information as described in ¶207(b)-(c).

### 7.  MoffettNathanson Analyst Call – May 10, 2021

257.    On May 10, 2021, during trading hours, CEO Schulman presented at MoffettNathanson's Analyst call.  During that call, in response to a question about PayPal's goal to achieve 750 million NNAs by 2025, CEO Schulman stated:

Yes. *Well, we had another good Q1, 14.5 million new customers coming in.* We raised guidance for net new actives, up from 50 million to 52 million to 55 million. *So we're clearly seeing more strength on that than we've imagined. We're going to end the year somewhere around 430 million net new actives assuming we stay relatively constant, maybe grow a little bit next year. I mean, you've got 0.5 billion people on the platform that's like within near-term [sight] and I think there are probably 3 or 4 things that give me a lot of confidence on the net new actives. And I think net actives will continue to grow year-over-year.*

*First of all, bottom of the funnel when you get to be closing in on 400 million net new actives, the bottom of the funnel, the churn is almost as important, if not more important than the top of the funnel. And the new products we're putting out are having a pretty big impact on engagement. In general, the move into a digital world is helping our daily active users were up 33% in the quarter. So we're seeing our churn rate come down. And I think we're just at the very beginning of what we can see churn rate drop to. Obviously, the more products*

*in services we put out more engagement, the more our churn will decrease. And even with a consistent level of top of the funnel, your net new actives will go up as a result.*

Second thing is, honestly, just streamlining the basics, and there's so much low-hanging fruit yet that we can do. Like our guest to member conversion flows, we have a ton of people that sign in guests but don't become members. That just needs to be a much smoother process for us. We can get a ton more net new actives by looking at that process. And of course, we are looking at that process. Our marketing programs are starting to kick in. *Our marketing team is really beginning to get their rhythm in terms of just reactivations, life cycle management and a number of things that are basic things, but we've been doing a, I'd say okay to good job, but not a great job yet. And clearly, we've got great in our sights on that.*

258.   The statements in the prior paragraph were misleading because they: (1) touted PayPal's NNA growth and future NNA growth while omitting related information as described in ¶207(b)-(d); (2) touted supposed increases in engagement and reductions in churn, while omitting related information as described in ¶207(e); and (3) touted the results of PayPal's marketing programs, without disclosing that those marketing programs were bringing "minimally engaged" customers onto PayPal's platform, rather than generating engaged NNAs that were likely to contribute to future TPV and other sources of revenue.

259.   On May 10, 2021, CEO Schulman presented at MoffettNathanson's Analyst call. During that call, an analyst asked the following question, to which CEO Schulman responded as stated below:

**Lisa Ann Dejong Ellis:** Actually, I had a quick follow-on on this topic, right off the bat out of the question list. So how do you highlight that -- starting to highlight now more of the top funnel versus the bottom of the funnel. So when you're thinking about investments, how do you think about balancing between new growth and retention?

**Schulman:** Well, I think they kind of go hand-in-hand because a lot of our new growth will come from new products coming into the portfolio. And those help on the bottom line as well. So new product innovation is clearly, one of my top focuses that we have as a company. And you've seen from kind of our increase in marketing spend and OpEx, product development. We're clearly going to invest into the

opportunity. There's so much potential for PayPal. ***We want to be 750 million, but everybody has heard me talk about -- our goal is to be 1 billion-plus users on our platform. You've got to invest into it. And we're quite measured in the way we think about investment. We've had very tight controls on OpEx, we still do. But when we see a real good ROI return, we're going to invest in it right now. And all of those numbers that we shared for our medium-term and short-term guidance contemplate significant investment in the business.***

260.    The statements in the prior paragraph were misleading because they: (1) touted PayPal's NNA growth and future NNA growth while omitting related information as described in ¶207(b)-(d); and (2) touted the results of PayPal's marketing programs, without disclosing that those marketing programs were bringing "minimally engaged" customers onto PayPal's platform, rather than generating engaged NNAs that were likely to contribute to future TPV and other sources of revenue — indeed, it was misleading to tout the "ROI" on PayPal's marketing activity given PayPal was essentially wasting money by offering promotional dollars to essentially buy "minimally engaged" accounts.

261.    On May 10, 2021, CEO Schulman presented at MoffettNathanson's Analyst call. During that call, CEO Schulman explained:

> ***But if you think about it, we are also putting on a lot more net new actives than we've ever put on before. We're typically averaging about 35 million, 37 million a year. We're up at now somewhere between 52 million and 55 million.***

262.    The statements in the prior paragraph were misleading because they touted PayPal's NNA growth and future NNA growth while omitting related information as described in ¶207(b)-(d).

### 8. J.P. Morgan's Payments and IT Services Sector Analyst Call – May 24, 2021

263.    On May 24, 2021, during trading hours, CFO Rainey presented at J.P. Morgan's Payments and IT Services Sector analyst call.  During that call, in response to an analyst question about the Company's increased NNAs, CFO Rainey stated:

Sure. *Well, to start with, we're seeing increases in net new actives across all parts of our business. And they skew heavily towards our core markets, U.S., Canada, U.K., Australia, Germany, markets like that. But also in a lot of emerging regions as well. The footprint of new users is relatively similar to what our existing footprint is. And Venmo continues to be a very large contributor to that. And certainly, as you see, the displacement of cash through enhanced P2P experiences, that's one of the best acquisition channels that we have for a new customer.*

*But we did put out a pretty grand target of 0.75 billion at our Investor Day. And I think that's going to come through a number of different ways, but I think very importantly is reducing churn. And very much tied to that is the increase in engagement that we expect to see from these new cohorts that are coming on. And irrespective of what cohort we're talking about, post pandemic, we see much elevated levels of engagement,* whether we look at like 10-day adoption rates or 90-day adoption rates. And this is exciting for us. And I think it's in part because of this push to e-commerce or digital payments that happened in part by necessity when people did not have mobility. But as we've said, we're not just going to sit back and wait on these secular trends that happen to us. We want to help shape them. And that's why we're adding so many new experiences as we look forward through the digital wallet, and I'm sure we'll talk about some of those things to increase those levels of engagement and reduce that churn over time.

264. The statements in the prior paragraph were misleading because they: (1) touted PayPal's NNA Growth and future NNA growth, while omitting related information as described in ¶207(b)-(d); and (2) touted "elevated levels of engagement," while omitting related information as described in ¶207(e).

265. On May 24, 2021, CFO Rainey presented at J.P. Morgan's Payments and IT Services Sector analyst call. During that call, CFO Rainey stated:

Yes. *So our customer acquisition cost, historically, has been very low. And that's in part because so many of our new customers come to us through the person-to-person type of experience. And as we noted in the first quarter, that was still our single largest contributor to customer acquisition. What we've done over the last, call it, 18 months is put much more rigor into the CLV component of that rather than chasing a low-value, net new active that maybe pumps up numbers and the optics look good, really looking at how they're going to contribute to the PayPal platform over time. And so overall, our CAC, or customer acquisition costs still remains very low. But we've been more targeting in some of the sales and marketing efforts around that.*

And so we noted in the back half of last year that we had intended to spend $300 million investing into PayPal, a lot of that through sales and marketing, and you likely saw that through some of the year-over-year increases. And some of that is targeted efforts around in-store QR code, things like that, but a lot of it is still around customer acquisition. ***And I'm always happy to spend money like this when I know what the return is going to be, and I've got a high degree of confidence in that. And so we're doing a better job there in our sales and marketing teams is really going out and acquiring those customers. And knowing what that return -- what that profile of customer is going to be over the next several years.***

266.    The statements in the prior paragraph were misleading because they: (1) touted PayPal's NNAs growth and engagement, by distinguishing the NNAs they were adding from "low-value, net new actives that maybe pump[] up numbers and optics," while omitting related information as described in ¶207(e); and (2) touted the results of PayPal's marketing programs, including by assuring investors that these marketing programs were targeted at creating legitimate customers, not "low-value, net new actives that maybe pump[] up numbers and optics" without disclosing that those marketing programs were bringing "minimally engaged" customers onto PayPal's platform, rather than generating engaged NNAs that were likely to contribute to future TPV and other sources of revenue.

267.    On May 24, 2021, CFO Rainey presented at J.P. Morgan's Payments and IT Services Sector analyst call.  During that call, CFO Rainey stated:

It is. ***It's up there with engagement as one of the top metrics that I'm looking at, particularly engagement tied to some of the new experiences that we're rolling out.*** But historically, our average revenue per user has been in the mid-50s and not really bounced around a whole lot from that range. It is -- it's something that we're very focused on improving over the next several years. We talked at Investor Day, if we can get that mid- or medium-gauged consumer or customer to get to the high gauge, that's a 2x opportunity for us on ARPU. ***And so this very much dovetails into like rolling out these new experiences to get people more engaged with us so that we can have more opportunities for them to use us in a way that we can benefit and monetize.***

268.    The statements in the prior paragraph were misleading because they touted engagement, while omitting related information as described in ¶207(e).

**9. Bank of America Securities Keynote Session – June 9, 2021**

269.    On June 9, 2021, during trading hours, CEO Schulman presented at a Bank of America Securities keynote session.  During that call, in response to an analyst question on PayPal's NNA metric, CEO Schulman stated:

> Yes. Well, net new actives, it's a math equation. It's sort of top of the funnel, what is demand, new demand coming in minus churn, what's coming out of the bottom of the funnel. And clearly, as we get bigger and bigger -- we're 400 million-or-so people on the platform now. That's a pretty huge number, and so the bottom of the funnel is extremely important to manage.
>
> ***Look, demand -- we're seeing consistent demand for our services, maybe even growing demand. We put on, I think, 2 new customers every second last quarter.*** We put on a new merchant every 5 seconds last quarter. ***We're seeing new segments of the population.*** And man, silver tech, more of -- greater than 50 years old is still flocking to the platform. ***We're seeing more and more use of the platform. We're going into more and more countries.*** We'll expand Venmo internationally. I mean there's so many things we can do better at top of the funnel. ***Our marketing is finally starting to kick in, in ways that we can really measure and look at it, invest wisely and get a return on that and bring in high-quality net new actives at the top of the funnel.***
>
> In churn, churn is really all about how do we reduce that. It's really more about new products coming in, new use cases, beautiful experiences so that people want to use our platform not 4 times a month but every single day. That's clearly the goal that we have. And if we get anywhere close to that, our net new active numbers are going to increase dramatically from what already are, as you mentioned, pretty good numbers in terms of the NNAs.
>
> And I would say, as I look at the year, I'm feeling really good about the year. ***This quarter -- we've always had a forecast or target about 11 million or so. I think we'll be right around there and maybe a little bit above. We said we were going to be 52 million to 55 million for the year. I would bet that we're going to be closer to the high end of that range than we are to the low end of that range. And so I'm feeling really good about our progress on NNAs, our transactions per active going up really nicely, and I'd expect that to continue.***

270.    The statements in the prior paragraph were misleading because they: (1) touted PayPal's NNA Growth and future NNA growth while omitting related information as described in ¶207(b)-(d); and (2) touted supposed increased engagement and demand, while omitting related information as described in ¶207(e).

**10. Second Quarter Fiscal 2021 Results – July 28, 2021**

271.     On July 28, 2021, at market close, PayPal reported its financial results for 2Q2021.

The corresponding Investor Update presentation included the following graphic:



272.     The statements in the prior paragraph were misleading because they (1) they touted PayPal's TPV figures while omitting related information as described in ¶207(a); and (2) touted PayPal's future NNA growth while omitting related information as described in ¶207(b)-(d).

273.     On July 28, 2021, at market close, PayPal reported its financial results for 2Q2021. The corresponding Investor Update presentation included the following graphic:



274.    The statements in the prior paragraph were misleading because they: (1) they touted PayPal's TPV figures while omitting related information as described in ¶207(a); (2) touted PayPal's NNA growth and future NNA growth while omitting related information as described in ¶207(b)-(d); and (3) touted supposed "increased engagement" and reduced churn, while omitting related information as described in ¶207(e).

275.    On July 28, 2021, at market close, PayPal reported its financial results for the 2Q2021.  The corresponding Investor Update presentation included the following graphic:

## FY-21 Guidance
### Raising TPV and reaffirming revenue outlook

| | |
|---|---|
| Net Revenue ($B) | ~$25.75 |
| Net Revenue Growth (Spot) | ~20% |
| Non-GAAP EPS Growth | ~21% |
| Free Cash Flow ($B) | >$5.0 |

*Percentages shown are year-on-year growth rates*

- Non-GAAP effective tax rate of ~12%-14%
- Capex of ~3% of revenue
- GAAP EPS of ~$3.49

- **NNAs:** Expect to add 52-55 million NNAs in FY-21
- **TPV:** Expect TPV growth to be in the range of ~33%-35% on a spot and FXN basis
  - +3-5 points vs. prior guidance of ~30% on the same basis
- **Revenue:** Expect revenue growth of ~20% at spot and ~18.5% FXN
  - Includes an expected ~7 point drag to growth from eBay Marketplaces
- **Non-GAAP Operating Margin:** Expect flat to modest expansion
- **EPS:** Expect non-GAAP EPS growth of ~21% to ~$4.70
  - GAAP EPS guidance includes a net gain of ~$0.11 on PayPal's strategic investment portfolio
  - In 2020, GAAP EPS included a net gain of ~$1.24 on PayPal's strategic investment portfolio

276.    The statements in the prior paragraph were misleading because they (1) touted PayPal's TPV figures while omitting related information as described in ¶207(a); and (2) touted PayPal's future NNA growth while omitting related information as described in ¶207(b)-(d).

277.    On July 28, 2021, at market close, PayPal reported its financial results for the 2Q2021. That same day, after the market closed, the Company hosted a conference call to discuss its quarterly results. During that call, CEO Schulman stated:

> Excluding eBay, our volumes grew by a remarkable 48% on a spot basis. ***Our active accounts now exceed 400 million, up 16% and to 403 million. We added 11.4 million net new active accounts in the quarter***, including an additional 1.5 million merchant accounts. That brings our total merchant count to 32 million. ***We still expect to end the year at the higher end of our previous guidance of 52 million to 55 million net new active accounts.***
>
> Transactions in the quarter grew by 27% to $4.74 billion. ***And even as our net new actives continue to show strong growth, our transactions per active account accelerated 11% in the quarter to 43.5x as our consumers engage more frequently across our growing suite of services.*** We grew our revenues by 19% to $6.4 billion. This growth comes even as we lap strong results from last year and absorbed 811 basis points of revenue pressure from eBay, as their revenues on our platform declined 51% in Q2.

278.    The statements in the prior paragraph were misleading because they: (1) touted PayPal's NNA growth and future NNA growth while omitting related information as described in

¶207(b)-(d); and (2) touted supposed "increased engagement" and reduced churn, while omitting

related information as described in ¶207(e).

279.    On July 28, 2021, at market close, PayPal reported its financial results for the

2Q2021.  That same day, after the market closed, the Company hosted a conference call to discuss

its quarterly results.  During that call, CFO Rainey stated:

> I'd now like to discuss our outlook for the rest of 2021. ***Our business is performing exceedingly well and overall, consistent with the outlook we provided on our last call. Given our strong year-to-date performance and our expectations for the back half, we're raising our TPV outlook and reiterating full year revenue and earnings. We now expect TPV growth to be in the range of 33% to 35% given the strong volume trends in our business.***
>
> ***
>
> ***Overall, our growth remains strong.*** And importantly, we continue to see the categories that benefited from quarantine measures and shelter-in-place activities last year maintain higher levels of e-commerce volumes in comparison to pre-COVID levels. Our conviction and our ability to drive sustainably strong performance and in the strength of our franchise has never been greater.
>
> ***This year, we expect to process approximately $1.25 trillion of payments volume. We expect to grow revenue by 20%, more than offsetting pressure to revenue growth of approximately 7 points from eBay and lapping our strongest year with 22% revenue growth.*** And given the momentum we have in development and innovation, and the pace of scale of the new experiences we're bringing to our customers, we are investing in our business at record levels. Further, last year, we grew earnings 31%. On top of that performance, this year, we plan to grow our earnings by 21%.

280.    The statements in the prior paragraph were misleading because they touted

PayPal's TPV figures while omitting related information as described in ¶207(a).

281.    On July 29, 2021, after the market closed, Defendants filed PayPal's Form 10-Q

for 2Q2021, which stated:

> Transaction revenues grew by $852 million, or 17%, and $2.3 billion, or 25%, for the three and six months ended June 30, 2021, respectively, compared to the same periods of the prior year. ***The growth in transaction revenues was mainly attributable to our core PayPal and Braintree products and services driven by***

*strong growth in TPV and the number of payment transactions, both of which resulted primarily from an increase in our active accounts.*

\*\*\*

*We had 403 million active accounts as of June 30, 2021 compared to 346 million as of June 30, 2020, an increase of 16%.* Number of payment transactions were 4.7 billion for the three months ended June 30, 2021 compared to 3.7 billion in the three months ended June 30, 2020, an increase of 27%. Number of payment transactions were 9.1 billion for the six months ended June 30, 2021 compared to 7.0 billion in the six months ended June 30, 2020, an increase of 30%. *TPV was $311 billion for the three months ended June 30, 2021 compared to $222 billion in the three months ended June 30, 2020, an increase of 40%. TPV was $596 billion for the six months ended June 30, 2021 compared to $412 billion in the six months ended June 30, 2020, an increase of 45%.*

282.    The statements in the prior paragraph were misleading because they: (1) touted

PayPal's TPV figures while omitting related information as described in ¶207(a); and (2) touted

PayPal NNA growth while omitting related information as described in ¶207(b)-(c).

**11. Deutsche Bank Fireside Chat – September 9, 2021**

283.    On September 9, 2021, during trading hours, CFO Rainey presented at a Deutsche

Bank fireside chat.  In response to an analyst question on how PayPal will achieve its $750

million NNA target over the next four years, CFO Rainey stated:

> Well, I think it's important to step back and think about the composition of net new actives. And so net new actives is a function of 3 things. It's new activations plus reactivations, and then we subtract up churn and improving a lot of focus on new activations. And we saw that during the height of the shelter-in-place during COVID early last year.
>
> *But a lot of our focus, a lot of our rigor, the data science that we provide around this is around reactivations and churn.* Reactivations are actually a great opportunity for us because we already have that customer's payment credentials vaulted with us. And so there's a lot less friction in reactivating the customer versus activating a new customer.
>
> On the churn side, look, it's not something that we disclose, but you can make your own assumption. With 400 million customers around the world, the churn numbers can be pretty large each year. *And so a lot of the focus that we have, not only this year but going forward, is to keep those customers engaged and allow them to*

*use us in many different ways, many avenues that they haven't before to diminish that chance for churn.*

*And so as we look forward over the coming years, as we add capabilities into the digital wallet, things like crypto, things like investing, buy now, pay later, all of these things are key drivers that increase in engagement and therefore, decrease churn.*

284.    The statements in the prior paragraph were misleading because they touted PayPal's strong engagement and decreased churn driven by demand for PayPal's products, while omitting related information as described in ¶207(e).

### 12. J.P. Morgan All Stars Conference – September 23, 2021

285.    On September 23, 2021, during trading hours, Defendant Schulman presented at J.P. Morgan's All Stars Conference.  During this conference, CEO Schulman stated:

Yes. Look, we gave guidance for the quarter. *I think we'll be right down the middle of the fairway in all the guidance that we talked about. Things are coming in pretty much where we expected them to be for the quarter.* And so my view is the world move towards digital.

286.    The statements in the prior paragraph were misleading because they touted PayPal's future NNA growth while omitting related information as described in ¶207(d).

### 13. Third Quarter Fiscal 2021 Results – November 8, 2021

287.    On November 8, 2021, at market close, PayPal reported its financial results on Form 8-K for 3Q2021.  The corresponding Investor Update presentation included the following graphic:



288.    The statements in the prior paragraph were misleading because they (1) touted PayPal's TPV figures while omitting related information as described in ¶207(a); and (2) touted PayPal's NNA growth — including by counting at least 4.5 million illegitimate accounts in the reported NNA results, while omitting related information as described in ¶207(b)-(d).

289.    On November 8, 2021, at market close, PayPal reported its financial results for 3Q2021.  The same day, after the market closed, the Company hosted a conference call to discuss its quarterly results.  During this call, CEO Schulman stated:

> *Our active accounts were up 15% year-over-year, reaching 416 million. We added 13.3 million net new active accounts in the quarter, including another 1.2 million merchant accounts, bringing our total merchant account to 33 million. And we remain on track to deliver more than 52 million NNAs for the year. Importantly, our diverse suite of products and services drove double-digit growth in our transactions per active account, up 10% to 44.2x.*

290.    The statements in the prior paragraph were misleading because they touted PayPal's NNA growth — including by counting at least 4.5 million illegitimate accounts in the

reported NNA results — and future NNA growth, while omitting related information as described in ¶207(b)-(d).

291.    On November 8, 2021, at market close, PayPal reported its financial results for 3Q2021.  The corresponding Investor Update presentation included the following graphic:



### FY-21 Guidance
**Revenue expected to grow ~18% and end the year with >430M active accounts**

| Net Revenue ($B) | $25.3-$25.4 |
| --- | --- |
| Net Revenue Growth (Spot) | ~18% |
| Non-GAAP EPS Growth | ~19% |
| Free Cash Flow ($B) | ~$5.2 |

*Percentages shown are year-on-year growth rates*

- Non-GAAP effective tax rate of ~12%
- Capex of ~4% of revenue
- GAAP EPS of ~$3.62

- **NNAs:** Expect to add ~55 million NNAs in FY-21, including ~3 million active accounts added from the acquisition of Paidy
- **TPV:** Expect TPV growth to be in the range of ~33%-34% on a spot and ~31%-32% FXN basis
    - Excluding eBay, TPV expected to grow ~39%
- **Revenue:** Expect revenue growth of ~18% at spot and ~17% FXN, which includes eBay revenue decline of ~$1.4B
    - Excluding eBay, revenue expected to grow ~28%
- **Non-GAAP Operating Margin:** Expect in-line with prior year
- **EPS:** Expect non-GAAP EPS growth of ~19% to ~$4.60
    - GAAP EPS guidance includes a net gain of ~$0.24 on PayPal's strategic investment portfolio
    - In 2020, GAAP EPS included a net gain of ~$1.24 on PayPal's strategic investment portfolio

Non-GAAP EPS, non-GAAP operating margin and free cash flow are non-GAAP financial measures. Please see the Supplemental Information for a reconciliation of these non-GAAP financial measures to the most directly comparable GAAP financial measures.

**PayPal** ©2021 PayPal Holdings Inc.                    Q3-21 Investor Update • 24

292.    The statements in the prior paragraph were misleading because they (1) touted PayPal's TPV figures while omitting related information as described in ¶207(a); and (2) touted PayPal's NNA growth — including by counting at least 4.5 million illegitimate accounts in the reported NNA results — and future NNA growth, while omitting related information as described in ¶207(b)-(d).

293.    On November 8, 2021, at market close, PayPal reported its financial results for 3Q2021.  The same day, after the market closed, the Company hosted a conference call to discuss its quarterly results.  During this call, CFO-Rainey stated:

> To give you a better sense of the scale of growth we've experienced, it took 20 years for PayPal to reach $600 billion in annual payment volume, which occurred in 2019. Only 2 years later, we crossed $1.2 trillion. ***Relative to 2019, we've seen***

***significant growth across our key performance indicators, including active accounts, engagement, TPV, revenue, EPS and free cash flow.***

294.    The statements in the prior paragraph were misleading because they (1) touted PayPal's TPV figures while omitting related information as described in ¶207(a); (2) touted PayPal's NNA growth — including by counting at least 4.5 million illegitimate accounts in the reported NNA results — while omitting related information as described in ¶207(b)-(d); and (3) touted supposed growth in engagement, while omitting related information as described in ¶207(e).

295.    On November 8, 2021, at market close, PayPal reported its financial results for 3Q2021.  The same day, after the market closed, the Company hosted a conference call to discuss its quarterly results.  During this call, CFO Rainey stated:

> ***In providing quarterly and annual guidance since July of last year, our goal has been to responsibly balance transparency with reliability and certainty.*** At the same time, we've also tried to emphasize the complexity of forecasting in this environment. We are taking what we view to be a prudent step in adjusting our outlook. ***But let me be very clear, our key strategic initiatives are on track and performing very well. The initial response to our new digital wallet experiences has been very strong,*** and the implementation of our new headline pricing in the U.S. has been successful with no discernible impact to merchant activity.
>
> The underlying strength, diversification and resilience of our business on an absolute level and relative to pre-pandemic are unassailable and position us to remain on offense regardless of short-term headwinds. ***Our ability to sustainably deliver strong growth at our scale is indicative of the network effects of our business and our competitive positioning as a global leader in digital payments at the intersection of the powerful secular tailwinds of e-commerce penetration and cash displacement has never been stronger.***

296.    The statements in the prior paragraph were misleading because they touted PayPal's future NNA growth, while omitting related information as described in ¶207(d).

297.    On November 8, 2021, at market close, PayPal reported its financial results for 3Q2021.  The same day, after the market closed, the Company hosted a conference call to discuss its quarterly results.  During this call, CEO Schulman stated:

Well, let me talk a little bit about NNAs. *So 13.3 million in the quarter, up about 2 million from last quarter, growing 15% year-over-year, unlike a lot of companies that experienced growth in the off time and then are unwinding.*

*Our growth remains incredibly strong on the NNA side.* I mean, think about it in the minute that we've been talking so far, Darren. *We've got -- we put on about 100 consumers and 9 new merchants. We are putting on 1.5 consumers every second of the quarter, every 6 seconds we put on another merchant.* It's really unbelievable. And if I look 5 years ago, and you remember this, 5 years ago, we put on 13 million net new actives for the year. *This quarter alone, and we put on 110 million net new actives since January of 2020. And as we said, I think, in our press release, we expect to end the year north of 430 million actives on the platform. So obviously, continued strong growth.*

298.    The statements in the prior paragraph were misleading because they touted PayPal's NNA growth — including by counting at least 4.5 million illegitimate accounts in the reported NNA results — and future NNA growth, while omitting related information as described in ¶207(b)-(d).

299.    On November 8, 2021, at market close, PayPal reported its financial results for 3Q2021.  The same day, after the market closed, the Company hosted a conference call to discuss its quarterly results.  During this call, CEO Schulman stated:

But as we look forward to that []750 million, Darren, there are 2 places that our net new actives come from. One is top of the funnel, and top of the funnel is actually pretty strong right now and remain so. It's a kind of a must-have platform for merchants and consumers, and scale begets scale in this business. But as you get bigger and bigger, the bottom of the funnel becomes equally -- it's not even more important. *And so reduction in churn becomes a really important element of our ability to get to the 750 million. That's why we're so excited about what we're seeing in terms of our TPA numbers, again, normalize it ex-eBay, up 18%. Last quarter, I think it was up 17%, double-digit growth even with eBay.*

*And at 2 quarters in a row, some of the things I was talking to Lisa about in terms of the engagement on the app, those are things that the more people engaged, the*

*more people get cash cards utilizing that service offline. We see halo effects inside the business.* Buy Now, Pay Later, all of that actually affects churn rate. And if we can keep a consistent top of the funnel, maybe even improve that a little bit, but reduce our churn rate, you'll start to see net new actives actually accelerate going forward. *And so we remain still quite confident in the 750 million, but that's what the drivers are of that, Darren.*

300.    The statements in the prior paragraph were misleading because they (1) touted PayPal's future NNA growth, while omitting related information as described in ¶207(d); and (2) touted supposed increased engagement and demand, while omitting related information as described in ¶207(e).

301.    On November 8, 2021, at market close, PayPal reported its financial results for 3Q2021.  The same day, the Company hosted a conference call to discuss its quarterly results.  On November 9, 2021, the Company hosted a related buyside analyst call, on which, in response to an analyst question on NNAs, CFO Rainey stated:

Well, this answer is going to be similar to my last one in so far as, as we sit here today, and we go back to the beginning and compare to the beginning of the year. *Our net new actives are going to do better than what we originally expected on an organic basis. So, I'm excluding Paidy from that. So, we perform very well there.* Again, we've seen strong correlation with shelter in place or locked down and net new active trends on the top of the funnel. And so that's driven some of the results over the last year and a half. And so, as we were sitting there in the first quarter with an expectation that some of that would persist longer than it actually has, that caused us to increase our guidance around that new actives.

*[Low quality new actives] is not something that we want to chase as a company, and we can certainly go out and spend money on customer acquisition and get very low value net new actives to inflate or pump up that number, but that's not the right economic decision for us longer term. And I've got confidence in where we are longer term around net new actives. We consistently put out aggressive numbers. I think this is one that falls into that category, but historically we've done a pretty good job of achieving that performance.* As we look forward over the next several years, more of that growth is going to come through retention of the bottom of the funnel, where we focus a lot on our churn metrics. And as we have experiences that improve engagement, that will certainly help there. And then international expansion is another one that, I think has a real opportunity for us to increase that number over the next few years.

302.    The statements in the prior paragraph were misleading because they touted PayPal's future NNA growth, while omitting related information as described in ¶207(d).  These statements were particularly misleading given the explicit reference to "organic" NNA doing better than previously expected, and the assurance that PayPal was "certainly" not going out and spending money on "low value net new actives to inflate or pump up that number."

303.    On November 9, 2021, after the market closed, Defendants filed PayPal's Form 10-Q for 3Q2021, which stated:

Three months ended September 30, 2021 and 2020

*Net revenues increased $723 million, or 13%, in the three months ended September 30, 2021 compared to the same period of the prior year driven primarily by growth in total payment volume ("TPV", as defined below under "Net Revenues") of 26%.*

*** 

Nine months ended September 30, 2021 and 2020

Net revenues increased $3.1 billion, or 20%, in the nine months ended September 30, 2021 compared to the same period of the prior year *driven primarily by growth in TPV of 38%.*

***

*We had 416 million active accounts as of September 30, 2021 compared to 361 million as of September 30, 2020, an increase of 15%.* Number of payment transactions were 4.9 billion for the three months ended September 30, 2021 compared to 4.0 billion in the three months ended September 30, 2020, an increase of 22%. Number of payment transactions were 14.0 billion for the nine months ended September 30, 2021 compared to 11.0 billion in the nine months ended September 30, 2020, an increase of 27%. TPV was $310 billion for the three months ended September 30, 2021 compared to $247 billion in the three months ended September 30, 2020, an increase of 26%. TPV was $906 billion for the nine months ended September 30, 2021 compared to $659 billion in the nine months ended September 30, 2020, an increase of 38%.

Transaction revenues grew more slowly than TPV and number of payment transactions for the three and nine months ended September 30, 2021 compared to the same periods in the prior year due primarily to a decline in eBay's marketplace

platform TPV with higher rates, a higher portion of TPV generated by platform partners, large merchants, and other marketplaces who generally pay lower rates with higher transaction volumes, and an unfavorable impact from hedging. Changes in prices charged to our customers did not significantly impact transaction revenue growth for the three and nine months ended September 30, 2021.

304.    The statements in the prior paragraph were misleading because they (1) touted PayPal's NNA growth — including by counting at least 4.5 million illegitimate accounts in the reported NNA results — and future NNA growth, while omitting related information as described in ¶207(b)-(d); and (2) touted PayPal's TPV figures while omitting related information as described in ¶207(a).

### 14. CNBC's *Mad Money with Jim Cramer* – November 30, 2021

305.    On November 30, 2021, after the market closed, Defendant Schulman participated in an interview on *Mad Money with Jim Cramer*.  During that interview, in response to a question about PayPal's goal of 750 million users by 2025, CEO Schulman stated:

> So this year what we told the market is we do about 55 million net new actives and *we're on track to do 55 million net new actives.* Um, I would say the way to think about this, Jim, is there are two ways of thinking about net new actives. One is the top of the funnel. How many new are you getting? *And then there's the bottom of the funnel because today we're over 416 million people on the platform today. We'll wind up the year north of 430 million, uh, on the platform.* So the key to stopping people from leaving the platform is engagement, right? And engagement has to do with expanding our value proposition into new applications. Like for instance, buy now, pay later, which we should talk about later because that's been one of the stars actually of the holiday season for us.

306.    The statements in the prior paragraph were misleading because they (1) touted PayPal's NNA growth — including by continuing to count at least 4.5 million illegitimate accounts in the reported NNA results — and future NNA growth, while omitting related information as described in ¶207(b)-(d).  In particular, by touting 416 million NNAs in the quarter and 430 million NNAs for the year, PayPal was continuing to affirm its 3Q2021 results as accurate, despite the fact that those results included 4.5 million illegitimate NNAs, which should

not have counted toward the 416 million and 430 million NNAs CEO Schulman was touting in this statement.  *See* ¶207(c).

### 15. Goldman Sachs Conference – December 7, 2021

307.    On December 7, 2021, during trading hours, Defendant Schulman presented on a Goldman Sachs conference call.  During that call, in response to an analyst question about what accelerates the growth of PayPal's platform, CEO Schulman stated:

> *We're actually putting on 110 million net new actives in 7 quarters, so January 2020 to end of last quarter.* And if you look at other metrics, I think it took us 20 years to get to $600 billion of TPV going through the platform. So here we are 2 years later, and I think we'll do somewhere around $1.25 trillion through the platform, so doubled in 2 years.

> \*\*\*

> *Like today, probably not many people realize this, when you do a transaction on PayPal, we look obviously at your user name and your password. But that's kind of Jacks-or-Better to sort of like open sort things. We look at 200-plus different indicators to decide instantaneously is it you or not.* We don't need user name and password. Eventually, that will probably go away to take a lot of friction out of the system, and we'll use all the different data points we have to create a frictionless checkout experience. Right now, our checkout, as best we can tell, is about 34% more efficient than anyone else's checkout.

308.    The statements in the prior paragraph were misleading because they touted PayPal's NNA growth — including by continuing to count at least 4.5 million illegitimate accounts in the reported NNA results — and future NNA growth, while omitting related information as described in ¶207(b)-(d).  In particular, by touting 110 million NNAs for the seven (7) quarters proceeding this statement, Defendants were continuing to affirm PayPal's 3Q2021 results as accurate, despite the fact that those results included 4.5 million illegitimate NNAs, which should not have counted toward the 110 million NNAs CEO Schulman was touting in this statement.  *See* ¶207(c).

## ii.  Actionable Omissions in Violation of Disclosure Obligations

309.    In addition to barring false or misleading statements, the securities laws also require certain SEC filings to affirmatively provide certain information to investors.  As relevant here, there were two such affirmative duties to disclose that Defendants violated throughout the Class Period.

310.    Throughout the Class Period, PayPal issued Quarterly and Annual Reports with the SEC.  PayPal issued such reports on or about (1) February 5, 2021 (2020 10-K); (2) May 5, 2021 (1Q2021 10-Q); (3) July 28, 2021 (2Q2021 10-Q) and (4) November 8, 2021 (3Q2021 10-Q), and each report and/or each of their accompanying Sarbanes Oxley certifications were signed by Defendants Schulman and Rainey.  Defendants had a duty to include in those reports — under Item 7 of Form 10-K and Item 2 of Form 10-Q — the information called for under Regulation S-K [17 C.F.R. §229.303], Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A").

## 1.  Defendants Violated Duties Pursuant to Item 303

311.    Among other things, Item 303 of Regulation S-K requires that the MD&A section of the Forms 10-K and 10-Q filed by PayPal disclose known events or uncertainties that had, or were reasonably likely to have had, a material impact on its revenues or income from continuing operations.  The SEC has issued interpretative guidance associated with the requirements of Item 303 of Regulation S-K concerning the disclosure of material events or uncertainties.  The interpretative guidance states, in pertinent part, as follows:

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

* * *

Events that have already occurred or are anticipated often give rise to known uncertainties. For example, a registrant may know that a material government contract is about to expire. The registrant may be uncertain as to whether the contract will be renewed, but nevertheless would be able to assess facts relating to whether it will be renewed. More particularly, the registrant may know that a competitor has found a way to provide the same service or product at a price less than that charged by the registrant, or may have been advised by the government that the contract may not be renewed. The registrant also would have factual information relevant to the financial impact of non-renewal upon the registrant. In situations such as these, a registrant would have identified a known uncertainty reasonably likely to have material future effects on its financial condition or results of operations, and disclosure would be required.

312.    The MD&A disclosures in PayPal's Forms 10-K and 10-Q filed with the SEC during the Class Period were materially false or misleading because Defendants failed to disclose material uncertainties and trends detailed herein.  These undisclosed material uncertainties and events, which were then known to management, were reasonably likely to, and did, have a material effect on the Company's future operating results. Specifically:

(a)    Throughout the Class Period, PayPal was generating a large number of "minimally engaged" users that were unlikely to contribute to future TPV, future revenue, or future profit;

(b)    Throughout the Class Period, PayPal's TPV concentration was growing increasingly concentrated, such that by the release of the 4Q2021 results only "one third" of users were contributing the "vast majority" of TPV; and

(c)    Throughout the Class Period, PayPal was subject to ongoing efforts by bad actors to take advantage of its promotional offerings for personal profit and as a result PayPal was accumulating a significant quantity of "illegitimate" accounts on its system while wasting promotional dollars on acquiring "illegitimate" accounts.

### 2. Defendants Violated Duties Pursuant to Item 105

313.    Among other things, Item 105 of Regulation S-K requires that the MD&A section of the Forms 10-K and 10-Q filed by PayPal disclose "the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. §229.105. The MD&A disclosures in PayPal's Forms 10-K and 10-Q filed with the SEC during the Class Period were materially false or misleading because Defendants failed to disclose material factors that made investment in PayPal risky, including that:

(a)    Throughout the Class Period, PayPal was subject to and would likely continue to be subject to efforts by bad actors to take advantage of its promotional offerings for personal profit and as a result PayPal was accumulating a significant quantity of "illegitimate" accounts on its system while wasting promotional dollars on acquiring "illegitimate" accounts;

(b)    Throughout the Class Period, PayPal was generating a large number of "minimally engaged" users, which posed a substantial risk that the touted NNA growth would not translate to increases in TPV, future revenue, or future profit; and

(c)    Throughout the Class Period, PayPal's TPV concentration was growing increasingly concentrated, such that by the release of the 4Q2021 results only "one third" of users were contributing the "vast majority" of TPV, which posed a substantial risk that touted NNA growth would not translate to increases in TPV, future revenue, or future profit.

314.    The risks and trends that were disclosed in PayPal's 10-Ks and 10-Qs either did not disclose these trends and risks, or to the extent they could be interpreted as relevant to these issues, disclosed possible future events while omitting to disclose that the risks and trends had already materialized.

### b. Defendants Acted With Scienter

315.    At all relevant times, Defendants acted with scienter.  Numerous facts support that Defendants either had actual knowledge of the truthful facts that they omitted to disclose and which contradicted their false or misleading statements, or acted with reckless disregard for the truth or falsity of those statements and omissions.  PayPal has the scienter of its management-level employees, including each of the Individual Defendants.

316.    Each of the following subsections are mutually reinforcing and together, along with the other allegations herein, support a strong inference of scienter.

### i. The Individual Defendants' Motive and Opportunity

#### 1. The Individual Defendants' Sale of More Than $170 Million in PayPal Stock Raises a Strong Inference of Scienter

317.    During the Class Period, the Individual Defendants sold 645,321 shares of PayPal stock for total proceeds of $170,587,589.  Schulman sold 359,205 shares and collected insider trading proceeds of $94,729,281.  Rainey sold 155,979 shares and collected insider trading proceeds of $42,000,201.  And Auerbach sold 130,137 shares and collected insider trading proceeds of $33,858,106.  The proceeds (and profits) [12] of these stock sales dwarfed each of the Individual Defendants' salaries and were suspicious in both scope and timing.  Moreover, not a single one of the Individual Defendants purchased any PayPal stock during the Class Period.

---

[12] The only price Defendants paid for acquiring any of their shares was in the form of in-the-money exercises of options awarded to them by PayPal.  In 2019, Defendant Schulman exercised such options awarded to him for a cost of $6,480,391, and in 2018, for a cost of $5,105,272.  In 2019, Defendant Rainey exercised such options awarded to him for a cost of $615,397, and in 2018, for a cost of $2,338,385.  In 2021, Defendant Auerbach exercised such options for a cost of $1,520,345.  Thus, if the costs of all of the Individual Defendants' option exercises are assigned completely to their sales in 2021, Schulman had $73,143,618, Rainey $39,046,419, and Auerbach $32,337,761 in profits from the insider trading of PayPal stock.

318. According to a 2010 study by two Wharton professors, "the typical CEO sells only about 1.9% of her equity incentives each year."[13] But during the Class Period, each Individual Defendant unloaded far more than that on unsuspecting investors.

319. Data from SEC Form 4 Filings shows that the Individual Defendants sold vast portions of their total PayPal holdings during the Class Period. Specifically, Schulman, Rainey, and Auerbach sold 59%, 57%, and 69% of their shareholdings. This calculation is conservative, because it is based on their total sales over the number of shares they would have held at the end of the Class Period had they not made such sales, and thus increases the denominator (and reduces the percentage) by an amount corresponding to any shares they acquired during the Class Period through performance compensation.[14]

320. The following chart shows the percentage of shares sold during the Class Period:

| **Defendant** | **Total PayPal Shares Sold During the Class Period** | **All Sales as Percent of All Shares Available to Sell** |
|---|---|---|
| Schulman | 359,205 | 59% |
| Rainey | 155,979 | 57% |
| Auerbach | 130,137 | 69% |

321. The following table shows Defendant Schulman's sales during the Class Period:

| **Defendant Schulman** | | | |
|---|---|---|---|
| **Date** | **Shares Sold** | **Average Share Price** | **Proceeds** |
| February 5, 2021 | 1,000 | 265.39 | 265,390.00 |

[13] John E. Core & Wayne R. Guay, *Is CEO Pay Too High and Are Incentives Too Low? A Wealth-Based Contracting Framework*, 24 ACAD. MGMT. PERSP. 1, 5 (Feb. 2010).
[14] This figure is calculated for each Individual Defendant by dividing the total number of shares the Defendant sold during the Class Period by the sum of their holdings as of the start of the Class Period and the shares they acquired during the class period. Thus, Schulman sold 359,205 shares which is 59% of 632,163 shares; Rainey sold 155,979 shares which is 57% of 263,824 shares; Auerbach sold 130,137 shares which is 69% of 188,515 shares.

| Defendant Schulman | | | |
|---|---|---|---|
| **Date** | **Shares Sold** | **Average Share Price** | **Proceeds** |
| February 5, 2021 | 1,594 | 269.32 | 429,296.08 |
| February 5, 2021 | 2,105 | 266.50 | 560,982.50 |
| February 5, 2021 | 2,150 | 267.53 | 575,189.50 |
| February 5, 2021 | 3,151 | 268.73 | 846,768.23 |
| February 15, 2021 | 12,301 | 298.37 | 3,670,249.37 |
| February 16, 2021 | 200 | 298.73 | 59,746.00 |
| February 16, 2021 | 300 | 308.05 | 92,415.00 |
| February 16, 2021 | 600 | 300.51 | 180,306.00 |
| February 16, 2021 | 830 | 301.84 | 250,527.20 |
| February 16, 2021 | 1,200 | 306.88 | 368,256.00 |
| February 16, 2021 | 1,200 | 302.85 | 363,420.00 |
| February 16, 2021 | 1,300 | 305.93 | 397,709.00 |
| February 16, 2021 | 1,800 | 303.98 | 547,164.00 |
| February 16, 2021 | 2,570 | 304.94 | 783,695.80 |
| March 1, 2021 | 52,134 | 273.63 | 14,265,426.42 |
| March 1, 2021 | 112,154 | 273.63 | 30,688,699.02 |
| March 10, 2021 | 520 | 244.97 | 127,384.40 |
| March 10, 2021 | 620 | 248.77 | 154,237.40 |
| March 10, 2021 | 817 | 246.75 | 201,594.75 |
| March 10, 2021 | 900 | 247.66 | 222,894.00 |
| March 10, 2021 | 2,206 | 243.18 | 536,455.08 |
| March 10, 2021 | 2,273 | 244.14 | 554,930.22 |
| March 10, 2021 | 2,664 | 242.26 | 645,380.64 |
| April 1, 2021 | 62,616 | 247.54 | 15,499,964.64 |
| April 30, 2021 | 100 | 265.94 | 26,594.00 |
| April 30, 2021 | 500 | 265.22 | 132,610.00 |
| April 30, 2021 | 2,283 | 263.28 | 601,068.24 |
| April 30, 2021 | 2,421 | 264.19 | 639,603.99 |
| April 30, 2021 | 4,696 | 262.18 | 1,231,197.28 |
| May 18, 2021 | 500 | 247.07 | 123,535.00 |
| May 18, 2021 | 607 | 243.34 | 147,707.38 |
| May 18, 2021 | 1,760 | 244.29 | 429,950.40 |
| May 18, 2021 | 3,033 | 245.35 | 744,146.55 |
| May 18, 2021 | 4,100 | 246.39 | 1,010,199.00 |
| June 10, 2021 | 100 | 261.98 | 26,198.00 |
| June 10, 2021 | 400 | 263.95 | 105,580.00 |
| June 10, 2021 | 1,100 | 265.75 | 292,325.00 |
| June 10, 2021 | 2,000 | 267.05 | 534,100.00 |
| June 10, 2021 | 3,187 | 268.18 | 854,689.66 |
| June 10, 2021 | 3,213 | 269.15 | 864,778.95 |
| July 30, 2021 | 300 | 280.21 | 84,063.00 |

| Defendant Schulman | | | |
|---|---|---|---|
| **Date** | **Shares Sold** | **Average Share Price** | **Proceeds** |
| July 30, 2021 | 935 | 279.39 | 261,229.65 |
| July 30, 2021 | 1,450 | 277.97 | 403,056.50 |
| July 30, 2021 | 2,200 | 277.25 | 609,950.00 |
| July 30, 2021 | 2,335 | 276.19 | 644,903.65 |
| July 30, 2021 | 2,780 | 275.14 | 764,889.20 |
| August 12, 2021 | 1,400 | 273.63 | 383,082.00 |
| August 12, 2021 | 1,500 | 276.41 | 414,615.00 |
| August 12, 2021 | 2,946 | 275.92 | 812,860.32 |
| August 12, 2021 | 4,154 | 274.86 | 1,141,768.44 |
| September 10, 2021 | 500 | 288.51 | 144,255.00 |
| September 10, 2021 | 792 | 287.73 | 227,882.16 |
| September 10, 2021 | 2,323 | 285.71 | 663,704.33 |
| September 10, 2021 | 3,156 | 286.60 | 904,509.60 |
| September 10, 2021 | 3,229 | 284.60 | 918,973.40 |
| October 29, 2021 | 300 | 237.28 | 71,184.00 |
| October 29, 2021 | 985 | 233.11 | 229,613.35 |
| October 29, 2021 | 1,100 | 236.33 | 259,963.00 |
| October 29, 2021 | 1,651 | 232.38 | 383,659.38 |
| October 29, 2021 | 2,896 | 234.27 | 678,445.92 |
| October 29, 2021 | 3,068 | 235.47 | 722,421.96 |
| November 12, 2021 | 331 | 206.21 | 68,255.51 |
| November 12, 2021 | 400 | 209.78 | 83,912.00 |
| November 12, 2021 | 400 | 203.06 | 81,224.00 |
| November 12, 2021 | 1,007 | 204.28 | 205,709.96 |
| November 12, 2021 | 1,526 | 205.53 | 313,638.78 |
| November 12, 2021 | 1,641 | 202.07 | 331,596.87 |
| November 12, 2021 | 2,124 | 209.00 | 443,916.00 |
| November 12, 2021 | 2,571 | 208.30 | 535,539.30 |
| December 10, 2021 | 100 | 193.64 | 19,364.00 |
| December 10, 2021 | 400 | 192.93 | 77,172.00 |
| December 10, 2021 | 500 | 191.92 | 95,960.00 |
| December 10, 2021 | 900 | 190.57 | 171,513.00 |
| December 10, 2021 | 1,010 | 189.61 | 191,506.10 |
| December 10, 2021 | 2,889 | 188.42 | 544,345.38 |
| December 10, 2021 | 4,201 | 187.63 | 788,233.63 |
| **Total** | **359,205** | **263.72** | **94,729,281.09** |

113

322.    The Class Period stock sales for Defendant Rainey are set forth below:

| Defendant Rainey | | | |
|---|---|---|---|
| Date | Shares Sold | Average Share Price | Proceeds |
| February 15, 2021 | 4,311 | 298.37 | 1,286,273.07 |
| February 17, 2021 | 5,377 | 298.00 | 1,602,346.00 |
| March 1, 2021 | 22,655 | 273.63 | 6,199,087.65 |
| March 1, 2021 | 49,878 | 273.63 | 13,648,117.14 |
| March 3, 2021 | 200 | 267.20 | 53,440.00 |
| March 3, 2021 | 900 | 264.27 | 237,843.00 |
| March 3, 2021 | 1,697 | 266.54 | 452,318.38 |
| March 3, 2021 | 4,525 | 263.23 | 1,191,115.75 |
| March 3, 2021 | 7,397 | 262.28 | 1,940,085.16 |
| March 3, 2021 | 8,639 | 265.45 | 2,293,222.55 |
| March 3, 2021 | 8,900 | 258.30 | 2,298,870.00 |
| March 3, 2021 | 12,722 | 261.24 | 3,323,495.28 |
| March 3, 2021 | 13,963 | 259.30 | 3,620,605.90 |
| March 3, 2021 | 14,815 | 260.10 | 3,853,381.50 |
| **Total** | **155,979** | **269.27** | **42,000,201.38** |

323.    The Class Period stock sales for Defendant Auerbach are set forth below:

| Defendant Auerbach | | | |
|---|---|---|---|
| Date | Shares Sold | Average Share Price | Proceeds |
| February 15, 2021 | 3,795 | 298.37 | 1,132,314.15 |
| February 23, 2021 | 100 | 267.07 | 26,707.00 |
| February 23, 2021 | 600 | 255.16 | 153,096.00 |
| February 23, 2021 | 1,100 | 253.59 | 278,949.00 |
| February 23, 2021 | 2,208 | 266.41 | 588,233.28 |
| February 23, 2021 | 2,284 | 256.06 | 584,841.04 |
| February 23, 2021 | 2,625 | 262.26 | 688,432.50 |
| February 23, 2021 | 2,800 | 263.31 | 737,268.00 |
| February 23, 2021 | 2,900 | 259.26 | 751,854.00 |
| February 23, 2021 | 2,909 | 258.19 | 751,074.71 |
| February 23, 2021 | 3,472 | 257.03 | 892,408.16 |
| February 23, 2021 | 5,400 | 261.09 | 1,409,886.00 |
| February 23, 2021 | 5,458 | 264.51 | 1,443,695.58 |
| February 23, 2021 | 6,978 | 265.48 | 1,852,519.44 |
| February 23, 2021 | 7,300 | 260.21 | 1,899,533.00 |
| March 1, 2021 | 14,848 | 273.63 | 4,062,858.24 |
| March 1, 2021 | 25,672 | 273.63 | 7,024,629.36 |

| Defendant Auerbach | | | |
|---|---|---|---|
| **Date** | **Shares Sold** | **Average Share Price** | **Proceeds** |
| May 25, 2021 | 2,137 | 259.77 | 555,128.49 |
| May 25, 2021 | 4,690 | 258.29 | 1,211,380.10 |
| May 25, 2021 | 7,415 | 259.07 | 1,921,004.05 |
| August 24, 2021 | 1,300 | 277.28 | 360,464.00 |
| August 24, 2021 | 5,186 | 279.19 | 1,447,879.34 |
| August 24, 2021 | 5,828 | 278.46 | 1,622,864.88 |
| November 23, 2021 | 100 | 190.68 | 19,068.00 |
| November 23, 2021 | 800 | 189.85 | 151,880.00 |
| November 23, 2021 | 1,063 | 188.94 | 200,843.22 |
| November 23, 2021 | 1,700 | 185.91 | 316,047.00 |
| November 23, 2021 | 2,651 | 187.85 | 497,990.35 |
| November 23, 2021 | 6,000 | 186.81 | 1,120,860.00 |
| December 16, 2021 | 818 | 188.75 | 154,397.50 |
| **Total** | **130,137** | **260.17** | **33,858,106.39** |

324.    When compared to their trading both prior to and after the Class Period, the

Individual Defendants stock sales are also suspicious.  As set forth in the chart below, the

Individual Defendants' proceeds from the sale of PayPal stock were substantially higher in 2021,

during the Class Period, than they were in the full years preceding and following the Class Period:

| Table Showing Greater Stock Sales During Class Period Compared to 2020 | | | |
|---|---|---|---|
| **Year** | **Schulman** | **Rainey** | **Auerbach** |
| 2020 | $78,864,988 | $19,821,406 | $23,168,718 |
| Class Period (2021) | $94,729,281 | $42,000,201 | $33,858,106 |
| (% Increase in 2021) | **20% Increase** | **112% Increase** | **46% Increase** |

| Table Showing Greater Stock Sales During Class Period Compared to 2022 | | | |
|---|---|---|---|
| **Year** | **Schulman** | **Rainey** | **Auerbach** |
| Class Period (2021) | $94,729,281 | $42,000,201 | $33,858,106 |
| 2022 | $23,034,916 | $6,595,446 | $8,946,116 |
| (% Decrease in 2022) | **76% Decrease** | **84% Decrease** | **74% Decrease** |

325.    The timing of the Individual Defendants' stock sales is also suspicious.  The average price at which the Defendants sold their stock during the Class Period was $264.35 per share, which is $15.51 per share higher than PayPal's average stock price during the Class Period. Indeed, all but three of the days on which the Individual Defendants sold stock were within nine (9) trading days of an alleged false or misleading statement or omission.  Had Defendants waited and sold their stock on February 3, 2022, *after* the truth about their fraudulent scheme was revealed, their sales proceeds would have been at least $90 million *less* than what they collected from their insider sales during the Class Period.[15]

326.    Further, no Individual Defendant had any PayPal stock purchases during the Class Period.  But two days after the February 1, 2022 disclosure of the truth about PayPal's NNAs, and after the artificial inflation caused by Defendants' fraud was removed from the stock price, Defendant Schulman bought 7,994 shares of PayPal stock at an average price of $124.57 per share *after* the stock plummeted.  As *Barron's* reported that "[t]his was his first open-market purchase of the stock since he became CEO in July 2015; most of his shares were received for his services to the company."[16]  Schulman's post-Class Period stock purchases were at a price of nearly $140 per share lower than the average price at which he sold stock during the Class Period ($263.72 per share).  This purchase is notable because it further demonstrates that Schulman's sales were not motivated by extrinsic non-company specific reasons, but instead that he was

---

[15] PayPal's stock price closed at $124.30 on February 3, 2022.  It is currently trading for less than $75 per share.

[16] The same *Barron's* article also quoted defendant Rainey speaking at a buy-side conference after the "steep drop in the stock price" as saying, "I'm a buyer right now, and I was a buyer at our prices last quarter. I think that, look, I'm very disappointed in where we are today."  But Rainey never actually bought any PayPal stock on the open market during or after the Class Period.

actively trading on PayPal's value — selling while the stock traded at artificially inflated levels and then turning around and buying low when the truth was revealed.

### 2. PayPal's Compensation Structure Created the Motive and Opportunity for the Individual Defendants to Commit Fraud

327.    The Individual Defendants had the motive and opportunity to mislead PayPal investors.  Specifically, the structure of the Individual Defendants' performance-based compensation created a concrete and personal benefit to each of them, rewarding them for artificially inflating NNAs and PayPal's stock price.

328.    In early 2020, PayPal's Board of Directors Compensation Committee elected to grant performance-based compensation for the Individual Defendants based on increasing reported NNAs, along with hitting revenue and operating margin targets.  The Company's disclosures on the Individual Defendants' compensation rationalized using the NNA metric saying, "measuring NNAs reinforces the critical importance of growing our customer base to build for the future.  The number of NNAs is also a key operational metric that the Company uses internally to measure ongoing performance."  Based on this compensation structure, the Individual Defendants had the potential to earn performance-based compensation that was many times greater than their annual salaries.

329.    For 2021, PayPal's Board of Directors Compensation Committee kept the same structure for awarding performance-based compensation, including by having reported NNA growth as the only operational performance measure.  As in 2020, the Compensation Committee rationalized using the NNA metric saying, "measuring NNAs reinforces the critical importance of growing our customer base to build for the future.  The number of NNAs is also a key operational metric that the Company uses internally to measure ongoing performance."

330.    The performance-based compensation for each of the Individual Defendants for fiscal year 2021 was awarded in the first quarter of 2021, with the final value of each Individual Defendants' award determined on a review by the Board which occurred for Defendant Schulman during 2021 and for the other Individual Defendants in early 2022 — all before Defendants disclosed the truth about PayPal's purported NNA growth.  As a result of their fraudulent conduct throughout 2021, the Individual Defendants collected performance-based compensation for 2021 that far exceeded their annual salaries.  Schulman received $30,545,381 in stock award and incentive plan compensation, more than 27 times (2,722%) his base salary of $1,122,115.  Rainey received $11,492,377 in stock award and incentive plan compensation, more than 15 times (1,532%) his base salary of $750,000.  And Auerbach received $11,439,082 in stock award and incentive plan compensation, more than 16 times (1,637%) his base salary of $698,846. Collectively, the Individual Defendants stock award and incentive plan compensation increased $14,997,181 in 2021, while they were misleading investors, compared to 2020, with Schulman's stock award and incentive plan compensation increasing 39%, Rainey's increasing 25%, and Auerbach's increasing 57%.

331.    Through their insider trading and performance-based compensation, the Individual Defendants took advantage of their fraudulent conduct and pocketed over $224 million.

### ii.  Knowledge and Recklessness

#### 1.  The NNA and TPV Metrics Were of Such Significance to PayPal That Defendants' Knowledge of Available Information Concerning TPV Composition and NNA Engagement Can Be Inferred

332.    As described herein, PayPal's entire growth philosophy — including its aspirations of one day becoming a Super App — depended critically on the idea that both its NNAs and TPV would increase.  As a result, and because a majority of PayPal's revenues were derived from

charging fees for transactions completed on its platform, PayPal's ability to drive new users to its platform and have those users be active users (who transacted often) was immensely important to PayPal's financial success.

333.    Prior to and throughout the Class Period, Defendants publicly touted PayPal's current and potential NNA and TPV growth, which would be achieved in large part by driving engaged users to PayPal's platform.  In fact, both NNA and TPV were reported at the start of each earnings call and highlighted in PayPal's financial results and investor update presentations.

334.    Defendants repeatedly described increases in new accounts and transaction growth as pivotal to PayPal's success.  On May 6, 2020, Defendant Schulman stated: "As our platform sees record increases in both new customer accounts and transactions, it is clear that PayPal's products are more important and relevant than ever before."  PayPal's Form 10-K for fiscal year 2020 (filed on February 5, 2021) explained that its key growth strategies included expanding its customer base and scale, and increasing its customers' use of PayPal's products and services.

335.    Similarly, on May 5, 2021, Defendant Schulman stated: "I'm particularly pleased to see our transactions per active account begin to accelerate due to increased engagement across our portfolio."  On May 10, 2021, Defendant Schulman explained: "There's so much potential for PayPal" and attributed that to the Company growing its user base to one billion users.

336.    Given the multitude of statements concerning PayPal's NNA and TPV metrics and their potential future growth during the Class Period, as well as the importance of these metrics to the Company, it is unreasonable to think that the Individual Defendants—who were responsible for tracking or reporting PayPal's revenue—would be unaware of the financial significance and status of the Company's NNAs and TPV.

337.    Moreover, the Individual Defendants were highly sophisticated and in executive positions at the Company, such that they would know that their statements concerning PayPal's NNA and TPV growth were false or misleading.  For example, Defendant Schulman has been the President and CEO of PayPal since 2015 and currently serves on Verizon's Board of Directors. Prior to his tenure at PayPal, Defendant Schulman worked at American Express, Sprint Nextel Corporation, Priceline Group, Inc. and AT&T.  Defendant Rainey was the CFO and EVP of Global Customer Operations at PayPal from 2015 until his departure in May 2022.  Prior to PayPal, Defendant Rainey worked for United Airlines as its EVP and CFO.  Defendant Auerbach has been PayPal's EVP and Chief Strategy, Growth and Data Officer since 2015.  Defendant Auerbach also serves as strategic advisor to PayPal's operations in China and is responsible for the Company's Blockchain, Crypto, and Digital Currencies business unit.

338.    The sophistication of the Individual Defendants strengthens the allegations of scienter by undermining exculpating explanations for the fraud.

## 2. Defendants Personally Tracked Information Concerning NNAs and Engagement

339.    In addition to being touted in PayPal's public filings and statements to investors, PayPal's NNA and TPV metrics and supporting data were heavily and frequently analyzed internally at PayPal, including by the Individual Defendants and high-level executives who reported to the Individual Defendants.

340.    On a February 10, 2021 company conference call, then-Chief Technology Officer (CTO) Sripada Shivananda explained that "[t]ransaction sanctity on the platform is one of the most important things for trust." PayPal's CTO explained that "[w]ithin 300 milliseconds during a transaction, we have tens of models that actually look at the context around the transaction and

evaluate the safety of the transaction. And that happens on every single transaction that occurs on the platform."

341. On the same February 10, 2021 company conference call, Shivananda described PayPal's Company-wide approach to cybersecurity, revealing "[w]e don't just allow for all the teams in the company to do it differently, we have [a] specialized team that built that platform. We actually mandate the leverage of that platform across the whole company." This gave PayPal "the best up-to-date differences possible at any time."

342. At PayPal's 2021 Investor Day, on February 11, 2021, VP and Head of Payments, Product & Engineering Jim Magats explained that "within 0.3 seconds, we're able to run hundreds of models using thousands of different data variables to score a transaction, to maximize the amount of good users that are using our systems and eradicate bad users from our platform."

343. Indeed, on March 4, 2021, CFO Rainey highlighted the sheer volume of data PayPal manages and touted it as educating the Company about any given transaction on its platform: "[W]e benefit so much from the amount of data that we have, something like 500 petabytes of data, which is just a ridiculous amount." CFO Rainey added: "the number of checks that we run on any given transaction goes into the hundreds."

344. On a December 7, 2021 conference call, CEO Schulman similarly stated that PayPal looks at "200-plus different indicators to decide instantaneously is it you or not" when consumers make a transaction on PayPal's platform.

345. On a February 3, 2021 quarterly earnings call, Defendant Schulman touted that PayPal "knows" its customer base, stating: "First of all, we've got 350 million customers that we can bring that trust to PayPal. We know them."

346.    On a May 24, 2021 J.P. Morgan's Payments and IT Services Sector analyst call CFO Rainey told investors that "**engagement [is] one of the top metrics that I'm looking at, particularly engagement tied to some of the new experiences that we're rolling out.**"

347.    Not only do these statements from PayPal's executives illustrate PayPal's data-centric capabilities, but CWs also confirm that PayPal dedicated a working group to its critically important NNA metric such that the Individual Defendants were able to — and did — track the Company's NNA metrics on a granular basis.

348.    CW-1 explained that the NNA metric was so important, that PayPal had assembled a team of individuals from throughout the Company to attend weekly NNA Rally meetings, to discuss NNA growth, and stated that the assembly of this sort of team was unusual for PayPal, but undertaken given the "tremendous" leadership demand for growing NNAs.  That NNA Rally team reported to PayPal's SLT, which included Defendant Schulman, Defendant Rainey, Defendant Auerbach, Chief Marketing Officer Leanne Sheraton, Executive Vice President, Global Sales Peggy Alford, Executive Vice President and Chief Enterprise Services Officer Aaron Karczmer, Chief Risk and Compliance Officer Fiachre O'Neil, and Executive Vice President and Chief Product Officer Mark Britto.

349.    CW-2, a former Director in the finance organization at PayPal, explained that the NNA metrics were measured daily and that an automated daily report was generated and sent to PayPal's C-suite, which tracked gross new additions, churn, and activity by cohort.  CW-2 also recalled the "big push" in 2021 to pursue NNA growth.  Similarly, CW-3 also recalled a "heavy" push on NNAs at all costs during the Class period.

350.    CW-5 explained that at the Marketing team's weekly or bi-weekly meetings, the Marketing team weighed "buying" more active users in order to more closely track their NNA

goals, while balancing the risk that new users would be lower quality. According to CW-5, Lamb and Doshi presented information from these meetings to the C-Suite. CW-5 stated that Michael Lamb worked closely with Chief Marketing Officer Leanne Sheraton and that conversations regarding the risk of low-quality new users were communicated to PayPal's C-Suite.

351.    Given the magnitude of data collected and analyzed by PayPal in connection with its NNA metrics and the systematic approach the Company took to analyzing its TPV and transactions on its platform, it strains credulity to suggest that Defendants were not aware of PayPal's NNA and engagement metrics throughout the Class Period.

### 3. Defendants Were Directly Apprised of the Risks Concerning the NNA Promotions

352.    Not only were Defendants aware of the Company's NNA and engagement metrics during the Class Period, but also were apprised of the risks concerning these promotions such that the addition of low value accounts to PayPal's platform was both predictable and inevitable.

353.    CW-4 was in the "inner circle" at PayPal, which included CEO Schulman and CFO Rainey. CW-4 recalled that before the start of 2021, he voiced concerns in a room of senior executives, including Senior Vice President, Chief Compliance Officer, Fiachre O'Neill, regarding the risk that the promotion to pay people to open accounts would lead to people opening accounts, without otherwise using PayPal's services. CW-4 recalled that others in the room also expressed concerns about this risk, but that ultimately PayPal decided to proceed with the use of the incentive payments anyways.

354.    CW-4 advised that the risks he identified regarding the paid incentives were included in the NBIA (New Business Initiative), which was ultimately reviewed by CFO John Rainey as part of his approval of the promotional campaigns. CW-4 added that any new marketing campaign or promotion at PayPal has to have an NBIA, which he explained is a

document that is "signed off on by everybody," including Vice President Regulatory Relations, Andrea Donker, PayPal's Compliance department, and the CFO.  CW-4 advised that CEO Schulman and CFO John Rainey were informed about the marketing practices and updated on its results, adding that "anything that had a dollar amount to it would need CFO approval."

355.    CW-5 explained that the Company was aware of the risk that new users acquired through this promotional activity would be lower quality, but at the time, the focus was on growing the number of NNAs.

356.    Moreover, CW-3 explained that a large meeting was held in October 2021 over Microsoft Teams to discuss the trend he had identified.  By then, CW-3's underinclusive SQL query was identifying about a million fake accounts.  CW-3 explained that there were approximately 400 attendees at that meeting, including the Global Seller Risk teams and Strategy teams.  CW-3 also explained that there were senior directors, who were two levels below CEO Schulman in the meeting.

357.    CW-3 explained that during that meeting, a PowerPoint presentation explained how the fake account trend had been identified, including data regarding its prevalence and data regarding the number of promotional incentive payments that were being transferred into individual accounts and then transferred out of PayPal.

358.    During the October meeting, CW-3 advocated for PayPal to shut down the fake accounts and his boss ultimately approved of "limiting"[17] these accounts.  CW-3 believes that the information about the fake accounts was escalated to the executive level because they would have needed executive approval to limit that many accounts.  CW-3 clarified that even if an account

---

[17] PayPal refers to applying flags to accounts, such as when those accounts are suspected of fraud, to limit their activity, as "limiting" accounts.

was "limited" it would still be able to withdraw the money eventually, meaning that applying that flag would not deter fraudsters from taking advantage of the promotion.

359.    Following the October group meeting, CW-3 continued to discuss the issue with a member of PayPal's strategy team in Shanghai.  CW-3 explained that spreadsheets regarding the fake accounts were sent to this member of the strategy team, and he repeatedly interacted with this member of the strategy team about PayPal's follow up into investigating the issue.  CW-3 advised that the team based in Shanghai collected all of CW-3's team's data and disseminated it to senior leadership.  CW-3 also explained that he communicated with others in various positions throughout PayPal about the fraudulent accounts he had identified.

360.    CW-4 also explained that PayPal was required by various U.S. and international regulations to analyze each new account within days of its creation to determine its authenticity, which PayPal's Compliance and Know Your Customer ("KYC") functions did through checking the information provided by the customer against various datapoints.  Due to this process, CW-4 did not understand how PayPal could not have immediately been aware of widespread activity to create fake accounts through bot farms.

361.    CW-4 also explained that PayPal was required by various state laws to track account activity and dormancy.  CW-4 added that PayPal was required to review and monitor accounts for dormancy on a regular basis, and that PayPal understood that under some state regulations an account would be deemed dormant if it had no activity for 30 days.  CW-4 explained that PayPal had systems for monitoring for account activity to comply with these regulations.  CW-4 recalled that reports on dormant accounts, account activity, and any potentially improper fees and charges related to these accounts, went to the Chief Risk Officer and Head of Compliance, and then to CFO John Rainey.

362.    By October 2021, PayPal's illegitimate accounts had become so widely known that employees — across different departments and levels at PayPal — were able to identify the risks associated with these accounts and their existence on PayPal's platform.  These employees had raised concerns to their superiors and senior management about the promotional activity and resultant illegitimate account activity long before PayPal alerted investors to these issues.

### 4.    The Illegitimate Account Issue Was So Widely Known Within PayPal That Defendants' Knowledge of the Issue Was Overwhelmingly Likely

363.    The wide-spread nature of "minimally engaged," low value NNAs on PayPal's platform paired with senior management's hyper fixation on driving NNA growth makes Defendants' knowledge of these accounts during the Class Period highly probable.

364.    For example, CW-6 explained that the 4.5 million fraudulent accounts that PayPal disclosed in February 2022 likely would have been identified during PayPal's normal fraud review process.  Specifically, CW-6 explained that PayPal used artificial intelligence to link similar activity — such as the same IP address, the same physical address, or any other personal identifying information — across different accounts.  CW-6 explained that even if someone didn't use their real name across accounts, if the accounts were created from the same computer login, the system would flag the accounts.

365.    CW-6 further explained that pursuant to PayPal's internal policies and requirements of regulatory agencies, any amount of loss or fraud above $50,000 was a "concern" and there was "always a roll up" to CEO Schulman and CFO Rainey.  CW-6 stated that this $50,000 or more threshold of fraud would have a root cause investigation performed, and both the root cause investigation and results of that investigation were reported to Vice President, Head of Global Fraud Arthi Rajan Makhija, who was part of the analysis group.  CW-6 explained that the

$50,000 threshold applied whether it was one instance of fraud or a trend of smaller instances that added up to $50,000, including fraud leading to marketing loss.

366.    These allegations make clear that Defendants' false or misleading statements were not simply a mistake or mismanagement, but rather that the Defendants knew or recklessly disregarded that the Company's touted NNA and TPV growth was driven by low value, "minimally engaged" customers that would not result in long-term, organic growth for PayPal.

### c.    Loss Causation and Economic Loss

367.    During the Class Period, as detailed herein, Defendants made false or misleading statements and omissions about PayPal that caused PayPal's Securities to trade at artificially inflated levels.  Defendants' misrepresentations concerning PayPal's NNAs and failure to disclose the risks of its promotional activity, made PayPal's Securities appear to be more valuable than they were (thereby artificially inflating and/or artificially maintaining PayPal's stock price at inflated levels) by, among other things: (1) misrepresenting the number of legitimate and engaged accounts on PayPal's platforms; (2) overstating PayPal's success at generating legitimate and engaged NNAs; (3) understating the risks that NNA numbers would be inflated by illegitimate or minimally engaged accounts; and (4) understating the risks that PayPal would be unable to reach higher NNA figures and achieve its stated business objectives which depended on PayPal's increasing the number of active users on its platforms.  Due to Defendants' misrepresentations and omissions, PayPal's stock reached a Class Period high stock price of $310.16 and throughout the Class Period PayPal's Securities traded at artificially inflated levels due to Defendants' misrepresentations and omissions.

368.    On February 2, 2022, and into February 3, 2022, PayPal's stock price fell in reaction to Defendants' disclosures (made after trading hours on February 1, 2022) revealing true information concerning the illegitimate accounts that had previously contributed to PayPal's

publicly reported NNA figures.  The truthful information revealed on February 1, 2022, revealed that: (a) PayPal had not actually produced the number of net new accounts it had previously touted and repeatedly guided for; (b) PayPal had permitted malicious actors to scam its promotions and in the process permitted the creation of millions of fake accounts; (c) PayPal had failed to accurately inform the market of the risks concerning its promotional activity; (d) PayPal's account growth trajectory was far worse than previously claimed and repeatedly guided for; and (e) PayPal would not be able to meet its previously touted account growth goals.  This news both corrected the misrepresentations and omissions Defendants previously made, and revealed that the previously concealed risks to PayPal's business had materialized.

369.    Due to Defendants' disclosure of the truth on February 1, 2022, after market close, PayPal's stock price fell dramatically over the next two trading days.

370.    On February 2, 2022, PayPal's stock fell from a prior closing price of $175.80 to a closing price of $132.57, which was a 24.6% decline and resulted in a market capitalization loss of $49.3 billion.  PayPal's stock price continued to fall on February 3, 2022, from a closing price of $132.57 on February 2, 2022, to a closing price of $124.30 on February 3, 2022 — which was an additional 6.2% decline and resulted in an additional market capitalization loss of $9.4 billion.  Altogether, this two-day decline amounted to a 29.3% decline in stock price and a loss of $58.7 billion in PayPal's market capitalization.

371.    As a result of their purchases of PayPal stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.  Defendants' false or misleading statements and omissions had the intended effect — or recklessly disregarded the result — and caused PayPal's Securities to trade at artificially inflated and artificially maintained levels throughout the Class Period.  When PayPal's stock price

declined as the truth was revealed, investors suffered losses.  The timing and magnitude of the price declines and analyst reactions to the news, individually and collectively, negate any alternative inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

372.    As a result of PayPal's Securities trading at artificial levels, PayPal's call options traded at artificially inflated levels.  As a result of their purchases of PayPal call options during the Class Period, Class members suffered economic loss, *i.e.*, damages, under the federal securities laws, because the misstatements and omissions caused those options to trade at artificially inflated levels and, when the price of these options declined as the truth was revealed, these investors suffered losses.

### d.  Presumption of Reliance

373.    Plaintiffs allege omissions concerning the risks associated with PayPal's promotional activity, the disengaged and illegitimate accounts PayPal was counting as part of its NNA figures, and omitted information rendering the Company's publicly stated guidance misleading.  Where claims, like these, involve primarily failures to disclose, the requirement of proving reliance is relieved, pursuant to the Supreme Court's decision in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972) ("*Affiliated Ute*").

374.    Plaintiffs and Class members are entitled to a presumption of reliance on the material misrepresentations and omissions alleged herein pursuant to the fraud-on-the-market theory adopted by the Supreme Court in *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988) ("*Basic*"). Throughout the Class Period, PayPal's stock traded in an efficient market and under *Basic*, Plaintiffs are entitled to a presumption that (a) the misrepresentations and omissions alleged herein affected the market price for PayPal's stock, and (b) reasonable investors, including

Plaintiffs and members of the Class, relied on Defendants' misrepresentations and omissions when trading PayPal Securities at the market price or at prices informed thereby. The following allegations show that PayPal's Securities traded in an efficient market throughout the Class Period.

     (a)    Throughout the Class Period, PayPal's stock met the requirements for listing on, and was traded on the NASDAQ, and securities that trade on the NASDAQ overwhelmingly trade in an informationally efficient market.

     (b)    Throughout the Class Period, PayPal's stock traded at high volumes, with an average daily trading volume during the Class Period of approximately 10 million shares.

     (c)    Throughout the Class Period, PayPal's stock traded with a narrow bid-ask spread, with an average daily bid-ask spread of approximately 0.03% of PayPal's trading price.

     (d)    Throughout the Class Period, PayPal maintained a large market capitalization; PayPal's average market capitalization was over $280 billion throughout the Class Period.

     (e)    Throughout the Class Period, PayPal's stock was registered with the SEC, and PayPal filed periodic reports with the SEC.

     (f)    Throughout the Class Period, PayPal communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

     (g)    Throughout the Class Period, the market reacted promptly to public information disseminated by and about PayPal.

(h)    Throughout the Class Period, PayPal was covered by numerous securities analysts employed by major brokerage firms during the Class Period.  PayPal was extensively covered by news media and investor publications throughout the Class Period.

375.    As a result of the foregoing, the market for PayPal's Securities promptly digested current information regarding or relevant to PayPal from all publicly available sources and reflected such information in the stock prices.

376.    Defendants' material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of PayPal's Securities.

377.    Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs and other members of the Class purchased PayPal Securities between the time Defendants misrepresented or failed to disclose material facts and the end of the Class Period.

### e.  No Safe Harbor

378.    The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false or misleading statements and omissions alleged in this Complaint.  The statements at issue are not protected by the PSLRA's safe harbor or the common law bespeaks caution doctrine for a variety of reasons, including the following.

379.    First, Defendants' statements and omissions alleged to be false or misleading relate to historical facts or existing conditions and, therefore, are not protected by the safe harbor.  Second, to the extent any of the false or misleading statements alleged may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made.  Third, any purported forward-looking statements were not accompanied by meaningful cautionary language because risks that Defendants warned of had already come to pass, and any cautionary language did not mention important factors of similar significance to those actually

realized.  Fourth, to the extent that there were any forward-looking statements that were identified as such, Defendants are liable because, at the time each of those forward-looking statements was made, the speaker knew the statement was false and/or misleading when made.

## VI.    CLASS ACTION ALLEGATIONS

380.    Plaintiffs bring this federal securities class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all persons and entities that purchased or otherwise acquired PayPal publicly traded common stock or any exchange-traded option to purchase PayPal publicly traded stock during the period from February 3, 2021 through February 1, 2022, inclusive (the "Class Period"), and were damaged thereby, except as excluded below (the "Class").

381.    Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Individual Defendant; (iii) any person who was an officer or director of PayPal during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) affiliates of PayPal, including its employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person in (i)-(v) of this paragraph.

382.    The members of the Class are so numerous that joinder of all members is impracticable.  According to its quarterly and annual reports filed with the SEC, during the Class Period, there were approximately one billion shares of PayPal stock outstanding during the Class Period, and PayPal's stock was actively traded on the NASDAQ under the ticker symbol PYPL.  While the exact number of Class members is unknown to Plaintiffs at this time, and such number can only be ascertained through appropriate discovery, Plaintiffs believe that the proposed Class has thousands of members and is widely dispersed geographically.  Record owners and other

members of the Class may be identified from records maintained by PayPal and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

383.    Plaintiffs' claims are typical of the claims of the members of the Class.  All members of the Class were similarly affected by Defendants' alleged wrongful conduct in violation of the Exchange Act as complained of herein.

384.    Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs have retained counsel competent and experienced in class action and securities litigation.

385.    Common questions of law and fact exist as to all members of the Class, and predominate over questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include, but are not limited to, the following:

(a)    Whether Defendants violated the federal securities laws by their acts and omissions alleged herein;

(b)    Whether Defendants' trading constitutes a deceptive device under Rule 10-b5 of the Exchange Act;

(c)    Whether the statements Defendants made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

(d)    Whether, and to what extent, the market price of PayPal Securities was artificially inflated during the Class Period because of the material misstatements and omissions alleged herein;

(e)    Whether Defendants acted with the requisite level of scienter;

(f)  Whether Defendants Schulman, Rainey, and Auerbach were controlling persons of PayPal;

(g)  Whether Lead Plaintiff and other Class members traded contemporaneously with Defendants; and

(h)  Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of such damages.

386.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VII.   COUNTS

### a.   COUNT I: Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

387.  Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

388.  This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC, on behalf of Plaintiffs and the Class, against PayPal and the Individual Defendants.

389.  During the Class Period, Defendants deceived the investing public, including Plaintiffs and the Class, and artificially inflated or artificially maintained the price of PayPal Securities.

390.    Defendants made untrue statements of material fact and/or omitted material facts necessary to make their statements made not misleading.  Defendants' false or misleading statements and omissions are described in Section V(a).

391.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the adverse material information as specified herein.

392.    Defendants had actual knowledge of the misrepresentations, omissions, and deceptive conduct alleged herein, or acted with reckless disregard for the truth.  The facts demonstrating that Defendants acted with actual knowledge or recklessness are stated in Section IV, and more specifically stated in Section V(b).

393.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

394.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and members of the Class suffered damages in connection with their respective purchases of PayPal Securities during the Class Period.

**b.  COUNT II: Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

395.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

396.    This Count is asserted pursuant to Section 20(a) of the Exchange Act, on behalf of Plaintiffs and the Class, against the Individual Defendants.

397.    As alleged in Count I, PayPal violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder by making materially false or misleading statements and omitting material information about PayPal.

398.    Defendants' fraudulent conduct was undertaken with scienter, and PayPal is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with reckless disregard of the falsity or misleading nature of their statements and the fraudulent nature of PayPal's scheme during the Class Period.  Thus, PayPal is primarily liable under Section 10(b) of the Exchange Act.

399.    As set forth above, the Individual Defendants had control over PayPal and made the materially false or misleading statements and omissions on behalf of PayPal within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their executive positions and their culpable participation, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of PayPal, including the content and dissemination of the various statements that Plaintiffs contend were false or misleading.  The Individual Defendants were provided with or had unlimited access to PayPal's internal reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or to cause them to be corrected.

400.    In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of PayPal and, therefore, are presumed to have had the power to control or to influence the conduct giving rise to the securities violations as alleged herein.  PayPal, in turn, controlled the Individual Defendants and all of its employees.

401.    The Individual Defendants also were culpable participants in the conduct alleged herein, because they: (a) made materially false and misleading statements or omitted to disclose truthful information; (b) had knowledge of the wrongful conduct or were reckless in not having

such knowledge and continued in the capacity of control persons of PayPal; (c) provided credibility to PayPal's public disclosures by appearing in public events on behalf of PayPal while he conduct alleged herein occurred; and/or (d) did not act to prevent the wrongful conduct alleged herein, despite an ability to do so.

402.    By reason of such wrongful conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of PayPal Securities during the Class Period.

### c.  COUNT III: Violation of Section 20A of the Exchange Act Against the Individual Defendants

403.    Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

404.    As detailed herein, the Individual Defendants were in possession of material non-public information concerning PayPal.  The Individual Defendants took advantage of their possession of material non-public information regarding PayPal to obtain significant insider trading profits during the Class Period.

405.    The Individual Defendants' sales of PayPal common stock (set forth below and in the attached Appendix) were made contemporaneously with Lead Plaintiff's purchases of PayPal common stock (set forth below and in Lead Plaintiff's certifications (*see* ECF No. 12-3)) during the Class Period.

406.    Defendant Schulman made the following sales of PayPal common stock contemporaneously with the following Lead Plaintiff's purchases of PayPal common stock:

| Lead Plaintiff's Purchases (Within 3 Days) | | | Defendant Schulman's Sales | | |
|---|---|---|---|---|---|
| Date | Shares | Price | Date | Shares | Price |
| February 16, 2021 | 23,100 | 304.79 | February 16, 2021 | 200 | 298.73 |
| | | | February 16, 2021 | 300 | 308.05 |
| | | | February 16, 2021 | 600 | 300.51 |
| | | | February 16, 2021 | 830 | 301.84 |
| | | | February 16, 2021 | 1,200 | 306.88 |
| | | | February 16, 2021 | 1,200 | 302.85 |
| | | | February 16, 2021 | 1,300 | 305.93 |
| | | | February 16, 2021 | 1,800 | 303.98 |
| | | | February 16, 2021 | 2,570 | 304.94 |
| April 30, 2021 | 23,853 | 262.29 | April 30, 2021 | 100 | 265.94 |
| | | | April 30, 2021 | 500 | 265.22 |
| | | | April 30, 2021 | 2,283 | 263.28 |
| | | | April 30, 2021 | 2,421 | 264.19 |
| | | | April 30, 2021 | 4,696 | 262.18 |
| May 19, 2021 | 41,533 | 244.63 | May 18, 2021 | 500 | 247.07 |
| | | | May 18, 2021 | 607 | 243.34 |
| | | | May 18, 2021 | 1,760 | 244.29 |
| | | | May 18, 2021 | 3,033 | 245.35 |
| | | | May 18, 2021 | 4,100 | 246.39 |
| July 30, 2021 | 12,700 | 275.53 | July 30, 2021 | 300 | 280.21 |
| | | | July 30, 2021 | 935 | 279.39 |
| | | | July 30, 2021 | 1,450 | 277.97 |
| | | | July 30, 2021 | 2,200 | 277.25 |
| | | | July 30, 2021 | 2,335 | 276.19 |
| | | | July 30, 2021 | 2,780 | 275.14 |
| October 29, 2021 | 15,538 | 234.22 | October 29, 2021 | 300 | 237.28 |
| November 1, 2021 | 846 | 231.50 | October 29, 2021 | 985 | 233.11 |
| November 2, 2021 | 882 | 231.21 | October 29, 2021 | 1,100 | 236.33 |
| | | | October 29, 2021 | 1,651 | 232.38 |
| | | | October 29, 2021 | 2,896 | 234.27 |
| | | | October 29, 2021 | 3,068 | 235.47 |

407.    Defendant Rainey made the following sales of PayPal common stock contemporaneously with the following Lead Plaintiff's purchases of PayPal common stock:

| Lead Plaintiff's Purchases (Within 3 Days) | | | Defendant Rainey's Sales | | |
|---|---|---|---|---|---|
| Date | Shares | Price | Date | Shares | Price |
| February 16, 2021 | 23,100 | 304.79 | February 15, 2021 | 4,311 | 298.37 |
| | | | February 17, 2021 | 5,377 | 298.00 |

408.    Defendant Auerbach made the following sales of PayPal common stock contemporaneously with the following Lead Plaintiff's purchases of PayPal common stock:

| Lead Plaintiff's Purchases (Within 3 Days) | | | Defendant Auerbach | | |
|---|---|---|---|---|---|
| Date | Shares | Price | Date | Shares | Price |
| February 26, 2021 | 150,000 | 259.85 | February 23, 2021 | 100 | 267.07 |
| | | | February 23, 2021 | 600 | 255.16 |
| | | | February 23, 2021 | 1,100 | 253.59 |
| | | | February 23, 2021 | 2,208 | 266.41 |
| | | | February 23, 2021 | 2,284 | 256.06 |
| | | | February 23, 2021 | 2,625 | 262.26 |
| | | | February 23, 2021 | 2,800 | 263.31 |
| | | | February 23, 2021 | 2,900 | 259.26 |
| | | | February 23, 2021 | 2,909 | 258.19 |
| | | | February 23, 2021 | 3,472 | 257.03 |
| | | | February 23, 2021 | 5,400 | 261.09 |
| | | | February 23, 2021 | 5,458 | 264.51 |
| | | | February 23, 2021 | 6,978 | 265.48 |
| | | | February 23, 2021 | 7,300 | 260.21 |
| May 27, 2021 | 41,807 | 259.47 | May 25, 2021 | 2,137 | 259.77 |
| | | | May 25, 2021 | 4,690 | 258.29 |
| | | | May 25, 2021 | 7,415 | 259.07 |

409.    In addition, each of the Individual Defendants' sales of PayPal common stock during the Class Period were contemporaneous with purchases of members of the Class who purchased PayPal common stock during the Class Period.  *See* ¶¶321-323 (listing each Individual Defendants' Class Period sales).

410.    Lead Plaintiff and members of the Class who purchased PayPal Securities contemporaneously with sales by the Individual Defendants suffered damages because: (1) in reliance on the integrity of the market,  Lead Plaintiff and members of the Class paid artificially inflated prices as a result of the violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder, as alleged herein; and (2) Lead Plaintiff and members of the Class would not have purchased the securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by Defendants' false or misleading statements and concealment alleged herein.

411.    By reason of the above conduct, the Individual Defendants are liable pursuant to §20A of the Exchange Act, 15 U.S.C. §78t-1.

## VIII.  PRAYER FOR RELIEF

412.    WHEREFORE, Plaintiffs, on behalf of themselves and the other members of the

Class, pray for judgment as follows:

(a)    Declaring this action to be a class action properly maintained pursuant to

Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiffs as Class

Representatives, and Labaton Sucharow LLP and Robbins Geller Rudman & Dowd LLP as Class

Counsel;

(b)    Awarding compensatory damages in favor of Plaintiffs and the other

members of the Class against all Defendants, jointly and severally, for all damages sustained as a

result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiffs reasonable costs and expenses incurred in this action,

including attorneys' fees, experts' fees, and other costs and disbursements; and

(d)    Awarding such further relief, including any equitable/injunctive relief, as

the Court may deem just and proper.

## IX.  JURY TRIAL DEMANDED

413.    Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated:  March 13, 2023

Respectfully submitted,

**SEEGER WEISS LLP**

By: */s/ Christopher A. Seeger*
    Christopher A. Seeger
    Christopher L. Ayers
    Jennifer R. Scullion
    55 Challenger Road, 6th Floor
    Ridgefield Park, NJ 07660
    Telephone: (973) 639-9100
    Facsimile: (973) 679-8656
    cseeger@seegerweiss.com
    cayers@seegerweiss.com
    jscullion@seegerweiss.com

*Liaison Counsel*

**LABATON SUCHAROW LLP**
Carol C. Villegas *(pro hac vice)*
Jake Bissell-Linsk *(pro hac vice)*
Lisa Strejlau *(pro hac vice)*
Danielle Izzo *(pro hac vice)*
140 Broadway
New York, NY  10005
Telephone: (212) 907-0700
Fax: (212) 818-0477
cvillegas@labaton.com
jbissell-linsk@labaton.com
lstrejlau@labaton.com
dizzo@labaton.com

**LABATON SUCHAROW LLP**
Mark Willis *(pro hac vice* forthcoming*)*
1050 Connecticut Avenue NW
Suite 500
Washington, D.C. 20036
Telephone: (202) 772-1880
Fax: (212) 818-0477
mwillis@labaton.com

*Counsel for Lead Plaintiff and*
*Co-Lead Counsel for the Class*

**ROBBINS GELLER RUDMAN & DOWD LLP**
Tor Gronborg *(pro hac vice)*
Matthew I. Alpert *(pro hac vice)*
Patton L. Johnson *(pro hac vice)*
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
Fax: 619/231-7423
torg@rgrdlaw.com
malpert@rgrdlaw.com
pjohnson@rgrdlaw.com

**ROBBINS GELLER RUDMAN & DOWD LLP**
Jacob G. Gelman *(pro hac vice)*
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
Fax: 415/288-4534
jgelman@rgrdlaw.com

*Counsel for PERA and*
*Co-Lead Counsel for the Class*

**OFFICE OF THE NEW MEXICO ATTORNEY GENERAL**
RAÚL TORREZ, Attorney General
JACQUELINE ORTIZ, Assistant Attorney General
Post Office Drawer 1508
Santa Fe, NM  87504-1508
Telephone:  505/490-4060
jortiz@nmag.gov

*Counsel for PERA*

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2023, I authorized the electronic filing of the foregoing Consolidated Amended Complaint For Violations Of The Federal Securities Laws with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses of all counsel of record.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED:      March 13, 2023
            Camden, New Jersey

                                        /s/ *Christopher A. Seeger*
                                        Christopher A. Seeger