NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE PAYPAL HOLDINGS INC. SECURITIES LITIGATION | Civil Action No. 22-5864 (RK) (JBD)  **OPINION** |

**KIRSCH, District Judge**

**THIS MATTER** comes before the Court upon a Motion to Dismiss, (ECF No. 76), filed by Defendants PayPal Holdings, Inc. ("PayPal" or the "Company"), Daniel Schulman ("Schulman"), John Rainey ("Rainey"), and Jonathan Auerbach ("Auerbach") (collectively "Defendants").[1] Defendants seek to dismiss Lead Plaintiff Caisse dépôt et placement du Québec ("Lead Plaintiff") and additional named Plaintiffs' Public Employee Retirement Association of New Mexico's ("PERA") (collectively "Plaintiffs") Amended Consolidated Complaint, ("Am. Compl.," ECF No. 49). Plaintiffs filed a brief in opposition, ("Pls. Opp'n," ECF No. 77), and Defendants filed a reply brief, ("Defs. Reply," ECF No. 78). The Court has considered the parties' submissions and resolves the matter without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, Defendants' Motion to Dismiss is **GRANTED**.

## I.    BACKGROUND

This matter concerns a purported class action brought by purchasers of PayPal stock between February 3, 2021 and February 1, 2022 ("the Class Period") against PayPal and its key officers asserting claims for securities fraud under Section 10(b) and Rule 10b-5, as well as Section

---

[1] The Court will refer to Defendants' brief in support of their Motion to Dismiss, (ECF No. 76-1), as "Defs. Mot." The Court also refers to Schulman, Rainey and Auerbach together as the "Individual Defendants."

20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78a *et seq*. The suit alleges that Defendants—PayPal and three of its officers—made material false or misleading statements, or omitted material information, relating to its growth and future prospects and that Defendants had reason to believe their statements were false. When the truth was revealed to investors, Plaintiffs contend that the stock plummeted, causing Plaintiffs to suffer significant losses. The facts below are taken from the Amended Complaint and assumed to be true solely for the purposes of deciding the subject Motion.

### A.    THE PARTIES

Lead Plaintiff, an investment group, purchased PayPal stock at alleged "artificially inflated prices" during the Class Period, suffering losses when the stock tumbled. (Am. Compl. ¶ 37.) PERA manages thirty-one retirement plans for New Mexico public employees, including police and firefighters. (*Id.* ¶ 38.) It too purchased PayPal stock during the Class Period. (*Id.*) PayPal, a Delaware corporation with its principal place of business in San Jose, California, is a technology company, previously part of eBay, that operates a digital payment platform. (*Id.* ¶¶ 1, 6, 39.) The Company's stock trades publicly on the Nasdaq Stock Market under the symbol "PYPL." (*Id.* ¶ 39.) Defendant Schulman was the Chief Executive Officer ("CEO") of PayPal and a member of the Board of Directors during the Class Period. (*Id.* ¶ 40.) Also during this time period, Defendant Rainey was the Company's Chief Financial Officer ("CFO"), and Defendant Auerbach was the Executive Vice President, Chief Strategy, Growth and Data Officer. (*Id.* ¶¶ 41–42.)

### B.    PAYPAL'S BUSINESS MODEL AND EXPANSION STRATEGY

As a "leading technology platform," PayPal facilitates transactions between consumers and merchants—allowing consumers to pay for goods and services or enabling parties to transfer money between PayPal accounts. (*Id.* ¶¶ 51–52.) Among PayPal's numerous product offerings are

its "checkout" products which allow consumers to purchase goods from merchants, as well as "person-to-person" products such as Venmo and Xoom. (*Id.* ¶ 52.) PayPal collects fees for, *inter alia*, completed transactions; therefore, the more transactions that occur on its platform, the more revenue PayPal accrues. (*Id.* ¶ 53.) PayPal also earns revenue through partnerships with other brands, including Shopify and SalesForce, as well as interest and fees from customer accounts. (*Id.* ¶ 56.)

Accordingly, PayPal tracks and discloses a number of key metrics that track user growth and usage on its platform. (*Id.* ¶¶ 54–55.) First, one of PayPal's "key performance indicators" is "Total Payment Volume" ("TPV"), or the "total value of payments, net of payment reversals on its payment platforms or enabled by PayPal via a partner payment solution." (*Id.* ¶ 54.) Second, PayPal monitors its new users by tracking the "Net New Actives" ("NNA"), or the "net increases to the number of active accounts." (*Id.* ¶ 55.) An NNA is a new user who completes a transaction through PayPal or one of its partner accounts within the past 12 months, with the Lifetime Value ("LTV") of an account typically calculated between 18 to 24 months. (*Id.* ¶¶ 55, 134.) Third, PayPal tracks the total number of payment transactions on its platform. (*Id.* ¶ 55.)

The Amended Complaint alleges that beginning in November 2020, PayPal adopted a new strategy in order to become a "Super App," offering a suite of new capabilities, including budgeting and shopping tools. (*Id.* ¶ 57.) To achieve this, NNAs took on a prominent role that would "drive[] future TPV and corresponding revenue." (*Id.* ¶ 59.) As such, NNA growth became the main focus. (*Id.* ¶ 60.) To achieve this growth, PayPal sought to rapidly grow its NNAs and expressed this focus both internally among employees and externally to investors. (*Id.* ¶¶ 61–63.) Plaintiffs allege that NNAs were "measured daily" through reports, measuring "gross new additions, churn, and activity," sent to PayPal's executives each day. (*Id.* ¶ 65.)

To gain new users, PayPal undertook a number of new marketing schemes. (*Id.* ¶ 66.) Plaintiffs contend, however, that "this growth [in NNAs] was achieved in large part due to risky promotions that essentially paid people to sign up for PayPal accounts purely to earn cash that the Company was offering for new accounts." (*Id.*) As one example, Plaintiffs reference a promotion where a new user would receive $5 in exchange for creating a new account. (*Id.* ¶ 67.) This promotion was allegedly popular among Chinese users, with one website promising each user the ability to make "$500–1000/person/day" by fraudulently signing up for multiple new PayPal accounts. (*Id.* ¶¶ 67–71.) The Amended Complaint alleges that PayPal's marketing budget in 2021 increased 33% from 2020, and up 71% from 2019. (*Id.* ¶ 122.) The "heavy use of promotional activity" led to a large increase in "unengaged users" on the platform. (*Id.* ¶ 120.)

### C.    DEFENDANTS' PUBLIC STATEMENTS REGARDING NNAS

Beginning at the start of the Class Period and continuing throughout it, Plaintiffs allege that Defendants highlighted to investors the importance of NNA growth and PayPal's strong results throughout the period. In February 2021, Defendant Schulman noted the Company's "record growth in net new active accounts" and its expectations that NNAs would continue to climb, estimating growth of an additional 50 million NNAs in 2021. (*Id.* ¶¶ 60–62, 141.) PayPal continued to tout its growth numbers, stating at the February 11, 2021 Investor Day that it expected "engagement levels [to] increase dramatically throughout our base" and to decrease the churn rate with which customers left its platform. (*Id.* ¶¶ 143–44.) In PayPal's quarterly reports and associated earnings calls, PayPal continued to express confidence in its NNA growth. (*Id.* ¶ 148 (noting that PayPal increased active accounts by 21% from Q1 2020 to Q1 2021); ¶ 149 (Defendant Schulman expecting to grow NNAs between 52 and 55 million for 2021).) In July 2021, PayPal "reaffirmed its guidance of 52-55 million NNAs for the year." (*Id.* ¶ 151.) Again in November

2021, PayPal told investors that it believed it would add 52 to 55 million NNAs for the year 2021. (*Id.* ¶¶ 159–165.)

Plaintiffs claim, however, that internally the Company was aware that its marketing strategies had given rise to illegitimate and unengaged accounts. Confidential Witness 4 ("CW-4")[2], a member of PayPal's "inner circle," contends that he alerted "senior executives, including Senior Vice President, Chief Compliance Officer Fiachre O'Neill," about certain risks involved with PayPal's aggressive marketing strategies, including that it would "lead to people opening accounts without otherwise using PayPal's services." (*Id.* ¶¶ 75–76.) Despite raising his concerns, CW-4 claims that the senior executives signed off on these promotional strategies. (*Id.*) As CW-4 alleged, such sign-off included a "dollar amount" and would therefore need clearance from PayPal's CFO. (*Id.* ¶ 76.) CW-5, a former Senior Manager of Finance, alleges that PayPal was aware of "the risks associated with the accounts generated by the NNA promotions" yet decided to continue with the aggressive marketing strategies. (*Id.* ¶ 79.)

CW-6, a Senior Manager of Risk and Compliance, contends that PayPal's fraud review process likely would have identified fraudulent accounts that had signed up for the platform. (*Id.* ¶¶ 80–81.) CW-6 explains that, as part of its fraud review procedures, PayPal monitors accounts for various red flags, including the same IP and physical addresses being used across different accounts. (*Id.* ¶ 81.) CW-6 discussed with PayPal's strategy team needing "controls [] in place to prevent accounts being opened solely for the sake of obtaining the promotion." (*Id.* ¶ 83.) CW-3, a member of the Seller Fraud Operations Department, states that he "first became aware of fraudulent accounts being created at a large scale to take advantage of PayPal's new account

---

[2] Consistent with Plaintiff's Amended Complaint, all references to "CW-#" refer to one of seven Confidential Witnesses, who are former PayPal employees. (Am. Compl. ¶ 12 n.1.)

payment incentive in early 2021." (*Id.* ¶ 90.) CW-3 continued investigating these accounts, which culminated in a meeting of the Global Seller Risk teams and Strategy teams in October 2021. (*Id.* ¶ 96.)[3] This meeting was attended by "approximately 400" PayPal employees, including unnamed and otherwise unidentified "senior directors" but none of the named Defendants. (*Id.*)  At this meeting, CW-3 explained his process that had identified around one million fake accounts, through which he later identified approximately two million "accounts that were engaging in incentive abuse." (*Id.* ¶¶ 97–100.) CW-3 "advocated for PayPal to shut down" the suspicious accounts, but his boss only approved "limiting" those accounts, which would "flag" or designate the accounts as suspected of fraud and "limit their activity." (*Id.* ¶ 98 & n.6.) This "limiting" process, however, would not prevent the affected accountholders from withdrawing any money. (*Id.*) Aside from these vague assertions, no additional information was provided.

PayPal continued to monitor its NNAs throughout the Class Period. As CW-2, a Director of Finance, explained, various PayPal units, including teams responsible for PayPal checkout and Venmo, measured NNAs daily through automated reports sent to PayPal's executives. (*Id.* ¶¶ 108–09.) CW-4 also explained that PayPal's regulatory and state law reporting obligations required the Company to constantly monitor new accounts and NNA activity. (*Id.* ¶¶ 110–15.)

### D.    ALLEGED FALSE AND MISLEADING STATEMENTS

Plaintiffs allege that throughout the Class Period, Defendants made five sets of false or misleading statements: (1) "touting TPV growth," (2) "tout[ing] PayPal's supposed NNA growth," (3) "touting NNA growth [that] counted illegitimate bot-accounts as legitimate NNAs," (4) "provid[ing] or confirm[ing] PayPal's guidance as to future NNA growth," and (5) "tout[ing]

---

[3] This October 2021 meeting was corroborated by CW-7, an employee in PayPal's fraud department. (Am. Compl. ¶¶ 103–04.)

engagement with PayPal's services by NNAs and/or actual or expected reductions in churn due to such engagement." (*Id.* ¶ 207.) As a result of these statements, Plaintiffs contend that PayPal's stock price became and remained artificially inflated during the Class Period. (*Id.* ¶ 205.) Within these five groups, the Amended Complaint breaks down the allegedly problematic statements into fifteen sets.

The first challenged statements occurred on February 3, 2021 when PayPal reported its 2020 financial results. (*Id.* ¶ 209.) In its 2020 Form 8-K, PayPal reported that it "[e]xpect[ed] ongoing momentum with strong TPV growth and NNAs" and expected to add "50 million NNAs" in 2021. (*Id.*) In addition, on a conference call to discuss the Company's quarterly results, Defendant Schulman stated: "In 2021, we expect to add another 50 million net new active accounts." (*Id.* ¶ 213.) Schulman also stated that engagement was strong for new accounts, referencing "double-digit increases in value" and a 13% increase in engagement rates. (*Id.* ¶ 217; *see also id.* ¶ 221.) Schulman said that churn rates were decreasing in part "because of increased engagement." (*Id.* ¶ 219.) On this same call, Defendant Rainey touted the Company's success, stating that the "core business continues to perform at unprecedented levels" and the Company's "addressable opportunity has never been more expansive." (*Id.* ¶ 215.) Finally, in its 2020 Form 10-K, PayPal stated that "P2P [peer to peer] is a significant customer acquisition channel that facilitates organic growth . . . ." (*Id.* ¶ 223.)

The second challenged statements occurred on February 11, 2021 at PayPal's Investor Day. (*Id.* ¶ 225.) Defendant Schulman continued to express optimism in PayPal's growth, stating that he believed "we can grow [] 377 million to 750 million active accounts on our platform" due to increasing engagement levels and decreased churn rates. (*Id.* ¶¶ 225, 227.) Auerbach also stated that PayPal added "roughly 73 million net new actives to PayPal in 12 months. . . . And these new

cohorts are using PayPal more than the old cohorts did." [4] (*Id.* ¶ 229.) Auerbach also noted that the Company has "gotten much better as a company at generating and engaging high-quality net new actives." (*Id.*) In addition, Auerbach touted the NNAs as "not simply a factor of marketing. We're getting much better [as] a company across PayPal through better user experiences, risk management, stronger ecosystem partnerships to drive NNAs on a sustainable basis" with expectations to double consumers over the next three to five years. (*Id.* ¶ 231.)

The third challenged statements were made at PayPal's Company Conference Presentation on March 2, 2021. (*Id.* ¶ 233.) In response to a question about PayPal's aspirations to achieve 750 million active users, Defendant Rainey stated that "the plan that we laid out doubles our customers over the next 5 years . . . [a]nd it really comes through multiple forms. I'll start with one of the big efforts that we've made related to the increased engagement is to see a reduction in churn." (*Id.*)

The fourth group of statements occurred on March 4, 2021 at Evercore ISI's Payments and Fintech Innovators Forum. (*Id.* ¶ 235.) Defendant Rainey again touted the Company's plans to double its NNAs over the next five years, explaining that "a significant driver of that is actually reducing the churn of the existing customers." (*Id.*)

The fifth group of statements were made in Defendant Schulman's comments on March 9, 2021 at the Wolfe Fintech Forum. (*Id.* ¶ 237.) Schulman stated that PayPal had a "relatively consistent and growing set of customers and merchants we want to come on to our platform" and "new demographics, new markets, [and] new products [] are attracting new customers at the top of that funnel." (*Id.*) He also stated that 90-day engagement rates had increased 13% over the past

---

[4] In contrast to CEO Schulman and CFO Rainey, the Court notes that Plaintiffs' only factual allegations of false or misleading statements involving Defendant Auerbach are his statements at PayPal's Investor Day on February 11, 2021. (Am. Compl. ¶ 229–32.)

year and continued to increase, new users were joining the platform, and PayPal was experiencing "reduction in churn" along with an "increase in average revenue per user." (*Id.*)

The sixth group of statements concern the Company's 1Q2021 earnings, announced on May 5, 2021. (*Id.* ¶ 239.) PayPal's Form 8-K stated that this quarter was the "strongest first quarter results in PayPal's history" with 14.5 million NNAs, resulting in 392 million active accounts. (*Id.*) The 8-K also stated that PayPal was "[r]aising NNAs, TPV, revenue and earnings guidance" and increased its expectations in NNAs for 2021 to between 52 and 55 million. (*Id.*) PayPal also reiterated this expected growth in its corresponding Investor Presentation released on May 5. (*Id.* ¶ 241.)

Additional challenged statements were made on earnings calls that same day. Schulman stated: "We added 14.5 million net new active accounts, ending the quarter with 392 million active accounts, up 21% year-over-year" and emphasized that PayPal "now believe[d] our NNAs will be between 52 million to 55 million, up from our previous expectations of approximately 50 million last quarter. (*Id.* ¶ 247.) Schulman also claimed PayPal had "a lot of momentum as we exit Q1." (*Id.*) Schulman emphasized that the Company's growth had been due in part to "our marketing programs [] really beginning to deliver excellent results." (*Id.* ¶ 251.) Schulman stated that he was "bullish on . . . our NNA trends" and PayPal was poised to remain "really strong on the NNA front [and] really strong on the engagement front." (*Id.* ¶ 253.) Rainey also reiterated this predicted growth, believing that PayPal would "add more new users between last year and this year than we did in 2016, '17, '18 and '19 combined." (*Id.* ¶ 249.) In its Form 10-Q for 1Q2021, PayPal disclosed increased revenues, which grew "primarily" based on "strong growth in TPV and the number of payment transactions, both of which resulted primarily from an increase in our active

accounts." (*Id.* ¶ 255.) The Company also reported that that it had increased total accounts, transactions, and TPV by 21%, 34%, and 50%, respectively, from 1Q2020. (*Id.* ¶ 255.)

A seventh group of statements were made on May 10, 2021 on a MoffettNathanson Analyst Call. (*Id.* ¶ 257.) Schulman again reiterated the Company's focus on NNAs and its 14.5 million new additions in 1Q2021. (*Id.*) He also referenced the decreased churn rate and the productive efforts of the marketing team to bring in new users. (*Id.*) Finally, Schulman reiterated the Company's expected goal of adding between 52 and 55 million NNAs. (*Id.* ¶ 261.)

The eighth set of alleged false or misleading statements was made on May 24, 2021 at J.P. Morgan's Payments and IT Services Sector Analyst call. (*Id.* ¶ 263.) PayPal repeated its goal of reaching 750 million total users, which it would achieve through "reducing churn" and bringing on users with "elevated levels of engagement." (*Id.* ¶ 263.) On the same call, Rainey stated that PayPal was focused on low cost customer acquisition, as well as not "chasing a low-value, net new active that maybe pumps up the numbers and the optics look good . . . ." (*Id.* ¶¶ 265–68.)

The ninth group of challenged statements were made on June 9, 2021 at the Bank of America Securities Keynote Session. (*Id.* ¶ 269.) Schulman, in response to a question concerning NNAs, stated that "[o]ur marketing is finally starting to kick in, in ways that we can really measure and look at it, invest wisely and get a return on that and bring in high-quality net new actives at the top of the funnel." (*Id.*) He also echoed PayPal's prediction that it would add between 52 and 55 million NNAs during 2021. (*Id.*)

The tenth group of statements concern the Company's 2Q2021 earnings, announced on July 28, 2021. (*Id.* ¶ 271.) PayPal reported 11.4 million NNAs and reaffirmed its guidance to add 52–55 million NNAs for the year. (*Id.* ¶¶ 271–77) PayPal also stated that TPV grew by 40%, as did customer engagement, measured as the payment transactions per active account. (*Id.*) Other

challenged statements occurred on the earnings call that same day. Schulman stated that PayPal had added 11.4 million NNAs for the quarter and expected to hit its projected range for the year. (*Id.* ¶ 277.) Schulman also noted that consumers were "engag[ing] more frequently across our growing suite of services." (*Id.*) On that same call, Rainey, stated that "growth remains strong" and raised expectations for TPV growth and revenue. (*Id.* ¶ 279.) In its Form 10-Q, PayPal stated that its "growth in transaction revenues was mainly attributable to our core PayPal and Braintree products and services driven by strong growth in TPV and the number of payment transactions, both of which resulted primarily from an increase in our active accounts." (*Id.* ¶ 281.) The Company also reported that that it had increased total accounts, transactions, and TPV by 16%, 30%, and 40% respectively, from 2Q2020. (*Id.* ¶ 255.)

The eleventh set of alleged false or misleading statements occurred on September 9, 2021 at the Deutsche Bank Fireside Chat. (*Id.* ¶ 283.) In response to a question concerning PayPal's 750 million user target over the next four years, Rainey responded that the Company has focused on limiting churn and "keep[ing] those customers engaged and allow them to use us in many different ways, many avenues that they haven't before to diminish the chance for churn." (*Id.*)

Another challenged statement, the twelfth contested, occurred at the J.P. Morgan All Stars Conference on September 23, 2021. (*Id.* ¶ 285.) With respect to PayPal's expectations for the quarter, Schulman stated that he believed the Company would "be right down the middle of the fairway in all the guidance that we talked about. Things are coming in pretty much where we expected them to be for the quarter." (*Id.*)

The thirteenth group of statements concern the Company's 3Q2021 earnings, announced on November 8, 2021. (*Id.* ¶ 287.) In its Form 8-K, PayPal reported 13.3 million NNAs, as well as increased TPV growth. (*Id.*) On the corresponding earnings call, Schulman stated that active

accounts "were up 15% year-over-year, reaching 416 million." (*Id.* ¶ 289.) Schulman emphasized that PayPal "remain[ed] on track to deliver more than 52 million NNAs for the year," as well as double-digit growth in the transactions per active account. (*Id.*) He characterized the Company's NNA growth as "incredibly strong," closing the year with over 430 million active users. (*Id.* ¶ 297.) Like in past quarters, Schulman emphasized the importance of reducing churn to enable PayPal to achieve its goals with respect to active users. (*Id.* ¶ 299.) Rainey noted that PayPal has seen increased growth among key metrics such as active accounts, engagement, and TPV. (*Id.* ¶ 293.) Rainey also stated that PayPal's "key strategic initiatives are on track and performing very well." (*Id.* ¶ 295.) The next day, on a buyside analyst call, Rainey highlighted that PayPal continued to prioritize engaged users over low quality new actives: "we can certainly go out and spend money on customer acquisition and get very low value net new actives to inflate or pump up that number, but that's not the right economic decision for us longer term. And I've got confidence in where we are longer term around net new actives." (*Id.* ¶ 301.) In PayPal's Form 10-Q, it highlighted that net revenues increased 13% year-over-year "driven primarily by growth in total payment volume." (*Id.* ¶ 303.) PayPal also saw a 15% increase in active accounts during that same period. (*Id.*)

The fourteenth challenged statement occurred on November 30, 2021 on CNBC's Mad Money with Jim Cramer. (*Id.* ¶ 305.) Schulman appeared on the program and was asked a question concerning PayPal's goal of obtaining 750 million users by 2025. (*Id.*) Schulman responded that PayPal was on track for 55 million NNAs for the year, with a total of about 430 million active accounts on the platform. (*Id.*)

The fifteenth set of challenged statements were made during a Goldman Sachs Conference on December 7, 2021. (*Id.* ¶ 307.) Schulman continued to tout PayPal's NNA growth, stating that

PayPal had added 110 million NNAs between January 2020 to the end of the third quarter 2021. (*Id.*) He also mentioned PayPal's user tracking systems, noting that the Company has "200-plus different indicators to decide instantaneously is it you or not." (*Id.*)

E.    DISCLOSURES AND MARKET REACTION

On February 1, 2022, PayPal released its earnings and results for the Fourth Quarter of 2021 and held accompanying earnings calls with investors. (*Id.* ¶ 167.) According to the Amended Complaint, the Company "disclosed that PayPal's position was far weaker than previously stated, including because PayPal had counted 'illegitimate' accounts as part of its publicly reported NNA figures and because the vast majority of even the legitimate accounts that PayPal had generated in 2021 were essentially unengaged with the platform." (*Id.*) PayPal reported NNAs of only 9.8 million for the Fourth Quarter, well below investor expectations of around 15.8 million new accounts. (*Id.* ¶¶ 168–70.) On the February 1, 2022 earnings call, Defendant Rainey explained that PayPal had counted "illegitimate" accounts in its preceding quarterly results for 2021, including nearly 4.5 million such accounts in its Third Quarter year-to-date results. (*Id.* ¶ 171.) On a subsequent analyst call the next day, Defendant Rainey explicated that these illegitimate accounts "were the primary driver of the miss," and that "bot" accounts had taken advantage of PayPal's aggressive marketing campaigns. (*Id.* ¶ 172 (internal quotation marks omitted).) Defendant Rainey stated that many of PayPal's users were "minimally engaged" and that one third of PayPal's users accounts for the "vast majority" of the transactions on the platform. (*Id.* ¶ 174.) PayPal announced that it would shift its focus in 2022 away from the "less engaged customers," who the Company believed would leave the platform. (*Id.* ¶ 178.) Accordingly, PayPal slashed its NNA guidance for 2022 to only 15 to 20 million expected NNAs. (*Id.* ¶ 179.)

Following the 2021 Fourth Quarter results, Plaintiffs allege that "PayPal shares suffered their worst selloff in the Company's history." (*Id.* ¶ 181.) The stock price fell from a closing price of $175.80 on February 1, 2022 to $132.57 at close of market on February 2, or a 24.6% decline, resulting in a market capitalization losses of $49.3 billion. (*Id.*) The stock continued to fall, closing at $124.30 on February 3, 2022. (*Id.*) Subsequent analyst and media reports, from sources such as Barclays, Jeffries, and Bloomberg, focused on the missed NNA guidance. (*Id.* ¶¶ 182–83.)

Plaintiffs contend that PayPal's misrepresentations concerning its NNA growth and user engagement artificially inflated the stock price during the Class Period. (*Id.* ¶ 367.) Following PayPal's disclosures during its 2021 Fourth Quarter results and earnings calls, Plaintiffs contend that "PayPal's stock price fell dramatically over the next two trading days." (*Id.* ¶ 369.) Plaintiffs contend that they suffered economic losses as a result of the stock decline. (*Id.* ¶¶ 371–72.)

**F.    DEVELOPMENTS AFTER THE CLOSE OF THE CLASS PERIOD**

The Amended Complaint chronicles certain developments after the closing of the Class Period allegedly relevant to Plaintiffs' claims. Plaintiffs contend that PayPal's NNAs continued to decline in 2022. (*Id.* ¶ 185.) PayPal's focus also shifted to the "quality of the user versus the overall quantity." (*Id.* ¶ 190; *see also* ¶ 192 (Defendant Schulman, on an April 27, 2022 earnings call, noting expectations of higher churn rate based on "low engaged users" leaving the platform "because the ROI to keep them isn't worth it").) On August 2, 2022, PayPal reported its Second Quarter results for 2022, where the Company reported 400,000 NNAs. (*Id.* ¶ 197.) Significant executive turnover occurred at the Company, with PayPal replacing Rainey as its CFO in April 2022, its Chief Product Officer in September 2022, its Chief Accounting Officer in February 2023, Schulman retiring at the end of 2023, and Rainey's replacement CFO leaving in March 2023. (*Id.* ¶¶ 31, 199–204.)

### G.   NO SAFE HARBOR

Plaintiffs also allege that the statutory safe harbor for forward-looking statements does not apply to any of the false or misleading statements alleged in the Amended Complaint. (*Id.* ¶ 378.) Plaintiffs contend that the statements were not identified as forward-looking statements when made, related to existing conditions, or did not contain any meaningful cautionary language outlining the various risks to PayPal. (*Id.* ¶ 379.) Finally, Plaintiffs contend that Defendants knew at the time the statements were false or misleading. (*Id.*)[5]

### H.   PROCEDURAL HISTORY

On October 4, 2022, Plaintiff Defined Benefit Plan of the Mid-Jersey Trucking Industry and Teamsters Local 701 Pension and Annuity Fund filed a putative class action complaint. (ECF No. 1.) On January 11, 2023, the Honorable Georgette Castner, U.S.D.J. appointed Caisse dépôt et placement du Québec as Lead Plaintiff. (ECF No. 18.) An Amended Complaint, (ECF No. 49), was filed on March 13, 2023. The Amended Complaint asserted one claim for violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against all Defendants (Count One) and two violations of Section 20(a) of the Exchange Act against the Individual Defendants (Counts Two and Three). (Am. Compl. ¶¶ 387–411.)[6] In lieu of answering, Defendants moved to dismiss the Amended Complaint. (ECF No. 76.)[7] This Motion is now ripe.

---

[5] Other allegations from the Amended Complaint, such as Plaintiffs' allegations that Defendants failed to disclose facts and risks in violation of Items 303 and 105 of SEC Regulation S-K, (Am. Compl. ¶¶ 311–14), or those facts specifically related to allegations of Defendants' scienter, (*id.* ¶¶ 315–66), are not necessary to resolution of the Subject Motion and are not repeated here.

[6] This matter was subsequently transferred to the Undersigned on May 15, 2023. (ECF No. 67.)

[7] Plaintiffs filed a notice of supplemental authority on July 15, 2024, (ECF No. 80), to which Defendants replied on July 22, 2024, (ECF No. 82).

## II.    **LEGAL STANDARD**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), the court may dismiss a complaint for "failure to state a claim upon which relief can be granted." For a complaint to survive dismissal under this rule, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In evaluating the sufficiency of a complaint, "[a]ll allegations in the complaint must be accepted as true, and the plaintiff must be given the benefit of every favorable inference to be drawn therefrom." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011) (citations omitted). A pleading that "offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (citations and quotation marks omitted). In short, the pleading's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

For fraud claims, a complaint is subject to Rule 9(b)'s heightened pleading standard "[i]ndependent of the standard applicable to Rule 12(b)(6) motions." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). A party alleging fraud must therefore support its allegations with "the who, what, when, where and how of the events at issue." *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) (citations omitted); *see also Feingold v. Graff*, 516 F. App'x 223, 226 (3d Cir. 2013) ("[T]he plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." (quoting

*Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007))). Rule 9(b)'s heightened pleading standard "ensure[s] that defendants are placed on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of fraud." *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) (citations and quotations omitted). Rule 9(b)'s requirements are "rigorously applied in securities fraud cases," including those brought under the Exchange Act. *Cal. Pub. Emps' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144 (3d Cir. 2004) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997)).

In addition to satisfying Rule 9(b), plaintiffs alleging securities fraud pursuant to the Exchange Act must also comply with the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4, *et seq.* The PSLRA "imposes another layer of factual particularity to allegations of securities fraud." *In re Rockefeller Ctr.*, 311 F.3d at 217. To allege fraud under the PSLRA, the plaintiff must "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.'" [8] *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313, 321 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, and n.12 (1976)).

## III.   **DISCUSSION**

Defendants move to dismiss the Amended Complaint in its entirety and with prejudice. Defendants argue that Plaintiffs fail to allege a Section 10(b) and 10b-5 claim because Plaintiffs fail to plead an actionable misstatement or omission or the requisite strong inference of scienter. Defendants further contend that the Section 20(a) and Section 20A claims must be dismissed based

---

[8] Determining whether Plaintiffs alleged scienter with particularity is not necessary for the resolution of the present Motion and is therefore not addressed. *See supra* n. 5.

on the failure of Plaintiffs' Section 10(b) claim. Prior to addressing the merits of Defendants' arguments, the Court first turns to the parties' threshold dispute regarding the documents the Court may consider in connection with the Subject Motion.

### A.    JUDICIALLY NOTICEABLE DOCUMENTS

Defendants seek the Court to take judicial notice of 36 exhibits that were submitted with their Motion. (*See* Exs. to Decl. of Lyle Roberts, ECF Nos. 76-3 to 76-38.)[9] These exhibits, described in greater detail below, include, *inter alia*, SEC Filings, Conference Call Transcripts, and Publicly Available Articles. (*See id.*) Plaintiffs concede that the Court may consider certain exhibits "for the existence of these documents, but [] object where Defendants attempt to offer these exhibits for the truth of the matters contained therein or to support Defendants' inferences." (Pls. Opp'n at 13.)[10] Plaintiffs, however, oppose the Court considering other exhibits, contending that they are attempts by Defendants to make factual rebuttals to the allegations in the Amended Complaint. (*Id.* at 14–15.) Defendants respond that these exhibits are integral to the Amended Complaint's allegations and are properly considered. (Defs. Reply at 23–25.)

While the Court may normally "not consider matters extraneous to the pleadings" at the motion to dismiss stage, the Court may rely on documents that are "*integral to or explicitly relied upon in the complaint*" without converting the motion into one for summary judgment. *In re Burlington Coat Factory*, 114 F.3d at 1426 (emphasis in original) (citations omitted). The exception's applicability turns on "whether the claims in the complaint are 'based' on an extrinsic document and not merely whether the extrinsic document was explicitly cited." *Id.* at 1426 (citations omitted). The exception's purpose is to prevent a plaintiff from "maintain[ing] a claim

---

[9] In this Opinion, all references to "Exhibit" or "Ex." refers to the Exhibits to Lyle Roberts's Declaration.

[10] Specifically, Plaintiffs concede the noticeability of Exhibits 4, 7, 18–23, 25–26, and 29–30.

of fraud by extracting an isolated statement from a document and placing it in the complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent." *Id.* at 1426 (citation omitted).

The Court may also consider documents containing facts that are "not subject to reasonable dispute in that [they are] either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002) (citing Fed. R. Evid. 201(b)). As the Third Circuit cautioned, "[o]nly in the clearest of cases should a district court reach outside the pleadings for facts necessary to resolve a case" at the motion to dismiss stage. *Victaulic Co. v. Tieman*, 499 F.3d 227, 236 (3d Cir. 2007), as amended (Nov. 20, 2007). Defendant's exhibits fall into the following categories:

(1) SEC Filings and Conference Call Transcripts relied upon in the Amended Complaint: Exhibits 4, 7, 18–23, 25–26, 28–30; [11]

(2) SEC Filings and Conference Call Transcripts from outside the Class Period: Exhibits 2–3, 5, 17;

(3) SEC Form 4 Filings: Exhibits 31–33, 35;

(4) Articles and Reports: Exhibits 6, 8–16, 27; and

(5) Compensation Chart: Exhibit 34.

---

[11] As referenced above, Plaintiffs do not contest the Court's consideration of these exhibits for their existence, but "object where Defendants attempt to offer these exhibits for the truth of the matters contained therein or to support Defendants' inferences." (Pls. Opp'n at 13.) Defendants concede that "they do not ask the Court to do so, but rather to recognize that these disclosures and statements were indeed made." (Defs. Reply at 24.) As such, because these exhibits are not in dispute, the Court will consider them.

The Court does note that Exhibit 28 was not included in either parties' discussion of which exhibits the Court may consider. However, this exhibit is PayPal's 2021 Form 10-K filed with the SEC. (*See* Ex. 28.) As such, the Court groups this exhibit with other SEC filings made during the Class Period.

Except for the exhibits relied upon in the Amended Complaint, which Plaintiffs concede are appropriately considered, the Court briefly discusses each category in turn.[12]

### 1.    SEC Filings at Issue: Exhibits 2–3, 5, 17

The parties disagree as to whether the Court may take judicial notice of SEC filings that fall outside the class period. A court may "tak[e] judicial notice of properly-authenticated public disclosure documents filed with SEC." *In re NAHC*, 306 F.3d at 1331 (citing *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000)). This may include documents not relied upon in the complaint. *Id.*; *see also In re Amarin Corp. PLC Sec. Litig.*, No. 19-6601, 2021 WL 1171669, at *8 (D.N.J. Mar. 29, 2021), *aff'd* No. 21-2071, 2022 WL 2128560 (3d Cir. June 14, 2022). Like the above SEC filings, these documents "cannot be offered 'to prove the truth of their contents but only to determine what the documents stated.'" *Id.* (quoting *Oran*, 226 F.3d at 289).

### 2.    SEC Form 4 Filings: Exhibits 31–33, 35

Defendants submitted the Individual Defendants' Form 4 plans adopted by Schulman, Rainey, and Auerbach on various dates between 2019 and 2021. (Exs. 31–33, 35.) "[A] 'Form 4' filed with the Commission [] sets forth the insider's name, the date of the transaction, the number of shares sold or bought and the price per share." *Payne v. DeLuca*, 433 F. Supp. 2d 547, 566 n.11 (W.D. Pa. 2006) (citing *Tristar Corp. v. Freitas*, 84 F.3d 550, 552–53 (2d Cir. 1996)). Like the above, these documents were filed with the SEC. *See In re Merck Co., Inc., Sec., Derivative & "ERISA" Litig.*, No. 05-1151, 2006 WL 8460903, at *4 (D.N.J. Jan. 20, 2006) ("It is . . . without dispute that SEC Forms 4 and 5 are in fact SEC filings contemplated by *Oran*"). As such, the Court may take judicial notice. *See Oran*, 226 F.3d at 289 (taking judicial notice of Form 4s filed with

---

[12] The Court will not take judicial notice of Exhibit 24, as Plaintiffs object to same, (Pls. Opp'n at 14), and Defendants do not oppose.

the SEC); *see In re Hertz Glob. Holdings, Inc. Sec. Litig.*, No. 13-7050, 2017 WL 1536223, at *22

n.10 (D.N.J. Apr. 27, 2017), *aff'd sub nom. In re Hertz Glob. Holdings Inc*, 905 F.3d 106 (3d Cir.

2018) (considering Form 4s in deciding motion to dismiss and noting "it can take judicial notice

of the public filings showing that the challenged sales by the defendants were made pursuant to

10b5-1 plans") (citations omitted).

### 3.      Articles and Reports: Exhibits 6, 8–16, 27

Defendants seek the Court to take judicial notice of a number of articles and reports. (*See*

Defs. Reply at 25.) These concern "commentary and information available to investors about

internet account fraud." (*Id.*) Plaintiffs object, arguing that the Court should not take judicial notice

of the "factual arguments predicated on them." (Pls. Opp'n at 14.) The Court did not consider these

documents to reach its decision and therefore need not resolve the parties' dispute over their

noticeability. *See In re PTC Therapeutics, Inc. Sec. Litig.*, No. 16-1124, 2017 WL 3705801, at *3

n.5 (D.N.J. Aug. 28, 2017) (declining to take judicial notice where, in part, documents would not

alter court's analysis).

### 4.      Compensation Chart: Exhibit 34.

Defendants seek the Court to take judicial notice of a compensation chart its counsel

"compiled from public disclosures and pertains to allegations in the Complaint." (Defs. Reply at

25.) Plaintiffs object, contending that "Defendants' self-created and self-serving chart is not

subject to incorporation by reference and it is far from the type of fact 'not subject to reasonable

dispute.'" (Pls. Opp'n at 15 (quoting Fed. R. Evid. 201(b)).) While the contents of the chart may

have been pulled from publicly available information, the Court does not find that this chart created

by counsel is "capable of accurate and ready determination by resort to sources whose accuracy

cannot reasonably be questioned." *In re NAHC*, 306 F.3d at 1331 (citing Fed. R. Evid. 201(b)). Therefore, the Court will not take judicial notice of Exhibit 34.

* * *

In summary, in deciding Defendants' Motion to Dismiss, the Court will consider:

    i.    SEC Filings and Conference Call Transcripts relied upon in the Amended Complaint: Exhibits 4, 7, 18–23, 25–26, 28–30
    ii.   SEC Filings at Issue: Exhibits 2–3, 5, 17
    iii.  SEC Form 4 Filings: Exhibits 31–33, 35

However, the Court will not consider:

    i.    Compensation Chart: Exhibit 34
    ii.   Articles and Analyst Reports: Exhibits 6, 8–16, 27
    iii.  Exhibit 27[13]
    iv.  Exhibit 24

## B.    MOTION TO DISMISS SECTION 10(B) CLAIM

In Count One, Plaintiffs assert a claim under Section 10(b) and Rule 10b-5. Section 10(b) of the Exchange Act creates a private cause of action for the "use or employ, in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5, which implements § 10(b), makes it unlawful, in connection with the purchase or sale of any security:

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

---

[13] Defendants concede that they do not ask the Court to take judicial notice of this exhibit, so the Court will not do so. (Defs. Reply at 25.)

17 C.F.R. § 240.10b-5. In asserting a claim for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff "must allege (1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014). In a securities fraud case, "[a] corporation is liable for statements by employees who have apparent authority to make them." *Inst. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009) (citing *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 708 (7th Cir. 2008)).

### Material Misrepresentation or Omission

Since Plaintiffs must satisfactorily plead all six elements of Rule 10b-5 securities fraud in order to state a claim, the Court is compelled to grant Defendant's motion in the event that any single element is not met. Consequently, the Court's analysis begins and ends with the first element.

To make out a Section 10(b) claim, a plaintiff must "identify a false representation of material fact or omission that makes a disclosed statement materially misleading." *In re NAHC*, 306 F.3d at 1330 (citing *In re Burlington Coat Factory*, 114 F.3d at 1419). A statement or omission of fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (citation omitted); *see also In re Newell Brands, Inc. Sec. Litig.*, 837 F. App'x 869, 874 (3d Cir. 2020) (statements or omissions viewed "in light of all the information then available to the market"). Further, a statement or omission only gives rise to liability if it was "misleading at the time it was

made; liability cannot be imposed on the basis of subsequent events." *In re NAHC*, 306 F.3d at 1330 (citation omitted).

The contours of what qualifies as an actionable misstatement are well articulated. First, "[o]pinions are only actionable under the securities laws if they are not honestly believed and lack a reasonable basis." *City of Edinburgh Council*, 754 F.3d at 170 (citing *In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*, 543 F.3d 150, 166 (3d Cir. 2008)). Next, the PSLRA creates a "safe harbor" for forward-looking statements. Alleged misrepresentations are not actionable if the statements "are (1) identified as [forward-looking], and accompanied by meaningful cautionary statements; or (2) immaterial; or (3) made without actual knowledge that the statement was false or misleading." *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 278–79 (3d Cir. 2010) (citing 15 U.S.C. § 78u-5(c)). Finally, the Court must distinguish material representations from statements of opinions that "constitute no more than 'puffery' and are understood by reasonable investors as such." *In re Newell Brands*, 837 F. App'x at 874 (citing *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 872 (3d Cir. 2000)). The former are actionable while the latter are not.

In addition, while omissions may lead to liability, "Section 10(b) and Rule 10b-5 'do not create an affirmative duty to disclose any and all material information." *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, No. 16-6509, 2018 WL 3772675, at *15 (D.N.J. Aug. 8, 2018) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)). "Disclosure is required only when necessary to make statements made, in the light of the circumstances under which they were made, not misleading." *Id.* (cleaned up). If a defendant "makes an affirmative statement or characterization about its business, it puts that subject 'in play' and assumes a duty, under the securities laws, to speak truthfully about that subject. *In re Merck & Co., Inc. Sec., Derivative, &*

"ERISA" Litig., No. 05-1151, 2011 WL 3444199, at *9 (D.N.J. Aug. 8, 2011) (citing *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992)).

The first element is subject to the PSLRA's "[e]xacting pleading requirements." *City of Edinburgh Council*, 754 F.3d at 168 (citing *Tellabs*, 551 U.S. at 313). Thus, "[a] complaint involving securities fraud must 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation . . . is made on information and belief . . . all facts on which that belief is formed.'" *In re Newell Brands*, 837 F. App'x at 874 (quoting 15 U.S.C. § 78u-4(b)(1)). "The purpose of the heightened pleading requirements is to ensure that private securities actions do not become "a partial downside insurance policy" against the vicissitudes of the market." *Id.* at 874.

As described above, Plaintiffs' claims are based on alleged false or misleading statements made by Defendants on fifteen separate occasions, which the Amended Complaint groups into five categories: (1) statements "touting TPV growth," (2) statements "tout[ing] PayPal's supposed NNA growth," (3) "statements touting NNA growth [that] counted illegitimate bot-accounts as legitimate NNAs," (4) statements "provid[ing] or confirm[ing] PayPal's guidance as to future NNA growth," and (5) statements "tout[ing] engagement with PayPal's services by NNAs and/or actual or expected reductions in churn due to such engagement." (Am. Compl. ¶ 207.) Defendants argue that Plaintiffs fail to allege any material misrepresentation or omission, or that any alleged false statements are nonactionable or protected by the PSLRA's safe harbor for forward-looking statements. (*See generally*, Defs. Mot.)

With this as the backdrop, the Court analyzes the alleged false and misleading statements to determine whether Plaintiffs have satisfied the high bar of the PLSRA's "[e]xacting pleading requirements." *City of Edinburgh Council*, 754 F.3d at 168. The Court notes that Plaintiffs' claims

are based on alleged misstatements, set out in detailed, block quotes that emphasize certain language and that span nearly 100 paragraphs and 40 pages. (Am. Compl. ¶¶ 209–308.) [14]

### 1.    NNA Results

Plaintiffs allege that throughout the Class Period, Defendants made numerous false and misleading statements regarding PayPal's quarterly NNA results. (*See, e.g.*, Am. Compl. ¶¶ 213, 235, 239, 241, 243, 247, 255, 257, 271, 273, 277, 281, 287, 289, 297, 303.) For example, Plaintiffs allege that when PayPal reported its 1Q2021 results, it touted that it had "added 14.5 million Net New Accounts" and "ended the quarter with 392 million active accounts." (*Id.* ¶ 239.) Likewise, in reporting its 2Q2021 results, PayPal stated that the Company added "11.4 million net new active accounts in the quarter" and "active accounts now exceed 400 million." (*Id.* ¶ 277.)

Plaintiffs contend that these statements were false and misleading for numerous reasons. (*Id.* ¶ 207.) First, the statements failed to "disclos[e] that PayPal's new users were low value 'minimally engaged' accounts," which left investors with the misleading impression that the growth in supposedly active users would contribute to future TPV." (*Id.* ¶ 207(b).) Second, Plaintiffs contend that PayPal failed to disclose that "growth was largely dependent on promotional activity" and as such, the public believed that "PayPal was able to organically generate new users." (*Id.*) Additionally, by failing to disclose PayPal's "marketing and customer acquisition strategies," PayPal "created the misleading impression that PayPal's NNAs would consist of legitimate and engaged users." (*Id.*) PayPal also failed to disclose that "they counted illegitimate bot-accounts as legitimate." (*Id.* ¶ 207(c).) The inclusion of these bots "inflated PayPal's NNA numbers," a "key performance indicator[]," led investors to believe these accounts would contribute to future

---

[14] Like the parties, the Court will not examine each statement individually, but rather, consistent with the parties' approach, will assess each category of allegedly false and misleading statements, and identify specific statements as examples, where necessary.

revenue, and "concealed the risk that PayPal would later disclose significantly worse NNA numbers." (*Id.*)

"Accurate statements of past earnings are not actionable under § 10(b)." *In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*, No. 05-1151, 2012 WL 3779309, at *2 (D.N.J. Aug. 29, 2012). Likewise, "disclosure of accurate historical data" does not give rise to a violation of the federal securities law "absent an allegation that the data are false." *In re Cognizant*, 2018 WL 3772675, at *21. Plaintiffs make no allegations that the NNA numbers were not accurate at the time. Each time the Company, whether in an SEC filing or in a statement made by an individual Defendant, stated the NNA numbers from the previous quarter or year, Defendants were making true statements of reported historical facts. *See Zucker v. Quasha*, 891 F. Supp. 1010, 1015 (D.N.J. 1995), *aff'd* 82 F.3d 408 (3d Cir. 1996) (statement based on "historical fact" not false or misleading when true when made).

Plaintiffs contend, however, without conceding the accuracy of the reported NNA results, that the statements were misleading because they failed to disclose that these results were driven by aggressive marketing tactics which caused the users to have lower engagement and higher churn. (Pls. Opp'n at 26.) Plaintiffs also contend that Defendants failed to disclose that by October 2021, Defendants knew that many illegitimate accounts were included in these results, rendering Defendants' November 2021 statements reporting NNA results highly misleading. (*Id.* at 27–29.)

The Court considers the statements made before October 2021 and those made after October 2021 separately. Plaintiffs allege that before October 2021, Defendants were aware of the *risks* associated with reporting user numbers based on a marketing campaign that was premised on free money and a susceptibility to manipulation. (*See, e.g.*, Am. Compl. ¶¶ 74, 77, 78.) But, as Plaintiffs allege, it was not until *after* October 2021 that the statements concealed known

illegitimate accounts, rather than just the theoretical prospect of illegitimate accounts. (*See, e.g.*, *id.* ¶¶ 90–102.)  Therefore, the Court proceeds to analyze statements prior to October 2021 first, and then statements made after October 2021.

### i.    Statements Prior to October 2021

Defendants "had no duty to disclose the alleged, unmaterialized risks." *SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*, 499 F. Supp. 3d 49, 64 (D. Del. 2020), *aff'd* No. 20-3427, 2022 WL 3442353 (3d Cir. Aug. 17, 2022); *see id.* ("no duty to disclose a risk that had not 'actually materialized' at the time of the allegedly misleading prior disclosure"). Plaintiffs' allegations regarding the risk of Defendants' promotional activities are exactly that: a potential risk. Plaintiffs first contend that "[t]hroughout 2021," Chinese websites disclosed ways to take advantage of PayPal's marketing promotions. (Am. Compl. ¶¶ 67–73.) These postings, Plaintiffs allege, allowed "PayPal . . . to make it look like they were continuing to rapidly grow NNAs" by disclosing illegitimate accounts throughout its quarterly reports in 2021. (*Id.* ¶¶ 72–73.) Plaintiffs, however, fail to show that Defendants knew about these websites, or even if they did, when PayPal might have learned these accounts were being exploited. As such, with no alleged actual knowledge about the manipulation of PayPal's marketing promotions, the NNA results cannot be deemed false or misleading. *See Williams v. Globus Med., Inc.*, 869 F.3d 235, 243 (3d Cir. 2017) (holding statement was not false where defendants were not aware of risk at the time statements were made).

Plaintiffs also contend that prior to launching PayPal's promotional campaigns, Defendants were warned of the risks associated with same. (Am. Compl. ¶ 74.) The Amended Complaint contends that "before the start of 2021," CW-4 raised concerns that "the risk that the promotion to pay people to open accounts would lead to people opening accounts without otherwise using PayPal's services." (*Id.* ¶ 75.) These risks of minimally engaged or illegitimate accounts were

allegedly included in materials that would have been reviewed and signed off on by Rainey based on his role as CFO. (*Id.* ¶ 76.) Likewise, CW-5 stated that "the Company was aware of the risk that new users acquired through this promotional activity would be lower quality." (*Id.* ¶ 77.)[15] Despite knowledge of these risks, PayPal "decided to proceed with the promotions." (*Id.* ¶ 78.)

Prior to launching its promotion, Defendants were under no duty to disclose the potential risks of its marketing campaigns. *See SLF Holdings*, 499 F. Supp. 3d at 64. It is self-evident that a risk has not come to fruition prior to it being launched. CW-4 and CW-5's statements that the company was aware of potential risks reflects that the Company weighed the pros and cons before deciding on a potential course of action. *See In re Newell Brands*, No. 18-10878, 2019 WL 6715055, at *11 (D.N.J. Dec. 10, 2019), *aff'd* 837 F. App'x 869 (3d Cir. 2020) ("[B]usiness decisions made in good faith that do not play out as hoped do not give rise to securities fraud."). Further, although confidential witnesses allegedly identified potential risks before October 2021 (which are inherent in any business decision), at best, this constitutes nothing more than expressed concern—and not a reasonable belief that such concerns would actually come to bear. Without such allegations, Defendants had no obligation to disclose the potential risks of its marketing campaigns to investors. *See In re NAHC*, 306 F.3d at 1330 (explaining that a company is "not obligated to predict future events unless there is reason to believe that they will occur"); *Oran*, 226 F.3d at 285 ("[N]on-disclosure of material information will not give rise to liability under Rule 10b-5 unless the defendant had an affirmative duty to disclose that information.").

The Court finds the Honorable Stanley Chesler, U.S.D.J.'s analysis in *In re Merck* persuasive. 2012 WL 3779309, at *2. In that case, the plaintiffs alleged that the defendants'

---

[15] The Amended Complaint fails to plead how CW-5 became aware that the Company was aware of these risks. *See Avaya*, 564 F.3d at 253 (Rule 9(b) particularity "requires plaintiffs to plead the who, what, when, where and how: the first paragraph of any newspaper story.").

statements of past earnings were misleading where the company failed to disclose that "current sales were not a reliable metric of its success" because of undisclosed "adverse information" regarding the safety of one of its drugs. *Id.* at *2. The plaintiffs contended that defendants failed to disclose this information, which "jeopardized and undercut the drug's commercial value and capacity for growth." *Id.* Judge Chesler rejected this theory of liability, finding that it would "make a company's disclosure obligations almost limitless." *Id.* The court in that case explained that "this approach . . . would expose a company to liability every time it reported previous successes without disclosing any and every reason, established or not, the company had for second-guessing the reported performance, be it a contemplated change in business strategy, dissension among company management or adverse information about a key product." *Id.* Moreover, Judge Chesler held that the "literally true statements" in the earnings statements did not "put 'in play'" safety information about the drug that would require the company to disclose any adverse information regarding same. *Id.* at *3. In the case at bar, Defendants past statements regarding NNA results were "literally true" statements, and Defendants were not required disclose the reason it had "for second-guessing the reported performance." *See id.* at *2–3. Relying on these allegations and others, the Court finds that Plaintiffs have not adequately alleged that Defendants misled investors by failing to disclose the risks of PayPal's marketing practices. *Id.*

### ii.    Statements After October 2021

The Court next considers the statements made after October 2021. The Amended Complaint details CW-3's investigation into alleged fraudulent accounts. (Am. Compl. ¶¶ 90– 102.) CW-3 contends that they first discovered approximately 33,000 fraudulent accounts in August 2021, with the number growing to about one million by October 2021. (*Id.* ¶¶ 91–96.) PayPal held a large meeting to discuss these discoveries. (*Id.* ¶ 96.) At that meeting, which was

attended by over 400 people, none of whom were named as defendants in this case, CW-3 "advocated for PayPal to shut down the fake accounts." (*Id.* ¶ 96, 98.) CW-3's boss, who is not identified in the Complaint, decided to "limit" the accounts instead of shutting them down altogether. (*Id.* ¶ 98.) Plaintiffs' Complaint does not describe where, in the corporate hierarchy, this "boss" stood, and fails to define or explain what it means to "limit" an account, aside from circularly noting that "limiting" means "applying flags to accounts . . . to limit their activity." (*Id.* ¶ 98 & n.6.) CW-3 continued his investigations, discovering approximately 2 million accounts he believed "were engaging in incentive abuse." (*Id.* ¶ 100.) As such, Plaintiffs contend that Defendants' statements regarding NNA growth, without disclosing the results of this investigation, was a material misrepresentation to investors. (Pls. Opp'n at 27–28.)

However, "for a statement to constitute a material misrepresentation or omission, the plaintiff must show that the speaker was in possession of some contrary information at the time the statement was made – making it so that either the speaker was aware, or at least should have been aware, that his statement was false or misleading." *Tanaskovic v. Realogy Holdings Corp.*, No. 19-15053, 2021 WL 211049, at *6 (D.N.J. Jan. 21, 2021). The statements must be "actionably unsound when made" and not rely "on hindsight" to establish a false or misleading statement. *Williams*, 869 F.3d at 244 (quoting *In re Burlington Coat Factory*, 114 F.3d at 1430).

As the Court in *Tanaskovic* explained, "a purported claim of securities fraud based merely on information that became apparent after the fact, with no indication that the speaker was aware, or at least should have been aware of the information at the time of his earlier statement, is the exact type of 'fraud by hindsight' argument that the Third Circuit has long rejected as improper." *Id.* (citing *Chubb*, 394 F.3d at 158); *see also Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("Corporate officials need not be clairvoyant; they are only responsible for revealing those material

facts reasonably available to them. Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud.").

Ultimately, then, the Court must determine whether Plaintiffs have sufficiently alleged "that the speaker was in possession of some contrary information at the time the statement was made." *Tanaskovic*, 2021 WL 211049, at *6. To support their contentions that, at various times, Defendants Schulman and Rainey *were* in possession of such contrary information, Plaintiffs rely on a parade of confidential witnesses who are alleged to be former PayPal employees in positions of varying degrees of seniority—all of whom were apparently attenuated from the vortex of power. The Third Circuit allows pleadings based on these confidential witnesses, but imposes a "heightened importance" on the particularity requirements for such witnesses, "given the inadequacy of their documentary source." *Chubb*, 394 F.3d at 147–48. Specifically, the Third Circuit has held:

> The PSLRA imposes a particularity requirement on all allegations, whether they are offered in support of a statement's falsity or of a defendant's scienter. 15 U.S.C. § 78u–4(b)(1), (b)(2). In the case of confidential witness allegations, we apply that requirement by evaluating the "detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *Chubb,* 394 F.3d at 147. If anonymous source allegations are found wanting with respect to these criteria, then we must discount them steeply. This is consistent with *Tellabs*'s teaching that "omissions and ambiguities count against inferring scienter" under the PSLRA's particularity requirements. *Tellabs,* 127 S.Ct. at 2511. If, on the other hand, a complaint's confidential witness allegations are adequately particularized, we will not dismiss them simply on account of their anonymity.

*Avaya*, 564 F.3d at 263. [16]

Alleging that Defendants Schulman and Rainey possessed the requisite knowledge, Plaintiffs rely on CW-3's investigation into the alleged accounts that resulted in a meeting among 400 PayPal employees. (*See* Am. Compl. ¶¶ 98–101.) Plaintiffs contend that "CW-3 believes that the information about the fake accounts was escalated to the executive level because they would have needed executive approval to limit that many accounts." (*Id.* ¶ 98.) Plaintiffs also allege, based on CW-7's statements, that the "executives at PayPal would have been updated on the fraud trend by the Policy team." (*Id.* ¶ 106.) Finally, Plaintiffs point to CW-4's statements "that if PayPal had identified that a large number of bot accounts were being created, that information would have immediately been made known to Schulman and Rainey." (*Id.* ¶ 110.)

However, none of the confidential witnesses were "in a position to possess" information about when and whether Defendants Schulman and Rainey actually learned about the alleged fake accounts. *See In re Synchronoss Sec. Litg.*, 705 F. Supp. 2d 367, 400–01 (D.N.J. 2010). For example, Plaintiffs allege that CW-1 was "3 reporting levels below the SLT, which included the Individual Defendants." (Am. Compl. ¶ 44.) CW-2 was "2-3 reporting levels below CFO Rainey." (*Id.* ¶ 45.)  CW-7's reporting structure allegedly placed him four reporting levels below "Chief Enterprise Officer Aaron Karczmer," though there is no indication of how close Karczmer was to any of the named Defendants. (*See id.* ¶ 50.) Additionally, Plaintiffs fail to allege how CW-3, an employee in the Seller Fraud Operations Department in Chandler, Arizona, would have known that any information would have been disclosed to the executive board, aside from his own

---

[16] As other courts in this district have explained, "the lack of sufficient allegations concerning a Defendant's knowledge could also be disposed of in [a discussion of] scienter." *In re Celgene Corp. Sec. Litig.*, No. 18-4772, 2019 WL 6909463, at *18 n.24 (D.N.J. Dec. 19, 2019). However, since the parties discuss this issue both in their discussions of actionable misstatements or omissions as well as scienter, the Court will address this issue here.

speculation. *See In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 362 (D.N.J. 2007) ("confidential witnesses' conclusory allegations of what senior management knew, without particularity or specificity indicate that the witnesses' knowledge is not averred" (cleaned up) (citing *Zack v. Allied Waste Indus.*, No. 04-1640, 2005 WL 3501414, at *7 (D. Ariz. Dec. 15, 2005))**.** Even CW-4, who is vaguely described as being "in the inner circle" (Am. Compl. ¶ 75), and evidently "worked and interacted with" Defendants Schulman and Rainey by "participating in status updates" on "regulatory matters" (*id.* ¶ 47), is not alleged to have been in a position to possess any information relating Defendants' knowledge of fake accounts. The simple fact that CW-4 interfaced with Schulman and Rainey on a particular subject matter does not mean that he was privy to any relevant communications. In short, Plaintiffs do not allege that any witnesses had sufficient seniority in the Company to have known what was being discussed in meetings with Schulman or Rainey**;** each one was at least a few reporting levels away. Plaintiffs did not plead that these confidential witnesses were senior executives with the "personal knowledge" of specific meetings. *See In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d at 401.

Even if the relevant confidential witnesses were senior executives, no confidential witness has alleged with sufficient particularity any interaction or event where Defendants Schulman and Rainey learned about fraudulent accounts before making their November 2021 statements. Statements from undisclosed witnesses must include, *inter alia*, "the dates on which the relevant information was acquired, the facts detailing how the source obtained access to the information, specific details regarding the basis for the source's personal knowledge, and detailed descriptions of the alleged events." *See In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d at 358–59. Plaintiffs have not alleged any "detailed descriptions of the alleged events" via the confidential witnesses, or otherwise. Instead, the Complaint is replete with speculative, conclusory, and abstract assertions

instead of the required specific details that might render the claims of material misstatement reliable.

For example, CW-3 attended a meeting in October 2021 where fraudulent accounts were discussed, but Plaintiffs do not allege that any of the Defendants were at that meeting or that CW-3 or any other of the 400 meeting attendees definitively spoke with any Defendant about the meeting. (*See* Am. Compl. ¶ 98–101.) CW-3 merely "*believes* that the information about the fake accounts was escalated to the executive level because they *would have needed* executive approval to limit that many accounts." (*Id.* ¶ 98 (emphasis added).)[17] Similarly, CW-7 alleges that the Policy team "*would have*" updated executives regarding the October meeting (*Id.* ¶ 106 (emphasis added)), but not that any such update actually occurred. *See In re Adolor Corp. Sec. Litig.*, 616 F. Supp. 3d 551, 574–75 (E.D. Pa. 2009) (discounting claims from a confidential witness that the individual defendants knew certain information because a separate team learned of that information).

As for CW-4, who was allegedly in the "inner circle" at PayPal (Am. Compl. ¶ 75), his contention that information about fraudulent accounts "*would have* immediately been made known" (*id.* ¶ 110 (emphasis added)) to Rainey and Schulman contains no "facts detailing how the source obtained access to the information." *In re Intelligroup*, 527 F. Supp. 2d at 359.[18] His similar allegation that an issue affecting 250,000+ PayPal accounts "*would be* automatically and immediately escalated to the CEO" (Am. Compl. ¶ 116 (emphasis added)), does not demonstrate

---

[17] Repeated assertions such as "believes;" "would have needed;" and "would have been updated," etc., are, by definition, riddled with surmise and conjecture. (*See, e.g.*, Am. Compl. ¶¶ 98, 100, 101, 106, 107, 110, 112, 116.)

[18] Further, while CW-2 described the various reports regarding NNAs that would have been automatically generated, he does not allege that these reports contained information regarding the October meeting. (*Id.* ¶ 109.)

any actual escalation. Likewise, CW-4's allegation that he "did not understand how PayPal could not have immediately been aware of widespread activity to create fake accounts through bot farms," is insufficient to show that named Defendants *were* aware. (*Id.* ¶ 113.) *See City of Brockton Ret. Sys v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 473 (S.D.N.Y. 2008) (explaining that it is not enough for "plaintiff to allege that because executives like the Individual Defendants were 'closely involved' in [the] business, one can strongly infer" that they were in possession of information contrary to their statements). However seemingly earnest such hypotheses might be, they do not provide the necessary "who, what, when, where and how" evidencing PayPal leadership's knowledge. *See Avaya*, 564 F.3d at 253.

        None of the above representative allegations—of any similar allegations in the Complaint—contains details about actual meetings or communications where Defendants learned information that contradicted their public statements. Although multiple confidential witness hypothecated that there *might have* or *would have* been occasions for Defendants to receive information that would render their statements false, none can point to a date, time, or location. *See In re Hertz Glob. Holdings, Inc. Sec. Litig.*, No. 13-7050, 2015 WL 4469143, at *20 (D.N.J. July 22, 2015) ("Nowhere in Plaintiff's . . . allegations is there any suggestion that any of the CWs communicated in any way with [individual defendants], or any person at [defendant company] who might have been familiar with [individual defendants'] thinking."). Plaintiffs also present no account of any conversation that might have transpired at any meeting with named Defendants. This dearth of allegations "renders that source irrelevant for the purposes of plaintiff's allegations." *In re Intelligroup*, 527 F. Supp. 2d at 290 (explaining that "allegations attributed to the information obtained from a confidential source must contain specific details regarding the basis for the source's personal knowledge and describe supporting events in detail"); *Nat'l Junior Baseball*

*League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 540 (D.N.J. 2010) (discounting confidential allegations where the complaint failed to specify when confidential witnesses learned of information).

Aside from conclusory allegations, the Amended Complaint lacks any details regarding when discussions with executives occurred.[19] As such, the Court finds that Plaintiffs fail to plead with particularity that Defendants knew the statements concerning NNA results made in November 2021 were misleading. *See Tanaskovic*, 2021 WL 211049, at *6.

### 2.      NNA and TPV Growth and Guidance

Plaintiffs allege that Defendants made numerous false or misleading statements relating to NNA, TPV, and churn growth and guidance relating to same. (*See, e.g.*, Am. Compl. ¶¶ 207, 209, 211, 213, 219, 231, 239, 241, 245, 247, 249, 257, 261, 269, 271, 275, 277, 279, 289, 291, 297.) With respect to TPV growth, Plaintiffs contend that Defendants misled investors by "touting" such growth, leading investors to believe that PayPal users were highly engaged and understating the risk of continued growth. (*Id.* ¶ 207(a).) Plaintiffs allege that Defendants' NNA guidance failed to disclose that growth was due to "minimally engaged" users, which therefore gave the false impression that these users would contribute to future TPV. (*Id.* ¶ 207(d).) Further, Defendants allegedly misled investors into thinking the NNA guidance was achievable without disclosing the risks that illegitimate accounts would need to be removed, or that PayPal's lofty numbers were

---

[19] Defendants released their 3Q2021 results on November 8, 2021. (*See* Am. Compl. ¶ 293.) Without allegations concerning when executives may have learned about CW-3's investigation, it is not clear that Defendants had any duty to update their projections if they were "made reasonably and in good faith." *See In re Burlington Coat Factory*, 114 F.3d at 1433 ("[W]e do not think it can be said that an ordinary earnings projection contains an implicit representation on the part of the company that it will update the investing public with all material information that relates to that forecast."); *see also In re Focus Media Holding Ltd. Litig.*, 701 F. Supp. 2d 534, 539–40 (S.D.N.Y. 2010) (noting that "courts have been reluctant to impose liability based upon a failure to disclose financial data for a fiscal quarter in progress" (quoting *Schoenhaut v. American Sensors, Inc.*, 986 F. Supp. 785, 791 (S.D.N.Y. 1997))).

only achievable by including these fake accounts. (*Id.*) Finally, Plaintiffs contend that Defendants misled investors on the expected reductions in churn, as Defendants failed to disclose its users were minimally engaged and a byproduct of the aggressive promotions. (*Id.* ¶ 207(e).) Defendants contend that many of these statements are forward looking statements that fall under the PSLRA's safe harbor.

The safe harbor provision of the PSLRA "immunizes from liability any forward-looking statement, provided that: the statement is identified as such and accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood." *Avaya*, 564 F.3d at 254 (citing 15 U.S.C. § 78u-5(c)). A "forward-looking" statement is one that contains a "projection of revenues, income [], earnings [] per share, capital expenditures, dividends, capital structure, or other financial items," or statements of "future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management." *Id.* at 255 (citing 15 U.S.C. § 78u–5(i)(1)(A)–(C)). These statements also may include "any statement of the assumptions underlying or relating to any statement described" in such statements. *Id.* (quoting § 78u–5(i)(1)(D)). This safe harbor may apply to material misstatements and omissions. 15 U.S.C. § 78u-5(c).

Many of the statements at issue here involve Defendants' representations about its NNA growth for the year. (*See., e.g., id.* ¶ 209 ("50 million NNAs expected to be added to PayPal's platform in FY'21."); *id.* ¶ 249 ("Based on the 14.5 million additional accounts added in Q1 and our current trends, we now expect to add in the range of 52 million to 55 million new users this year.").) Plaintiffs concede that PayPal's user growth underlies its financial growth. (*See* Am. Compl. ¶ 207(c) ("[I]nflating the NNA results left investors with the misleading impression that the growth in supposedly active users would contribute to future TPV growth (from these NNAs

transacting at a meaningful level on PayPal's system) and future revenue and profit from PayPal's additional services.").) As such, the Court finds projections related to NNA growth fall within the PLSRA's safe harbor for forward-looking statements. *See In re Aetna*, 617 F.3d at 281 ("Statements about future profitability and assumptions underlying management's expectations about the future fall squarely within the definition of forward-looking statement.").

Plaintiffs contend that these forward-looking statements were misleading because Defendants "knew, but did not disclose, that the NNA numbers were being boosted by PayPal's unprecedented cash incentive programs and the low-quality and fraudulent accounts they generated." (Pls. Opp'n at 25.) Plaintiffs further argue that by October 2021, Defendants knew that "millions of fraudulent accounts had been included in the publicly stated NNA numbers." (*Id.*)

For the same reasons discussed in the preceding section, the Court finds Defendants statements regarding NNA guidance to fall within the forward-looking safe harbor. Plaintiffs have "not alleged specific facts showing that the Individual Defendants had such actual knowledge" of the alleged fraudulent accounts when the statements were made. *In re Datatec Sys., Inc. Sec. Litig.*, No. 04-525, 2006 WL 3095951, at *17 (D.N.J. Oct. 30, 2006). Defendants were under no duty to disclose risks that had not yet materialized. *See SLF Holdings, LLC*, 499 F. Supp. at 64 ("[N]o duty to disclose [a] risk that had not 'actually materialized at the time of' the allegedly misleading prior disclosure."). Moreover, the safe harbor "immunizes from liability any forward-looking statement . . . [where] the plaintiff fails to show the statement was made with actual knowledge of its falsehood." *In re Synchronoss Techs., Inc. Sec. Litig.*, No. 17-2978, 2019 WL 2849933, at *19 (D.N.J. July 2, 2019) (quoting *Avaya*, 564 F.3d at 254). The Court held above that Plaintiffs failed to demonstrate actual knowledge that any November or December 2021 statements were false and misleading. "Therefore, because Plaintiff has failed to adequately plead that Defendants were

actually aware of the falsity of the revenue projections, Plaintiff's claims based on forward-looking statements fail . . . ." *Id.*[20]

### 3. Statements Regarding the Quality of its Users TPV Growth

Plaintiffs allege that throughout the Class Period, Defendants made numerous false and misleading statements regarding the quality of PayPal's users and its "strong" TPV growth. (*See, e.g.*, Am. Compl. ¶¶ 209, 211, 217, 219, 221, 225, 227, 229, 263, 237, 247, 253, 293, 299, 305.) Plaintiffs allege that Defendants misled investors when claiming that its new users were highly engaged without disclosing that many of these users in fact were illegitimate. (*See, e.g.*, *id.* ¶ 209 ("Expect ongoing momentum with strong TPV growth and NNAs"); *id.* ¶ 225 ("[W]e are seeing engagement levels increase dramatically throughout our base especially with the new products that we've put out."); *id.* ¶ 263 (explaining new users were going to be "tied to [] the increase in engagement that we expect to see from these new cohorts that are coming on. And irrespective of what new cohort we're talking about, post pandemic, we see much elevated levels of engagement.").) According to Plaintiffs, these "implied that the new users being added to PayPal would be highly engaged, and thus profitable and paving a path to the promised 'Super App,' and less likely to churn." (Pls. Opp'n at 31–32.) Plaintiffs argue that Defendants knew that their new active users were less engaged and had a higher propensity to churn. (*Id.* at 32.) Defendants, on the other hand, contend that they had no knowledge regarding the alleged engagement of its users before it its 4Q2021 disclosures. (Defs. Mot. at 29–33.) Further, Defendants contend that these statements are non-actionable puffery. (*Id.* at 35–38.)

---

[20] Like the Court in *In re Synchronoss*, 2019 WL 2849933, at *19, this Court need not address Defendants' arguments regarding the risk disclosures.

"[A]lthough questions of materiality have traditionally been viewed as particularly appropriate for the trier of fact, complaints alleging securities fraud often contain claims of omissions or misstatements that are obviously so unimportant that courts can rule them immaterial as a matter of law at the pleading stage." *In re Aetna*, 617 F.3d at 283. "A representation is immaterial if the 'statement at issue is too vague to be actionable.'" *Id.* (quoting *In re Burlington Coat Factory*, 114 F.3d at 1428). These statements may include "opinions, motives, and intentions, or general statements of optimism." *Id.* Puffery may also include statements regarding "dramatic deposit growth," "strong performance," and "unique business model." *Galati v. Com. Bancorp, Inc.*, 220 F. App'x 97, 102 (3d Cir. 2007). Any such statements, however, must be considered within their context, including the alleged facts that underlie the opinion or optimism. *In re Allergan Generic Drug Pricing Sec. Litig.*, No. 16-9449, 2019 WL 3562134, at *10 (D.N.J. Aug. 6, 2019). Statements of opinion "are only actionable under the securities law if they are not honestly believed and lack a reasonable basis. *City of Edinburgh Council*, 754 F.3d at 170 (citing *In re Merck*, 543 F.3d at 166). As the Third Circuit explained, "in the context of a claim alleging falsely-held opinions or beliefs, investors must have sufficient information to suspect that the defendants engaged in culpable activity, i.e., that they did not hold those opinions or beliefs in earnest." *In re Merck*, 543 F.3d at 166.

The Court finds that these statements are inactionable as opinions and immaterial puffery. (*See, e.g.*, Am. Compl. ¶ 223 ("P2P is a significant customer acquisition channel that facilitates organic growth"); *id.* ¶ 265 ("What we've done over the last, call it, 18 months is put much more rigor into the CLV component of that rather than chasing a low-value, net new active that maybe pumps up numbers and the optics look good, really looking at how they're going to contribute to the PayPal platform over time."); *id.* ¶ 301 ("[W]e can certainly go out and spend money on

customer acquisition and get very low value net new actives to inflate or pump up that number, but that's not the right economic decision for us longer term.").)

The Court's above analysis further supports the conclusion that these statements are not actionable. When Defendants made the statements, Defendants genuinely believed them to be true based on the earnings that the Company was reporting. Plaintiffs have not alleged that it was clear to PayPal, at this point, that its marketing practices had led to an increase in illegitimate accounts. Rather, PayPal only knew about certain risks associated with its promotions. Further, when PayPal employees did become aware of the fraudulent accounts, it was not clear that Defendants were made aware of these statements prior to disclosing its 4Q2021 results.

Likewise, statements regarding Defendants' expectations on churn are based on Defendants' opinions regarding what could help lead to reductions in churn. In addition, it is not clear that these statements were false when made. (*See, e.g.*, Am. Compl. ¶ 283 ("And so as we look forward over the coming years, as we add capabilities into the digital wallet, things like crypto, things like investing, buy now, pay later, all of these things are key drivers that increase in engagement and therefore, decrease churn."); *id.* ¶ 263 ("And I think that's going to come through a number of different ways, but I think very importantly is reducing churn.").)

Moreover, it is not clear that the failure to disclose the results of the October team meeting and CW-3's investigation was misleading under the Supreme Court's decision in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015). In interpreting *Omnicare*, the Third Circuit has stated that "an opinion statement is misleading if it: (i) was not sincerely believed when made; (ii) contains an expressly embedded, untrue factual assertion; or (iii) reasonably implies untrue facts and omits appropriate qualifying language." *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 686 (3d Cir. 2023). First,

as discussed above, Plaintiffs' allegations fail to adequately allege facts that Defendants did not believe their optimism when expressed or did not believe their statements when made. Plaintiffs fail to allege that Defendants did not believe their statements, or that such were untrue, that the Company believed "growth remains strong," (Am. Compl. ¶ 279), or was "on track and performing very well," (*id.* ¶ 295). As discussed in detail above, Plaintiffs fail to demonstrate that Defendants had knowledge of the illegitimate accounts prior to issuing its 4Q2021 disclosures. Moreover, even assuming *arguendo* that Defendants did have knowledge of the October team meeting and its results, it is not clear that Defendants did not believe their opinions. *City of Warren*, 70 F.4th at 686 ("[A]ctual knowledge that sales from one source might decrease is not the same as actual knowledge that the company's overall sales projections are false." (quoting *Williams*, 869 F.3d at 246)).

Moreover, under the third *Omnicare* factor regarding "falsity by omission," it is not clear that the failure to disclose the results of the October 2021 investigation were misleading. *Id.* at 687. As the Third Circuit has explained, "because '[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts,' an opinion statement is 'not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way.'" *Id.* (quoting *Omnicare*, 575 U.S. at 189–90). Thus, the allegations of the omitted fact must render that fact "so great that it would, for a reasonable investor, eclipse the balance of the numerous other considerations." *Id.* In the case at bar, the October 2021 investigation revealed close to one million fraudulent accounts. (*See* Am. Compl. ¶ 95.) However, Plaintiffs fail to demonstrate that disclosure of the one million NNAs (of the projected 52 to 55 million) from 2021 would have been of such great importance to Defendants' projections as to render its opinions, such as Rainey's "confidence in where we are," (*id.* ¶ 301), to be misleading. Therefore, the Court finds that Defendants'

statements expressing confidence in the quality of its users or the quality and its strong growth, among other like statements, inactionable as statements of opinion or puffery.[21]

The Court grants Defendants' Motion to Dismiss Count I of the Amended Complaint. As the Court finds that Plaintiffs fail to allege with particularity misstatements or omissions of material facts made by Defendants, the Court does not address Defendants arguments regarding the remaining requirements of Plaintiffs' Section 10(b) claim. *See In re BioLineRx Ltd. Sec. Litig.*, No. 23-041, 2024 WL 3409800, at *11 (D.N.J. July 15, 2024) ("Because the Court finds the FAC does not sufficiently allege with particularity misstatements or omissions of material facts made by Defendants, it concludes that further analysis of the complaint is unnecessary at this time.").[22]

## C.    COUNTS II AND III – SECTION 20(A) – CONTROL PERSON LIABILITY

In Counts Two and Three, Plaintiffs asserts claims for control person liability against the Individual Defendants under Section 20(a). (Am. Compl. ¶¶ 395–411.) "Section 20(a) makes controlling persons jointly and severally liable with the controlled person. [] But controlling-person liability is 'premised on an independent violation of the federal securities laws.'" *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 275–76 (3d Cir. 2005) (quoting *In re Rockefeller Ctr.*, 311 F.3d at 211). To allege a violation of Section 20(a), a plaintiff must show "(1) the defendant controlled another person or entity; (2) the controlled person or entity committed a primary violation of the securities laws; and (3) the defendant was a culpable participant in the fraud." *In re Newell Brands*, 2019 WL 6715055, at *14 (citations and quotation marks omitted). As such,

---

[21] The Court cited a number of examples of statements which the Court viewed as typical but did not address each and every purported statement. For the above-mentioned reasons, the Court finds that Plaintiffs fail to allege an actionable omission or misstatement.

[22] Plaintiffs further allege that Defendants made materially false or misleading statements in violation of Item 303 and Item 105. (*See* Am. Compl. ¶¶ 311–14.) However, as the Court finds that Plaintiffs failed to identify material misrepresentations or omissions, the Court need not consider whether these statements violated Item 303 and Item 105.

"liability under Section 20(a) is contingent upon sufficiently pleading an underlying violation of Section 10(b) by the controlled person." *Id.* (citation omitted). Accordingly, because the Section 10(b) claims are dismissed for the reasons stated above, the Court also dismisses Counts Two and Three.

Finally, the Court notes that the Defendants seek dismissal with prejudice. (Defs Mot. at 7.) Indeed, the Court notes that the operative pleading here is an Amended Complaint. (ECF No. 49.) However, until now, the allegations in the original Complaint were never subjected to judicial scrutiny since Plaintiffs filed an Amended Complaint following the appointment of a Lead Plaintiff. (*See* ECF Nos. 4, 56-1.) The Court recognizes that "allowing amendments in order to correct deficiencies in pleadings furthers one of the basic objectives of the federal rules—the determination of cases on the merits." *Pro. Cleaning & Innovative Bldg. Servs., Inc. v. Kennedy Funding, Inc.*, 245 F. App'x 161, 165 (3d Cir. 2007).

The Court finds, in the interest of justice, and in the event they so choose, that Plaintiffs should be afforded another opportunity to amend their complaint and comport with the particularized pleading standards articulated above. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008) ("[I]f a complaint is vulnerable to a 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile."). Accordingly, the Amended Complaint is **DISMISSED WITHOUT PREJUDICE.**

**CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss is **GRANTED**. Plaintiffs may file an amended complaint addressing the deficiencies identified by the Court within 45 days. Failure to file an amended pleading within 45 days will result in dismissal with prejudice. An appropriate Order will accompany this Opinion.

ROBERT KIRSCH
UNITED STATES DISTRICT JUDGE

Dated: January 29, 2025