**LABATON KELLER SUCHAROW LLP**
Carol C. Villegas (*pro hac vice*)
Jake Bissell-Linsk (*pro hac vice*)
Lisa Strejlau (*pro hac vice*)
Danielle Izzo (*pro hac vice*)
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Fax: (212) 818-0477
cvillegas@labaton.com
jbissell-linsk@labaton.com
lstrejlau@labaton.com
dizzo@labaton.com

**LABATON KELLER SUCHAROW LLP**
Mark Willis (*pro hac vice* forthcoming)
1050 Connecticut Avenue NW, Suite 500
Washington, D.C. 20036
Telephone: (202) 772-1880
Fax: (212) 818-0477
mwillis@labaton.com

**ROBBINS GELLER RUDMAN & DOWD LLP**
Tor Gronborg (*pro hac vice*)
Matthew I. Alpert (*pro hac vice*)
Patton L. Johnson *(pro hac vice)*
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Fax: (619) 231-7423
torg@rgrdlaw.com
malpert@rgrdlaw.com
pjohnson@rgrdlaw.com

**ROBBINS GELLER RUDMAN & DOWD LLP**
Jacob G. Gelman (*pro hac vice*)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: (415) 288-4545
Fax: (415) 288-4534
jgelman@rgrdlaw.com

*Co-Lead Counsel for the Class*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE PAYPAL HOLDINGS INC. SECURITIES LITIGATION | Case No.: 3:22-cv-05864 (RK) (JTQ)<br><br>Hon. Robert Kirsch, U.S.D.J.<br>Hon. Justin T. Quinn, U.S.M.J.<br><br>CLASS ACTION<br><br>**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

**Page**


I. PROCEDURAL HISTORY AND SUMMARY OF ALLEGATIONS ....1

II. JURISDICTION AND VENUE ....5

III. PARTIES ....5

IV. BACKGROUND ....7

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD ....10

A. 1Q21 Materially False and Misleading Statements ....10

B. 2Q21 Materially False and Misleading Statements ....14

C. 3Q21 Materially False and Misleading Statements ....17

D. 4Q21 Materially False and Misleading Statements ....18

VI. DISCLOSURE OF THE TRUTH ABOUT PAYPAL'S NNAs....21

VII. ANALYST COVERAGE OF DEFENDANTS' CLASS PERIOD STATEMENTS AND DISCLOSURES....30

A. Analyst Reports Confirm that Defendants' False and Misleading Statements During the Class Period Were Material ....30

B. Analyst Reports Following Defendants' Admissions Confirm the Materiality of the False and Misleading Statements During the Class Period....34

VIII. DEFENDANTS ACTED WITH SCIENTER ....40

A. Defendants' Own Admissions Raise a Strong Inference of Their Scienter....40

B. Defendants' Admissions of Relying on Information that Contradicts Their Public Statements Raises a Strong Inference of Scienter ....42

C. Confidential Witness Accounts Confirm Defendants' Knowledge and Access to Information that Rendered Their Public Statements Misleading ....45

1. Confidential Witness No. 1's Statements ....46

2. Confidential Witness No. 2's Statements ....48

3. Confidential Witness No. 3's Statements ....49

**Page**


4. Confidential Witness No. 4's Statements ....................52

5. Confidential Witness No. 5's Statements ....................54

6. Confidential Witness No. 6's Statements ....................55

7. Confidential Witness No. 7's Statements ....................55

D. The Individual Defendants' Motive and Opportunity ....................56

1. The Individual Defendants' Sale of More than $170 Million in PayPal Stock Raises a Strong Inference of Scienter ....................56

2. Paypal's Compensation Structure Created the Motive and Opportunity for the Individual Defendants to Commit Fraud ....................63

IX. LOSS CAUSATION AND ECONOMIC LOSS ....................65

X. PRESUMPTION OF RELIANCE ....................66

XI. NO SAFE HARBOR ....................68

XII. CLASS ACTION ALLEGATIONS ....................69

XIII. COUNTS ....................71

XIV. PRAYER FOR RELIEF ....................77

XV. JURY TRIAL DEMANDED ....................78

## I. PROCEDURAL HISTORY AND SUMMARY OF ALLEGATIONS

1. Pursuant to the Court's January 29, 2025 Opinion and Order (ECF 86-87) ("Order"), Lead Plaintiff Caisse de dépôt et placement du Québec and plaintiff Public Employees Retirement Association of New Mexico (collectively, "Plaintiffs") submit this First Amended Complaint for Violations of the Federal Securities Laws.

2. In 2020, the COVID-19 pandemic helped PayPal Holdings, Inc. ("PayPal" or the "Company"), like many online companies, achieve record online transactions and new accounts. The most important factor for investors coming into 2021 was whether PayPal could maintain this record account growth or whether it was just a temporary phenomenon driven by the pandemic. Defendants responded by telling investors that PayPal planned to achieve 50 million net new actives ("NNAs") in 2021, a significant increase from the pre-pandemic normalized level of around 35 million NNAs per year. Achieving the NNA results was particularly important because PayPal told investors that its scale was a competitive strength and was particularly important to driving global organic earnings growth. Thus, investors were told that PayPal's increasing active accounts was a measure of the Company's success and performance. As PayPal stated in its 2020 Annual Report, "[t]he number of active accounts provides management with additional perspective on the growth of accounts across our Payments and Honey Platforms as well as the overall scale of our platforms."

3. During the February 3, 2021 through February 1, 2022 Class Period, Defendants made materially false and misleading statements about PayPal's NNAs. These statements artificially inflated the Company's stock price to over $300 per share. As more specifically described below, while reporting continued record growth in NNAs and increasing NNA targets for 2021, Defendants also assured investors that "rather than chasing a low-value, net new active that maybe pumps up numbers and the optics look good," PayPal was instead "really looking at

how they're going to contribute to the PayPal platform over time." Defendants stated that the new accounts PayPal had added were "high-quality net new actives" and the "most engaged cohorts that we've ever seen." Defendants repeated these statements to the market throughout the Class Period, telling investors that low quality NNAs "is not something that we want to chase as a company, and we can certainly go out and spend money on customer acquisition and get very low value net new actives to inflate or pump up that number, but that's not the right economic decision for us longer term."

4. But what investors were not told is that Defendants had set out on an intentional strategy to do exactly what they told investors they were not doing in an effort to boost PayPal's reported NNAs. Each Defendant was involved in approving and implementing incentive campaigns that specifically targeted low-engaged accounts to inflate reported NNAs. These campaigns would target new users and accounts that were dormant or soon to be dormant with a cash incentive to do one transaction to be counted as an NNA. Defendant Daniel Schulman ("Schulman"), CEO of PayPal during the Class Period, set PayPal's strategy and had ultimate responsibility for PayPal trying to meet his publicly stated NNA targets. Defendant John Rainey ("Rainey"), CFO of PayPal during the Class Period, increased budgets for these cash incentive campaigns and was required to sign off on each incentive campaign. And defendant Jonathan Auerbach ("Auerbach"), Executive Vice President, Chief Strategy, Growth and Data Officer of PayPal during the Class Period, led a special team formed in 2021 responsible for monitoring and growing NNAs and directed the teams running the incentive programs.[1] As top C-suite level executives at PayPal, these Defendants all received specific reporting on NNAs that not only

---

[1] Defendants Schulman, Rainey, and Auerbach are collectively referred to herein as the Individual Defendants.

measured NNAs daily, but measured the activity of each cohort of new accounts and the success of the incentive campaigns to drive up NNA results. While all three of the Individual Defendants led investors to believe that PayPal was achieving fundamental organic NNA growth, they were responsible for the Company becoming increasingly reliant on incentive campaigns that chased low-engagement, low-value customers, who served only to temporarily boost the reported NNA results. Further, not only did PayPal's aggressive use of promotional activity inflate its NNA numbers through preservation of low value accounts, but it also encouraged the widespread creation of fake accounts through bot farms aimed at claiming these free promotional dollars.

5. Defendants knew from the onset that these incentive campaigns were highly risky because paying global customers to do just one transaction is a hotbed for fraudulent accounts – and indeed every incentive campaign had a signoff process that required Defendants' approval. Indeed, by October 2021, a limited review of recently added NNAs quickly identified, at first, one million fake accounts, and then, two million fake accounts, that had received transfers of incentive payments from PayPal during just May 2021 to July 2021. Moreover, at an October 2021 internal meeting with approximately 400 attendees, the disturbing trend was discussed in detail. The initial response from PayPal's management, however, was to do nothing. The reason: the fraudulent accounts were taking money from PayPal, not PayPal's customers, so they could still be reported as NNAs without triggering customer complaints.

6. Even as the millions of fraudulent accounts tied to the 2021 incentive programs were recognized internally at PayPal, and the Company at Defendants' direction, was intentionally targeting low-quality "one-and-done" accounts, externally, on November 8, 2021, Defendants continued to tout the fact that PayPal added 13.3 million NNAs in 3Q21 and reiterated that they were not spending money to chase low value accounts.

7. But on February 1, 2022, the truth finally caught up to Defendants. They were forced to admit that they had pursued a strategy of incentivizing illegitimate and low-engaged accounts to do one transaction, temporarily boosting NNAs. Defendants publicly admitted that this strategy was "very successful in generating account creation. But overall, these customers have lower engagement and a higher propensity to churn and have not matched our required level of return." Defendants also admitted that, in 2021, they had relied on the incentive campaigns "to a much greater extent than we ever have in our history." Defendants publicly acknowledged that PayPal had been reliant on paying low engaged customers up to $20 to do one transaction as a means to boost NNAs, and subsequently pledged to stop "throw[ing] away money" just to add "hollow net new active[s] on [PayPal's] base that's not adding revenue or bottom line impact."

8. Defendants also quantified that their incentive campaigns resulted in at least 4.5 million illegitimate accounts being counted as NNAs, and, because they were no longer going to continue their cash incentives, "20 million incremental one-and-done customers" would fall out of NNAs in 2022. In other words, of the 48.9 million NNAs PayPal reported in 2021, approximately half were either illegitimate or low and unengaged customers, directly contradicting Defendants' Class Period statements to investors.

9. Having spent the prior year misleading investors and chasing low-value NNAs – while concurrently selling 645,321 shares of the Company's stock (and buying none) for insider trading proceeds of more than $170 million – Defendants' admissions were not well received. PayPal's stock price plummeted nearly 30% per share – the largest stock price decline in Company history. On February 2, 2022, PayPal's stock price dropped from over $175 per share to below $125 per share. On just that day, PayPal's market capitalization plummeted $58.7 billion. The stock price continued to fall the next day, and by the end of February 3, 2022, it was down nearly

30% from the price just two days earlier. In the four years since the February 1, 2022 disclosures, PayPal's stock price has never recovered – and it now trades for less than one-quarter of what it did during the Class Period. Not surprisingly, none of the Individual Defendants remain at PayPal.

## II. JURISDICTION AND VENUE

10. The claims asserted herein arise under Exchange Act §10(b) (15 U.S.C. §78j(b)), Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5), and Exchange Act §§20(a) (15 U.S.C. §78t(a)) and 20A (15 U.S.C. §78t-1).

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §27 of the Exchange Act (15 U.S.C. §78aa).

12. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and §27 of the Exchange Act (15 U.S.C. §78aa(c)), as the alleged misstatements were publicly disseminated to investors within this Judicial District, affected the market price for PayPal Securities, and subsequently caused damages to investors within this Judicial District. PayPal shareholders located in this Judicial District invested in PayPal at artificially inflated prices as a result of Defendants' misrepresentations and omissions. *See e.g.*, ECF 1, ¶21.

## III. PARTIES

13. Lead Plaintiff Caisse de dépôt et placement du Québec ("Caisse" or "Lead Plaintiff") is a global investment group with 473 billion Canadian dollars in assets under management. Caisse purchased PayPal stock at artificially inflated prices during the Class Period and was damaged as a result of the conduct alleged herein. ECF 12-3. On January 11, 2023, the Court appointed Caisse to serve as Lead Plaintiff pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"). ECF 18.

14. Plaintiff Public Employees Retirement Association of New Mexico ("PERA"), established in 1947, manages 31 retirement plans for state, county, and municipal employees

including police, firefighters, judges, magistrates, legislators, and volunteer firefighters and has $18 billion in assets under management. PERA purchased PayPal stock at artificially inflated prices during the Class Period and was damaged as a result of the conduct alleged herein. *See* Ex. A to ECF 49-1.

15. Defendant PayPal is incorporated under the laws of Delaware and has its principal executive offices in San Jose, California. PayPal's common stock trades on the Nasdaq Stock Market (the "NASDAQ") under the ticker symbol "PYPL." References herein to "PayPal's stock," "PayPal stock," "PayPal publicly traded common stock," and "PayPal's common stock" refer to the publicly traded PayPal common stock that traded on the NASDAQ under ticker symbol "PYPL." During the Class Period, there was also a robust market for call options corresponding to PayPal stock. References to "PayPal Securities" refer to both PayPal stock and any exchange-traded option to purchase PayPal publicly traded stock.

16. Defendant Schulman was, at all relevant times, the Chief Executive Officer of PayPal and a member of its Board of Directors. As set forth in ¶¶30-32, 34, 38, 41, 44, 46-47 below, during the Class Period, Schulman repeatedly made false and misleading statements to investors and the public about PayPal's NNAs and its impact on PayPal's business.

17. Defendant Rainey was, at all relevant times, the Chief Financial Officer of PayPal. As set forth in ¶¶30-33, 38-40, 44, 46-47 below, during the Class Period, Rainey repeatedly made false and misleading statements to investors and the public about PayPal's NNAs and its impact on PayPal's business.

18. Defendant Auerbach was, at all relevant times, the Executive Vice President, Chief Strategy, Growth and Data Officer of PayPal. As set forth in ¶¶31-32, 46 below, during the Class

Period, Auerbach repeatedly made false and misleading statements to investors and the public about PayPal's NNAs and its impact on PayPal's business.

19. The Individual Defendants, because of their positions within the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, presentations to securities analysts, money and portfolio managers, and investors (*i.e.*, the market). Because of their positions and access to material non-public information available to them, the Individual Defendants knew or were reckless in not knowing that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading. The Individual Defendants are liable for the misleading statements and material omissions pleaded herein.

## IV. BACKGROUND

20. PayPal was incorporated in Delaware in January 2015 and became a public company in July 2015 as part of a spinoff from eBay Inc. PayPal is a digital payments platform, most well-known for facilitating online purchases and person-to-person money transfers. PayPal's proprietary Payments Platform consists of various payment applications, including core PayPal, PayPal Credit, Braintree, Venmo, Xoom, iZettle, and Hyperwallet.

21. During the Class Period, almost 90% of PayPal's revenue was generated through fees on transactions over its payment applications. PayPal generally does not charge consumers to fund or draw from their accounts. Rather, PayPal earns revenues primarily by charging fees for completing payment transactions, which it says is typically based on the volume of activity processed on its Payments Platform. These fees include transfer fees and foreign currency conversion, and PayPal also earns interest and charges fees for various credit products.

22. Throughout this time period, PayPal identified various metrics that it reported quarterly to investors. As stated in its Annual Report for the fiscal period ending December 31, 2020 filed with the SEC on Form 10-K:

> We measure the relevance of our products and services to our customers and the performance and success of our business through active accounts, payment transactions, and total payment volume:
>
> An ***Active Account*** is an account registered directly with PayPal or a platform access partner that has completed a transaction on our Payments Platform or through our Honey Platform, not including gateway-exclusive transactions, within the past 12 months. A platform access partner is a third party whose customers are provided access to PayPal's Payments Platform through such third-party's login credentials.
>
> ***Number of Payment Transactions*** are the total number of payments, net of payment reversals, successfully completed on our Payments Platform or enabled by PayPal via a partner payment solution, not including gateway-exclusive transactions.
>
> ***Total Payment Volume ("TPV")*** is the value of payments, net of payment reversals, successfully completed on our Payments Platform or enabled by PayPal via a partner payment solution, not including gateway-exclusive transactions.

23. Net New Actives or NNAs, was another key metric that the Company directed investors to and reported quarterly. The Company's Definitive Proxy Statement for 2021 – filed with the SEC on Schedule 14A – explained that NNAs "[m]easures the net change in the number of organic active customer accounts" and stated that it is "a key operational metric that the Company uses internally to measure ongoing performance." As Rainey explained to investors during the Deutsche Bank Technology Conference in 2021, "net new actives is a function of 3 things. It's new activations plus reactivations, and then we subtract up churn." PayPal used the term "churn" to reference accounts that went 12 months without a transaction. Thus, if an account had not completed a transaction for 12 months and then completed a transaction, the account would increase NNAs as a reactivation. Likewise, if an account that was close to not completing a

transaction within a 12-month window completed one transaction, the NNA metric was positively impacted because that account would have otherwise been subtracted from the NNA metric.

24. In 2020, the COVID-19 pandemic helped PayPal achieve record online transactions and new accounts. PayPal achieved an average of 18.2 million quarterly NNAs, up 92% from the 2019 quarterly average of 9.4 million. Over 2020, PayPal's stock price more than doubled. On November 2, 2020, the quarter prior to the Class Period, Schulman, speaking at PayPal's 3Q20 earnings call, commented on the record results:

> Our transactions in the quarter were just over 4 billion, growing 30% year-over-year. This is the first time we have processed over 4 billion transactions in a quarter. And it's worth noting that our core PayPal daily active accounts increased 32% versus a year ago, consistent with last quarter. We added 15.2 million net new actives in Q3, our second highest quarter for organic customer acquisitions after last quarter's 21.3 million NNAs. We added over 1.5 million new merchants in the quarter, over 2x our pre-COVID rate, and we now have 28 million merchants on our platform. We ended Q3 with 361 million active accounts, and we remain on track to end the year with a record 70 million NNAs.
>
> This influx of new customers and record transactions drove strong financial results.

25. Investors were naturally keen on understanding whether this historic growth would continue or whether it was just due to the pandemic. In response to the first question from an analyst at the 3Q20 earnings call, Schulman stated:

> So we had another strong quarter for NNAs, our second highest organic quarter for net new actives. By the way, interestingly, the shape of that is very consistent, approximately 5 million net new actives each month coming in, no falloff, no pull forward, just consistent growth in that metric. And as you know, we're still targeting and feel comfortable with the 70 million number that we gave last quarter for NNAs for the year.
>
> * * *
>
> And so I think you've got a continued drive every industry towards digitization, more and more merchants coming on, more products, more functionality and reduced churn, and I think as we look forward, I think NNAs will continue to remain elevated versus pre-COVID levels.

26. Defendants also announced their intention to transform PayPal into what is known in the industry as a "Super App," one integrated application enabling transfers for shopping, payments, and finance, saying:

> Over the next year, both the Venmo and PayPal apps will undergo a fundamental transformation intended to dramatically increase their functionality and drive engagement. Our goal is to provide our customers with a comprehensive set of services and tools to manage their financial lives as well as enhance their ability to shop both online and offline. This expanded suite of services will include enhanced direct deposit and check cashing; budget and savings tools; bill pay; investment alternatives including crypto; subscription management; buy now, pay later optionality; and all of Honey's shopping tools from wish lists, price monitoring, deals, coupons and rewards.
>
> * * *
>
> We are at a moment in our history where all of our past efforts, our scale, brand reputation and regulatory relationships position us to play an expansive role in our customers' lives.

27. But a Super App requires scale to become a truly one-stop-shop. As Schulman told Bloomberg news in the beginning of 2021, "[t]his needs massive scale." He further stated that, "[h]alf a billion to 1 billion people, at a minimum. One billion people would be ideal."

28. Thus, leading into the Class Period, the ability of PayPal to continue to grow NNAs was of critical importance to investors and the market – NNAs was presented as evidence of PayPal's continued growth and of PayPal's ability to transform itself into a Super App.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### A. 1Q21 Materially False and Misleading Statements

29. On February 3, 2021, after the market closed, PayPal filed a press release with the SEC on Form 8-K announcing an "Outstanding finish to a record year." The press release identified among "Operating Highlights" that 16 million NNAs were added in 4Q20, and

emphasized that investors should "Expect ongoing momentum" with NNAs, claiming that "~50 million NNAs [were] expected to be added to PayPal's platform in FY'21."

30. Following the issuance of the February 3, 2021 press release, PayPal held its 4Q20 earnings call hosted by defendants Schulman and Rainey. Analysts expressed particular interest in the reasons for PayPal's NNA growth and how PayPal would sustain that growth into the future:

> [Darrin David Peller Wolfe Research, LLC:]
>
> Congrats on the year also. Look, your expectation for adding 50 million net new actives in '21 was clearly an impressive number when looking at 72 million, you guys just added. And then the prepandemic normalized level is around 35 million, I think, per year, right?
>
> Does that – I guess, first, does that underscore the incremental adds, your confidence that the incremental adds in 2020 will really not pull forward, but they're just new demographics. And just looking off of last year, if you could walk us through the different drivers, whether it's geography or products, giving you the confidence in adding 50 million net new actives in '21 versus the prepandemic 35 million or so levels, would be great.
>
> [Schulman:]
>
> Yes. Yes, Darrin, ***I think when we look at the cohort of net new actives from last year, it's clearly incremental people coming on. The – over 50 demographic, 50 years old demographic, one of our strongest growth vectors that we've had. So you're really seeing new demographics come onto the platform. But what's really interesting to me is the engagement metrics of that cohort are also up substantially. We have double-digit increases in value for net new active[s]. Our 90-day engagement rates are up 13% plus over traditional cohorts***.
>
> * * *
>
> ***There is plenty of demand to come on to our platform***.
>
> * * *
>
> And so I think that 50 million is a real good guide right now. We'll obviously update as we go on. ***But we're seeing a lot of really encouraging trends in the underlying cohorts that we're bringing on***, which gives a lot of confidence to that 50 million number.

31. On February 11, 2021, PayPal held its first Investor Day in nearly three years. Defendants Schulman, Rainey, and Auerbach all gave presentations, and Defendants announced

an ambitious five-year plan to grow its active accounts from the 377 million it had just reported (for the end of 2020) to 750 million by 2025, nearly doubling in size. In his opening remarks, Schulman stated that PayPal was seeing rising engagement throughout its base, and the reason for this was because of the breadth of PayPal's product portfolio:

> This is the first time we're going to talk about a metric, but I'm very excited that over the next 5 years, we believe we can grow this 377 million to 750 million active accounts on our platform.
>
> And the reason we feel so confident about that is that ***we are seeing engagement levels increase dramatically throughout our base especially with the new products that we've put out***.

32. Defendant Auerbach presented PayPal's strategy for growing its NNAs. In response to a question about PayPal's NNAs, Auerbach stated:

> And third, we added roughly 73 million net new actives to PayPal in 12 months. So we start 2021 with essentially 25% more customers than we started last year. ***And these new cohorts are using PayPal more than the old cohorts did, which is a remarkable accomplishment. But it's not simply due to the pandemic***. ***We've gotten much better as a company in generating and engaging high-quality net new actives***.
>
> *　　*　　*
>
> Fifth, ***we are much more programmatically driving new – new net actives. And this is not simply a factor of – COVID-19 is not simply a factor of marketing. We're getting much better a[s] a company across PayPal through better user experiences, risk management, stronger ecosystem partnerships to drive NNAs on a sustainable basis***.

33. On March 4, 2021, Rainey was interviewed at the Evercore Payments and Fintech Innovators Forum and asked what was driving PayPal's NNA growth. Rainey responded that reduced churn and international markets were the two biggest drivers, stating:

> Sure. So we were excited to announce the plans over the next 5 years of doubling our net new actives. . . .
>
> So a big driver of that increase is reduced churn. I guess, secondarily to that, we've got some plans to grow in particular international markets, which also

> includes expanding Venmo internationally. ***So those are probably the 2 big drivers of the net new active growth***.

34. On March 9, 2021, Schulman was interviewed at the Wolfe Research FinTech Forum and was specifically asked about what was driving NNA growth. In response, Schulman stated in relevant part:

> ***And so we've got new demographics, new markets, new products that are attracting new customers at the top of that funnel***. But to me, what's really important is that we close down the bottom of the funnel where people drop out. And there, there are a host of things that we're doing. And I'm really very encouraged by the results that we're seeing in terms of engagement. ***We've seen double-digit increases in our 2020 cohorts in terms of their customer lifetime value. Our 90-day engagement rates for last year's cohorts are up 13%***. Our daily active users are consistently up about 30% year-over-year.

35. Defendants' statements bolded and italicized above in ¶¶30-34 were materially false and misleading because they failed to disclose, as Defendants later publicly admitted, that in 2021 PayPal had "leaned into incentivized customer acquisition tactics to a much greater extent than we ever had in our history" and was boosting NNAs by incentivizing customers to "be engaged with [PayPal's] platform." PayPal was chasing low engaged customers that "clearly came in for 1 or 2 transactions and [was] trying to incent them to stay with [PayPal] by offering them $5, $10, $20." The result, as Defendants later admitted, was that the Company's accounts were plagued by "hollow net new active[s]" in the form of illegitimate and minimally engaged accounts, and by pivoting away from these incentive campaigns, over one year "20 million incremental one-and-done customers" would fall out of PayPal's reported NNAs. The customers PayPal was targeting, Defendants would concede, had "lower engagement and a higher propensity to churn" and did "nothing for [PayPal's] revenue growth" because they "would do one transaction and then fall dormant."

**B. 2Q21 Materially False and Misleading Statements**

36. On May 5, 2021, after the market closed, PayPal filed a press release with the SEC on Form 8-K announcing the "Strongest first quarter results in PayPal's history." The press release identified among "Operating Highlights" that PayPal added 14.5 million NNAs in 1Q21, and that PayPal was raising its NNA guidance to "52-55 million NNAs expected to be added in FY'21."

37. Following the issuance of the May 5, 2021 press release, PayPal held its 1Q21 earnings call hosted by defendants Schulman and Rainey.

38. The first question from an analyst on the May 5, 2021 conference call concerned NNA growth and Schulman and Rainey responded by stating that PayPal's marketing programs were delivering excellent results with current engagement rates going up because new users were coming to PayPal's platform:

> [Darrin David Peller, Wolfe Research, LLC:]
>
> Great results here. When we look at coming out of last year's record NNAs, we thought 50 million was a good number, and now you're raising that. If you could just touch on the dynamics you're seeing around the net new actives, what's driving the upside even after these kinds of record rates? And especially as we go into reopening in the market, can you just talk through the activity and the churn levels? And then maybe on the other side of the funnel, if you could touch on the incremental users coming on, even as the world reopens, is it partnerships like Alibaba you mentioned today or other kinds of international? Or just really what's the big driving force for that confidence?
>
> [Schulman:]
>
> We brought on in Q1, 2 new customers every second throughout the quarter. . . .
>
> And I think of the drivers, it's predominantly PayPal's, predominantly still in our core markets, still seeing great growth from Venmo. But my view on net new actives is I say without being too aggressive here, look, I think we have a lot of opportunity yet here. We have a lot of expansion into international markets. ***I think our marketing programs are really beginning to deliver excellent results***. I think we're just scratching the surface there.

> ***And when I think about what's going on inside the base, our engagement levels are going up substantially. . . . And that is really a result of our daily active users coming on***.
>
> And ***so we're clearly beginning to see both at the top of the funnel, the potential for increases into the top of the funnel and really narrowing the bottom of the funnel***, which is why I'm bullish on – actually our NNA trends.
>
> * * *
>
> [Rainey:]
>
> Even as Dan said, despite the improvements we've made in reducing churn, there's still a lot of pressure there. And so Q2 is going to be sort of the low point for the year for us. And then we expect 3Q and 4Q to see strengthening acceleration there. But the thing that I will say that sort of gives us confidence in this, and we've talked about this for a period of time, but we've consistently said that ***these have been our most engaged cohorts that we've ever seen***.
>
> ***And we're continuing to see those trends***. They haven't waned like what you might expect related to people returning to the physical world. And so that gives us the conviction around raising this and really what it bodes for the rest of our business as well.

39. On May 24, 2021, Rainey spoke at the JPMorgan Global Technology, Media and Communications Conference. In response to a question about NNAs, Rainey stated that PayPal's new customers were more engaged than previous ones:

> [Tien-Tsin Huang, JPMorgan Chase & Co:]
>
> Yes. No, for sure. Let's talk about users. I get a lot of questions on users, John. I'm learning to appreciate the net new actives. I think it was up, what, 14.5 million, up 21% is what I wrote down. And then you have a goal of 750 million out in 5-plus years. Who are these new users? What can you tell us about where they're coming from? What's the typical profile of some of the newer users that you're bringing on?
>
> [Rainey:]
>
> Sure. Well, to start with, we're seeing increases in net new actives across all parts of our business. . . .
>
> But we did put out a pretty grand target of 0.75 billion at our Investor Day. And I think that's going to come through a number of different ways, but I think very importantly is reducing churn. And very much tied to that is the increase in engagement that we expect to see from these new cohorts that are coming on. And

> ***irrespective of what cohort we're talking about, post pandemic, we see much elevated levels of engagement, whether we look at like 10-day adoption rates or 90-day adoption rates*.**

40. Rainey also responded to the host analyst's questions regarding the profile of the new users PayPal was bringing on and customer acquisition costs, with the following:

> Yes. So our customer acquisition cost, historically, has been very low. And that's in part because so many of our new customers come to us through the person-to-person type of experience. And as we noted in the first quarter, that was still our single largest contributor to customer acquisition. ***What we've done over the last, call it, 18 months is put much more rigor into the CLV* [*Customer Lifetime Value*] *component of that rather than chasing a low-value, net new active that maybe pumps up numbers and the optics look good, really looking at how they're going to contribute to the PayPal platform over time***. And so overall, our CAC, or customer acquisition costs still remains very low. ***But we've been more targeting in some of the sales and marketing efforts around that***.
>
> And so we noted in the back half of last year that we had intended to spend $300 million investing into PayPal, a lot of that through sales and marketing, and you likely saw that through some of the year-over-year increases. And some of that is targeted efforts around in-store QR code, things like that, but a lot of it is still around customer acquisition. ***And I'm always happy to spend money like this when I know what the return is going to be, and I've got a high degree of confidence in that***. ***And so we're doing a better job there in our sales and marketing teams is really going out and acquiring those customers. And knowing what that return – what that profile of customer is going to be over the next several years***.

41. On June 9, 2021, Schulman spoke at the Bank of America Global Technology Conference about PayPal's marketing purportedly targeting high-quality customers:

> [Jason Alan Kupferberg, BofA Securities:]
>
> That's tremendous. One of the metrics that I think has been also a byproduct of all this has been your net new adds, and we continue to ask a lot about that. They've been pretty eye-popping for the past year.
>
> Obviously, you've had a lot of brand-new users adopting PayPal amid the pandemic, but maybe an overlooked piece of the growth in this metric is just the improvement in retention of existing users. So I wanted to see if you can perhaps quantify the degree of improvement in active user retention since the start of the pandemic and also discuss some of the initiatives that PayPal has implemented to really help promote this dynamic.

[Schulman:]

> Look, demand – we're seeing consistent demand for our services, maybe even growing demand. We put on, I think, 2 new customers every second last quarter. We put on a new merchant every 5 seconds last quarter. We're seeing new segments of the population. And man, silver tech, more of – greater than 50 years old is still flocking to the platform. We're seeing more and more use of the platform. We're going into more and more countries. We'll expand Venmo internationally. I mean there's so many things we can do better at top of the funnel. ***Our marketing is finally starting to kick in, in ways that we can really measure and look at it, invest wisely and get a return on that and bring in high-quality net new actives at the top of the funnel***.

42. Defendants' statements bolded and italicized above in ¶¶38-41 were materially misleading because they failed to disclose, as Defendants later publicly admitted, that in 2021 PayPal had "leaned into incentivized customer acquisition tactics to a much greater extent than we ever had in our history" and was boosting NNAs by incentivizing customers to "be engaged with [PayPal's] platform." PayPal was chasing low engaged customers that "clearly came in for 1 or 2 transactions and [was] trying to incent them to stay with [PayPal] by offering them $5, $10, $20." The result, as Defendants later admitted, was that the Company's accounts were plagued by "hollow net new active[s]" and by pivoting away from these incentive campaigns, over one year "20 million incremental one-and-done customers" would fall out of PayPal's reported NNAs. The customers PayPal was targeting, Defendants would concede, had "lower engagement and a higher propensity to churn" and did "nothing for [PayPal's] revenue growth" because they "would do one transaction and then fall dormant."

**C. 3Q21 Materially False and Misleading Statements**

43. After the market closed on July 28, 2021, PayPal filed a press release with the SEC on Form 8-K. The press release identified among "Operating Highlights" that 11.4 million NNAs were added in 2Q21, and repeated that that "52-55 million NNAs expected to be added in FY'21."

44. Following the issuance of the July 28, 2021 press release, PayPal held its 2Q21 earnings call hosted by defendants Schulman and Rainey. Revenues had missed the consensus estimates, which made investors concerned about the value of PayPal's reported NNAs. Defendants attributed falling revenue to PayPal's split from eBay and assured investors that the most recent cohorts of new accounts were performing better than any of PayPal's previous cohorts. In response to an analyst question concerning NNA growth Schulman stated:

> Yes, sure. I'll start right with that quickly. We always knew that second quarter was going to be the low point of the year because we did '21 like 0.3 million or 0.4 million NNAs a year ago. And even though ***they're performing better than cohorts that we previously had historically, their churn is lower***, it's still a ton of incremental churn versus traditional cohorts on the second quarter.

45. Defendants' statement bolded and italicized above in ¶44 was materially false and misleading because they failed to disclose, as Defendants later publicly admitted, that in 2021 PayPal had "leaned into incentivized customer acquisition tactics to a much greater extent than we ever had in our history" and was boosting NNAs by incentivizing customers to "be engaged with [PayPal's] platform." PayPal was chasing low engaged customers that "clearly came in for 1 or 2 transactions and [was] trying to incent them to stay with [PayPal] by offering them $5, $10, $20." The result, as Defendants later admitted, was that the Company's accounts were plagued by "hollow net new active[s]" and by pivoting away from these incentive campaigns, over one year "20 million incremental one-and-done customers" would fall out of PayPal's reported NNAs. The customers PayPal was targeting, Defendants would concede, had "lower engagement and a higher propensity to churn" and did "nothing for [PayPal's] revenue growth" because they "would do one transaction and then fall dormant."

### D. 4Q21 Materially False and Misleading Statements

46. After the market closed on November 8, 2021, PayPal filed a press release with the SEC on Form 8-K. The press release reported as key performance metrics that "***13.3 million Net***

***New Active Accounts (NNAs) added; ended the quarter with 416 million active accounts***," and that "~55 million NNAs [were] expected to be added in FY'21."

47. Following the issuance of the November 8, 2021 press release, PayPal held its 3Q21 earnings call hosted by defendants Schulman and Rainey. In response to an analyst question about NNAs, Schulman stated:

> Well, let me talk a little bit about NNAs. ***So 13.3 million in the quarter, up about 2 million from last quarter, growing 15% year-over-year***, unlike a lot of companies that experienced growth in the off time and then are unwinding.
>
> ***Our growth remains incredibly strong on the NNA side***. I mean, think about it in the minute that we've been talking so far, Darren. We've got – we put on about 100 consumers and 9 new merchants. We are putting on 1.5 consumers every second of the quarter, every 6 seconds we put on another merchant. It's really unbelievable. And if I look 5 years ago, and you remember this, 5 years ago, we put on 13 million net new actives for the year. This quarter alone, and we put on 110 million net new actives since January of 2020. And as we said, I think, in our press release, we expect to end the year north of 430 million actives on the platform. So obviously, continued strong growth.
>
> But as we look forward to that $750 million, Darren, there are 2 places that our net new actives come from. One is ***top of the funnel, and top of the funnel is actually pretty strong right now and remains so***.

48. On November 9, 2021, Rainey participated in a Buyside analyst call hosted by Jason Kupferberg of BofA Securities and responded to questions about NNA acquisitions, as follows:

> [Jason Alan Kupferberg, BofA Securities:]
>
> . . . I guess maybe we can talk about net new adds. I know the outlook now includes 3 million benefit from the NNAs acquisition [from Paidy]. So, it seems like the Q4 NNAs are coming in a little bit lower than you might have otherwise expected. Can you just talk about the drivers of that dynamic?
>
> [Rainey:]
>
> Yeah. Well, this answer is going to be similar to my last one in so far as, as we sit here today, and we go back to the beginning and compare to the beginning of the year. ***Our net new actives are going to do better than what we originally expected on an organic basis***. So, I'm excluding Paidy from that. So, we perform

very well there. Again, we've seen strong correlation with shelter in place or locked down and net new active trends on the top of the funnel. And so that's driven some of the results over the last year and a half. And so, as we were sitting there in the first quarter with an expectation that some of that would persist longer than it actually has, that caused us to increase our guidance around that new actives.

***[Low quality new actives] is not something that we want to chase as a company, and we can certainly go out and spend money on customer acquisition and get very low value net new actives to inflate or pump up that number, but that's not the right economic decision for us longer term*.**

49. Defendants' statements bolded and italicized above in ¶¶46-48 were materially false and misleading because they failed to disclose, as Defendants later publicly admitted, that in 2021 PayPal had "leaned into incentivized customer acquisition tactics to a much greater extent than we ever had in our history" and was boosting NNAs by incentivizing customers to "be engaged with [PayPal's] platform." PayPal was chasing low engaged customers that "clearly came in for 1 or 2 transactions and [was] trying to incent them to stay with [PayPal] by offering them $5, $10, $20." The result, as Defendants later admitted, was that the Company's accounts were plagued by "hollow net new active[s]" and by pivoting away from these incentive campaigns, over one year "20 million incremental one-and-done customers" would fall out of PayPal's reported NNAs. The customers PayPal was targeting, Defendants would concede, had "lower engagement and a higher propensity to churn" and did "nothing for [PayPal's] revenue growth" because they "would do one transaction and then fall dormant." In addition, the statements, including those about PayPal's 3Q21 and FY 21 NNA results, were materially false and misleading because they failed to disclose that, by no later than October 2021, PayPal had identified that millions of "accounts that were illegitimately created" in 2021 as a result of the Company's incentive campaigns.

## VI. DISCLOSURE OF THE TRUTH ABOUT PAYPAL'S NNAs

50. After the market closed on February 1, 2022, PayPal reported its financial results for 4Q21 in a press release filed with the SEC on Form 8-K. PayPal had previously given guidance of 15.8 million NNAs in 4Q21 (and 55 million for 2021), but PayPal reported that NNAs only grew by 9.8 million (and 48.9 million for 2021), 3.2 million of which were from PayPal's acquisition of Paidy.

51. That same day, PayPal held its 4Q21 earnings call and Rainey acknowledged that it was now anticipating that PayPal would only add 15 million to 20 million NNAs for all of 2022.

52. Rainey admitted that, contrary to Defendants' previous Class Period statements to investors that the Company was not chasing low value NNAs, PayPal had in fact been using incentive campaigns to boost NNAs, and that they used these campaigns to a much greater extent than they ever had previously. These incentive campaigns had the intended effect of increasing PayPal's reported NNAs, but they attracted minimally engaged users and fraudulent accounts. As a result, two-thirds of PayPal's user base was, at best, minimally engaged. For example, Rainey acknowledged:

> ***Last year, given the strong user growth, we pursued a strategy to retain those customers most likely to churn as well as attract many more new customers. We also leaned into incentivized customer acquisition tactics to a much greater extent than we ever have in our history*.**
>
> To assess the effectiveness of these strategies, we look at the impact on customer behavior in the months that follow account creation, in essence, looking at the ROI or return on that investment spend from their expected contribution to TPV, revenue and operating income. ***These programs are very successful in generating account creation. But overall, these customers have lower engagement and a higher propensity to churn and have not matched our required level of return***.
>
> ***This dynamic compounds over time as it requires increasing investment simply to keep minimally engaged users on our platform***. Similar to a lot of businesses, we have a Pareto dynamic in ours where ***the vast majority of our volume comes from about 1/3 of our customer base***. What this means is that unlike

a subscription model where more users equates to more revenue, in our business, that relationship is much more attenuated.

53. Rainey then conceded that Defendants already knew that without continuing to use these incentive campaigns, NNAs would be materially reduced in 2022:

> We strongly believe that we are making the right decisions in redirecting our spend toward high-value customer acquisition and engagement channels. That said, ***over the next 12 months as these less engaged customers naturally roll off, it will materially reduce our quarterly net adds***.

54. Rainey also disclosed that, as a result of PayPal's increased use of incentive campaigns in 2021, the Company had to remove 4.5 million accounts created in 2021 that were illegitimate.

> In the fourth quarter, ***in connection with the increased use of incentive campaigns throughout 2021, we identified 4.5 million accounts that we believe were illegitimately created***.

55. Analysts and investors were shocked by these disclosures that followed so soon after Defendants' false and misleading statements about PayPal's NNAs. In response to the first question asked at the 4Q21 earnings call, Defendants admitted that PayPal had been using incentive campaigns to engage low-engaged customers to do one transaction and then go dormant. Defendants then acknowledged the massive extent to which these incentive campaigns had inflated PayPal's NNAs: as of February 1, 2022, PayPal already estimated that because it was no longer incentivizing low value accounts to do a transaction, 20 million accounts that were added as NNAs in 2021 would roll off in 2022 and, in the interim, those accounts would have no beneficial impact on PayPal's revenue:

> [Tien-Tsin Huang JPMorgan Chase & Co.:]
>
> I wanted to drill in on the NNAs again if you don't mind. Just what drove the decision here to focus on engagement, focusing on quality instead of growth in NNA? Just trying to gauge your confidence on expanding ARPU [average revenue per user] as implied in the guidance both this year and I suppose in the midterm, now that the 750 million is off the table.



4927-1323-5496.v1

[Rainey:]

Sure, Tien-Tsin. I'll start, and Dan might want to jump in. Look, I'll start with some context. We're a data-driven business. And if you just look at the last year, we did almost 20 billion transactions on our platform. And each of those transactions has hundreds of signals about that transaction. What was the size of the transaction? Was it – what was the price point? Was it on a mobile device? Was it a repeat customer? Did it happen after a P2P transaction?

And that informs our strategy. And we analyze that. It informs the strategy. We measure the results, and it creates this feedback loop that we then refine and pivot our strategies as well.

And what we've been able to see is that when we assess the strategy around trying to retain these very low engaged users versus attempting to move people up maybe from the medium engaged user to the high engaged user group, the latter is much more effective. It's much more effective for us to focus on engagement. And I think it's important to note, ***we are not a subscription model business where there's a direct relationship between our net new actives and the amount of revenue***.

As I noted in my prepared remarks, there's a Pareto dynamic in our business where ***the vast majority of our volume comes from about 1/3 of our customers***. ***And so we think that we need to pivot*** to evolve with the feedback that we've received and go achieve our medium-term guidance a different way than what we initially had laid out.

* * *

[Schulman:]

Maybe I'll just add a couple of things onto John's response. First of all, we did put on 122 million NNAs over the last 2 years, which is obviously substantially more than what our pre-pandemic levels were. And within that, there are always a number that are low engaged or have done one transaction and nothing else. ***And we drove some programs, incentive-based programs to see if they would reengage and then engage back with the base. And what we found is that they would do one transaction and then fall dormant again. And so our view is spending money on lower-value NNAs that are not engaged in the base becomes an increasingly expensive proposition over time and does nothing for our revenue growth***.

In fact, this year, when we're saying that we're going to do 15 million to 20 million, ***it's probably going to be about 20 million incremental one-and-done customers that roll off. That does nothing to our revenue. That is actually just people coming out of the base that were never engaged***.

* * *

> And this shift is one that doesn't mean that we won't bring on tens of millions of NNAs every quarter. ***It just means that we're not going to throw marketing dollars at low-value subscribers coming in. And that, as John mentioned in his remarks, is a conscientious choice that we're making***.

56. The market reacted immediately. On February 2, 2022, as a result of Defendants' disclosures, PayPal's stock lost approximately a quarter of its value in one day, dropping from $175.80 to $132.57 per share, on extremely high trading volume of over 136 million shares.

57. The next day, on February 2, 2022, Rainey was interviewed in a Buyside call by Tien-Tsin Huang, a J.P. Morgan analyst, and engaged in the following exchange regarding PayPal's illegitimate accounts:

> [Tien-Tsin Huang, J.P. Morgan:]
>
> Yes. Okay. No, good. Thanks for that. Let's get into the NNAs a little bit. I had a lot of questions about the 5 million [Note: PYPL reported ~4.5 million] illegitimate users. So can you elaborate on what that is, how you identified it? Because it feels like that's the bulk of what drove the difference in NNAs versus your and our expectations.
>
> [Rainey:]
>
> Sure. And you're correct that it is the primary driver of the miss in end Q4. So as context, in any quarter, we're constantly assessing the legitimacy of new accounts that are created. And when I say legitimacy, we don't want to have bad actors coming to our platform that are simply availing themselves of some incentive type offer that we're providing but have no intent to actually be a legitimate customer, transacting going forward. And particularly so when there are these bots that are creating multiple accounts to avail themselves of this.
>
> And so we often, in any quarter, exclude a certain number of accounts that are created because we don't think they are a representation of the true customers that we're adding. We had that again in the fourth quarter, but in addition . . . Well, and ***I should say it was exacerbated in the fourth quarter because of the nature of some of these incentive campaigns that we offered in the quarter. We also looked back and recognised that there were about half of that 4.5 million number that were created in quarters one through three that we excluded also***.

58. Rainey also confirmed that accounts added during the Class Period were low engaged customers, and repeated that, without the incentive campaigns, these accounts were the ones that were expected to roll off in 2022:

> [Tien-Tsin Huang, J.P. Morgan:]
>
> I see. I see. No, that's helpful to hear. So I think you've mentioned that the first quarter, you'll see some churn as well with the low engaged customers if you want to call it that. So is that different than what you've experienced versus prior years? I'm just trying to understand what's happening in the first quarter there.
>
> [Rainey:]
>
> Sure. So again, I anticipate you're going to ask about the guidance on net new actives going forward.
>
> [Tien-Tsin Huang, J.P. Morgan:]
>
> Yes.
>
> [Rainey:]
>
> So I'll save a little bit of the question for that. But given the fact that we brought in basically twice as many customers in the last two years as we do on a normal year, ***in the absence of anything done to try to keep them on our platform, like incentive campaigns or other things like that, we're going to expect a higher level of churn, a much higher level of churn than what we've seen in previous years***. And so that is most impactful in the first quarter.

59. Rainey also gave more details about the incentive campaign strategy Defendants used in 2021 to boost NNAs, and how PayPal needed to shift away from low engaged users:

> [Rainey:]
>
> Look, we had 120 million customers that came to our platform over the last two years. Tien-Tsin, it's kind of analogous. If you've got a storefront and twice as many customers walk in there one day, you don't want them to just leave. ***And so we've made various attempts to try to incent them to be engaged with our platform***.
>
> And each one of those efforts requires analysing the impact of that. That doesn't happen just in a day or two. This is over months, to see, okay, is this affecting their engagement with us, their willingness to stay on our platform? ***And so we analyse, we assess this, it informs our strategy, we pivot on our strategy***.

> And we've gotten to a point where we recognise that, like any company, you've got a certain amount of money that you allocate to marketing and sales. ***We are better served, as a company, by redirecting that towards higher-value efforts that have a higher ROI [return on investment]***.
>
> And it is the right decision for our business. We believe that we can achieve all of the goals that we had by pivoting on this. But it was certainly worth the attempt to try to keep 120 million customers, not that all of them are going to churn, but try to keep that elevated level of customers on our platform. ***But when you look at the cost of acquisition relative to the CLV [customer lifetime value] of some of these customers, we believe that this pivot is appropriate for this business***.

60. Finally, Rainey acknowledged that PayPal's falling stock price was a reaction to their disclosures, and admitted that Defendants had lost credibility with investors:

> [Tien-Tsin Huang, J.P. Morgan:]
>
> Okay, great. So last one, and we'll get you guys out of here. ***Just obviously humbling to see the stock*** and the guidance changes here. What can we expect PayPal to do differently in '22 to win back investor confidence here? I know people are asking, are expectations set low enough to get back to beating and raising, etc.? But curious, bigger picture here, what might you guys do differently?
>
> [Rainey:]
>
> ***Stating the obvious, I am extremely disappointed to be in this situation, seeing the stock price reaction, and I'm sure all of our listeners are disappointed as well. And that doesn't sit well with myself or the rest of the management team***. I feel like we have done a pretty good job over the last several years of building credibility, getting people to understand our story and the opportunity that we have in front of us.
>
> ***And we've damaged that. There's been some missteps this year***.

61. PayPal's stock price continued to fall on February 3, 2022, dropping another 6% to close at $124.30 per share, on a very high trading volume of approximately 52 million shares.

62. Subsequently, on March 3, 2022, Rainey participated in the Evercore Payments & FinTech Innovators Forum. Rainey was asked by Evercore analyst David Togut if "the market overreacted to or misunderstood anything about the 4Q print and 2022 outlook?" In response Rainey acknowledged that, in 2021, PayPal had internally focused on quantity versus quality of

users, and that turning away from the incentive campaigns would result in more normalized NNA growth:

> I know there's been a fair amount of questions or confusion around the strategy with net new actives. And I want to emphasize that we still see an opportunity to add new users going forward. It's not as if we are pivoting away from growth. It's simply that ***when we consider the best return for our investment dollars, we think that we should focus more on the quality of the users versus the overall quantity. And in 2022, because of that, we're going to see a more elevated level of churn***.

63. Rainey also confirmed that PayPal had the means to authenticate the legitimacy of accounts created in real time:

> [Y]ou can think about authenticating a customer in many ways other than having them login with a password. You can send them a text with a passcode, among other things. And ***in a typical PayPal transaction, we do about 200 risk checks in the milliseconds that follow to authenticate or make sure that's a legitimate customer***.

64. On March 8, 2022, Schulman spoke at the Morgan Stanley Technology, Media, and Telecom Conference. Schulman admitted that PayPal's strategy during the Class Period, contrary to Defendants' prior statements, was to try and get low engaged customers to do one or two transactions by using cash incentives, up to $20 for a transaction. He also acknowledged that the incentive campaigns were constantly monitored:

> We're not pivoting away from net new actives. We're still going to put on this year, 15 million to 20 million because we're letting those that are not active in the base roll off. I'll talk about that in a second. But we'll go back to pre-pandemic levels in terms of adding net new actives. I mean, we'll add 30 million plus a year in the out years. That could be 30 million to 40 million, depending on where we are. There are very few companies that add that many net new actives to a base that's already 425 million going forward. So we're still going to go after net new actives. We're going after – we're being – ***what we're not going to do is throw away money to try and engage somebody in our base that clearly came in for 1 or 2 transactions and us trying to incent them to stay with us by offering them $5, $10, $20 does not meet our ROI criteria***.
>
> And what we learned – and by the way, we've done on 120 million people during the pandemic. Again, a lot of behavioral changes. ***We constantly do test and learn types of promotions out there. What's working? What's not working?***

> ***What's the ROI on that? What's the ROI versus, for instance, trying to engage a medium-engaged user to become a high-engaged user***? There, we were seeing very high ROI. So we're very different than a subscription business, to your point.
>
> If a low-engaged customer used us 1 time in the year leaves us, that has basically no impact on revenues. It's basically allowing us to shed some costs associated with keeping that customer. But it's no impact on our revenue potential going forward.
>
> And so what we are doing clearly is putting out products that incent more engagement, more average revenue per active account and the digital wallet is beginning to fulfill on that promise. But it's going to be a combination of new actives coming in because the top of the funnel is obviously very strong. ***We're letting nonengaged roll off, not trying to incent them to stay on, which is our decision to go do it***. And I think if anybody was sitting in our seat, they would make the same decision.
>
> ***You don't want to incent somebody just to have a hollow net new active on your base that's not adding revenue or bottom line impact***. What you want to do is take your marketing resources and make sure they're engaged in the highest ROI activities. And that combination of bringing on high-value net new actives and we'll still bring on 100 million plus over the next several years and increasing engagement is a tried-and-true methodology that we've had over the past few years, and it's – and I think it's absolutely the right one for us.

65. On April 27, 2022, after the market closed, PayPal held its 1Q22 earnings call hosted by defendants Schulman and Rainey. Schulman began his discussion of PayPal by taking responsibility for PayPal's recent performance, and mentioned how NNAs only grew by 2.4 million in 1Q22 and PayPal now expected only 10 million NNAs. He went on to confirm that the approximately 20 million accounts they had expected to roll off in PayPal's 4Q21 disclosures, were in fact rolling off:

> I want to begin my prepared remarks by acknowledging that our shareholders expect more from us than our track record over the past several quarters has delivered. ***And I take full accountability for that***.
>
> * * *
>
> As I shared last quarter, we are increasing our emphasis on incremental engagement across our existing customer base while continuing to add higher-value accounts. In Q1, ***we added 2.4 million net new active accounts*** in the quarter, bringing our total active base to 429 million.

* * *

> ***We are now forecasting 10 million net new active accounts for the year.***[2]

* * *

> [B]y the way, we know, this year, our churn rate will be somewhat higher because we're letting these low engaged consumers churn off the platform because the ROI to keep them isn't worth it.

66. On May 11, 2022, at the MoffettNathanson Payments, Processors, and IT Services Summit, Schulman continued apologizing for the state of PayPal. Schulman also acknowledged that highly engaged customers did not come from incentive campaigns:

> Well, I'd start off by saying we clearly got ahead of ourselves. We looked at early trends during the pandemic as many people did, and we talked to a lot of people about this. And our assumption sets about how they would play out going forward proves to be wrong. And – yes, look, at the end of the day, ***I take full accountability for that***.

* * *

> And even in years where churn is constant, like – the bottom of the funnel is really the issue in terms of growing our net new actives. The bigger you get the more that matters. Because the top of our funnel is strong and consistent. And the fact that we put on 120 million net new actives over the last couple of years, and ***we're letting some of these low engaged churn off as opposed to spending marketing dollars that really don't have the ROI to keep them on the platform***.

* * *

> ***Well, the vast majority of our highly engaged customers come to us through product experiences as opposed to direct marketing attempts***.

---

2 As reported in PayPal's 4Q22 Investor Update, PayPal only had 8.6 million NNAs for all of 2022.

# VII. ANALYST COVERAGE OF DEFENDANTS' CLASS PERIOD STATEMENTS AND DISCLOSURES

## A. Analyst Reports Confirm that Defendants' False and Misleading Statements During the Class Period Were Material

67. Analyst reports confirm that Defendants' false and misleading statements were material to investors. Analysts republished PayPal's NNA results and forecasts in their reports to investors, focused on the NNA metric, and reported and repeated Defendants' false and misleading talking points.

68. For example, after PayPal's earnings release on February 3, 2021, Barclays' February 4, 2021 report emphasized the importance of NNAs and Defendants' statements regarding new products and new cohorts:

> **No Signs of Slowing Down**
> PYPL'S Q4 earnings and forward guidance exceeded high expectations, with the company calling out impressive new user additions and increased engagement driven by recent product launches (BNPL, QR Code, Crypto, etc). We expect the stock to outperform nicely in tomorrow's tape on the back of these results.
>
> * * *
>
> **Engagement expected to remain robust, helped by Crypto, BNPL, and QR code offerings**. The company expects to continue its impressive growth of NNAs with ~50M adds slated for F21, down from ~74M new active users in F20 (but still quite healthy). ***On the call, management highlighted substantial growth from older users, including double-digit growth in value per net new active along with low-teens growth in 90-day engagement metrics compared to traditional cohorts***. Importantly, ***PYPL's impressive customer acquisition metrics are combining with lower churn rates due to increased engagement from new product offerings***, such as crypto along with BNPL capabilities.

69. JMP Securities assessed the main takeaways from PayPal's February 3, 2021 earnings announcement, mirroring Schulman's false and misleading statements:

> ***Surprisingly strong outlook for NNA in 2021 following what had been a record year in 2020***. For the current year, management expects to add another 50M net new active accounts to the platform, notwithstanding a record 2020 that posted nearly twice the amount of new additions compared the prior record year (73M vs.

> 37M in 2019). ***Management noted on the call that the confidence it has in the figure derives from the fact that: i) churn rate has fallen notably since the pandemic's onset; and ii) incremental growth has been coming from new demographics, highlighting particular strength in the over-50-years-old demographics***.

70. After PayPal's February 11, 2021 Investor Day, William Blair, for example, reported on the purportedly high-quality NNAs and new cohorts that Defendants touted:

> ***New users are also three times more likely to be "highly engaged," using more PayPal services more frequently***.
>
> ***Newer customer cohorts are more engaged, and customer churn has improved. Lifetime revenue of more engaged PayPal customers can increase by a factor of two while more engaged Venmo users can increase by a factor of 10 times***.

71. BTIG's February 16, 2021 report highlighted Defendants' statements concerning the ability of PayPal to achieve sustainable NNA growth as significant:

> ***Management in offering ambitious five-year guidance during PYPL's Investor Day last week sounded highly confident while doing so, and they illustrated the reasons for that confidence*** while outlining a plan aimed at levering the company's 377mm active customers and acceptance by ~29mm merchants into the creation of a "super app."
>
> While PYPL's new financial targets were eye-opening, ***we note that they exclusively reflected management's expectations for organic growth*** . . . .
>
> While PYPL has been a clear outperformer during the COVID-19 pandemic as consumers have adopted digital payments at an unprecedented rate, ***the company's Investor Day presentation made clear management's view that its recent strong growth would not only be sustained, but also accelerated***.

72. Following Wolfe Research's discussion with Schulman on March 9, 2021, Wolfe Research put out a report that same day highlighting Defendants' false and misleading statements concerning attracting new NNAs:

> Considering 377mm users on the platform today, ***Dan reiterated that*** every basis point of churn can have significant impact on the overall model. And while ***inbound demand at the top of the funnel continues to be robust***, Dan believes that PayPal can significantly reduce churn via increased engagement across the ecosystem, accelerated by new product launches.

73. On May 5, 2021, after PayPal announced its 1Q21 results and Defendants made their false and misleading statements in the earnings call, Canaccord Genuity reported on the "top-of-the funnel" NNA metrics that Defendants had discussed:

> **Key points**
> **Top-of-the-funnel metrics accelerated in Q1**. The company reported the best Q1 in its history. Unprecedented demand for digital solutions by both consumers and merchants resulted in net new user adds of 14.5 million, up from 10M organic adds in Q1 of last year.

74. RBC Capital Markets in their May 5, 2021 report raised their guidance to $300 per share and also echoed Defendants discussion of increased NNAs and increased engagement, saying:

> ***Growth in active accounts + increased engagement = durable growth***.

75. William Blair's May 5, 2021 report raised its PayPal stock rating to Outperform based on Defendants' comments touting the supposed strong engagement of new NNAs:

> **Impressive Start to 2021, Highlighted by Strong Customer Engagement**
> On the heels of its investor day (see note), recent momentum in the business continued and management raised 2021 guidance; PayPal remains a clear beneficiary of the accelerated digital transformation and growth of e-commerce. ***Management is focused on expanding functionality of its platform, which should drive user engagement and growth***; we are raising our 2021 estimate and reiterate our Outperform rating.

76. BTIG's May 5, 2021 report also reported on the engagement and NNA trends that Defendants had discussed:

> **WHAT YOU SHOULD KNOW**: After PayPal Holdings (PYPL) during 2020 posted accelerating growth in payment volume, revenues and earnings spurred by the increased adoption of e-commerce and digital wallets amidst the COVID-19 pandemic, ***management continued to assert that consumers' move to online and digital wallet-driven payments resulting from the crisis would persist after its impact had abated***.
>
> ***The upshot is that PYPL's results provided ample evidence that it is not simply a pandemic trade***.

* * *

> We believe the company's 1Q21 report should have helped to ease any residual qualms investors may have had regarding its ability to sustain its operating momentum as the economy reopens ***while providing encouraging evidence that its platform has become increasingly intertwined with consumers' daily financial lives***.
>
> *   *   *
>
> If anything, ***we believe the extent of PYPL's engagement with its customers is understated given its rapid growth in net new active users (NNAs)***, who take some time to ramp up their engagement with the company's offerings. The company in 1Q21 added 14.5mm NNAs, up 21%, to bring its total active accounts to 392mm.

77. On May 5, 2021, BofA Securities also highlighted Defendants' claims about engagement from PayPal's new cohorts:

> We are not surprised to see shares trade ~5% higher after hours on 1Q results that significantly exceeded expectations, while PYPL increased 2021 guidance across all key metrics, which was not anticipated. ***Management emphasized that PYPL is seeing sticky consumer behaviors*** with respect to online spending, driving structurally faster growth even in countries that have re-opened. . . . Additionally, the company now expects to add 52M-55M net new users in 2021 (up from ~50M prior) . . . .

78. On May 6, 2021, a JMP Securities report repeated Defendants' comments that growth in NNAs was driven by PayPal's products (as opposed to incentive campaigns) and that NNA growth was paramount:

> **Engagement observations**. As noted earlier, ***the list of new initiatives undertaken recently has been very impressive and a driver of the outperformance in net new accounts (NNA)***. These include the launch of the Venmo credit card to all 70M users, further expansion of the BNPL Pay in 4 offering, expanding QR code checkout (now up to one million merchants), and a host of cryptocurrency and digital wallet offerings. . . . While the focus on account growth has been paramount, we see how increasing engagement helped drive an 11% increase in transactions per account and a 24% increase in volume per account Y/Y.

79. Following Schulman's discussions at the June 9, 2021 Global Technology Conference, BofA Securities issued a report on June 10, 2021 discussing Defendants' statements concerning PayPal's NNA growth:

**Net new actives (NNAs) tracking to high end of '21 guide**

> . . . PYPL added two new consumers to the platform every second and a new merchant every five seconds, while continuing to reduce churn within the existing user base. PYPL is on track for about 11M NNAs in 2Q (consistent with management's commentary on the last earnings call that NNAs would be down in 2Q vs. 1Q), and management said full year 2021 NNAs are trending towards the higher end of the 52M-55M guidance range.

80. Following PayPal's 2Q21 earnings call, Berenberg's July 29, 2021 report emphasized that the reported NNA results were an indicator of future revenue:

> Positive trends in the core PayPal thesis: In our view, the key growth drivers in PayPal's investment thesis are: 1) ***the continued growth of its user base, which is an early indicator of future growth and monetisation opportunities*** . . . During PayPal's Q2 results – published yesterday after the US market closed – we have witnessed positive progress on all of the points mentioned above. In Q2, PayPal has added 11m new active accounts and has reiterated that the user base increase for 2021 will be at the high end of its guided 52m-55m range.

81. On November 8, 2021, following PayPal's 3Q21 conference call, Canaccord Genuity reported on the NNA growth purportedly resulting from demand for PayPal's products:

> ***Continued strong demand for digital solutions by both consumers and merchants resulted in net new user adds of 13.3M in Q3, up from 11.4M in Q2***.

82. Morningstar Equity Research's November 8, 2021 report similarly stated:

> ***Net new active accounts for the quarter were 13.3 million, a pickup from the last quarter. We remain impressed by PayPal's ability to keep the increase in active accounts well above prepandemic levels***.

## B. Analyst Reports Following Defendants' Admissions Confirm the Materiality of the False and Misleading Statements During the Class Period

83. Analyst reports following Defendants' February 2022 admissions also illustrate the importance of NNAs to PayPal's investors and the materiality of Defendants' Class Period statements and called into question Defendants' credibility. For example, JMP Securities' February 2, 2022 report highlighted the disclosure concerning PayPal's pursuit of low value customers and questioned the timing of PayPal's disclosures:

> **Better late than never with respect to addressing the issue of low engagement and low ROI users**. ***We are now learning in hindsight that the unsustainably high and record level of new account growth throughout 2020 and 2021 consisted of a lot of "one and done" and low-volume users. In response, the company's muted guidance for just 15M-20M NNAs in 2022 reflects a shift in focus away from promotional campaigns and the pursuit of low-engagement accounts. Management suggests that we should see tens of millions of these accounts churn and fall off this year, while NNA growth should ultimately return to a more normalized ~30M per annum level by the end of next year. Given that about one-third of users account for the bulk of PYPL's revenue, and the inherent operating leverage associated with greater per-user engagement, we cannot fault management for the pivot. However, we also feel as though investors may be struggling with the question of "why now?", and whether management had been chasing too much low-ROI growth in recent years***. Until we see the company deliver on meaningful margin expansion to validate the new strategy, ***our sense is that there is likely a permanent valuation reset*** to a P/E at a discount to what we have seen over the past six to eight quarters.
>
> **What near-term headwinds were cited by the company and do they appear to be transitory?** Management noted that demand decelerated throughout the quarter, and that it really didn't sense the 4Q trajectory until after mid-October. ***Several factors seem to be macro driven and transitory, although the timing remains less than perfectly clear***. The company attributed the slower-than-forecast NNA growth to: 1) more muted e-commerce growth over the holidays; ***2) reduced incentive campaigns in the back-half that target low-volume users; and 3) the elimination of ~4.5M accounts from the NNA count as they were identified as illegitimate (primarily one and done accounts set up throughout the year to take advantage of incentive campaigns which PYPL admits it leaned too heavily into during 2021). The issues related to incentives are captured by the marketing pivot going forward***.

84. Truist Securities' February 1, 2022 report cut their target from $200 to $130 and cast doubt on the veracity of Defendants' statements:

> **Eye-popping contrast**. ***We are skeptical*** re: PayPal's assertion that macro pressure is hurting C22 TPV and organic rev growth. This would contrast w/Visa (V, Buy) and Mastercard's (MA, Buy) recent bullish macro commentary. ***We are also surprised by management's comments that a "vast majority of TPV is generated by ~1/3 of users." This is new info, highlighting how narrow PayPal's eCommerce ubiquity is***. Management is accordingly reducing new customer marketing, in what we view as a challenging effort to boost engagement and add users who monetize.

85. BTIG's February 1, 2022 report downgraded PayPal and focused on the admissions regarding PayPal's use of incentive schemes in 2021 to boost reported NNAs and the impact of removing 20 million NNAs from PayPals' reporting:

> **WHAT YOU SHOULD KNOW**: We are downgrading our recommendation on PayPal Holdings (PYPL) to Neutral (from Buy) and removing our price target of $270 after the company today after the market close posted a 4Q21 report that included FY22 financial guidance that fell well short of our expectations and those of the Street. A particularly noteworthy part of management's guidance was its expectation ***that PYPL during FY22 would generate net new active users (NNAs) in a range of 15mm to 20mm, which would be down from 48.9mm in FY21*** and well below expectations of a year-over-year increase in that metric rather than a steep decline.
>
> * * *
>
> ***One new area of uncertainty around PYPL's story stems from management's disclosure during today's conference call of a significant shift in the company's approach to customer acquisition and engagement***.
>
> * * *
>
> ***PYPL's new strategy of focusing on ramping up the engagement of users with more potential for revenue generation rather than directing marketing spend toward boosting NNAs likely would have the effect of having a portion of its lower-yielding users leave the platform, management said. They added that they had disqualified ~4.5mm users who they deemed to be "illegitimate" inasmuch as their sole purpose to engage with the platform had been to take advantage of incentive programs***.

86. Barclays' February 1, 2022 report stated that the revelation that PayPal had to change strategy was material to investors and they expected the market to react negatively to PayPal's disclosures:

> ***Tonight's disappointing report and change of strategy around NNAs caught investors by surprise, with the stock now even more of a "show me" than before. We expect shares to significantly underperform tomorrow as investors digest meaningful changes to the growth algorithm***.
>
> **The key takeaway**: Although sentiment was already weak heading into the quarter, we expect PYPL shares to meaningfully underperform in tomorrow's tape after a thesis-changing earnings report. ***The company dramatically lowered net new active (NNA) expectations as it pivots its strategy by pulling back on***

> ***incentive-driven, high-churn customer acquisition*** and focusing instead on gaining and cultivating higher-quality users.

87. William Blair's February 1, 2022 report highlighted that PayPal's shift in strategy contradicted its prior statements to the market, and now tens of millions of customers would roll off PayPal's platform:

> [M]anagement pulled its prior target of reaching 750 million active customers by 2025 as it pivots to focus on revenue per user (RPU) as opposed to total users. We look forward to improved metrics to track the RPU, ***but management has previously suggested that increasing user engagement remains one of the largest opportunities at PayPal***. While recent results have been uncharacteristically soft, 2022 will be back-half loaded, and ***the strategy to focus investment dollars on the highest-quality customers and to pivot away from total new users was unexpected***.
>
> * * *
>
> Management pulled its prior goal of 15% annual user growth to 750 million by 2025, and ***anticipates tens of millions of users to churn in 2022. Management indicated that it is reducing incentive-driven campaigns that it feels drives lower returns***.

88. Morningstar's February 1, 2022 report summarized the negative disclosures about NNAs as a surprise to the market and how the expectation of future NNAs being cut to only 15-20 million showed that without the incentives PayPal's rate of growth was worse than pre-pandemic levels:

> ***The biggest negative surprise in the quarter was net new active accounts***, which were up 9.8 million sequentially, including 3.2 million added through the acquisition of Paidy. This was well below expectations. In part, this appears to be driven by management disqualifying 4.5 million accounts following an internal review. ***However, management also noted that the company expects to add only 15-20 million accounts in 2022. This suggests a rate of account growth not only below the level seen during the pandemic, but also below prepandemic levels. Management noted that incentive programs to add accounts have been proven to have relatively poor economics, as accounts acquired through incentives tended to churn quickly***. As a result, management is pivoting investment to focus on engagement of existing accounts.

89. Raymond James' February 2, 2022 report downgraded PayPal to "Market Perform," pulling its price target of $229 completely and the analyst stated he would drop coverage

until "investors gain confidence the 2022 guide is overly conservative." The report questioned the credibility of Defendants by saying that the NNA disclosures raised eyebrows and PayPal was now a "show me story":

> Downgrade to Market Perform; Stepping to the Sidelines Following Lackluster Outlook
>
> * * *
>
> ***Net new actives raises eyebrows; strategic shift in focus. In addition to financial guidance, mgmt expects to add only 15-20 million net new actives (NNA) in FY22 and has removed its medium term target to reach 750 million NNA*** as it eyes a new strategy to drive engagement and APRU within its current user base. ***Consider, ~1/3 of Paypal's user base accounts for a vast majority of its volume and maintaining lower value accounts through incentives can limit overall ROI on the user base***. . . .
>
> **Moving to the sidelines**. Simply put, we believe the stock is likely range-bound in the near to medium term . . . ***PYPL is a "show-me" story***.

90. Jefferies' February 2, 2022 report lowered the investment bank's price target from $200 to $145. Jefferies called the NNA miss startling and highlighted the link between reduced NNA expectation in 2022 and the disclosures about PayPal's reliance on incentive schemes in 2021:

> **4Q Wrap: Long Road to Redemption as Strategy Pivots Away From User Growth**
>
> **Key Takeaway**
>
> ***The call shed more light on the startlingly low Net New Active Acct. guide for FY22 as mgmt. has pivoted towards driving more engagement from high-value custys, & pulled the target of 750mn actives by FY25***. We view the after-hrs reaction (-18%) as justified with our revised FY23 EPS implying ~14% cut to Street ests, & our belief that a mid-20's P/E is the right multiple (modest discount to V/MA) until we have more conf. in the medterm growth profile.
>
> * * *
>
> ***Net New Actives the biggest neg. surprise; guide for 15-20mn NNAs in FY22 (Street +53mn) the result of pivot towards increasing engagement vs. growing the user base. 4Q NNAs of 9.8mn came in light of 14.3mn Street as eComm was more muted than exp., 4.5mn illegitimate accts. were dropped from***

> ***the user base, and PYPL began to pivot away from an incentive-based user acq. strategy mid-4Q. With ~1/3 of active accts. driving the majority of TPV, mgmt. is shifting focus towards driving higher engagement among their high-value NNAs***. FY22 NNA growth will be hit by elevated churn as a result (particularly in 1H), but mgmt. expects to revert to pre-COVID growth of ~35mn NNA/yr in '23.

91. In its February 2, 2022 report, J.P. Morgan also lowered its price target and highlighted the disclosures regarding NNA growth:

> **4Q Recap – Outlook Worse Than Feared; '22 Reset Marks Paradigm Shift to User Quality Over Quantity**
>
> We were bracing for an underwhelming outlook, and what management communicated was broadly disappointing, but probably necessary to reset expectations in order to get back to beating and raising expectations. 4Q revenue and EPS was in-line with guidance on softer TPV exiting the year, informing FY22 revenue growth forecast of 15-17% to be below the preliminary 18% target. Lowered outlook implies a much higher view on ARPU, as ***PayPal is making a surprise pivot to focus on quality versus quantity of users***. ***The pivot, coming just a year after setting an ambitious target of 750M users by 2025 (now withdrawn, but rev/EPS unchanged), raises TAM and competitive concerns, but we prefer the new alignment of investments with driving engagement over one-and-done users***. We're cutting estimates and PT but still see PayPal emerging from this air pocket with growth approaching 20% exiting FY22; our $190 PT implies a FCF yield of 2.7%.

92. J.P. Morgan analyst Tien-Tsin's February 3, 2022 report, after the February 2, 2022 Buy-Side Call discussion with Rainey, noted the admission that PayPal had been chasing one-and-done users to boost NNAs:

> 4Q21 Earnings Buy-Side Call Takeaways
>
> Earlier today, we hosted a call with PYPL's CFO, John Rainey, SVP Corp Finance & IR, Gabrielle Rabinovitch, and SVP Finance & Analytics, Erica Gessert. ***Management sounded contrite after revealing weaker-than-expected '22 guidance and a surprise pivot to focus on quality / ARPU vs. user growth***. . . .
>
> ARPU-driven Strategy. ***Following years of chasing user growth, PYPL is pivoting towards an engagement strategy, with a goal of cultivating a highly engaged and loyal user base (with high ARPU), rather than adding one-and-done users***.

## VIII. DEFENDANTS ACTED WITH SCIENTER

93. At all relevant times, Defendants acted with scienter. The allegations herein support that Defendants knew or recklessly disregarded that their Class Period statements were materially false or misleading to investors. Specifically, Defendants' own statements and admissions concede knowledge of facts or access to information contradicting their public statements. Defendants were also responsible for the approval and oversight of the incentive campaigns that they later admitted were used to a far greater extent in 2021 than previously, and were generating low engaged customers and leading to millions of illegitimate accounts. In addition, the Individual Defendants' stock sales and compensation structure created the motive and opportunity for them to commit fraud.

94. This strong inference of scienter is not only alleged against each Defendant, but is also alleged against PayPal under the core operations doctrine because the generation, growth, and engagement of NNAs and PayPal's strategy and communication to investors concerning NNAs were core matters of central importance to the Company.

### A. Defendants' Own Admissions Raise a Strong Inference of Their Scienter

95. Defendants' own statements after the Class Period show that they knew or were reckless in not knowing that, contrary to their public statements during the Class Period, PayPal was boosting NNAs through incentive schemes in an effort to show account growth. Defendants led investors to believe that PayPal was maintaining its Covid-era growth rates and organically expanding its user base with highly engaged accounts. But when Defendants were making these statements they knew, or were reckless in not knowing, that PayPal was (as later admitted) actually "lean[ing] into incentivized customer acquisition tactics to a much greater extent than we ever

have in our history" and, as a result, the customers being added to PayPal's user base had "lower engagement and a higher propensity to churn."

96. Throughout the Class Period, Defendants emphasized to investors that PayPal's reported NNA metrics were not the result of chasing low-quality customers. But Defendants' strategy in 2021 was exactly that – targeting low-value customers to do one transaction so that they could be counted and reported as an NNA. Defendant Rainey, for example, stated in May 2021 that PayPal was rigorously reviewing the value of the customer over the life of the account "rather than chasing a low-value, net new active that pumps up numbers and the optics." Later he again made similar denials. Schulman claimed that PayPal's "marketing programs are really beginning to deliver excellent results," and PayPal was getting a return on its investment and "bring[ing] in high-quality net new actives." These statements implied that Defendants knew about the incentive programs and the NNAs they were creating. To the extent Defendants had no such knowledge, the statements were, at a minimum, recklessly made.

97. After the Class Period, Defendants had to admit that in fact throughout the Class Period they actively "pursued a strategy" and made "a choice" to target "customers mostly likely to churn." Defendants' actual strategy was the opposite of their public statements, as they pursued a strategy that "requires increasing investment simply to keep minimally engaged users on our platform" – admitting that this tactic was literally "throw[ing] marketing dollars at low-value subscribers coming in." Schulman admitted that PayPal was no longer going to "throw away money to try and engage somebody in our base that clearly came in for 1 or 2 transactions and us trying to incent them to stay with us by offering them $5, $10, $20 does not meet our ROI criteria." At no time did Defendants say that they were not aware of the incentive programs or the low engaged NNAs they were generating.

98. Indeed, throughout the Class Period, Defendants claimed that the new NNAs were "our most engaged cohorts that we've ever seen" or "performing better than cohorts that we previously had historically." Auerbach stated that the "new cohorts are using PayPal more than the old cohorts did" claiming it was "a remarkable accomplishment." On multiple occasions during the Class Period, Defendants touted that PayPal's engagement metrics were up, "double-digit increases in value for net new actives." Defendants claimed that "we are seeing engagement levels increase dramatically throughout our base" or that "inside the base, our engagement levels are going up substantially." But these Class Period statements lie in stark contradiction with Defendants' admissions at the end of the Class Period. Defendants admitted that the incentivized customer acquisition tactics that they used to a greater extent than PayPal had ever used in its history drove account creation but the customers that had "lower engagement and a higher propensity to churn." The customers PayPal was actually targeting actually did "not match[] our required level of return." In describing the customers that would no longer be incentivized by PayPal to do one transaction to be included in NNAs, Schulman admitted that approximately 20 million of the new NNAs did "nothing for our revenue growth" and "were never engaged," and that another 4.5 million NNAs reported in 2021 were illegitimate.

### B. Defendants' Admissions of Relying on Information that Contradicts Their Public Statements Raises a Strong Inference of Scienter

99. Defendants' claimed knowledge of facts and access to information contradicting their public statements is indicative of scienter. Defendants publicly reported NNAs and discussed them in detail at every conference call. Defendants also not only monitored engagement (*i.e.*, the number of transactions a customer would complete), Defendants also discussed that they were monitoring 90-day engagement rates, 10- and 90-day adoption rates, engagement curves, and their Investment Updates reported ***daily*** active accounts. Thus, Defendants told investors that they were

actively monitoring the information that would have showed low engaged customers and illegitimate accounts being created because of their intentional use of incentive campaigns. Indeed, as they later admitted, under Defendants' direction, PayPal was using this information to target low engaged customers for the purpose of boosting reported NNA results.

100. Defendants' statements concerning their analysis of customer segmentation also illustrates that they had facts and access to information contradicting their Class Period statements. For example, on February 11, 2021, during PayPal's Investor Day, Rainey discussed the customer segmentation model that PayPal uses saying, "as a company, we've got robust analytics to segment and understand our customers. And we bucket them in low, medium and high engagement." The next day, on February 12, 2021, at the Buyside analyst call hosted by BofA Securities, Rainey gave additional details about PayPal's "RFM" customer segmentation model:

> We have a pretty standard customer segmentation, RFM customer segmentation model that focuses on recency, frequency and monetary,[3] but we complement that with two other metrics that we think are relevant to our customer base that include both a merchant breadth as well as consistency and we stratify that in Quintiles.

101. At the end of the Class Period, Defendants acknowledged that this same customer segmentation was used to determine that PayPal needed to pivot away from incentivizing low engaged customers to do an additional transaction and instead focus on "the medium engaged user to the high engaged user group."

102. And throughout the Class Period, Defendants continued to reference these segments, such as measuring the "high-quality net new actives" PayPal was adding or the "Low quality new actives" PayPal was not chasing. Thus, all throughout the Class Period, Defendants

[3] An RFM model measures: Recency: How recently a customer has made a transaction; Frequency: How often a customer makes a transaction; and, Monetary value: How much money a customer spends on a transaction.

were analyzing the same customer segmentation that they later claimed, after the Class Period, informed their decision to move away from chasing low value customers.

103. Further, in statements to investors PayPal stated that the Company collects and stores hundreds of data points that are used in models to analyze their customer base. These data points, which Defendants had throughout the Class Period, were used by Defendants to monitor the incentive campaigns. For example, at PayPal's Investor Day, on February 11, 2021, VP and Head of Payments, Product & Engineering Jim Magats explained that "we're able to run hundreds of models using thousands of different data variables to score a transaction, to maximize the amount of good users that are using our systems and eradicate bad users from our platform." On March 4, 2021, Rainey echoed this by saying at the Evercore Payments and Fintech Innovators Forum that "the number of checks that we run on any given transaction goes into the hundreds." Then on February 1, 2022, Rainey acknowledged that PayPal is a "data-driven business" that collects hundreds of data points on billions of transactions and that these data points are analyzed after "each one of" the incentive campaigns, which then informs PayPal's strategy. Rainey further disclosed that PayPal is "constantly assessing the legitimacy of new accounts that are created" and in particular accounts created by bot farms.

104. In addition, in each of PayPal's quarterly Form 10-Q and annual Form 10-K filings to the SEC in 2020 and 2021, defendants Schulman and Rainey both certified, in accordance with §302 of the Sarbanes-Oxley Act of 2002, that they had put in place "disclosure controls and procedures. . . to ensure that material information relating to [PayPal], including its consolidated subsidiaries, is made known to us by others within those entities." For example, one such procedure disclosed in PayPal's annual Form 10-K for 2021, filed with the SEC on February 3,

2022 and signed by Schulman and Rainey, confirmed that they would not update fraudulent accounts reported in prior periods, saying:

> [W]e continuously apply models, processes and practices designed to detect and prevent fraudulent account creation on our platforms, and work to improve and enhance those capabilities. When we detect a significant volume of illegitimate activity, we generally remove the activity identified from our key metrics. Although such adjustments may impact key metrics reported in prior periods, we generally do not update previously reported key metrics to reflect these subsequent adjustments unless the retrospective impact of process improvements or enhancements is determined by management to be material.

105. Thus, Defendants have acknowledged that they had and monitored the data showing that, among other things, the incentive campaigns were attracting low engaged and illegitimate accounts.

### C. Confidential Witness Accounts Confirm Defendants' Knowledge and Access to Information that Rendered Their Public Statements Misleading

106. Former employees at PayPal confirm that during the Class Period each Defendant was personally engaged in the incentive campaigns to boost reported NNAs.[4] Accounts of former PayPal employees document that from the beginning of the Class Period the Individual Defendants were the ones who had to approve the cash incentive schemes that were used generate NNAs. Since they had to approve them, not only were Defendants aware of the promotions, but they were specifically warned that the promotions would generate fraudulent and low engaged users. Further, as of October 2021, prior to their false and misleading statements in 4Q21, Defendants knew, or recklessly disregarded, that their incentive programs were creating millions of fraudulent accounts.

---

[4] Individuals referenced herein as "CWs" or "Confidential Witnesses" refer to former PayPal employees interviewed as part of Co-Lead Counsel's investigation of Plaintiffs' claims. In order to protect their identities, the CWs are referred to with male pronouns regardless of their gender.

### 1. Confidential Witness No. 1's Statements

107. CW-1 was a Senior Director of Product at PayPal from before the start of 2021 until at least three months after the Class Period. CW-1 was three reporting levels below the Senior Leadership Team ("SLT"), which included Defendants Schulman, Rainey, and Auerbach, and was a member of the "NNA Rally" team that reported to the SLT.

108. CW-1 explained that there was a "huge urgency" placed on NNAs by Schulman, and that there was a push coming from the top down throughout the Company to increase NNAs. CW-1 believed that Schulman wanted to report high NNA numbers to tell a growth story for PayPal and CW-1 stated that Schulman wanted to position the Company as a "Super App" which required a large user and consumer base.

109. CW-1 explained that the numbers for NNA targets came from Schulman through Auerbach's, Coons', and Lamb's teams. He explained that there were "extreme demands" coming down "like a hammer" from the top. CW-1 further stated that Schulman had set aggressive goals for growing NNAs, which were referred to as the "go-get numbers," meaning the numbers that the organization had to achieve. CW-1 explained that the go-get numbers were "top-down," driven by what Schulman wanted to achieve, and were not strictly based on any bottom-up analysis of NNA trends. CW-1 added, "Dan [Schulman] had a number and they had to hit their numbers."

110. In early 2021, as a result of Schulman's focus on the NNA figure, a special NNA Rally team was created that consisted of leaders across PayPal's branded businesses and reported to senior executives, including Auerbach. CW-1 was a member of PayPal's NNA Rally team and participated in weekly calls focused on PayPal's performance around generating NNA throughout 2021. The purpose of the team was to grow NNAs by asserting pressure on internal teams and removing roadblocks within the Company. CW-1 stated that the assembly of this sort of team was

unusual for PayPal, but was undertaken given the "tremendous" leadership demand for growing NNAs.

111. CW-1 stated that the NNA metrics used by the NNA Rally team were updated weekly, with about a three-day lag as the numbers were analyzed by PayPal's data scientists. CW-1 explained that the NNA Rally team produced weekly or bi-weekly reports that were inputted into PowerPoint slides and decks concerning NNA growth.

112. As a member of the NNA Rally team, CW-1 recalled discussions at the NNA Rally meetings regarding the use of incentive programs to drive NNAs and confirmed that increasing the marketing spend for these incentives was discussed at the NNA Rally meetings. CW-1 stated that the incentive programs were launched or ramped up in early 2021, driven by the Performance Marketing, P2P, and Venmo Teams. CW-1 also recalled lots of fraud issues with the referral programs (where PayPal users received money for getting another account signed up as a member), and many fraudulent accounts came from overseas "click farms."

113. CW-1 recalled a lot of stress at the NNA Rally meetings throughout 3Q21. CW-1 explained that the NNA Rally meetings became increasingly tense throughout 4Q21. Specifically, CW-1 stated that in November Auerbach asked the most senior or "inside" people at the meeting, to stay on the call afterwards to discuss earnings and NNA metrics for presentation to the Company's senior leadership. CW-1 described the follow-up call – which he was not part of – as a confidential meeting to prepare materials for the presentation to the SLT and the upcoming earnings call.

114. CW-1 explained that there was an at least monthly SLT meeting, where the NNA numbers would have been discussed. CW-1 advised that the NNA Rally team forwarded information to the SLT and financials were reported up monthly. CW-1 stated that PayPal's senior

executives would have had visibility into NNAs and fraudulent account issues. He confirmed that the SLT had access to the PowerPoint materials from the NNA Rally meetings.

**2. Confidential Witness No. 2's Statements**

115. CW-2 was formerly employed by PayPal from before 2018 through the end of the Class Period. Throughout 2021, CW-2 was a Director in the finance organization at PayPal and had held various other positions at PayPal over the many years of his tenure. In his final two roles at PayPal, CW-2 was two-to-three reporting levels below Rainey.

116. CW-2 stated that in 2021 PayPal had a "big push" to pursue "paid acquisitions" of new accounts, meaning NNAs that were brought in through an incentive program, such as the $10 credit given to new accounts, in contrast to organically developed accounts. According to CW-2, the Company's management was aware that it could not make its projected NNA numbers without the paid incentive marketing programs, even though management knew that these incentives could also potentially create issues such as low-quality accounts (that is, accounts that engage in few transactions) and other problems. CW-2 explained that he had raised concerns regarding the high churn rate of "paid" NNAs, in contrast to organically developed accounts, with several more senior PayPal employees, including Doug Bland, who was the Head of Consumer at PayPal.

117. CW-2 recalled the disclosure in 4Q21 restating NNA numbers for the year to correct for approximately 4.5 million illegitimate accounts created by bots. He explained that PayPal used risk analysis and data science to analyze whether accounts were legitimate and that this analysis looked at factors such as biometrics, time and place where the apps were used, transaction history, and other data points. He confirmed that this sort of analysis showed that "bot farms" and/or widespread promotional account creation were setting up illegitimate accounts to make use of the Company's incentive program.

### 3. Confidential Witness No. 3's Statements

118. CW-3 worked for PayPal between February 2016 and May 2022, most recently within the Seller Fraud Operations Department. CW-3 worked out of the Chandler, Arizona office. CW-3 advised that the Seller Fraud Operations Department fell under the Seller Risk Services Department, which included about 30 people.

119. CW-3 explained that he was responsible for looking at accounts that were already flagged for potential fraud. Specifically, CW-3 reviewed accounts based on a database query, using SQL that pulled in accounts that (a) had "non-ordinary emails," meaning emails that had a suspicious name and were not from a major email provider like Gmail; (b) had received at least three promotion credits; and (c) did not have other activity.[5] CW-3 explained that the SQL analysis he performed in August 2021 was examining NNAs from May-July 2021.

120. CW-3 explained that he conducted "penetration testing" to determine that the accounts his database query were pulling were fraudulent. He explained that this penetration testing involved reviewing a sample of the accounts, and that this review confirmed that his query was working correctly and only identifying fake accounts. He explained that his penetration testing needed to show the query was accurate at hundredths of a percent, or better, because bulk tagging accounts as fraudulent required near certainty before it could be implemented.

121. CW-3 stated that he first became aware of fraudulent accounts being created at a large scale to take advantage of PayPal's new account payment incentive in early August 2021. CW-3 explained that the promotions being abused were unique in that the fraudsters were able to get "instant" money by withdrawing the funds through Xoom or prepaid debit cards or gift cards given the lack of account vetting when those accounts are first created. He explained that prior

---

[5] SQL is a computer language used for interacting with, and pulling, data from databases.

promotions had usually been run in partnership with other companies, and imposed at least some obstacles to the continuous creation of fake accounts to take advantage of the incentive. He then saw that these accounts were receiving transfers of the incentive payments given by PayPal. According to CW-3, many of the fraudulent accounts that he identified were coming from China through throwaway virtual private networks (VPNs) which mask IP addresses.

122. CW-3 recalled that he first identified approximately 33,800 fraudulent accounts at that time but clarified that this number did not track all fraudulent accounts because his method for identifying fraudulent accounts was significantly underinclusive. CW-3 explained that this figure only counted "PayPal Accounts," not accounts on the other platforms owned by PayPal, such as Xoom and Venmo. CW-3 further explained that this method meant that he was certainly undercounting the total number of fraudulent accounts.

123. After identifying the scale of the fraudulent accounts taking advantage of PayPal's promotions, CW-3 suggested that PayPal should shut down all of these accounts immediately, but he received pushback against his suggestion. He continued to explain that PayPal had written "SOPs" concerning fraud detection, and that those policies were focused on violations of specific laws or frauds on PayPal's customers. He explained that the pushback primarily focused on the fact that the fraud was taking money from PayPal, but not PayPal's customers, meaning it was not resulting in fraud complaints from customers.

124. CW-3 explained that a large meeting was held in October 2021 over Microsoft Teams to discuss the trend he had identified. By then, his underinclusive SQL query was identifying about a million fake accounts. He explained that there were approximately 400 attendees at that meeting, including the Global Seller Risk teams and Strategy teams. CW-3 also explained that there were senior directors, who were two levels below Schulman in the meeting.

CW-3 advised that his SQL query ultimately identified about two million accounts that were engaging in incentive abuse.

125. CW-3 explained that during that meeting, a PowerPoint presentation explained how the fake account trend had been identified, including data regarding its prevalence and data regarding the number of promotional incentive payments that were being transferred into individual accounts and then transferred out of PayPal.

126. During the October meeting, CW-3 advocated for PayPal to shut down the fake accounts and his boss ultimately approved of "limiting" these accounts.[6] CW-3 believes that the information about the fake accounts was escalated to the executive level because they would have needed executive approval to limit that many accounts. CW-3 clarified that even if an account was "limited" it would still be able to withdraw the money eventually, meaning that applying that flag would not deter fraudsters from taking advantage of the promotion.

127. Following the October group meeting, CW-3 continued to discuss the issue with a member of PayPal's Strategy team in Shanghai. He explained that spreadsheets regarding the fake accounts were sent to this member of the Strategy team, and he repeatedly interacted with this member of the Strategy team about PayPal's follow-up into investigating the issue. CW-3 advised that the team based in Shanghai collected all of his team's data and disseminated it to senior leadership. CW-3 also explained that he communicated with others in various positions throughout PayPal about the fraudulent accounts he had identified.

128. CW-3 went on to say that there were likely more than the 4.5 million accounts that PayPal disclosed that were engaging in incentive abuse, since he doubted that he had personally

[6] PayPal refers to applying flags to accounts, such as when those accounts are suspected of fraud, to limit their activity as "limiting" accounts.

identified half of them and since his underinclusive query was unlikely to catch all of them as it was written. CW-3 recalled that NNA accounts were an important metric to PayPal and its investors, and CW-3 suggested that PayPal was using the incentive and this influx of accounts to "bullshit people" about its NNAs.

**4. Confidential Witness No. 4's Statements**

129. CW-4 worked at PayPal during the relevant time period as an employee in the Risk Management Organization, a role that involved participating in status updates pertaining to regulatory matters. CW-4 worked and interacted with Rainey, Schulman, and Senior Vice President-Chief Risk and Compliance Officer, Fiachre O'Neill, and was in the "inner circle" at PayPal.

130. CW-4 recalled that before the start of 2021, he voiced concerns in a room of senior executives, including O'Neill, regarding the risk that the promotion to pay people to open accounts would lead to people opening accounts, without otherwise using PayPal's services. CW-4 recalled that others in the room also expressed concerns about this risk, but that ultimately PayPal decided to proceed with the use of the incentive payments anyways.

131. CW-4 advised that the risks he identified regarding the paid incentives were included in each New Business Initiative ("NBIA"), which was ultimately reviewed by Rainey as part of his approval of the promotional campaigns. CW-4 added that any new marketing campaign or promotion at PayPal has to have a NBIA, which was a document that is "signed off on by everybody." CW-4 admitted that Schulman and Rainey were informed about the marketing practices and updated on its results, adding that "anything that had a dollar amount to it would need CFO approval."

132. CW-4 explained that as a result of PayPal's regulatory obligations, among other reasons, information concerning new accounts and the activity from those accounts was reported

to Schulman, Rainey, and PayPal's Board of Directors. He explained that regulatory agencies required that PayPal meet this "level of governance" where the CEO, CFO, and the Board of Directors are kept informed on issues concerning new accounts, and that as a result, information on new accounts was "made transparent" to Schulman and Rainey, including with a "repository of data" from PayPal's Compliance Department presented through reports to Schulman and Rainey, on issues within the Company.[7] As a result, CW-4 explained that if PayPal had identified that a large number of bot accounts were being created, that information would have immediately been made known to Schulman and Rainey.

133. According to CW-4, regulatory compliance required Rainey and PayPal's Chief Risk Officer to review and sign off on monthly updates required by some regulators, as they were "attested to by Chief Risk Officer." CW-4 also explained that the governance regimes PayPal was required to comply with also required the CEO and CFO be updated on the information, and as a result, PayPal's CEO and CFO would discuss the report, and information within it, with the Chief Risk Officer, which CW-4 recalled occurred in weekly meetings.

134. CW-4 explained that reports of fraud, including fake accounts, needed to be recorded in PayPal's system, which captures loss events and incidents, as required by various jurisdictions. He added that if a discovery of fraud is disclosed by another employee, that it must be recorded in the system that captures loss events and incidents. CW-4 then explained that the

---

[7] PayPal's Form 10-K filed with the SEC for 2021 stated: "As a licensed money transmitter, PayPal is subject to, among other requirements, restrictions with respect to the investment of customer funds, reporting requirements, bonding requirements, and inspection by state regulatory agencies. . . . In addition, financial services regulators in various jurisdictions, including the U.S. and the European Union ("EU"), have implemented authentication requirements for banks and payment processors intended to reduce online fraud . . . . In addition, based on our relationships with our partner financial institutions, we are, or may be, subject to indirect regulation and examination by the regulators of these financial institutions."

system that captures loss events and incidents is a tool and that there are different levels of escalation. Given the magnitude of this discovery, per PayPal's internal loss event policy, these events would have been reported to senior leadership.

135. CW-4 recalled that the highest tier of escalation applied to any situation affecting or potentially affecting 250,000+ accounts, regardless of whether the issue was resolved or ongoing. CW-4 stated that any situation meeting that threshold would be automatically and immediately escalated to the CEO.

### 5. Confidential Witness No. 5's Statements

136. CW-5 was employed by PayPal from early 2021 through early 2022 as a Senior Manager of Finance. CW-5 was responsible for planning and forecasting the Marketing team's budget, or "spend," and worked with the leaders of the Marketing team to assist in their planning. CW-5 reported to Neil DeSilva, VP of Finance at PayPal, who reported to Cosmin Pitigoi, Senior VP, Global FP&A, Operational Finance and Pricing, at the Company. CW-5 frequently worked with Michael Lamb, VP of Consumer Growth and Operations, since Lamb was in charge of PayPal's incentive programs.[8]

137. CW-5 explained that his team tracked-return on investment ("ROI") on incentive spending. He stated that the Company was aware of the risk that new users acquired through this promotional activity would be lower quality. CW-5 stated that Lamb, as VP, participated in discussions regarding how to balance the need for NNA growth with the risk that the promotional programs would attract "one and done" users. CW-5 explained the Marketing team participated in weekly or bi-weekly conference calls with Lamb and his "right-hand guy," Abhay Doshi, to

---

[8] As stated above, CW-1 stated that Lamb was Vice President, Performance Marketing and Marketing Transformation.

discuss the progress of marketing spend and to track the numbers associated with its campaigns. At these meetings, the team weighed "buying" more active users in order to more closely track their goals, while balancing the risk that the new buyers would be lower quality. According to CW-5, Lamb and Doshi presented information from these meetings to the C-Suite.

**6. Confidential Witness No. 6's Statements**

138. CW-6 was formerly employed by PayPal from well before 2010 through the Class Period, most recently as a Senior Manager, Risk and Compliance. CW-6's responsibilities included identifying potential risks associated with a launch at PayPal, such as the launch of a new product or marketing campaign. CW-6 also collaborated with the Risk Operations Teams and Strategy Teams to develop automated and manual controls intended to prevent fraud. CW-6 most recently reported to Christine Gonzalez, Vice President, Head of Global Risk and Compliance.

139. CW-6 explained that pursuant to PayPal's internal policies and requirements of regulatory agencies, any amount of loss or fraud above $50,000 was a "concern" and there was "always a roll up" to Schulman and Rainey. CW-6 added that this $50,000 or more threshold of fraud would have a root cause investigation performed, and both the root cause investigation and results of that investigation were reported to Vice President, Head of Global Fraud Arthi Rajan Makhija, who was part of the analysis group. CW-6 explained that the $50,000 threshold applied whether it was one instance of fraud or a trend of smaller instances that added up to $50,000, including fraud leading to marketing loss.

**7. Confidential Witness No. 7's Statements**

140. CW-7 was formerly employed by PayPal from before 2015 through at least the end of the Class Period and spent the vast majority of his tenure working in the fraud department. Throughout the Class Period, CW-7 was a Senior Risk Operations Team Leader. CW-7 reported

to Aaron Lingle, who reported to Wei Jiang, who reported to Kelly Dickerson, who reported up to Chief Enterprise Officer Aaron Karczmer.

141. CW-7 corroborated the October 2021 meeting during which the bot fraud trend was discussed with several hundred people present. CW-7 explained that the presentation given at this meeting included a PowerPoint presentation with information about the identified fraud trend and details on how the identified accounts could be placed into "limited" status to restrict their activity.

### D. The Individual Defendants' Motive and Opportunity

#### 1. The Individual Defendants' Sale of More than $170 Million in PayPal Stock Raises a Strong Inference of Scienter

142. During the Class Period, the Individual Defendants sold 645,321 shares of PayPal stock for total proceeds of $170,587,589. Schulman sold 359,205 shares and collected insider trading proceeds of $94,729,281. Rainey sold 155,979 shares and collected insider trading proceeds of $42,000,201. And Auerbach sold 130,137 shares and collected insider trading proceeds of $33,858,106. The proceeds (and profits)[9] of these stock sales dwarfed each of the Individual Defendants' salaries and were suspicious in both scope and timing. Moreover, not a single one of the Individual Defendants purchased any PayPal stock during the Class Period.

---

[9] The only price Defendants paid for acquiring any of their shares was in the form of in-the-money exercises of options awarded to them by PayPal. In 2019, defendant Schulman exercised such options awarded to him for a cost of $6,480,391, and in 2018, for a cost of $5,105,272. In 2019, defendant Rainey exercised such options awarded to him for a cost of $615,397, and in 2018, for a cost of $2,338,385. In 2021, defendant Auerbach exercised such options for a cost of $1,520,345. Thus, if the costs of all of the Individual Defendants' option exercises are assigned completely to their sales in 2021, Schulman's insider trading profits were $73,143,618, Rainey's insider trading profits were $39,046,419, and Auerbach's insider trading profits were $32,337,761.

143. According to a 2010 study by two Wharton professors, "the typical CEO sells only about 1.9% of her equity incentives each year."[10] But during the Class Period, each Individual Defendant unloaded far more than that on unsuspecting investors.

144. Data from SEC Form 4 Filings shows that the Individual Defendants sold vast portions of their total PayPal holdings during the Class Period. Specifically, Schulman, Rainey, and Auerbach sold 59%, 57%, and 69% of their reported shareholdings. This calculation is conservative, because it is based on their total sales over the number of shares they would have held at the end of the Class Period had they not made such sales, and thus increases the denominator (and reduces the percentage) by an amount corresponding to any shares they acquired during the Class Period through performance compensation.[11]

145. The following chart shows the percentage of shares sold during the Class Period:

| **Defendant** | **Total PayPal Shares Sold During the Class Period** | **All Sales as Percent of All Shares Available to Sell** |
|---|---|---|
| Schulman | 359,205 | 59% |
| Rainey | 155,979 | 57% |
| Auerbach | 130,137 | 69% |

146. The following table shows Schulman's sales during the Class Period:

---

[10] John E. Core & Wayne R. Guay, *Is CEO Pay Too High and Are Incentives Too Low? A Wealth-Based Contracting Framework*, 24 ACAD. MGMT. PERSP. 1, 5 (Feb. 2010).

[11] This figure is calculated for each Individual Defendant by dividing the total number of shares the Defendant sold during the Class Period by the sum of their holdings as of the start of the Class Period and the shares they received during the Class Period. Thus, Schulman sold 359,205 shares which is 59% of 632,163 shares; Rainey sold 155,979 shares which is 57% of 263,824 shares; Auerbach sold 130,137 shares which is 69% of 188,515 shares.

| Schulman | | | |
|---|---|---|---|
| **Date** | **Shares Sold** | **Average Share Price** | **Proceeds** |
| February 5, 2021 | 1,000 | 265.39 | 265,390.00 |
| February 5, 2021 | 1,594 | 269.32 | 429,296.08 |
| February 5, 2021 | 2,105 | 266.50 | 560,982.50 |
| February 5, 2021 | 2,150 | 267.53 | 575,189.50 |
| February 5, 2021 | 3,151 | 268.73 | 846,768.23 |
| February 15, 2021 | 12,301 | 298.37 | 3,670,249.37 |
| February 16, 2021 | 200 | 298.73 | 59,746.00 |
| February 16, 2021 | 300 | 308.05 | 92,415.00 |
| February 16, 2021 | 600 | 300.51 | 180,306.00 |
| February 16, 2021 | 830 | 301.84 | 250,527.20 |
| February 16, 2021 | 1,200 | 306.88 | 368,256.00 |
| February 16, 2021 | 1,200 | 302.85 | 363,420.00 |
| February 16, 2021 | 1,300 | 305.93 | 397,709.00 |
| February 16, 2021 | 1,800 | 303.98 | 547,164.00 |
| February 16, 2021 | 2,570 | 304.94 | 783,695.80 |
| March 1, 2021 | 52,134 | 273.63 | 14,265,426.42 |
| March 1, 2021 | 112,154 | 273.63 | 30,688,699.02 |
| March 10, 2021 | 520 | 244.97 | 127,384.40 |
| March 10, 2021 | 620 | 248.77 | 154,237.40 |
| March 10, 2021 | 817 | 246.75 | 201,594.75 |
| March 10, 2021 | 900 | 247.66 | 222,894.00 |
| March 10, 2021 | 2,206 | 243.18 | 536,455.08 |
| March 10, 2021 | 2,273 | 244.14 | 554,930.22 |
| March 10, 2021 | 2,664 | 242.26 | 645,380.64 |
| April 1, 2021 | 62,616 | 247.54 | 15,499,964.64 |
| April 30, 2021 | 100 | 265.94 | 26,594.00 |
| April 30, 2021 | 500 | 265.22 | 132,610.00 |
| April 30, 2021 | 2,283 | 263.28 | 601,068.24 |
| April 30, 2021 | 2,421 | 264.19 | 639,603.99 |
| April 30, 2021 | 4,696 | 262.18 | 1,231,197.28 |
| May 18, 2021 | 500 | 247.07 | 123,535.00 |
| May 18, 2021 | 607 | 243.34 | 147,707.38 |
| May 18, 2021 | 1,760 | 244.29 | 429,950.40 |
| May 18, 2021 | 3,033 | 245.35 | 744,146.55 |
| May 18, 2021 | 4,100 | 246.39 | 1,010,199.00 |
| June 10, 2021 | 100 | 261.98 | 26,198.00 |
| June 10, 2021 | 400 | 263.95 | 105,580.00 |
| June 10, 2021 | 1,100 | 265.75 | 292,325.00 |
| June 10, 2021 | 2,000 | 267.05 | 534,100.00 |
| June 10, 2021 | 3,187 | 268.18 | 854,689.66 |
| June 10, 2021 | 3,213 | 269.15 | 864,778.95 |

| Schulman | | | |
|---|---|---|---|
| **Date** | **Shares Sold** | **Average Share Price** | **Proceeds** |
| July 30, 2021 | 300 | 280.21 | 84,063.00 |
| July 30, 2021 | 935 | 279.39 | 261,229.65 |
| July 30, 2021 | 1,450 | 277.97 | 403,056.50 |
| July 30, 2021 | 2,200 | 277.25 | 609,950.00 |
| July 30, 2021 | 2,335 | 276.19 | 644,903.65 |
| July 30, 2021 | 2,780 | 275.14 | 764,889.20 |
| August 12, 2021 | 1,400 | 273.63 | 383,082.00 |
| August 12, 2021 | 1,500 | 276.41 | 414,615.00 |
| August 12, 2021 | 2,946 | 275.92 | 812,860.32 |
| August 12, 2021 | 4,154 | 274.86 | 1,141,768.44 |
| September 10, 2021 | 500 | 288.51 | 144,255.00 |
| September 10, 2021 | 792 | 287.73 | 227,882.16 |
| September 10, 2021 | 2,323 | 285.71 | 663,704.33 |
| September 10, 2021 | 3,156 | 286.60 | 904,509.60 |
| September 10, 2021 | 3,229 | 284.60 | 918,973.40 |
| October 29, 2021 | 300 | 237.28 | 71,184.00 |
| October 29, 2021 | 985 | 233.11 | 229,613.35 |
| October 29, 2021 | 1,100 | 236.33 | 259,963.00 |
| October 29, 2021 | 1,651 | 232.38 | 383,659.38 |
| October 29, 2021 | 2,896 | 234.27 | 678,445.92 |
| October 29, 2021 | 3,068 | 235.47 | 722,421.96 |
| November 12, 2021 | 331 | 206.21 | 68,255.51 |
| November 12, 2021 | 400 | 209.78 | 83,912.00 |
| November 12, 2021 | 400 | 203.06 | 81,224.00 |
| November 12, 2021 | 1,007 | 204.28 | 205,709.96 |
| November 12, 2021 | 1,526 | 205.53 | 313,638.78 |
| November 12, 2021 | 1,641 | 202.07 | 331,596.87 |
| November 12, 2021 | 2,124 | 209.00 | 443,916.00 |
| November 12, 2021 | 2,571 | 208.30 | 535,539.30 |
| December 10, 2021 | 100 | 193.64 | 19,364.00 |
| December 10, 2021 | 400 | 192.93 | 77,172.00 |
| December 10, 2021 | 500 | 191.92 | 95,960.00 |
| December 10, 2021 | 900 | 190.57 | 171,513.00 |
| December 10, 2021 | 1,010 | 189.61 | 191,506.10 |
| December 10, 2021 | 2,889 | 188.42 | 544,345.38 |
| December 10, 2021 | 4,201 | 187.63 | 788,233.63 |
| **Total** | **359,205** | **263.72** | **94,729,281.09** |

147. The Class Period stock sales for Rainey are set forth below:

| **Rainey** | | | |
|---|---|---|---|
| **Date** | **Shares Sold** | **Average Share Price** | **Proceeds** |
| February 15, 2021 | 4,311 | 298.37 | 1,286,273.07 |
| February 17, 2021 | 5,377 | 298.00 | 1,602,346.00 |
| March 1, 2021 | 22,655 | 273.63 | 6,199,087.65 |
| March 1, 2021 | 49,878 | 273.63 | 13,648,117.14 |
| March 3, 2021 | 200 | 267.20 | 53,440.00 |
| March 3, 2021 | 900 | 264.27 | 237,843.00 |
| March 3, 2021 | 1,697 | 266.54 | 452,318.38 |
| March 3, 2021 | 4,525 | 263.23 | 1,191,115.75 |
| March 3, 2021 | 7,397 | 262.28 | 1,940,085.16 |
| March 3, 2021 | 8,639 | 265.45 | 2,293,222.55 |
| March 3, 2021 | 8,900 | 258.30 | 2,298,870.00 |
| March 3, 2021 | 12,722 | 261.24 | 3,323,495.28 |
| March 3, 2021 | 13,963 | 259.30 | 3,620,605.90 |
| March 3, 2021 | 14,815 | 260.10 | 3,853,381.50 |
| **Total** | **155,979** | **269.27** | **42,000,201.38** |

148. The Class Period stock sales for Auerbach are set forth below:

| Auerbach | | | |
|---|---|---|---|
| **Date** | **Shares Sold** | **Average Share Price** | **Proceeds** |
| February 15, 2021 | 3,795 | 298.37 | 1,132,314.15 |
| February 23, 2021 | 100 | 267.07 | 26,707.00 |
| February 23, 2021 | 600 | 255.16 | 153,096.00 |
| February 23, 2021 | 1,100 | 253.59 | 278,949.00 |
| February 23, 2021 | 2,208 | 266.41 | 588,233.28 |
| February 23, 2021 | 2,284 | 256.06 | 584,841.04 |
| February 23, 2021 | 2,625 | 262.26 | 688,432.50 |
| February 23, 2021 | 2,800 | 263.31 | 737,268.00 |
| February 23, 2021 | 2,900 | 259.26 | 751,854.00 |
| February 23, 2021 | 2,909 | 258.19 | 751,074.71 |
| February 23, 2021 | 3,472 | 257.03 | 892,408.16 |
| February 23, 2021 | 5,400 | 261.09 | 1,409,886.00 |
| February 23, 2021 | 5,458 | 264.51 | 1,443,695.58 |
| February 23, 2021 | 6,978 | 265.48 | 1,852,519.44 |
| February 23, 2021 | 7,300 | 260.21 | 1,899,533.00 |
| March 1, 2021 | 14,848 | 273.63 | 4,062,858.24 |
| March 1, 2021 | 25,672 | 273.63 | 7,024,629.36 |
| May 25, 2021 | 2,137 | 259.77 | 555,128.49 |
| May 25, 2021 | 4,690 | 258.29 | 1,211,380.10 |
| May 25, 2021 | 7,415 | 259.07 | 1,921,004.05 |
| August 24, 2021 | 1,300 | 277.28 | 360,464.00 |
| August 24, 2021 | 5,186 | 279.19 | 1,447,879.34 |
| August 24, 2021 | 5,828 | 278.46 | 1,622,864.88 |
| November 23, 2021 | 100 | 190.68 | 19,068.00 |
| November 23, 2021 | 800 | 189.85 | 151,880.00 |
| November 23, 2021 | 1,063 | 188.94 | 200,843.22 |
| November 23, 2021 | 1,700 | 185.91 | 316,047.00 |
| November 23, 2021 | 2,651 | 187.85 | 497,990.35 |
| November 23, 2021 | 6,000 | 186.81 | 1,120,860.00 |
| December 16, 2021 | 818 | 188.75 | 154,397.50 |
| **Total** | **130,137** | **260.17** | **33,858,106.39** |

149. When compared to their trading both prior to and after the Class Period, the Individual Defendants stock sales are also suspicious. As set forth in the chart below, the Individual Defendants' proceeds from the sale of PayPal stock were substantially higher in 2021, during the Class Period, than they were in the full years preceding and following the Class Period:

| **Table Showing Greater Stock Sales During Class Period Compared to 2020** | | | |
|---|---|---|---|
| **Year** | **Schulman** | **Rainey** | **Auerbach** |
| 2020 | $78,864,988 | $19,821,406 | $23,168,718 |
| Class Period (2021) | $94,729,281 | $42,000,201 | $33,858,106 |
| (% Increase in 2021) | **20% Increase** | **112% Increase** | **46% Increase** |

| **Table Showing Greater Stock Sales During Class Period Compared to 2022** | | | |
|---|---|---|---|
| **Year** | **Schulman** | **Rainey** | **Auerbach** |
| Class Period (2021) | $94,729,281 | $42,000,201 | $33,858,106 |
| 2022 | $23,034,916 | $6,595,446 | $8,946,116 |
| (% Decrease in 2022) | **76% Decrease** | **84% Decrease** | **74% Decrease** |

150. The timing of the Individual Defendants' stock sales is also suspicious. The average price at which the Defendants sold their stock during the Class Period was $264.35 per share, which is $15.51 per share higher than PayPal's average stock price during the Class Period. Indeed, all but three of the days on which the Individual Defendants sold stock were within nine trading days of an alleged false or misleading statement or omission. Had Defendants waited and sold their stock on February 3, 2022, ***after*** the truth about their fraudulent scheme was revealed, their sales proceeds would have been at least $90 million ***less*** than what they collected from their insider sales during the Class Period.[12]

151. Further, no Individual Defendant had any PayPal stock purchases during the Class Period. But two days ***after*** the February 1, 2022 disclosure of the truth about PayPal's NNAs and the resulting stock price decline as the artificial inflation caused by Defendants' fraud was removed

[12] PayPal's stock price closed at $124.30 on February 3, 2022. It is currently trading for less than $70 per share.

from the price, Schulman bought 7,994 shares of PayPal stock at an average price of $124.57 per share. As *Barron's* reported, "[t]his was his first open-market purchase of the stock since he became CEO in July 2015; most of his shares were received for his services to the company."[13] Schulman's post-Class Period stock purchases were at a price nearly $140 per share lower than the average price at which he sold stock during the Class Period ($263.72 per share). This purchase is notable because it further demonstrates that Schulman's sales were not motivated by extrinsic non-company specific reasons, but instead that he was actively trading on PayPal's value – selling while the stock traded at artificially inflated levels and then turning around and buying only after the truth was revealed.

### 2. Paypal's Compensation Structure Created the Motive and Opportunity for the Individual Defendants to Commit Fraud

152. The Individual Defendants had the motive and opportunity to mislead PayPal investors. Specifically, the structure of the Individual Defendants' performance-based compensation created a concrete and personal benefit to each of them, rewarding them for artificially inflating NNAs and PayPal's stock price.

153. In early 2020, PayPal's Board of Directors Compensation Committee elected to grant performance-based compensation for the Individual Defendants based on increasing reported NNAs, along with hitting revenue and operating margin targets. The Company's disclosures on the Individual Defendants' compensation rationalized using the NNA metric saying, "measuring NNAs reinforces the critical importance of growing our customer base to build for the future. The

[13] The same *Barron's* article also quoted defendant Rainey speaking at a buy-side conference after the "steep drop in the stock price" as saying, "I'm a buyer right now, and I was a buyer at our prices last quarter. I think that, look, I'm very disappointed in where we are today." But even after the truth about PayPal's NNAs was revealed, Rainey could not stop misleading investors: He never actually bought any PayPal stock on the open market during or after the Class Period.

number of NNAs is also a key operational metric that the Company uses internally to measure ongoing performance." Based on this compensation structure, the Individual Defendants had the potential to earn performance-based compensation that was many times greater than their annual salaries.

154. For 2021, PayPal's Board of Directors Compensation Committee kept the same structure for awarding performance-based compensation, including by having reported NNA growth as the only operational performance measure. As in 2020, the Compensation Committee rationalized using the NNA metric saying, "measuring NNAs reinforces the critical importance of growing our customer base to build for the future. The number of NNAs is also a key operational metric that the Company uses internally to measure ongoing performance."

155. The performance-based compensation for each of the Individual Defendants for fiscal year 2021 was awarded in the first quarter of 2021, with the final value of each Individual Defendants' award determined on a review by the Board which occurred for defendant Schulman during 2021 and for the other Individual Defendants in early 2022 – all before Defendants disclosed the truth about PayPal's purported NNA growth. As a result of their fraudulent conduct throughout 2021, the Individual Defendants collected performance-based compensation for 2021 that far exceeded their annual salaries. Schulman received $30,545,381 in stock award and incentive plan compensation, more than 27 times (2,722%) his base salary of $1,122,115. Rainey received $11,492,377 in stock award and incentive plan compensation, more than 15 times (1,532%) his base salary of $750,000. And Auerbach received $11,439,082 in stock award and incentive plan compensation, more than 16 times (1,637%) his base salary of $698,846. Collectively, the Individual Defendants stock award and incentive plan compensation increased $14,997,181 in 2021, while they were misleading investors, compared to 2020, with Schulman's

stock award and incentive plan compensation increasing 39%, Rainey's increasing 25%, and Auerbach's increasing 57%.

156. All of the Individual Defendants are no longer with PayPal. On April 12, 2022, PayPal announced that Rainey would be leaving PayPal. Schulman and Auerbach would follow with the Company announcing their departures, respectively, on February 9, 2023 and August 10, 2023. However, through their insider trading and performance-based compensation, the Individual Defendants took advantage of their fraudulent conduct and pocketed over $224 million.

## IX. LOSS CAUSATION AND ECONOMIC LOSS

157. During the Class Period, as detailed herein, Defendants made false or misleading statements and omissions about PayPal that caused PayPal's Securities to trade at artificially inflated levels. Due to Defendants' misrepresentations and omissions, PayPal's stock reached a Class Period and all-time high stock price of $310.16 and throughout the Class Period PayPal's Securities traded at artificially inflated levels.

158. On February 2-3, 2022, PayPal's stock price fell in reaction to Defendants' disclosures (which they started to make after trading hours on February 1, 2022) revealing true information concerning PayPal's NNAs, including Defendants' reliance on incentive campaigns to boost reported NNA results and the resulting low-engagement and illegitimate accounts.

159. Due to Defendants' disclosure of the truth beginning after market close on February 1, 2022, PayPal's stock price fell dramatically.

160. On February 2, 2022, PayPal's stock price fell from a prior close of $175.80 to a closing price of $132.57 per share, a 24.6% decline that resulted in a market capitalization loss of $49.3 billion. PayPal's stock price continued to fall on February 3, 2022, from $132.57 to a closing price of $124.30 per share on February 3, 2022 – an additional 6.2% decline that resulted in a further market capitalization loss of $9.4 billion. Altogether, during the two trading days following

February 1, 2022, PayPal's stock price fell 29.3% decline resulting in a market capitalization loss of $58.7 billion.

161. As a result of their purchases of PayPal stock during the Class Period, Plaintiffs and the other Class members suffered economic loss (*i.e.*, damages), under the federal securities laws. Defendants' false and misleading statements caused PayPal's Securities to trade at artificially inflated levels throughout the Class Period. When PayPal's stock price declined as the truth was revealed, investors suffered losses. The timing and magnitude of the price declines and analyst reactions to the news, individually and collectively, negate any alternative inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

162. Because PayPal's stock traded at artificial levels, PayPal's call options also traded at artificially inflated levels. As a result of their purchases of PayPal call options during the Class Period, Class members suffered economic loss (*i.e.*, damages), under the federal securities laws, because the misstatements and omissions caused those options to trade at artificially inflated levels and, when the price of these options declined as the truth was revealed, these investors suffered losses.

## X. PRESUMPTION OF RELIANCE

163. Plaintiffs and Class members are entitled to a presumption of reliance on the material misrepresentations and omissions alleged herein pursuant to the fraud-on-the-market theory adopted by the Supreme Court in *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988) ("*Basic*"). Throughout the Class Period, PayPal's stock traded in an efficient market and under *Basic*, Plaintiffs are entitled to a presumption that: (a) the misrepresentations and omissions alleged herein affected the market price for PayPal's stock; and (b) reasonable investors, including

Plaintiffs and members of the Class, relied on Defendants' misrepresentations and omissions when trading PayPal Securities at the market price or at prices informed thereby. The following allegations show that PayPal's Securities traded in an efficient market throughout the Class Period.

(a) Throughout the Class Period, PayPal's stock met the requirements for listing on, and was traded on the NASDAQ, and securities that trade on the NASDAQ overwhelmingly trade in an informationally efficient market.

(b) Throughout the Class Period, PayPal's stock traded at high volumes, with an average daily trading volume during the Class Period of approximately 10 million shares.

(c) Throughout the Class Period, PayPal's stock traded with a narrow bid-ask spread, with an average daily bid-ask spread of approximately 0.03% of PayPal's trading price.

(d) Throughout the Class Period, PayPal maintained a large market capitalization; PayPal's average market capitalization was over $280 billion throughout the Class Period.

(e) Throughout the Class Period, PayPal's stock was registered with the SEC, and PayPal filed periodic reports with the SEC.

(f) Throughout the Class Period, PayPal communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

(g) Throughout the Class Period, the market reacted promptly to public information disseminated by and about PayPal.

(h) Throughout the Class Period, PayPal was covered by numerous securities analysts employed by major brokerage firms during the Class Period. PayPal was extensively covered by news media and investor publications throughout the Class Period.

164. As a result of the foregoing, the market for PayPal's Securities promptly digested current information regarding or relevant to PayPal from all publicly available sources and reflected such information in the stock prices.

165. Defendants' material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of PayPal's Securities.

166. Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs and other members of the Class purchased PayPal Securities between the time Defendants misrepresented or failed to disclose material facts and the end of the Class Period.

## XI. NO SAFE HARBOR

167. The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false or misleading statements and omissions alleged in this Complaint. The statements at issue are not protected by the PSLRA's safe harbor or the common law bespeaks caution doctrine for a variety of reasons, including the following.

168. First, Defendants' statements and omissions alleged to be false or misleading relate to historical facts or existing conditions and, therefore, are not protected by the safe harbor. Second, to the extent any of the false or misleading statements alleged may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made. Third, any purported forward-looking statements were not accompanied by meaningful cautionary language because risks that Defendants warned of had already come to pass, and any cautionary language did not mention important factors of similar significance to those actually realized.

Fourth, to the extent that there were any forward-looking statements that were identified as such, Defendants are liable because, at the time each of those forward-looking statements was made, the speaker knew the statement was false and/or misleading when made.

## XII. CLASS ACTION ALLEGATIONS

169. Plaintiffs bring this federal securities class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all persons and entities that purchased or otherwise acquired PayPal publicly traded common stock or any exchange-traded option to purchase PayPal publicly traded stock during the period from February 3, 2021 through February 1, 2022, inclusive (the "Class Period"), and were damaged thereby, except as excluded below (the "Class").

170. Excluded from the Class are: (a) Defendants; (b) members of the immediate family of any Individual Defendant; (c) any person who was an officer or director of PayPal during the Class Period; (d) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (e) affiliates of PayPal, including its employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (f) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person in (a)-(f) of this paragraph.

171. The members of the Class are so numerous that joinder of all members is impracticable. According to its quarterly and annual reports filed with the SEC, during the Class Period, there were approximately one billion shares of PayPal stock outstanding during the Class Period, and PayPal's stock was actively traded on the NASDAQ under the ticker symbol PYPL. While the exact number of Class members is unknown to Plaintiffs at this time, and such number can only be ascertained through appropriate discovery, Plaintiffs believe that the proposed Class has thousands of members and is widely dispersed geographically. Record owners and other members of the Class may be identified from records maintained by PayPal and may be notified

of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

172. Plaintiffs' claims are typical of the claims of the members of the Class. All members of the Class were similarly affected by Defendants' alleged wrongful conduct in violation of the Exchange Act as complained of herein.

173. Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel competent and experienced in class action and securities litigation.

174. Common questions of law and fact exist as to all members of the Class, and predominate over questions solely affecting individual members of the Class. The questions of law and fact common to the Class include, but are not limited to, the following:

(a) Whether Defendants violated the federal securities laws by their acts and omissions alleged herein;

(b) Whether Defendants' trading constitutes a deceptive device under Rule 10b-5 of the Exchange Act;

(c) Whether the statements Defendants made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

(d) Whether, and to what extent, the market price of PayPal Securities was artificially inflated during the Class Period because of the material misstatements and omissions alleged herein;

(e) Whether Defendants acted with the requisite level of scienter;

(f) Whether defendants Schulman, Rainey, and Auerbach were controlling persons of PayPal;

(g) Whether Lead Plaintiff and other Class members traded contemporaneously with Defendants; and

(h) Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of such damages.

175. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIII. COUNTS

### COUNT I
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

176. Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

177. This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC, on behalf of Plaintiffs and the Class, against PayPal and the Individual Defendants.

178. During the Class Period, Defendants deceived the investing public, including Plaintiffs and the Class, and artificially inflated or artificially maintained the price of PayPal Securities.

179. Defendants made untrue statements of material fact and/or omitted material facts necessary to make their statements made not misleading. Defendants' false or misleading statements and omissions are described above.

180. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the adverse material information as specified herein.

181. Defendants had actual knowledge of the misrepresentations, omissions, and deceptive conduct alleged herein, or acted with reckless disregard for the truth. The facts demonstrating that Defendants acted with actual knowledge or recklessness are described above.

182. By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

183. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and members of the Class suffered damages in connection with their respective purchases of PayPal Securities during the Class Period.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

184. Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

185. This Count is asserted pursuant to §20(a) of the Exchange Act, on behalf of Plaintiffs and the Class, against the Individual Defendants.

186. As alleged in Count I, PayPal violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder by making materially false or misleading statements and omitting material information about PayPal.

187. Defendants' fraudulent conduct was undertaken with scienter, and PayPal is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with reckless disregard of the falsity or misleading nature of their statements and the

fraudulent nature of PayPal's scheme during the Class Period. Thus, PayPal is primarily liable under §10(b) of the Exchange Act.

188. As set forth above, the Individual Defendants had control over PayPal and made the materially false or misleading statements and omissions on behalf of PayPal within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their executive positions and their culpable participation, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of PayPal, including the content and dissemination of the various statements that Plaintiffs contend were false or misleading. The Individual Defendants were provided with or had unlimited access to PayPal's internal reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or to cause them to be corrected.

189. In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of PayPal and, therefore, are presumed to have had the power to control or to influence the conduct giving rise to the securities violations as alleged herein. PayPal, in turn, controlled the Individual Defendants and all of its employees.

190. The Individual Defendants also were culpable participants in the conduct alleged herein, because they: (a) made materially false and misleading statements or omitted to disclose truthful information; (b) had knowledge of the wrongful conduct or were reckless in not having such knowledge and continued in the capacity of control persons of PayPal; (c) provided credibility to PayPal's public disclosures by appearing in public events on behalf of PayPal while he conduct alleged herein occurred; and/or (d) did not act to prevent the wrongful conduct alleged herein, despite an ability to do so.

191. By reason of such wrongful conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of PayPal Securities during the Class Period.

**COUNT III**
**Violation of Section 20A of the Exchange Act**
**Against the Individual Defendants**

192. Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

193. As detailed herein, the Individual Defendants were in possession of material non-public information concerning PayPal. The Individual Defendants took advantage of their possession of material non-public information regarding PayPal to obtain significant insider trading profits during the Class Period.

194. The Individual Defendants' sales of PayPal common stock (set forth below and in the attached Appendix) were made contemporaneously with Lead Plaintiff's purchases of PayPal common stock (set forth below and in Lead Plaintiff's certifications (*see* ECF 12-3)) during the Class Period.

195. Defendant Schulman made the following sales of PayPal common stock contemporaneously with the following Lead Plaintiff's purchases of PayPal common stock:

| **Lead Plaintiff's Purchases (Within 3 Days)** | | | **Schulman's Contemporaneous Sales** | | |
|---|---|---|---|---|---|
| **Date** | **Shares** | **Price** | **Date** | **Shares** | **Price** |
| February 16, 2021 | 23,100 | 304.79 | February 16, 2021 | 200 | 298.73 |
| | | | February 16, 2021 | 300 | 308.05 |
| | | | February 16, 2021 | 600 | 300.51 |
| | | | February 16, 2021 | 830 | 301.84 |
| | | | February 16, 2021 | 1,200 | 306.88 |
| | | | February 16, 2021 | 1,200 | 302.85 |
| | | | February 16, 2021 | 1,300 | 305.93 |
| | | | February 16, 2021 | 1,800 | 303.98 |
| | | | February 16, 2021 | 2,570 | 304.94 |
| April 30, 2021 | 23,853 | 262.29 | April 30, 2021 | 100 | 265.94 |
| | | | April 30, 2021 | 500 | 265.22 |
| | | | April 30, 2021 | 2,283 | 263.28 |
| | | | April 30, 2021 | 2,421 | 264.19 |
| | | | April 30, 2021 | 4,696 | 262.18 |
| May 19, 2021 | 41,533 | 244.63 | May 18, 2021 | 500 | 247.07 |
| | | | May 18, 2021 | 607 | 243.34 |
| | | | May 18, 2021 | 1,760 | 244.29 |
| | | | May 18, 2021 | 3,033 | 245.35 |
| | | | May 18, 2021 | 4,100 | 246.39 |
| July 30, 2021 | 12,700 | 275.53 | July 30, 2021 | 300 | 280.21 |
| | | | July 30, 2021 | 935 | 279.39 |
| | | | July 30, 2021 | 1,450 | 277.97 |
| | | | July 30, 2021 | 2,200 | 277.25 |
| | | | July 30, 2021 | 2,335 | 276.19 |
| | | | July 30, 2021 | 2,780 | 275.14 |
| October 29, 2021 | 15,538 | 234.22 | October 29, 2021 | 300 | 237.28 |
| November 1, 2021 | 846 | 231.50 | October 29, 2021 | 985 | 233.11 |
| November 2, 2021 | 882 | 231.21 | October 29, 2021 | 1,100 | 236.33 |
| | | | October 29, 2021 | 1,651 | 232.38 |
| | | | October 29, 2021 | 2,896 | 234.27 |
| | | | October 29, 2021 | 3,068 | 235.47 |

196. Defendant Rainey made the following sales of PayPal common stock contemporaneously with the following Lead Plaintiff's purchases of PayPal common stock:

| **Lead Plaintiff's Purchases (Within 3 Days)** | | | **Rainey's Contemporaneous Sales** | | |
|---|---|---|---|---|---|
| **Date** | **Shares** | **Price** | **Date** | **Shares** | **Price** |
| February 16, 2021 | 23,100 | 304.79 | February 15, 2021 | 4,311 | 298.37 |
| | | | February 17, 2021 | 5,377 | 298.00 |

197. Defendant Auerbach made the following sales of PayPal common stock contemporaneously with the following Lead Plaintiff's purchases of PayPal common stock:

| **Lead Plaintiff's Purchases (Within 3 Days)** | | | **Auerbach's Contemporaneous Sales** | | |
|---|---|---|---|---|---|
| **Date** | **Shares** | **Price** | **Date** | **Shares** | **Price** |
| February 26, 2021 | 150,000 | 259.85 | February 23, 2021 | 100 | 267.07 |
| | | | February 23, 2021 | 600 | 255.16 |
| | | | February 23, 2021 | 1,100 | 253.59 |
| | | | February 23, 2021 | 2,208 | 266.41 |
| | | | February 23, 2021 | 2,284 | 256.06 |
| | | | February 23, 2021 | 2,625 | 262.26 |
| | | | February 23, 2021 | 2,800 | 263.31 |
| | | | February 23, 2021 | 2,900 | 259.26 |
| | | | February 23, 2021 | 2,909 | 258.19 |
| | | | February 23, 2021 | 3,472 | 257.03 |
| | | | February 23, 2021 | 5,400 | 261.09 |
| | | | February 23, 2021 | 5,458 | 264.51 |
| | | | February 23, 2021 | 6,978 | 265.48 |
| | | | February 23, 2021 | 7,300 | 260.21 |
| May 27, 2021 | 41,807 | 259.47 | May 25, 2021 | 2,137 | 259.77 |
| | | | May 25, 2021 | 4,690 | 258.29 |
| | | | May 25, 2021 | 7,415 | 259.07 |

198. In addition, each of the Individual Defendants' sales of PayPal common stock during the Class Period were contemporaneous with purchases by members of the Class who purchased PayPal common stock during the Class Period. *See* ¶¶146-148 (listing each Individual Defendants' Class Period sales).

199. Lead Plaintiff and members of the Class who purchased PayPal Securities contemporaneously with sales by the Individual Defendants suffered damages because: (a) in reliance on the integrity of the market, Lead Plaintiff and members of the Class paid artificially inflated prices as a result of the violations of §§10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder, as alleged herein; and (b) Lead Plaintiff and members of the Class would not have purchased the securities at the prices they paid, or at all, if they had been

aware that the market prices had been artificially inflated by Defendants' false or misleading statements and concealment alleged herein.

200. By reason of the above conduct, the Individual Defendants are liable pursuant to §20A of the Exchange Act, 15 U.S.C. §78t-1.

## XIV. PRAYER FOR RELIEF

201. WHEREFORE, Plaintiffs, on behalf of themselves and the other members of the Class, pray for judgment as follows:

(a) Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiffs as Class Representatives, and Labaton Keller Sucharow LLP and Robbins Geller Rudman & Dowd LLP as Class Counsel;

(b) Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiffs reasonable costs and expenses incurred in this action, including attorneys' fees, experts' fees, and other costs and disbursements; and

(d) Awarding such further relief, including any equitable/injunctive relief, as the Court may deem just and proper.

## XV. JURY TRIAL DEMANDED

202. Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: March 17, 2025

**SEEGER WEISS LLP**

By: */s/ Christopher A. Seeger*
Christopher A. Seeger
Christopher L. Ayers
Jennifer R. Scullion
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Telephone: (973) 639-9100
Facsimile: (973) 679-8656
cseeger@seegerweiss.com
cayers@seegerweiss.com
jscullion@seegerweiss.com

*Liaison Counsel*

**LABATON KELLER SUCHAROW LLP**
Carol C. Villegas (*pro hac vice*)
Jake Bissell-Linsk (*pro hac vice*)
Lisa Strejlau (*pro hac vice*)
Danielle Izzo (*pro hac vice*)
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Fax: (212) 818-0477
cvillegas@labaton.com
jbissell-linsk@labaton.com
lstrejlau@labaton.com
dizzo@labaton.com

**LABATON KELLER SUCHAROW LLP**
Mark Willis (*pro hac vice* forthcoming)
1050 Connecticut Avenue NW, Suite 500
Washington, D.C. 20036
Telephone: (202) 772-1880
Fax: (212) 818-0477
mwillis@labaton.com

*Counsel for Lead Plaintiff and*
*Co-Lead Counsel for the Class*

Respectfully submitted,

**ROBBINS GELLER RUDMAN & DOWD LLP**
Tor Gronborg (*pro hac vice*)
Matthew I. Alpert (*pro hac vice*)
Patton L. Johnson (*pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Fax: (619) 231-7423
torg@rgrdlaw.com
malpert@rgrdlaw.com
pjohnson@rgrdlaw.com

**ROBBINS GELLER RUDMAN & DOWD LLP**
Jacob G. Gelman (*pro hac vice*)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: (415) 288-4545
Fax: (415) 288-4534
jgelman@rgrdlaw.com

*Counsel for PERA and*
*Co-Lead Counsel for the Class*

**OFFICE OF THE NEW MEXICO ATTORNEY GENERAL**
Raúl Torrez, Attorney General
Jacqueline Ortiz, Assistant Attorney General Post Office Drawer 1508
Santa Fe, NM 87504-1508
Telephone: (505) 490-4060
jortiz@nmag.gov

**BERGER MONTAGUE**
Michael Dell'Angelo
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
mdellangelo@bm.net

*Counsel for PERA*

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2025, I authorized the electronic filing of the foregoing **First Amended Complaint for Violations of the Federal Securities Laws** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses of all counsel of record.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: March 17, 2025
Ridgefield Park, New Jersey

*/s/ Christopher A. Seeger*
Christopher A. Seeger