SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
CHRISTOPHER L. AYERS
JENNIFER R. SCULLION
55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
Telephone:  212/584-0700
212/584-0799 (fax)
cseeger@seegerweiss.com
cayers@seegerweiss.com
jscullion@seegerweiss.com

Liaison Counsel

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re PAYPAL HOLDINGS, INC. SECURITIES LITIGATION | ) ) ) ) ) | No. 3:22-cv-05864-RK-JTQ <br><br> <u>CLASS ACTION</u> <br><br> OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAW |

4909-3813-8457.v1

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ............................................................................................1

II.     STATEMENT OF FACTS ............................................................................2

III.    LEGAL STANDARD ....................................................................................7

IV.     DEFENDANTS ARE LIABLE FOR THEIR
        MISREPRESENTATIONS REGARDING PAYPAL'S NNA
        ACQUISITION STRATEGY.........................................................................8

        A.    The Law of the Case Doctrine Does Not Apply ................................10

        B.    The NNA Acquisition Statements Are Material ................................12

        C.    The NNA Acquisition Statements Are Not Inactionable
              Statements of Opinion........................................................................16

        D.    Defendants' Implausible Mischaracterizations Should Be
              Rejected .............................................................................................19

V.      DEFENDANTS ARE LIABLE FOR THEIR NOVEMBER 2021
        FAILURE TO DISCLOSE THAT NNA RESULTS INCLUDED
        ILLEGITIMATE ACCOUNTS.....................................................................21

VI.     PLAINTIFFS ALLEGE A STRONG INFERENCE OF SCIENTER..........23

        A.    Plaintiffs Allege a Strong Inference that Defendants Knew or
              Recklessly Disregarded that Their Statements Were Misleading
              When Made .........................................................................................24

              1.    Defendants' NNA Acquisition Statements Were Made
                    with Scienter .............................................................................24

              2.    Defendants' Made Their 3Q21 NNA Result Statements
                    with Scienter .............................................................................28

              3.    The Core Operations Theory Supports an Inference of
                    Scienter......................................................................................31

**Page**

B.    Defendants' Motive and Opportunity Buttresses the Strong Inference of Scienter ...................................................................33

C.    Defendants Have Not Offered a Plausible Competing Inference that Is More Compelling than Plaintiffs' Allegations..........................38

VII.    THE SECTION 20(a) AND 20A CLAIMS ARE ADEQUATELY ALLEGED ...............................................................................40

VIII.  CONCLUSION.......................................................................40

- ii -

4909-3813-8457.v1

# TABLE OF AUTHORITIES

**Page**

## CASES

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
554 F.3d 342 (3d Cir. 2009) ...............................................................................15, 16

*Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*,
623 F. Supp. 3d 470 (E.D. Pa. 2022)..........................................................................14

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
28 F.4th 343 (2d Cir. 2022) .......................................................................................37

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)......................................................................................................7

*Azar v. Yelp, Inc.*,
2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) ...........................................................19

*Carmignac Gestion, S.A. v. Perrigo Co. PLC*,
2019 WL 3451523 (D.N.J. July 31, 2019) .................................................................32

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,
70 F.4th 668 (3d Cir. 2023) .............................................................................9, 29, 30

*City of Warwick Ret. Sys. v. Catelant, Inc.*,
2024 WL 3219616 (D.N.J. June 28, 2024)............................................................18, 30

*Del. Cnty. Emps. Ret. Sys. v. AdaptHealth Corp.*,
606 F. Supp. 3d 124 (E.D. Pa. 2022)..........................................................................15

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
81 F.4th 918 (9th Cir. 2023) ......................................................................................15

*Hall v. Johnson & Johnson*,
2019 WL 7207491 (D.N.J. Dec. 27, 2019)..................................................................24

*Hawkins v. Danaher Corp.*,
2025 WL 2216149 (D.D.C. Aug. 4, 2025) ..................................................................13

*Home Depot USA, Inc. v. Lafarge N. Am., Inc.*,
59 F.4th 55 (3d Cir. 2023) .........................................................................................11

4909-3813-8457.v1

**Page**

*In re Able Lab'ys Sec. Litig.*,
  2008 WL 1967509 (D.N.J. Mar. 24, 2008) ......................................................35

*In re Adams Golf, Inc. Sec. Litig.*,
  381 F.3d 267 (3d Cir. 2004) ........................................................................12

*In re Avon Sec. Litig.*,
  2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) .................................................13

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) ......................................................................37

*In re Campbell Soup Co. Sec. Litig.*,
  145 F. Supp. 2d 574 (D.N.J. 2001) ...............................................................31

*In re City of Phila. Litig.*,
  158 F.3d 711 (3d Cir. 1998) ........................................................................11

*In re Coinbase Glob., Inc. Sec. Litig.*,
  2024 WL 4053009 (D.N.J. Sep. 5, 2024) ......................................................19

*In re CommVault Sys., Inc. Sec. Litig.*,
  2016 WL 5745100 (D.N.J. Sep. 30, 2016) .....................................................34

*In re: Enzymotec Sec. Litig.*,
  2015 WL 8784065 (D.N.J. Dec. 15, 2015) .....................................................12

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
  2020 WL 1479128 (E.D. Pa. Mar. 25, 2020) .................................................31

*In re Novavax Inc. S'holder Derivative Litig.*,
  2023 WL 5353171 (D. Md. Aug. 21, 2023) ....................................................36

*In re Party City Sec. Litig.*,
  147 F. Supp. 2d 282 (D.N.J. 2001) ...............................................................37

*In re PTC Therapeutics, Inc. Sec. Litig.*,
  2017 WL 3705801 (D.N.J. Aug. 28, 2017) .....................................................24

4909-3813-8457.v1

**Page**

*In re RenovaCare, Inc. Sec. Litig.*,
  2024 WL 2815034 (D.N.J. June 3, 2024)...........................................................20

*In re Suprema Specialties, Inc. Sec. Litig.*,
  438 F.3d 256 (3d Cir. 2006) .......................................................34, 36

*In re Toronto-Dominion Bank Sec. Litig.*,
  2018 WL 6381882 (D.N.J. Dec. 6, 2018)......................................................31, 37

*In re Urb. Outfitters, Inc. Sec. Litig.*,
  103 F. Supp. 3d 635 (E.D. Pa. 2015)......................................................34

*In re Valeant Pharms. Int'l, Inc. Sec. Litig.*,
  2023 WL 3993740 (D.N.J. June 14, 2023)......................................................23

*In re Virtu Fin., Inc. Sec. Litig.*,
  770 F. Supp. 3d 482 (E.D.N.Y. 2025) ...............................................................14

*Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*,
  2021 WL 4191467 (D.N.J. Sep. 15, 2021) .........................................................36

*Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*,
  620 F. Supp. 3d 167 (D.N.J. 2022).....................................................................40

*Institutional Invs. Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009) .....................................................................*passim*

*Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*,
  2011 WL 2444675 (D. Del. June 14, 2011) .......................................................35

*Macquarie Infrastructure Corp. v. Moab Partners, L. P.*,
  601 U.S. 257 (2024)...........................................................................................19

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) .......................................................................33, 34

*Malleus v. George*,
  641 F.3d 560 (3d Cir. 2011) ...............................................................................7

4909-3813-8457.v1

**Page**

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
   761 F.3d 245 (2d Cir. 2014) ..................................................................22

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
   367 F. Supp. 3d 16 (S.D.N.Y. 2019) ....................................................17

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015)......................................................................13, 16

*Oran v. Stafford*,
   226 F.3d 275 (3d Cir. 2000) ..................................................8, 15, 16, 35

*Percoco v. Deckers Outdoor Corp.*,
   2013 WL 3584370 (D. Del. July 8, 2013) ............................................37

*Pub. Int. Rsch. Grp. of N.J., Inc. v. Magnesium Elektron, Inc.*,
   123 F.3d 111 (3d Cir. 1997) ..................................................................11

*Roofer's Pension Fund v. Papa*,
   2018 WL 3601229 (D.N.J. July 27, 2018) ............................................26

*Saint-Jean v. Palisades Interstate Park Comm'n*,
   49 F.4th 830 (3d Cir. 2022) ..................................................................11

*Schmidt v. Skolas*,
   770 F.3d 241 (3d Cir. 2014) ..................................................................35

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
   351 F. Supp. 3d 874 (E.D. Pa. 2018)....................................................25

*Seeks v. Boeing Co.*,
   752 F. Supp. 3d 992 (N.D. Ill. 2024)....................................................14

*Shenwick v. Twitter, Inc.*,
   282 F. Supp. 3d 1115 (N.D. Cal. 2017)................................................33

*Speeney v. Rutgers, The State Univ.*,
   369 F. App'x 357 (3d Cir. 2010) ..........................................................11

4909-3813-8457.v1

**Page**

*Strougo v. Mallinckrodt Pub. Ltd. Co.*,
2022 WL 17740482 (D.N.J. Dec. 16, 2022).............................................23, 28, 30

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007).................................................................8, 23, 24, 37

*Turocy v. El Pollo Loco Holdings, Inc.*,
2017 WL 3328543 (C.D. Cal. Aug. 4, 2017) ......................................................14

*U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*,
812 F.3d 294 (3d Cir. 2016) ........................................................................8

*United States ex rel. Petratos v. Genentech Inc.*,
855 F.3d 481 (3d Cir. 2017) ......................................................................10

*Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*,
176 F. Supp. 3d 387 (D. Del. 2016)................................................................37

*Utesch v. Lannett Co., Inc.*,
385 F. Supp. 3d 408 (E.D. Pa. 2019)..............................................................25

*West Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
2015 WL 3755218 (E.D. Pa. June 16, 2015)......................................................18

*Wu v. GSX Techedu Inc.*,
738 F. Supp. 3d 527 (D.N.J. 2024)................................................................29

*zCap Equity Fund LLC v. LuxUrban Hotels Inc.*,
__ F. Supp. 3d __, 2025 WL 2097951 (S.D.N.Y. July 25, 2025) .....................................20

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
§10(b).....................................................................................8, 40
§20(a) ......................................................................................40
§20A........................................................................................40

4909-3813-8457.v1

**Page**

Federal Rules of Civil Procedure
    Rule 8(c)................................................................................35
    Rule 9(b) ..............................................................................8
    Rule 12(b)(6)........................................................................7

17 C.F.R.
    §240.10b5-1 .........................................................................35
    §240.10b5-1(c).....................................................................36

4909-3813-8457.v1

## I.    INTRODUCTION

This is a straight-forward case of securities fraud.  Over the February 3, 2021-February 1, 2022 Class Period, Defendants made a series of statements about PayPal's net new account ("NNA") strategy, assuring investors that they were not chasing "low value net new actives," were "bring[ing] in high quality net new actives," and as a result "these have been the most engaged cohorts that we've ever seen."[1]  But by the start of February 2022, however, Defendants were forced to admit that they had "leaned into incentivized customer acquisition tactics to a much greater extent than we ever have in our history" and the resulting "customers have lower engagement and a higher propensity to churn."  In November 2021, Defendants also reported 13.3 million NNAs in 3Q21, only to admit in February 2022 as well, less than three months later that their 2021 incentive programs had resulted in millions of illegitimate accounts that never should have been included in NNA results.

In response to Plaintiffs' Complaint, Defendants argue that the allegations of falsity and scienter are insufficient.  But Plaintiffs have met all the requirements to plead falsity, identifying the alleged statements with particularity and specifically identifying why each statement was misleading when made.  The Court's prior

---

[1]    Unless otherwise noted, citations are omitted, emphasis is added, terms not defined herein have the same meaning as in the First Amended Complaint for Violations of the Federal Securities Laws (ECF 88) ("Complaint"), and all "¶_" references are to the Complaint.

- 1 -

concern that certain statements may not have been material has been addressed with allegations demonstrating that investors and analysts were particularly focused on Defendants' Class Period assurances regarding the NNA acquisitions, as well as the stock price reaction in response to the post-Class Period disclosure of the truth about those NNAs.  Plaintiffs also allege a strong inference of scienter – an element the Court did not reach in its January 29, 2025 Opinion (ECF 86) ("Opinion" or "Op.") – based on both Defendants' knowledge or reckless disregard of the truth about the NNA acquisition strategy and their motive and opportunity to commit the fraud. Accordingly, Defendants' Motion to Dismiss ("MTD") should be denied in its entirety.

## II.    STATEMENT OF FACTS

PayPal is a digital payments platform that primarily earns revenue by charging fees for users to complete transactions.  ¶¶20-21.  In 2020, the COVID-19 pandemic helped PayPal achieve record numbers of new accounts and online transactions.  ¶¶24-25.  Trying to capitalize on this growth, Defendants announced their intention to transform PayPal into a "Super App," a single application where users could shop, make payments, and manage their financial lives.  ¶26.  To achieve this goal, Defendants acknowledged they needed to increase PayPal's user base from 375 million active accounts to at least 500 million active accounts.  ¶27.  Thus, coming into 2021, the most important factor for investors was whether PayPal could generate

- 2 -

new accounts with engaged users, or whether user growth and engagement in 2020 was just a temporary phenomenon driven by the COVID-19 pandemic.

In response, Defendants directed investors to PayPal's NNA metric, which "[m]easures the net change in the number of organic active customer accounts." ¶23. In every earnings report, press release, and conference call during the Class Period, Defendants discussed NNAs. ¶¶29, 30-34, 36, 38-41, 43-44, 46-48. NNAs are a function of three things: (1) new accounts; (2) reactivation of dormant accounts (accounts without a transaction for 12 months); and (3) subtracting "churn," which is newly dormant accounts. ¶23.

By the start of 2021, however, PayPal was having difficulty generating the type of engaged NNAs that were necessary to grow the Company and keep alive the promise of PayPal becoming a Super App. So, as Defendants later admitted, they pursued a strategy of incentivizing low-engaged and illegitimate accounts to do one transaction, temporarily boosting NNAs. ¶¶52, 55, 58-59. But Defendants did not disclose this strategy to investors. To the contrary, while reporting continued growth in NNAs and increasing NNA targets for 2021, Defendants also assured investors that "rather than chasing a low-value, net new active that maybe pumps up numbers and the optics look good," PayPal was instead "really looking at how they're going to contribute to the PayPal platform over time." ¶40. Defendants said that the new accounts PayPal had added were "high-quality net new actives" and the "most

engaged cohorts that we've ever seen." ¶¶32, 38, 64.  Defendants repeated these statements to the market throughout the Class Period, telling investors that low-quality NNAs "is not something that we want to chase as a company, and we can certainly go out and spend money on customer acquisition and get very low value net new actives to inflate or pump up that number, but that's not the right economic decision for us longer term." ¶48.  In response, PayPal's stock price rose to over $300 per share.

What investors were not told is that Defendants had set out on an intentional strategy to do exactly what they told the market they were not doing.  Each Individual Defendant was involved in approving and implementing incentive campaigns that specifically went after low-engaged accounts to inflate reported NNAs. ¶¶106, 110, 131.  These campaigns targeted low-engaged users and accounts that were dormant or soon to be dormant with a cash incentive in exchange for a single transaction, which allowed the Company to include that account as an NNA.  Defendant Schulman, PayPal's then CEO, set the business strategy and had ultimate responsibility for the Company trying to meet his publicly stated NNA targets. ¶¶108-110.  Defendant Rainey, PayPal's then CFO, increased budgets for these cash incentive campaigns and was required to sign off on each incentive campaign. ¶¶2, 40, 104, 131.  And Defendant Auerbach, PayPal's then Chief Strategy, Growth and Data Officer, led a special team formed in 2021 responsible for monitoring and growing NNAs and directed the teams running the incentive programs. ¶¶110, 113.  As top C-suite level

- 4 -

executives at PayPal, these Defendants all received specific reporting on NNAs that not only measured NNAs daily, but also measured the activity of each cohort of new accounts and the success of the incentive campaigns to drive up NNA results. ¶¶107, 111, 114. While all three of the Individual Defendants led investors to believe that PayPal was achieving fundamental organic NNA growth, they were responsible for the Company's increased reliance on incentive campaigns that chased low-engagement, low-value customers, who served only to temporarily boost PayPal's reported NNA results.

Not only did Defendants' unprecedented use of promotional activity inflate PayPal's NNA numbers through preservation of low-value accounts, but it also encouraged the widespread creation of fake accounts through bot farms aimed at claiming these free promotional dollars. ¶¶4-5, 8, 54, 57, 112, 117, 120-123. Defendants knew (or at the very least were reckless in not knowing) from the onset that paying global customers to do just one transaction was a hotbed for fraudulent accounts – and indeed every incentive campaign had a signoff process that required Defendants' approval. ¶¶5, 130-131, 137.

By October 2021, a limited review of recently added NNAs quickly identified, at first, one million fake accounts, and then, two million fake accounts, that had received transfers of incentive payments from PayPal during just May 2021 to July 2021. ¶¶5, 11, 119-124. And in an October 2021 internal meeting with

4909-3813-8457.v1

approximately 400 attendees, the disturbing trend was discussed in detail.  ¶¶124-126, 141.  But even as the millions of fraudulent accounts tied to the 2021 incentive programs were already identified internally at PayPal, and Defendants were boosting the NNA results with low-quality, "one-and-done" accounts, externally, on November 8, 2021, Defendants continued to tout the fact that PayPal added 13.3 million NNAs in 3Q21 and reiterated that they were not spending money to chase low-value accounts.  ¶¶46-48.

But on February 1, 2022, the truth finally caught up to Defendants.  They were forced to admit that they had pursued a customer acquisition strategy that only temporarily boosted NNAs and resulted in millions of fraudulent accounts.  ¶¶54, 57.  Defendants publicly admitted that this strategy was "very successful in generating account creation.  But overall, these customers have lower engagement and a higher propensity to churn and have not matched our required level of return."  ¶52.  Defendants also admitted that, in 2021, they had relied on the incentive campaigns "to a much greater extent than we ever have in our history."  *Id.*  Defendants publicly acknowledged that PayPal had been paying low-engaged customers up to $20 to do one transaction to boost NNAs, and subsequently pledged to stop "throw[ing] away money" just to add "hollow net new active[s] on [PayPal's] base that's not adding revenue or bottom line impact."  ¶64.

- 6 -

Defendants also quantified that their incentive campaigns resulted in at least 4.5 million illegitimate accounts being counted as NNAs in 2021, and, as a result of stopping these cash incentives, "20 million incremental one-and-done customers" would fall out of NNAs in 2022. ¶¶54-55.  In other words, of the 48.9 million NNAs PayPal reported in 2021, approximately *half* were either unengaged or illegitimate customers, directly contradicting Defendants' Class Period statements to investors.

Having spent the prior year misleading investors – while concurrently selling 645,321 shares of the Company's stock (and buying none) for insider trading proceeds of more than $170 million (¶142) – Defendants' admissions shocked investors and analysts.  On February 2, 2022, PayPal's stock price plummeted to below $135 per share – the largest stock price decline in Company history and an over $50 billion drop in market capitalization in just one day. ¶9.  By the end of February 3, 2022, the stock price was down nearly 30% from the price just two days earlier.  ¶¶9, 61.  PayPal's stock price has never recovered.  ¶9.

## III.   LEGAL STANDARD

On a Rule 12(b)(6) motion to dismiss, "'[a]ll allegations in the complaint must be accepted as true, and the plaintiff must be given the benefit of every favorable inference to be drawn therefrom.'"  *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).  A complaint with a sufficient factual basis to state a facially plausible claim for relief should not be dismissed.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

4909-3813-8457.v1

Fraud-based claims under the Securities Exchange Act of 1934 are subject to the pleading requirements of Rule 9(b) and the PSLRA.  Rule 9(b) requires that a party plead "the who, what, when, where, and how" of the alleged fraud.  *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 308 (3d Cir. 2016).  Under the PSLRA, plaintiffs must "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007) ("*Tellabs*").  Defendants only challenge two elements of Plaintiffs' §10(b) claim: falsity and scienter.[2]

## IV.  DEFENDANTS ARE LIABLE FOR THEIR MISREPRESENTATIONS REGARDING PAYPAL'S NNA ACQUISITION STRATEGY

Set out in 12 sets of statements, Plaintiffs' Complaint focuses on Defendants' misrepresentations during the Class Period concerning PayPal's purported strategy for growing engaged NNAs.  ¶¶30-34, 38-41, 44, 47-48.  On conference calls with investors and analysts, Defendants repeatedly stated that they were not "chasing a low-value, net new active," were "bring[ing] in high-value net new actives at the top of the funnel," and that, as a result, "we are seeing engagement levels increase

---

[2]    Plaintiffs do not object to the Court taking judicial notice of Exhibits 1-4 and 9, attached to the Declaration of Lyle Roberts, with the understanding that the Court will not consider them "'to prove the truth of their contents but only to determine what [was] stated.'" *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000).  Exhibits 5-8 are addressed in §VI.B., *infra*.

dramatically throughout our base." *E.g.*, ¶¶31, 41, 64.[3]  There is no dispute that Plaintiffs plead these statements with particularity, identifying "the time, place, and contents of the false representations or omissions, as well as the identity of the person making the statement[s]." *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 680 (3d Cir. 2023); *see also* ¶¶30-34, 38-41, 44, 47-48.

Plaintiffs also identify with specificity why these statements were misleading when made.  ¶¶35, 42, 45, 49.  Specifically, as set forth in the Complaint, the statements were misleading because:

> [T]hey failed to disclose, as Defendants later publicly admitted, that in 2021 PayPal had "leaned into incentivized customer acquisition tactics to a much greater extent than we ever had in our history" and was boosting NNAs by incentivizing customers to "be engaged with [PayPal's] platform."  PayPal was chasing low engaged customers that "clearly came in for 1 or 2 transactions and [was] trying to incent them to stay with [PayPal] by offering them $5, $10, $20."  The result, as Defendants later admitted, was that the Company's accounts were plagued by "hollow net new active[s]" in the form of illegitimate and minimally engaged accounts, and by pivoting away from these incentive campaigns, over one year "20 million incremental one-and-done customers" would fall out of PayPal's reported NNAs.  The customers PayPal was targeting, Defendants would concede, had "lower engagement and a higher propensity to churn" and did "nothing for

---

[3]     Attempting to shoehorn unrelated parts of the Court's prior Opinion, Defendants wrongly and inconsistently refer to the NNA acquisition statements as "NNA and TPV Growth and Guidance" and/or "Quality of PayPal's Users and TPV Growth" statements.  MTD at 12-20.  There are no alleged misstatements in the Complaint regarding TPV growth, TPV guidance, or NNA guidance, and the statements that concern PayPal's user engagement were made in conjunction with statements about the NNA acquisition strategy (*e.g.*, "these have been our most engaged cohorts that we've ever seen" (¶38)).

4909-3813-8457.v1

[PayPal's] revenue growth" because they "would do one transaction and then fall dormant."

¶¶35, 42, 45, 49, 52-66.

Faced with these detailed allegations, Defendants invoke the law of the case doctrine arguing that the NNA acquisition statements should be ignored. And to the extent they do address them, Defendants contend that they must be dismissed as immaterial puffery, are inactionable "opinion" statements, or are somehow unrelated to NNA acquisitions. None of these arguments support dismissal.

### A.   The Law of the Case Doctrine Does Not Apply

According to Defendants, the Court dismissed most of the NNA acquisition strategy statements that appeared in the prior complaint, and therefore it should do so again pursuant to the law of the case doctrine. MTD at 6-7, 12, 16-17. Defendants insist that under that doctrine, the Court should gloss over the falsity of their statements, and even boldly claim that the prior Opinion is good enough for dismissing the Complaint for failure to adequately plead scienter, which the Court explicitly stated it did not address. *See* MTD at 21-24; Op. at 15 n.5, 44. But the law of the case doctrine does not apply here: "'Interlocutory orders . . . remain open to trial court reconsideration, and do not constitute the law of the case.' And the grant of a leave to amend is an interlocutory order." *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 493 (3d Cir. 2017).

- 10 -

Moreover, "[t]he law of the case doctrine is not a restriction on the court's power, but is a discretionary doctrine." *Speeney v. Rutgers, The State Univ.*, 369 F. App'x 357, 359 (3d Cir. 2010) (citing *In re City of Phila. Litig.*, 158 F.3d 711, 718 (3d Cir. 1998)). Indeed, "[a] court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance." *Pub. Int. Rsch. Grp. of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116 (3d Cir. 1997). This is particularly true here "[b]ecause an amended complaint 'supersedes the pleading it modifies,' the original complaint 'no longer perform[s] any function in the case.'" *Saint-Jean v. Palisades Interstate Park Comm'n*, 49 F.4th 830, 835 (3d Cir. 2022).

Further still, "'[l]aw of the case only extends to issues that were actually decided in prior proceedings.'" *Home Depot USA, Inc. v. Lafarge N. Am., Inc.*, 59 F.4th 55, 62 (3d Cir. 2023). And it "only precludes relitigation of issues that the parties had a full and fair opportunity to litigate." *Speeney*, 369 F. App'x at 360. Defendants suggest that the Court already decided that the alleged NNA acquisition statements are "inactionable because 'Defendants were under no duty to disclose risks that had not yet materialized'" and "they are forward-looking statements protected by the PSLRA's safe harbor." MTD at 12 (citing Op. at 37, 39). But the Court's Opinion regarding Defendants' duty to disclose and forward-looking statements was limited to "statements regarding NNA *guidance*" (Op. at 39), not the NNA statements at issue now. Plaintiffs did not re-plead any statements regarding NNA guidance,

- 11 -

none of the NNA acquisition statements are forward-looking, and the Complaint does not allege that there was some duty to disclose a risk. Instead, the Complaint alleges that Defendants failed to disclose their then ongoing strategy of using incentive schemes to add NNAs with "lower engagement and a higher propensity to churn" who did "nothing for [PayPal's] revenue growth" because they "would do one transaction and then fall dormant." ¶55. Accordingly, the law of the case doctrine provides no basis to dismiss any of Plaintiffs' allegations.

## B.      The NNA Acquisition Statements Are Material

The Court did previously hold that certain of the statements regarding NNA acquisitions, as previously pleaded, were "immaterial puffery." Op. at 41-42 (quoting the Consolidated Complaint (ECF 49) ("CC"), ¶265 (now ¶40) and CC, ¶301 (now ¶48)).[4] But "a statement is considered puffery only when it is immaterial." *In re: Enzymotec Sec. Litig.*, 2015 WL 8784065, at *14 (D.N.J. Dec. 15, 2015). And "'[o]nly if the alleged misrepresentations or omissions are so ***obviously unimportant*** to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law.'" *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 275 (3d Cir. 2004) (emphasis in original).

---

[4]      The Opinion did not directly cite to or address the NNA acquisition statements that are now pled at ¶¶20-24, 38-39, 41, 44, or 47.

- 12 -

Defendants make no attempt to argue that the NNA acquisition statements are immaterial – and for good reason.  The statements about PayPal's strategy to increase NNAs and the engagement levels of those customers were clearly important to investors.  After all, leading into the Class Period, the key question facing Defendants was whether PayPal could maintain customer growth after 2020 and whether those new customers would continue to be highly engaged.  ¶28; *see* ¶¶68-69, 71, 76.  Those were the keys to PayPal's continued financial growth and ability to become a Super App.  ¶¶26-28, 71, 108.  *Hawkins v. Danaher Corp.*, 2025 WL 2216149, at *4-*5 (D.D.C. Aug. 4, 2025) (Statements in amended complaint were not puffery because supported by allegations of what "investors were focused on.").

This is reflected in the fact that Defendants specifically spoke about the NNA acquisition strategy during each of PayPal's conference calls with investors during the Class Period.  *See* ¶¶30-32, 38, 44, 47; *see Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 260 (3d Cir. 2009) (finding repeated denials to analysts were materially false); *In re Avon Sec. Litig.*, 2019 WL 6115349, at *16 (S.D.N.Y. Nov. 18, 2019) ("Courts have found that when a company makes repeated representations on the same topic, even where those representation would otherwise be puffery, the repetition itself communicates to investors what 'matters [are] particularly important,' and 'those statements may become material to investors.'").  These statements were "not mere puffery, but . . . determinate, verifiable statement[s]."  *Omnicare, Inc. v. Laborers*

- 13 -

*Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184 (2015). Indeed, almost all of the alleged misrepresentations were made in direct response to analyst questions about the NNAs, including the strategy to grow NNAs and the engagement levels of those accounts. *See* ¶¶30, 32-34, 38-41, 44, 47-48; *In re Virtu Fin., Inc. Sec. Litig.*, 770 F. Supp. 3d 482, 502 (E.D.N.Y. 2025) ("[S]tatements made on a conference call, in investor presentations, or in response to direct questions by analysts are materially misleading when 'made in an effort to soften the significant financial impact' of a development and 'to reassure investors.'"); *Turocy v. El Pollo Loco Holdings, Inc.*, 2017 WL 3328543, at *14 (C.D. Cal. Aug. 4, 2017) (Finding statements material "[a]s evidenced by the repeated questions posed by analysts.").

Analysts themselves highlighted the material nature of the NNA acquisition statements, reporting to investors Defendants' claims that "inbound demand at the top of the funnel continues to be robust," "[n]ewer customer cohorts are more engaged," and "recent strong growth would not only be sustained, but also accelerated." *See* ¶¶67-82; *Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 623 F. Supp. 3d 470, 493 (E.D. Pa. 2022) (Finding that "analyst reports . . . show that securities analysts viewed the Company's [statements] as important to investors."); *Seeks v. Boeing Co.*, 752 F. Supp. 3d 992, 1017-18 (N.D. Ill. 2024) ("[A]llegations of financial analysts crediting Boeing's safety statements bolsters the inference a reasonable investor could have found these statements to be material."). And when the truth was

- 14 -

ultimately disclosed at the end of the Class Period that Defendants had "leaned into incentivized customer acquisition tactics to a much greater extent than we ever had in our history" and the customers added through these tactics had "lower engagement and a higher propensity to churn" (¶52), analysts made clear that this was material information, cutting price targets and reporting "We are now learning in hindsight that the unsustainably high and record level of new account growth throughout 2020 and 2021 consisted of a lot of 'one-and-done' and low-volume users." ¶¶83-92; *see also Del. Cnty. Emps. Ret. Sys. v. AdaptHealth Corp.*, 606 F. Supp. 3d 124, 139 (E.D. Pa. 2022) ("There is nothing so obviously unimportant about omissions pertaining to how the company was growing and derived its revenue that this court can determine as a matter of law that a reasonable investor would not want to know that information."); *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 943 (9th Cir. 2023) (analyst reaction can support materiality).

Moreover, in this Circuit it is well established that "the materiality of disclosed information may be measured *post hoc* by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock." *Oran*, 226 F.3d at 282; *see also Alaska Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 352 (3d Cir. 2009) (same). Defendants entirely ignore that disclosure of the truth about Defendants' NNA strategy and the fact that PayPal had been boosting NNA results with low-engaged customers caused PayPal's stock to drop 30%. ¶¶157-162. This is

- 15 -

a significantly greater stock price movement than the 4% drop in *Oran* and 9% drop in *Pharmacia* that the Third Circuit found was sufficient to show materiality. *Oran*, 226 F.3d at 285; *Pharmacia*, 554 F.3d at 352. As the Third Circuit recognized, "the materiality of the alleged misrepresentations is self-evident when we look at the market's negative reaction." *Pharmacia*, 554 F.3d at 352.

## C. The NNA Acquisition Statements Are Not Inactionable Statements of Opinion

Defendants also contend that the NNA acquisition statements must be dismissed as inactionable opinions. MTD at 13, 16-17. But the statements Plaintiffs now plead are not opinions, they are specific statements about PayPal's purported NNA acquisition strategy and the results of that strategy – statements that can be proven to be demonstrably false.[5] For example, in response to questions about where PayPal's new NNAs were coming from, Defendants told investors "What we've done over the last, call it, 18 months is put much more rigor into the CLV component of that rather than chasing a low-value, net new active that maybe pumps up numbers" and "[low-quality new actives] is not something we want to chase as a company, and we can certainly go out and spend money on customer acquisition and get very low value new actives to inflate and pump up that number, but that's not the right economic decision

---

[5]    With one exception (discussed below), the NNA acquisition statements lack the indicia of opinion statements (*e.g.*, "We believe. . . ." or "We think. . . ."). *See Omnicare*, 575 U.S. at 193 ("those magic words can preface nearly any conclusion, and the resulting statements . . . remain perfectly capable of misleading investors").

- 16 -

4909-3813-8457.v1

for us longer term." ¶¶40, 48.  Defendants were not offering personal opinions, they were telling investors what PayPal was purportedly doing and not doing.  And those statements are directly contradicted by what Defendants ultimately admitted they had actually been doing during the Class Period: PayPal had "leaned into incentivized customer acquisition tactics to a much greater extent than we ever had in our history" and went after customers with "lower engagement and a higher propensity to churn." ¶¶52, 55.

Similarly, when Defendants spoke about the new NNAs, they offered objective and verifiable facts, not opinions.  *See, e.g.*, ¶31 ("we are seeing engagement levels increase dramatically throughout our base"); ¶38 ("these have been our most engaged cohorts that we've ever seen"); ¶39 ("irrespective of what cohort we're talking about, post pandemic, we see much elevated levels of engagement"); *see Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 32 (S.D.N.Y. 2019) (finding "blanket characterization of the statements as mere opinions strains credulity" because statements that "purport to state historical facts" included those touting "'[s]trong end-user demand'").  These are objective facts, not opinions, and they are contradicted by the post-Class Period disclosures acknowledging that the NNAs acquired through the incentive programs "have lower engagement and a higher propensity to churn." ¶52.

- 17 -

Defendants take snippets of certain statements and contend they must be inactionable opinions. For example, Defendants challenge statements from PayPal's May 5, 2021 conference call (¶38), including "'I think our marketing programs are really beginning to deliver excellent results.'" MTD at 13. But they ignore that this statement was made in conjunction with the assertion that "these have been our most engaged cohorts that we've ever seen. And we're continuing to see those trends." ¶38. These statements were all made in response to a question about the "dynamics you're seeing around the net new actives" and read together, as is required, provide factual statements that Defendants' ultimate admissions demonstrate were not true. *See, e.g.*, *West Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2015 WL 3755218, at *13 (E.D. Pa. June 16, 2015) ("Far from being a vague statement of intention or optimism, [statements concerning] a fundamental aspect of DFC Global's business are of vital importance to investors.").[6]

---

[6]    Even if any of the alleged NNA acquisition statements could qualify as an opinion, none of them would be subject to dismissal because even opinions remain actionable where the statement "'reasonably implies untrue facts and omits appropriate qualifying language.'" *City of Warwick Ret. Sys. v. Catelant, Inc.*, 2024 WL 3219616, at *6 (D.N.J. June 28, 2024). Here, Defendants' statements created the impression that the Company was not chasing low-value NNAs and as a result PayPal's new customers were increasingly engaged, which in fact was false.

4909-3813-8457.v1

**D.    Defendants' Implausible Mischaracterizations Should Be Rejected**

Other than arguing the law of the case doctrine and incorrectly claiming that the Court already dismissed the NNA acquisition statements as inactionable opinions, Defendants only address two statements at ¶¶38 and 44.  MTD at 15, 18-19.  The Court should reject their arguments as they are implausible.

Defendants argue with respect to ¶38 that they had no duty to disclose "what impact" PayPal's NNA acquisition strategy had on engagement and activity levels. MTD at 18.  This is a misconstruction, as Defendants themselves stated (falsely) that their NNA acquisition strategy was "engaging high-quality net new actives." ¶32; *see also* ¶41 (we are "bring[ing] in high quality net new actives at the top of the funnel"). Having elected to speak about the subject (repeatedly), Defendants had a duty to disclose that they had actually "leaned into incentivized customer acquisition tactics to a much greater extent than we ever had in our history" and that, as a result, the new NNAs had "lower engagement and a higher propensity to churn." ¶¶49, 52; *see Azar v. Yelp, Inc.*, 2018 WL 6182756, at *12 (N.D. Cal. Nov. 27, 2018) ("failure to disclose the churn problems 'affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]'").  As the Supreme Court recently affirmed, half-truths, "'representations that state the truth only so far as it goes, while omitting critical qualifying information,'" are actionable.  *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 263 (2024); *see also In re*

- 19 -

*Coinbase Glob., Inc. Sec. Litig.*, 2024 WL 4053009, at *10 (D.N.J. Sep. 5, 2024) ("'[A] defendant may choose silence or speech based on the then-known factual basis, but cannot choose half-truths.'").[7]

Defendants next argue that Rainey's statement in May 2021 that "these have been our most engaged cohorts that we've ever seen" (¶38) ***only*** concerns "older cohorts." MTD at 18-19. But there is nothing to suggest Defendants' spin on the statement is correct, and on a motion to dismiss, the Complaint's allegations are to be taken as true. *zCap Equity Fund LLC v. LuxUrban Hotels Inc.*, __ F. Supp. 3d __, 2025 WL 2097951, at *19 (S.D.N.Y. July 25, 2025) ("[D]efendants' self-serving spin as to the import of their public statements is 'entitled to little weight at this stage of litigation.'"). And to the contrary, Rainey was following up on Defendant Schulman's statement that "We brought on in Q1 [2021], 2 new customers every second." ¶38. Moreover, even assuming *arguendo* that the "most engaged cohorts that we've ever

---

[7]  Defendants' contention that they acknowledged some level of churn existed on their platform (MTD at 19-20) disclosed nothing about the unprecedented reliance on incentive programs during the Class Period and is simply not the same as telling investors what Defendants' acknowledged after the Class Period, "in the absence of anything done to try to keep them on our platform, like incentive campaigns or other things like that, we're going to expect a higher level of churn, a much higher level of churn than what we've seen in previous years." ¶58; *see In re RenovaCare, Inc. Sec. Litig.*, 2024 WL 2815034, at *21 (D.N.J. June 3, 2024) ("[O]nce [defendant] opened the door and began to make disclosures about the Promotional Campaign, he was required to 'tell the whole truth.'").

- 20 -

seen" concerned 2020 NNAs, Rainey applied that statement to 2021 by immediately saying "And we're continuing to see those trends."  *Id.*

Defendants "temporal disconnect" argument also blindly ignores that NNAs is a function of not only new accounts, but also reactivations and reducing churn.  ¶23. The allegations are that one of the targets of the 2021 incentive campaigns were unengaged 2020 cohorts.  As Defendants explained to investors after the Class Period, PayPal targeted customers from the "last two years" and "in the absence of anything done to try to keep them on our platform" these cohorts would churn.  ¶58; *see also* ¶¶59, 62, 64, 66.  Indeed, at the close of the Class Period, Defendants already estimated that "20 million incremental one-and-done customers" from 2020 *and* 2021 would roll off "in 2022."  ¶¶55, 62.  Defendants' efforts to spin Plaintiffs' alleged statements are as implausible as they are improper on a motion to dismiss.[8]

## V. DEFENDANTS ARE LIABLE FOR THEIR NOVEMBER 2021 FAILURE TO DISCLOSE THAT NNA RESULTS INCLUDED ILLEGITIMATE ACCOUNTS

In addition to the NNA acquisition statements, the Complaint alleges that a set of statements on November 8, 2021 regarding the purported number of NNAs PayPal added in 3Q21 (13.3 million) were false and misleading because Defendants failed to disclose that it had already been discovered that their incentive programs had

---

[8]    For this same reason, Defendants' contention that Plaintiffs do not plead "facts showing that the estimated 15-20 million accounts that were likely to roll off in 2022 would be coming just from accounts added in 2021" is meaningless.  MTD at 35.

- 21 -

generated millions of illegitimately created accounts. ¶¶46-47, 49. Referencing the Opinion, Defendants argue that these statements cannot be false because they were "'true statements of reported historical facts'" and "'plaintiffs make no allegations that the NNA numbers were not accurate at the time.'" MTD at 11. But that's wrong. Plaintiffs actually do allege that the reported NNA results in November 2021 were inaccurate because it included millions of illegitimate accounts and Defendants' statements failed to acknowledge that the Company was already aware of these accounts by October 2021. ¶¶54, 57.[9] When Defendants elected to tell investors about the NNA results, they should have disclosed that the results included illegitimate accounts. *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014) ("[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth."). Thus, Plaintiffs plausibly allege why the November 8, 2021 NNA result statements were misleading when made.[10]

---

[9]    At least half of the 4.5 million illegitimate accounts disclosed in February 2022 were created prior to the October 2021 senior director meeting about the illegitimate accounts and should have been excluded from the 3Q21 NNA results. ¶57. In other words, the illegitimate accounts identified at the time represented over 15% of the reported NNAs on November 8, 2021.

[10]    In Defendants' letter motion, they claimed that the NNA result statements could not be false because there was no evidence of "'PayPal leadership's knowledge.'" ECF 91 at 2. Plaintiffs responded that for falsity "the relevant pleading standard is the 'who, what, when, where and how' *a statement* is false or misleading," not Defendants' knowledge, and for scienter "'[t]he inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong *inference of scienter*,' which can be shown with "'"circumstantial evidence of *either* reckless or conscious behavior."'"

- 22 -

## VI.    PLAINTIFFS ALLEGE A STRONG INFERENCE OF SCIENTER

To plead scienter, a plaintiff must "allege facts giving rise to a 'strong inference' of 'either reckless or conscious behavior.'"  *Avaya*, 564 F.3d at 267; *see also Strougo v. Mallinckrodt Pub. Ltd. Co.*, 2022 WL 17740482, at *7 (D.N.J. Dec. 16, 2022) ("The relevant inquiry for recklessness is whether defendants 'should have known that they were misrepresenting material facts related to the corporation[,]' *i.e.*, when defendants had 'knowledge of facts or access to information contradicting their public statements.'").  Moreover, "motive can be a relevant consideration" and allegations of a defendant's "personal financial gain may weigh heavily in favor of a scienter inference."  *Tellabs*, 551 U.S. at 325.

Allegations of scienter are to be reviewed "'holistically'" and not "'scrutinized in isolation.'"  *Avaya*, 564 F.3d at 268 (quoting *Tellabs*, 551 U.S. at 323, 326).  "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'"  *Tellabs*, 551 U.S. at 324.  In fact, Plaintiffs' inference of scienter need only be "'cogent and at least as compelling as any opposing inference of nonfraudulent intent.'"  *In re Valeant*

---

ECF 92 at 2-3 (emphasis in original) (citing cases).  Defendants have abandoned this knowledge argument, but to the extent the Court previously found that actual knowledge is required to sufficiently plead either falsity or scienter, that is incorrect.

- 23 -

*Pharms. Int'l, Inc. Sec. Litig.*, 2023 WL 3993740, at \*4 (D.N.J. June 14, 2023) (quoting *Tellabs*, 551 U.S. at 314).

**A.    Plaintiffs Allege a Strong Inference that Defendants Knew or Recklessly Disregarded that Their Statements Were Misleading When Made**

**1.    Defendants' NNA Acquisition Statements Were Made with Scienter**

The "most powerful evidence of scienter is the content and context of [Defendants'] statements themselves." *Avaya*, 564 F.3d at 269; *see also Hall v. Johnson & Johnson*, 2019 WL 7207491, at \*24 (D.N.J. Dec. 27, 2019) ("[T]he content and context of many of the alleged misleading statements further enhances the finding of scienter with respect to the individual defendants whom the Court has found to have the requisite scienter."). Here, each of the Defendants held themselves out as knowledgeable about PayPal's NNA acquisitions, specifically talking about what they had done and what they were seeing. *See, e.g.*, ¶40 ("what *we've* done . . . is put much more rigor into the CLV component of that rather than chasing a low-value, net new active that maybe pumps up numbers"); ¶31 ("*we* are seeing engagement levels increase dramatically throughout our base"). That Defendants' "statements to investors . . . implied that they had first-hand knowledge" "bolster[s] the inference that [they] 'knew at the time that [their] statements were false or was reckless in disregarding the obvious risk of misleading the public.'" *In re PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801, at \*17 (D.N.J. Aug. 28, 2017).

4909-3813-8457.v1

Thus, courts in the Third Circuit consistently find scienter where, like here, defendants hold themselves out as knowledgeable about the misrepresented topics. *See, e.g., SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 906 (E.D. Pa. 2018) (requisite scienter found where "officers were speaking as authoritative sources who possessed the information to support their statements"); *Utesch v. Lannett Co., Inc.*, 385 F. Supp. 3d 408, 422 (E.D. Pa. 2019) (scienter inferred where "a high-ranking officer 'evinc[es] certitude' as to a matter, particularly where the underlying substance is being publicly questioned").

Defendants not only spoke with authority about NNA acquisitions, they provided responses to specific questions from analysts about both where PayPal's new NNAs were coming from and how engaged they were. ¶¶30, 32-34, 38-41, 44, 47-48. Indeed, in response to an analyst question at PayPal's 2021 Investor Day, Defendant Rainey discussed PayPal's customer segmentation model, including that PayPal separated customers by recency and frequency into low, medium, and high engagement, to assure investors "we've got robust analytics to segment and understand our customers." ¶100.[11] These exchanges strengthen the inference that Defendants knew (or recklessly disregarded) the true facts about PayPal's NNA acquisition strategy during the Class Period. *See Avaya*, 564 F.3d at 270 ("Given the

---

[11]    After the Class Period, Defendants said that they would use this same analytic model to change their strategy and stop "spending money on lower value NNAs." ¶¶55, 59, 64

- 25 -

specificity and repetition of the analysts' questions, McGuire's position as Chief

Financial Officer, and the alleged state of Avaya's business at the time the questions

were asked, there is a strong inference that McGuire's behavior reached this threshold

of recklessness."); *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *22 (D.N.J.

July 27, 2018) (scienter evidenced by defendants' "statements implying firsthand

knowledge" and "their responses to specific questioning").

Defendants' post-Class Period statements not only revealed the truth about

PayPal's NNA acquisition strategy, they confirm the fact that Defendants were aware

of that strategy during 2021. Defendants acknowledged that "***we pursued*** a strategy to

retain those customers most likely to churn" and "***We also leaned into incentivized***

***customer acquisition tactics*** to a much greater extent than we ever have in our

history." ¶52.[12] Defendants did not disavow their knowledge or role in pursuing this

previously undisclosed NNA acquisition strategy. Indeed, Defendants post-Class

Period assertion that they were changing PayPal's business strategy to stop

"throw[ing] marketing dollars at low-value subscribers coming in" and that this was

---

[12]     Defendants recognize that the post-Class Period admissions completely undermine both their falsity and scienter arguments, so they suggest Plaintiffs have misrepresented them. MTD at 32-37. But this type of revisionist history and self-supporting spin has no place in a motion to dismiss. And while Defendants baselessly take issue with certain of Plaintiffs' wording in summarizing the admissions at ¶¶97-98 (*i.e.*, "target" versus "retain" or "pursued a strategy"), they do not and cannot dispute that those admissions are quoted accurately in the disclosure section of the Complaint (¶¶50-66).

"a conscientious choice that we're making" reinforces the inference that they were the ones who made the decision to throw PayPal's marketing dollars at those low-value NNAs during the Class Period.  ¶55; *see also* ¶53 ("We strongly believe that we are making the right decision in re-directing our spend toward high-value customer acquisition . . . .").[13]

The "content and context" of Defendants' statements during and after the Class Period are more than sufficient to establish that they knew or recklessly disregarded the true facts about PayPal's NNA acquisition strategy when they misleadingly assured investors that the Company was not chasing "low-value, net new actives that maybe pump[] up the numbers" and were "seeing engagement levels increase dramatically throughout our base."  Accordingly, Plaintiffs allege a strong inference of scienter for the statements at ¶¶30-34, 38-41, 44, 47-48.

---

[13]    The unmistakable conclusion that Defendants were the ones who decided to "lean[] into incentivized customer acquisition tactics to a much greater extent than we ever have in our history" and generate customers with "lower engagement and a higher propensity to churn" is further reinforced by the allegations attributed to CW-4. ¶¶129-135.  As CW-4 provided, any new paid incentive campaign at PayPal had to have a New Business Initiative ("NBIA") and any NBIA had to be approved by Defendants Schulman and Rainey.  ¶131.  Defendants do not address CW-4 and only generally attack the CW allegations on the basis that the CWs were not in meetings with Defendants.  MTD at 21-24.  But CW-4 did not need to meet with Defendants to know that PayPal incentive campaigns had to have an NBIA and that NBIAs had to be approved by Schulman and Rainey.  ¶¶129, 131.

## 2.    Defendants' Made Their 3Q21 NNA Result Statements with Scienter

At this stage of the proceedings, there can be no dispute that by October 2021 PayPal had identified millions of "accounts that were illegitimately created" as a result of the Company's NNA incentive programs and, as Defendants have admitted, at least 2.25 million of those accounts were created in the first three quarters of 2021. ¶¶54, 57. Thus, to determine if scienter has been pled for the NNA result statements at ¶¶46-47, the question is whether Plaintiffs allege a strong inference that Defendants knew or had access to information about those illegitimately created accounts. *See Strougo*, 2022 WL 17740482, at *7 (pleading recklessness only requires allegations of defendants' "'access to information contradicting their public statements'").

The only conclusion that can be drawn from Plaintiffs' allegations is that Defendants, at the very least, had access to the facts about the illegitimate accounts before they spoke on November 8, 2021. Plaintiffs have met the standard for pleading scienter by pinning the timing of Defendants' identification of these millions of illegitimate accounts to October 2021. *Avaya*, 564 F.3d at 272-73 (3d Cir. 2009) ("'[F]ederal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective.'"). CW-3 stated that by October 2021 he had identified and reported over two million fake accounts created during the period May 2021 to July 2021, a statement corroborated by Defendants' own acknowledgment that at least 2.25 million of the

- 28 -

illegitimate accounts were generated in the first three quarters of 2021. ¶¶54, 57, 119, 124, 127. CW-3 also provided that in October 2021 there was a meeting with over 400 attendees, including PayPal's Global Seller Risk team and Strategy team, that was called specifically to address the millions of fake accounts tied to the NNA incentive promotions. ¶¶124-126; *see Prudential*, 70 F.4th at 691 ("[T]he information from FE1 related to Prudential's discussions in May 2019 about taking a significant reserve charge cannot be discounted at the pleading stage."). This meeting is corroborated by a former PayPal Senior Risk Operations Team Leader, CW-7. ¶¶124-125, 141; *Prudential*, 70 F.4th at 692 ("[T]wo other confidential witnesses with dependable bases for their more limited knowledge corroborate FE1's report.").[14]

The inference of scienter is strengthened by the fact that the Individual Defendants themselves were responsible for monitoring fraud at PayPal. As CW-4

---

[14]    Referencing the Court's Opinion, Defendants attack the CW-3 allegations on the basis that the witness was not involved in "'actual meetings or communications'" with Defendants. MTD at 22-23. And the Court was correct when it noted that CW-3 does not identify any of the Defendants as attendees of the October 2021 meeting about the illegitimate accounts. Op. at 35. But the question is not whether CW-3 met with any of the Defendants. Rather, it is whether the allegations attributed to CW-3 support the inference that Defendants had access to information about millions of illegitimate accounts tied to their NNA promotion schemes prior to their November 8, 2021 statements. To that end, CW-3's corroborated account of a 400-person meeting at PayPal to specifically address the discovery of millions of illegitimate accounts that had been generated over just a few months in 2021, together with the allegations that the Individual Defendants were responsible for monitoring account fraud, renders it impossible to believe that Defendants did not have access to the truth about PayPal's NNA results. *Wu v. GSX Techedu Inc.*, 738 F. Supp. 3d 527, 544 (D.N.J. 2024) (corroboration of confidential witnesses shows scienter).

- 29 -

explained, reports of fraud and fake accounts were required to be recorded in PayPal's system, with new account and fraudulent activity compiled in reports and signed off by PayPal's Chief Risk Officer. ¶¶132-135. Fraudulent issues affecting over 250,000 accounts, far less than millions of illegitimate accounts identified by October 2021, were supposed to be immediately escalated to Schulman and Rainey because various regulatory regimes required the CEO and CFO to be kept informed of any potentially fraudulent activity. *Id.* This reporting mechanism was corroborated by CW-6. ¶139. While it might be theoretically possible that Defendants did not receive or review reports about the millions of illegitimate accounts created in 2021, Plaintiffs' allegations are more than sufficient at this stage to demonstrate that they at least had access to the illegitimate account information. *See, e.g.*, *Strougo*, 2022 WL 17740482, at *8 (allegations of a due diligence process that enabled access to information is sufficient to support a finding of recklessness); *Catelant*, 2024 WL 3219616, at *15 (Finding strong inference of scienter from defendants' statements about comprehensive databases and allegations of access to information through company meetings and monitoring metrics.).[15]

---

[15]  Once again, Defendants reference the Court's prior finding that the CWs did not state with certainty that the Defendants actually received the information about the illegitimate accounts. MTD at 22-23. But the CW statements, considered holistically with Plaintiffs' other allegations, strongly support an inference that, by October 2021, Defendants would have learned the truth about those accounts assuming PayPal's internal policies were followed and, at a minimum, Defendants had access to the true facts about the illegitimate accounts.

- 30 -

The CW explanations do not stand alone.  With each quarterly SEC filing during the Class Period, Defendants Schulman and Rainey certified that they had put in place "disclosure controls and procedures . . . to ensure that material information relating to [the Company] is made known to us by others within those entities." ¶104; *In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at *14 (D.N.J. Dec. 6, 2018) (finding "[p]laintiffs have made particular allegations as to scienter" based, in part, on SEC SOX certifications).  More specifically, Schulman and Rainey confirmed "we continuously apply models, processes and practices designed to detect and prevent fraudulent account creation our platforms" and "[w]hen we detect a significant volume of illegitimate activity, we generally remove the activity identified from our key metrics." ¶¶103-104.  Thus, "[e]ven assuming Plaintiffs failed to allege any facts that Defendants reviewed the evidence at issue, Plaintiffs certainly alleged Defendants' easy access to such evidence." *In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, 2020 WL 1479128, at *12 (E.D. Pa. Mar. 25, 2020).

### 3.    The Core Operations Theory Supports an Inference of Scienter

"[K]nowledge may be imputed to individual defendants when the disclosures involve the company's core business." *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001) (citing cases).  And "[a]llegations that fraud related to a high-earning segment of a company have been found sufficient to support a core

operations inference." *Carmignac Gestion, S.A. v. Perrigo Co. PLC*, 2019 WL 3451523, at *16 (D.N.J. July 31, 2019).

The generation and quality of NNAs was of utmost importance going into and throughout the Class Period. As discussed above, in the wake of the COVID-19 pandemic, investors were focused on whether PayPal could continue to generate large numbers of engaged customers allowing it to become a Super App. ¶¶2, 24-28, 32, 71, 108. Just as with materiality, the core importance of growing engaged NNAs is evidenced by analysts asking Defendants on every conference call and meeting in 2021 how PayPal was generating NNAs and whether they were attracting high-value customers. *See* §IV.B., *supra*. After all, PayPal only made money when its customers engaged in a transaction, and the key to the Company's financial future was acquiring more customers who engaged in more transactions. And when the truth about the 2021 NNA acquisition strategy and resulting unengaged and illegitimate accounts was disclosed in February 2022, analysts immediately cut their price targets or dropped coverage of the Company altogether. ¶¶83-92.

While PayPal's need to acquire engaged NNAs undoubtedly meets the criteria of a "core operation," that does not mean that Plaintiffs are asking the Court to automatically assume Defendants had to have known every fact about the NNA acquisition strategy (as Defendants claim (MTD at 37)). Rather, it is additional evidence that strengthens the inference that Defendants knew or had access to the true

- 32 -

4909-3813-8457.v1

facts about the NNA acquisitions, including the millions of illegitimate accounts identified by October 2021. *See Avaya*, 564 F.3d at 271 ("[T]he steep decline in Avaya's all-important margins in the second quarter of 2005 bolsters the inference that McGuire would have been alerted to the discounting.").

## B.    Defendants' Motive and Opportunity Buttresses the Strong Inference of Scienter

As Defendants acknowledge, motive and opportunity to commit fraud adds to the scienter analysis. MTD at 25. Defendants also acknowledge that showing investors that the 2020 NNAs were "not simply due to the pandemic," was critical and the fundamental transformation of creating a "Super App" required consistent NNA growth. ¶¶2, 24-28, 32, 71, 108. Indeed, at PayPal's first Investor Day in nearly three years, Defendants announced a five-year target to essentially double the number of active users by the end of 2025. ¶31. Thus, "Defendants were motivated by an attempt to live up to the overly optimistic promises [they] made at Analyst Day." *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1149 (N.D. Cal. 2017); ¶¶8-10. Defendants were also motivated not to disclose their NNA acquisition strategy. As Judge Posner recognized, "[p]rompt disclosure of the truth would have caused [the company]'s stock price to plummet, as it did when the truth came out a couple of months later." *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008). So too here, Defendants had motive to conceal their strategy of using incentive

- 33 -

programs to target low-engaged NNAs (*i.e.*, the "bad news"), "in the hope that it will be overtaken by good news." *Id.*

The Complaint also alleges that the Individual Defendants were motivated to boost PayPal's stock price in order to complete $170 million in insider trading. ¶¶142-151. In looking to determine whether Class Period sales are suspicious, courts consider the "'amount of profit made, amount of stock traded, the portion of stockholdings sold, the number of insiders involved,' 'whether the sales were "normal and routine,"' and whether the profits were substantial relative to the seller's ordinary compensation.'" *In re Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 654 (E.D. Pa. 2015) (quoting *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 277 (3d Cir. 2006)). During the Class Period, Schulman, Rainey, and Auerbach sold their stock for proceeds of over $94 million, $42 million, and $33 million, respectively. ¶142 & n.9. This volume of stock sales alone supports a strong inference of scienter. *In re CommVault Sys., Inc. Sec. Litig.*, 2016 WL 5745100, at *8 (D.N.J. Sep. 30, 2016) (insider sales proceeds of more than $18.6 million supported strong inference of scienter). Schulman, Rainey, and Auerbach's sales also totaled 59%, 57%, and 69%, respectively, of their Class Period holdings (¶145), far more than the 30% the Third Circuit held to be "sufficient at this stage to support a strong inference that [Defendants] had a motive and opportunity to inflate the value of their stock artificially." *Suprema*, 438 F.3d at 278. The proceeds from Defendants' stock sales

- 34 -

were also substantially more than profits from sales before and after the Class Period. ¶149. Tellingly, no Individual Defendant bought stock during the Class Period. ¶151. And further, the Complaint alleges that Defendants' sales dwarfed their salaries. ¶¶142, 155; *see Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*, 2011 WL 2444675, at \*13 (D. Del. June 14, 2011) (Strong scienter inference from stock sales worth one-third of total compensation.).

In response, Defendants urge the Court to take judicial notice of their Form 4 filings arguing that all Class Period stock sales were made pursuant to 10b5-1 trading plans, and therefore cannot support an inference of scienter. MTD at 25-26. In doing so, Defendants ask the Court to go beyond the limited scope of judicial notice on a motion to dismiss and accept that their sales were actually "conducted pursuant to SEC Rule 10b5-1 trading plans." *Id.* at 25. But the Court can only take judicial notice of the Forms 4 "to determine what the documents stated," "not to prove the truth of their contents." *Oran*, 226 F.3d at 289.

Defendants also ignore that invocation of their trading plans and claiming that they must have not traded ""'on the basis of" material non-public information'" (MTD at 25) is an **affirmative defense**, where Defendants, not Plaintiffs, have the burden of pleading and proof. Fed. R. Civ. P. 8(c); *Schmidt v. Skolas*, 770 F.3d 241, 251 (3d Cir. 2014) ("[A] plaintiff is not required to plead, in a complaint, facts sufficient to overcome an affirmative defense."); *see In re Able Lab'ys Sec. Litig.*, 2008 WL

- 35 -

1967509, at *27 n.40 (D.N.J. Mar. 24, 2008) ("[A] 10b5-1 trading plan does not provide an absolute defense to a claim of insider trading.  Rather, ***it requires an additional factual finding of good faith***. . . . [T]his Court [can] not make such factual findings when considering a motion to dismiss . . . .").[16]  In other words, even if the Court judicially notices the existence of a plan from the Forms 4, it would be an error to rule that the plans negate scienter, as none of the pertinent facts are in the record, and at this stage all inferences have to be drawn for Plaintiffs.  *See In re Novavax Inc. S'holder Derivative Litig.*, 2023 WL 5353171, at *15 (D. Md. Aug. 21, 2023) (rejecting argument that trades made pursuant to trading plans were normal because "at this stage the Court does not have information relating to when Erck entered into the trading plan or the specific terms of the plan"); *Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 2021 WL 4191467, at *20 (D.N.J. Sep. 15, 2021) (rejecting trading plan argument).

Perhaps most unconvincing, Defendants argue that the Court should not look at the profit from the shares sold (as the Third Circuit did in *Suprema*) because it is a

---

[16]    For the Court to find that the purported trading plans negate scienter, it would have to find, among other things, that Defendants entered the plans "[b]efore becoming aware of the information" and that the plan did not permit Defendants "to exercise any subsequent influence over how, when, or whether to effect" the sales.  17 C.F.R. §240.10b5-1(c).  Further still, Defendants will have to prove that they did not "alter[] or deviate[]" from the plan or enter into any "corresponding hedging transaction or position," and perhaps most critically, that it was entered into "in good faith."  17 C.F.R. §240.10b5-1(c).  None of these facts can be judicially noticed or assumed by the Court.

"function of an overall increase in PayPal's stock price."  MTD at 29.  But it is precisely the "'personal financial gain,'" *i.e.*, **in dollars**, that "'weigh[s] heavily in favor of a scienter,'" and inflating PayPal's stock price is how Defendants benefited in dollars from their fraudulent conduct.  *Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*, 176 F. Supp. 3d 387, 396 (D. Del. 2016) (quoting *Tellabs*, 551 U.S. at 325).  Had these Defendants waited until after their disclosures, the sales proceeds would have been $90 million less.  ¶150.[17]  In the end, the $170 million in insider trading supports a strong inference of scienter, and Defendants do not present "a compelling counter-narrative of the stock sales."  *Toronto-Dominion*, 2018 WL 6381882, at *16.[18]

---

[17]    Defendants' other arguments, such as that the Court should look to their version of a "pattern" of selling only shares received that year, or how "on a combined basis" Defendants sold a lower percentage of the shares they received during the Class Period, or actually increased their total holdings, are specious exercises in cherry picking that do not warrant dismissal of the allegations against them.  MTD at 26-28. Moreover, their factually dissimilar authority is inapt.  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1423 (3d Cir. 1997) ("two officer-defendants are not alleged to have traded at all" and the one defendant that did "appears to have sold no more than a minute fraction of his holdings, 0.5%"); *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 355 (2d Cir. 2022) ("net effect" was "all four [Defendants] bought more shares than they sold during the putative class period"); *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 313 (D.N.J. 2001) ("Mandell and Lauber only sold approximately eight percent of their combined holdings"); *Percoco v. Deckers Outdoor Corp.*, 2013 WL 3584370, at *6 (D. Del. July 8, 2013) ("George and Martinez purchased additional shares of Deckers stock during the Class Period").

[18]    Defendants' compensation structure is additional evidence of motive and opportunity.  ¶¶152-156.  As Defendants admit, one of the three specific performance metrics was beating NNA targets.  MTD at 30; Lyle Decl., Ex. 9 at 57.  Defendants try

- 37 -

C.   **Defendants Have Not Offered a Plausible Competing Inference that Is More Compelling than Plaintiffs' Allegations**

Ultimately, the question is whether "accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter." *Avaya*, 564 F.3d at 269.  Faced with Plaintiffs' particularized allegations of scienter, Defendants are left to argue that the "non-culpable inference" is that "PayPal spent a year implementing a certain business strategy, determined by the end of the year that the strategy was not working, and then promptly informed investors that it was going in a new direction."  MTD at 38-39.  According to Defendants, "[t]hat is not a description of securities fraud, it is a description of the normal business activities of a public corporation."  *Id.*  But as discussed in §VI.A.1, above, during the Class Period Defendants did not tell investors that they were implementing a new "business strategy" (MTD at 38) to utilize "incentivized customer acquisition tactics to a much greater extent than we ever have in our history" and "spend[] money on lower-value NNAs that are not engaged in the base."  ¶¶52, 55.  To the contrary, they claimed that they were not going to "go out and spend money on customer acquisition and get very

---

to take solace in the fact that they ultimately did not receive substantial bonuses based on that metric.  MTD at 30-31.  But that does nothing to diminish the fact that Defendants' bonus structure motivated them to boost results through their undisclosed NNA acquisition strategy.  That Defendants were unable to keep that charade going and had to disclose the truth about the NNA acquisitions in February 2022, does not alter the conclusion that their compensation structure adds to the evidence of motive and opportunity.

- 38 -

low net new actives to inflate or pump up that [NNA] number" and that "we are seeing engagement levels increase dramatically throughout our base." ¶¶31, 48. Investors only learned the truth about PayPal's 2021 business strategy in February 2022 – a strategy Defendants admit that they elected to pursue "during the Class Period." MTD at 38.

The supposed "new direction" (MTD at 39) Defendants told investors they were pursuing *after* the end of the Class Period was purportedly going to focus on the "quality of the users versus the overall quantity" and "not . . . throw marketing dollars at low-value subscribers coming in." ¶¶55, 62. But Defendants fail to explain how that is different from what they told investors *during* the Class Period. Because throughout 2021, Defendants did not tell investors they were making unprecedented use of incentive programs to chase new NNAs by adding poor quality and fraudulent users. To the contrary, they claimed "[w]e've gotten much better as a company in generating and engaging high-quality net new actives" and assured investors that they were not going to "chas[e] a low-value, net new active that maybe pumps up numbers and the optics look good." ¶¶32, 40. The new business strategy Defendants claim they told investors in February 2022 was the same strategy that they misleadingly told investors they were pursuing in 2021. That's not a "non-culpable explanation." It's securities fraud.

- 39 -

## VII.  THE SECTION 20(a) AND 20A CLAIMS ARE ADEQUATELY ALLEGED

Defendants' §§20(a) and 20A argument (MTD at 40) fails because Plaintiffs adequately pled a predicate §10(b) violation.  Accordingly, §§20(a) and 20A claims are adequately alleged as well.  *Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 620 F. Supp. 3d 167, 200 (D.N.J. 2022).

## VIII.  CONCLUSION

For the reasons stated herein, Defendants' motion to dismiss the Complaint should be denied.

DATED: August 5, 2025         SEEGER WEISS LLP
                              CHRISTOPHER A. SEEGER
                              CHRISTOPHER L. AYERS
                              JENNIFER R. SCULLION


                                    s/ Christopher A. Seeger
                              CHRISTOPHER A. SEEGER

                              55 Challenger Road, 6th Floor
                              Ridgefield Park, NJ  07660
                              Telephone:  212/584-0700
                              212/584-0799 (fax)
                              cseeger@seegerweiss.com
                              cayers@seegerweiss.com
                              jscullion@seegerweiss.com

                              Liaison Counsel

- 40 -

4909-3813-8457.v1

LABATON KELLER SUCHAROW LLP
CAROL C. VILLEGAS
JAKE BISSELL-LINSK
LISA STREJLAU
DANIELLE IZZO
140 Broadway, 34th Floor
New York, NY  10005
Telephone:  212/907-0700
212/818-0477 (fax)
cvillegas@labaton.com
jbissell-linsk@labaton.com
lstrejlau@labaton.com
dizzo@labaton.com

LABATON KELLER SUCHAROW LLP
MARK WILLIS
1050 Connecticut Avenue NW, Suite 500
Washington, D.C.  20036
Telephone:  202/772-1880
212/818-0477 (fax)
mwillis@labaton.com

Counsel for Lead Plaintiff and Co-Lead
Counsel for the Class

ROBBINS GELLER RUDMAN
  & DOWD LLP
TOR GRONBORG
MATTHEW I. ALPERT
PATTON L. JOHNSON
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
torg@rgrdlaw.com
malpert@rgrdlaw.com
pjohnson@rgrdlaw.com

Counsel for PERA and Co-Lead Counsel for
the Class

- 41 -

4909-3813-8457.v1

RAÚL TORREZ
Attorney General of the State of New Mexico
Julie Ann Meade
General Counsel
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM  87501
Telephone:  505/270-4332
jmeade@nmdoj.gov

Counsel for PERA

BERGER MONTAGUE PC
MICHAEL DELL'ANGELO
1818 Market Street, Suite 3600
Philadelphia, PA  19103
Telephone:  215/875-3000
215/875-4604 (fax)
mdellangelo@bm.net

Counsel for PERA

- 42 -

4909-3813-8457.v1