**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE PAYPAL HOLDINGS INC. SECURITIES LITIGATION | Civil Action No. 22-5864 (RK) (JTQ) |
| | **OPINION** |

**KIRSCH, District Judge**

**THIS MATTER** comes before the Court upon the second Motion to Dismiss, (ECF No. 104; *see also* "Mot.," ECF No. 104-1), filed by Defendants PayPal Holdings, Inc. ("PayPal" or the "Company"), Daniel Schulman ("Schulman"), John Rainey ("Rainey"), and Jonathan Auerbach ("Auerbach") (collectively "Defendants").[1] Defendants seek to dismiss Lead Plaintiff Caisse dépôt et placement du Québec ("Lead Plaintiff") and additional named Plaintiff Public Employees Retirement Association of New Mexico's ("PERA") (collectively "Plaintiffs") Second Amended Complaint, ("SAC," ECF No. 88).[2] Plaintiffs filed a brief in opposition, ("Opp.," ECF No. 105), and Defendants filed a reply brief, ("Reply," ECF No. 106). Plaintiffs also filed a letter informing the Court of recently decided cases, (ECF No. 107), and Defendants filed a responsive letter, (ECF No. 108).[3] The Court has considered the parties' submissions and resolves the matter without oral

---

[1] The Court will refer to Schulman, Rainey, and Auerbach together as the "Individual Defendants."

[2] While Plaintiffs caption this filing as the "First Amended Complaint," (*see* SAC), it is actually the Second Amended Complaint and the Court refers to it as such, (*see* ECF No. 1 (initial complaint); ECF No. 49 (First Amended Complaint)); *see also In re PayPal Holdings Inc. Sec. Litig.*, No. 22-5864, 2025 WL 325603, at *21 (D.N.J. Jan. 29, 2025).

[3] Although the parties did not seek leave to file these letters, as they should have, the Court has nonetheless considered the identified authorities. *See Gonzalez v. Lyft, Inc.*, No. 19-20569, 2020 WL 7183573, at *1 n.1 (D.N.J. Oct. 13, 2020), *report and recommendation adopted*, 2021 WL 303024 (D.N.J. Jan. 29, 2021). However, the Court will not consider any arguments included within the parties' letters. *See Atkins v. Capri Training Ctr., Inc.*, No. 13-6820, 2014 WL 4930906, at *10 (D.N.J. Oct. 1, 2014) ("Generally, if pertinent and significant authorities come to a party's attention after the party's brief has been filed, the party may advise the court of the relevant authority through a Notice of Supplemental Authority; however, a Notice

argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, Defendants' Motion to Dismiss is **GRANTED**.

## I.    BACKGROUND

This purported class action is brought by purchasers of PayPal stock between February 3, 2021 and February 1, 2022 ("the Class Period") against PayPal and its key officers asserting claims for securities fraud under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78a *et seq.*, and Rule 10b-5 promulgated thereunder, as well as Sections 20(a) and 20A of the Exchange Act. The facts are well known to the parties and recited at length in the Court's previous Opinion. *See In re PayPal Holdings Inc. Sec. Litig.* (*PayPal I*), No. 22-5864, 2025 WL 325603, at *1–7 (D.N.J. Jan. 29, 2025). Accordingly, the Court recites only those facts relevant to the disposition of Defendants' Motion.[4]

### A.    THE PARTIES

Lead Plaintiff, an investment group, purchased PayPal stock at alleged "artificially inflated prices" during the Class Period, suffering losses when the stock tumbled. (SAC ¶ 13.) Plaintiff PERA, another investment group, did the same (*Id.* ¶ 14.) Defendant PayPal is a technology company, whose stock trades publicly on the Nasdaq Stock Market under the symbol "PYPL." (*Id.* ¶¶ 15, 20.) Defendant Schulman was the Chief Executive Officer ("CEO") of PayPal and a member of the Board of Directors during the Class Period. (*Id.* ¶ 16.) Also during this time period, Defendant Rainey was the Company's Chief Financial Officer ("CFO"), and Defendant Auerbach was the Executive Vice President, Chief Strategy, Growth and Data Officer. (*Id.* ¶¶ 17–18.)

---

of Supplemental Authority should not advance new arguments . . . ." (citing *Beazer E., Inc. v. Mead Corp.*, 525 F.3d 255, 264 (3d Cir. 2008))).

[4] The Court accepts all factual allegations in the SAC as true for purposes of deciding the pending Motion. *See Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

### B.    PAYPAL'S BUSINESS MODEL AND EXPANSION STRATEGY

"PayPal is a digital payments platform, most well-known for facilitating online purchases and person-to-person money transfers." (*Id.* ¶ 20.) PayPal's platform consists of a variety of payment applications including Venmo and Xoom. (*Id.*) PayPal collects fees for completed transactions; therefore, the more transactions that occur on its platform, the more revenue PayPal accrues. (*Id.* ¶ 21.)

Accordingly, PayPal tracks and discloses a number of key metrics that track user growth and usage on its platform. (*Id.* ¶¶ 22–23.) This includes "Active Accounts" and "Net New Actives" ("NNAs"). (*Id.*) An Active Account is "an account registered directly with PayPal or a platform access partner that has completed a transaction on [its] Payments Platform . . . within the past 12 months." (*Id.* ¶ 22.) NNAs are newly activated or reactivated accounts minus inactive accounts that went 12 months without a transaction.[5] (*Id.* ¶ 23.)

In November 2020, buoyed by an increase in users and transactions during the COVID-19 pandemic, PayPal set its sights on becoming a "Super App," which would offer a suite of new capabilities to help customers "manage their financial lives." (*Id.* ¶¶ 24–26.) Becoming a Super App requires significant scale. To reach that scale, PayPal sought to expand its user base to between 500 million and one billion people. (*Id.* ¶ 27.) "NNAs w[ere] presented as evidence of PayPal's continued growth," so "the ability of PayPal to continue to grow NNAs was of critical importance to investors and the market" during the Class Period. (*Id.* ¶ 28.) NNAs were measured daily, and those reports were sent to the Individual Defendants. (*Id.* ¶¶ 4, 99.)

---

[5] For example, if ten new accounts signed up for PayPal in a given period of time but three pre-existing accounts went 12 months without a transaction, then the NNAs for that period of time would be seven.

To expand, PayPal began to offer promotions to incentivize new users to join. (*See, e.g.*, *id.* ¶¶ 35, 42, 45, 49, 59, 64.) PayPal used these tactics to a "much greater extent than [it] ever had in [its] history." (*Id.* ¶¶ 35, 42, 45, 49 (internal quotation marks omitted).) This led to the creation by users of "hollow" accounts that would be used for one or two transactions but then would become inactive, which had the effect of temporarily increasing the amount of NNAs. (*Id.*) These promotions also incentivized the creation by users of fraudulent accounts to take advantage of such promotions. (*Id.* ¶¶ 5, 52, 112.) Overall, Plaintiffs allege that "Defendants . . . quantified that their incentive campaigns resulted in at least 4.5 million illegitimate accounts being counted as NNAs, and, because they were no longer going to continue their cash incentives, '20 million incremental one-and-done customers' would fall out of NNAs in 2022." (*Id.* ¶ 8.) This represented approximately half of the 48.9 million NNAs PayPal reported in 2021. (*Id.*)

### C.    ALLEGED FALSE AND MISLEADING STATEMENTS

Plaintiffs allege that throughout the Class Period Defendants made twelve false or misleading statements generally related to PayPal's user growth and strategy for acquiring new users.[6] (*Id.* ¶¶ 30–48; Opp. at 8.) As a result of these statements, Plaintiffs contend that PayPal's stock price was artificially inflated during the Class Period. (SAC ¶ 157.) As made clear by the corresponding footnotes, virtually <u>every</u> single alleged false and misleading statement cited and relied on by Plaintiffs in the subject SAC was previously pleaded in the prior First Amended Complaint and analyzed by the Court in its prior Opinion. *See PayPal I*, 2025 WL 325603, at *13–21; ("FAC," ECF No. 49). The twelve alleged misstatements are as follows:[7]

---

[6] Almost all of the alleged statements were previously pleaded in the First Amended Complaint and addressed at length in the previous Opinion. The Court notes, via footnote throughout this Section and altogether in a chart in Section III.B, each statement previously pleaded and addressed. Overall, only one statement and portions of another were not previously pleaded in the First Amended Complaint.

[7] Bold and italics have been removed from these statements.

*First*, on February 3, 2021, PayPal held its fourth quarter 2020 earnings call where, in response to a question about NNAs, Defendant Schulman responded by stating:

> I think when we look at the cohort of net new actives from last year, it's clearly incremental people coming on. The – over 50 demographic, 50 years old demographic, one of our strongest growth vectors that we've had. So you're really seeing new demographics come onto the platform. But what's really interesting to me is the engagement metrics of that cohort are also up substantially. We have double-digit increases in value for net new active[s]. Our 90-day engagement rates are up 13% plus over traditional cohorts.
>
> . . . .
>
> There is plenty of demand to come on to our platform.
>
> . . . .
>
> . . . But we're seeing a lot of really encouraging trends in the underlying cohorts that we're bringing on . . . .

(SAC ¶ 30 (brackets in original).)[8]

*Second*, on February 11, 2021, in an "Investor Day" meeting, Defendant Schulman stated: "[W]e are seeing engagement levels increase dramatically throughout our base especially with the new products that we've put out." (*Id.* ¶ 31.)[9]

*Third*, during the same meeting, Defendant Auerbach stated:

> And these new cohorts are using PayPal more than the old cohorts did, which is a remarkable accomplishment. But it's not simply due to the pandemic. We've gotten much better as a company in generating and engaging high-quality net new actives.
>
> . . . .
>
> . . . [W]e are much more programmatically driving new – new net actives. And this is not simply a factor of – COVID-19 is not simply a factor of marketing. We're getting much better a[s] a company across PayPal through better user

---

[8] This statement was previously pleaded in the FAC and addressed in the previous Opinion. (*See* FAC ¶¶ 217, 219); *PayPal I*, 2025 WL 325603, at *19.

[9] This statement was previously pleaded in the FAC and addressed in the previous Opinion. (*See* FAC ¶ 225); *PayPal I*, 2025 WL 325603, at *19.

experiences, risk management, stronger ecosystem partnerships to drive NNAs on a sustainable basis.

(*Id.* ¶ 32 (second brackets in original).)[10]

*Fourth*, on March 4, 2021, in response to interview questions regarding the drivers of PayPal's NNA growth, Defendant Rainey stated that reduced churn[11] and expansion in international markets "are probably the 2 big drivers of the net new active growth." (*Id.* ¶ 33.)[12]

*Fifth*, on March 9, 2021, in response to an interview question asking about the drivers of NNA growth, Defendant Schulman stated: "And so we've got new demographics, new markets, new products that are attracting new customers at the top of that funnel. . . . We've seen double-digit increases in our 2020 cohorts in terms of their customer lifetime value. Our 90-day engagement rates for last year's cohorts are up 13%."[13] (*Id.* ¶ 34.)[14]

*Sixth*, on May 5, 2021, during PayPal's first quarter 2021 earnings call, in response to a question about NNA growth, Defendant Schulman stated:

I think our marketing programs are really beginning to deliver excellent results. . . .

And when I think about what's going on inside the base, our engagement levels are going up substantially. . . . And that is really a result of our daily active users coming on.

. . . [S]o we're clearly beginning to see both at the top of the funnel, the potential for increases into the top of the funnel and really narrowing the bottom of the funnel . . . .

---

[10] This statement was previously pleaded in the FAC and addressed in the previous Opinion. (*See* FAC ¶¶ 229, 231); *PayPal I*, 2025 WL 325603, at *18–19.

[11] "Churn" refers to accounts that went twelve months without a transaction and thus reduced NNAs. (SAC ¶ 23.)

[12] This statement was previously pleaded in the FAC and addressed in the previous Opinion. (*See* FAC ¶ 235); *PayPal I*, 2025 WL 325603, at *13.

[13] The "top of [the] funnel" refers to new users joining PayPal and adding to NNAs. (SAC ¶ 34.) Conversely, the "bottom of the funnel" refers to users becoming inactive and being lost via churn. (*Id.*)

[14] This statement was previously pleaded in the FAC and addressed in the previous Opinion. (*See* FAC ¶ 237); *PayPal I*, 2025 WL 325603, at *19.

(*Id.* ¶ 38.) Defendant Rainey responded to the same question by stating "these have been our most engaged cohorts that we've ever seen. And we're continuing to see those trends." (*Id.*)[15]

*Seventh*, on May 24, 2021, at a conference, in response to a question about the profile of NNAs, Defendant Rainey stated, "irrespective of what cohort we're talking about, post pandemic, we see much elevated levels of engagement, whether we look at like 10-day adoption rates or 90-day adoption rates." (*Id.* ¶ 39.)[16]

> *Eighth*, in response to the same question, Defendant Rainey further explained that:
>
> What we've done over the last, call it, 18 months is put much more rigor into the CLV [Customer Lifetime Value] component of that rather than chasing a low-value, net new active that maybe pumps up numbers and the optics look good, really looking at how they're going to contribute to the PayPal platform over time. . . . But we've been more targeting in some of the sales and marketing efforts around that.
>
>        . . . And I'm always happy to spend money like this when I know what the return is going to be, and I've got a high degree of confidence in that. And so we're doing a better job there in our sales and marketing teams is really going out and acquiring those customers. And knowing what that return – what that profile of customer is going to be over the next several years.

(*Id.* ¶ 40 (brackets in original).)[17]

*Ninth*, on June 9, 2021, at a conference, Defendant Schulman responded to a question about user retention by stating, "[o]ur marketing is finally starting to kick in, in ways that we can really measure and look at it, invest wisely and get a return on that and bring in high-quality net new

---

[15] The first and last paragraphs of the block quote were previously pleaded in the FAC and addressed in the previous Opinion. (*See* FAC ¶¶ 251, 253); *PayPal I*, 2025 WL 325603, at *19 (citing *id.* ¶ 253 and noting it was an example). The middle paragraph of the block quote and the quote following the block quote were not previously pleaded.

[16] This statement was previously pleaded in the FAC and addressed in the previous Opinion. (*See* FAC ¶ 263); *PayPal I*, 2025 WL 325603, at *19–20.

[17] This statement was previously pleaded in the FAC and addressed in the previous Opinion. (*See* FAC ¶ 265); *PayPal I*, 2025 WL 325603, at *20.

actives at the top of the funnel." (*Id.* ¶ 41.)[18]

*Tenth*, on July 28, 2021, during PayPal's second quarter 2021 earnings call, in response to a question about NNA growth, Defendant Schulman stated that new NNAs are "performing better than cohorts that we previously had historically, their churn is lower." (*Id.* ¶ 44.)[19]

*Eleventh*, on November 8, 2021, PayPal filed a press release with the SEC on Form 8-K that reported performance metrics, including, "13.3 million Net New Active Accounts (NNAs) added; ended the quarter with 416 million active accounts." (*Id.* ¶ 46.)[20] Additionally, during PayPal's third quarter 2021 earnings call that same day, in response to a question about NNAs, Defendant Schulman stated:

> So 13.3 million in the quarter, up about 2 million from last quarter, growing 15% year-over-year . . . .
>
> Our growth remains incredibly strong on the NNA side. . . .
>
> . . . [T]here are 2 places that our net new actives come from. One is top of the funnel, and top of the funnel is actually pretty strong right now and remains so.

(*Id.* ¶ 47.)[21]

*Twelfth*, on November 9, 2021, during an analyst call, Defendant Rainey responded to a question about NNAs by stating that "[o]ur net new actives are going to do better than what we originally expected on an organic basis." (*Id.* ¶ 48.) He further explained that:

> [Low quality new actives] is not something that we want to chase as a company, and we can certainly go out and spend money on customer acquisition and get very

---

[18] This statement was previously pleaded in the FAC and addressed in the previous Opinion. (*See* FAC ¶ 269); *PayPal I*, 2025 WL 325603, at *18.

[19] This statement was not previously pleaded.

[20] A substantively identical statement was previously pleaded in the FAC and addressed in the previous Opinion. (*See* FAC ¶ 287 (reproduced graphic with the same information); *id.* ¶ 289 ("Our active accounts were up 15% year-over-year, reaching 416 million. We added 13.3 million net new active accounts in the quarter . . . .")); *PayPal I*, 2025 WL 325603, at *13, *18.

[21] This statement was previously pleaded in the FAC and addressed in the previous Opinion. (*See* FAC ¶¶ 297, 299); *PayPal I*, 2025 WL 325603, at *13, *18–19.

8

low value net new actives to inflate or pump up that number, but that's not the right economic decision for us longer term.

(*Id.* (brackets in original).)[22]

All told, Plaintiffs contend that the above statements were materially false and misleading because Defendants failed to disclose that PayPal "leaned into incentivized customer acquisition tactics to a much greater extent than [it] ever had in [its] history" and chased "low engaged customers," leading to its accounts being "plagued by hollow net new actives." (*Id.* ¶¶ 35, 42, 45, 49 (cleaned up).) By pivoting away from these strategies, "over one year 20 million incremental one-and-done customers would fall out of PayPal's reported NNAs." (*Id.* (internal quotation marks omitted).) Additionally, say Plaintiffs, the eleventh and twelfth statements—made in November 2021—were materially false and misleading because Defendants failed to disclose that, "by no later than October 2021," PayPal was aware of millions of illegitimate accounts. (*Id.* ¶ 49.)

### D.   DISCLOSURES AND MARKET REACTION

On February 1, 2022, PayPal released its earnings and results for the Fourth Quarter of 2021 in a press release filed with the SEC on Form 8-K and held accompanying earnings calls with investors. (*Id.* ¶¶ 50–51.) PayPal reported NNAs of only 9.8 million for the Fourth Quarter, well below the previous estimation of approximately 15.8 million new accounts. (*Id.* ¶ 50.) PayPal shifted its NNA expectation for all of 2022 to only 15 to 20 million NNAs. (*Id.* ¶ 51.) On the earnings call, Defendant Rainey explained that PayPal had "leaned into incentivized customer acquisition tactics" resulting in an increase in NNAs. (*Id.* ¶ 52.) However, Plaintiffs assert that many of those NNAs were minimally engaged or fraudulent. (*Id.*) Overall, Rainey's statements indicated that "two-thirds of PayPal's user base was, at best, minimally engaged." (*Id.*) Defendants

---

[22] This statement was previously pleaded in the FAC and addressed in the previous Opinion. (*See* FAC ¶ 301); *PayPal I*, 2025 WL 325603, at *20–21.

further explained that PayPal removed "4.5 million accounts created in 2021 that were illegitimate" and estimated that 20 million NNAs would "roll off" in 2022 as PayPal shifted away from targeting those customers. (*Id.* ¶¶ 54–55.) Defendant Rainey explained that the removal of the 4.5 million illegitimate accounts was "the primary driver of the miss[ed]" NNA prediction. (*Id.* ¶ 57.)

On February 2, 2022, PayPal's stock lost approximately a quarter of its value, falling from $175.80 to $132.57 per share. (*Id.* ¶ 56.) The next day, the stock fell to $124.30 per share. (*Id.* ¶ 61.) During that two-day period, the stock price fell 29.3%, a total market capitalization loss of $58.7 billion. (*Id.* ¶ 160.) Plaintiffs characterize this as "the largest stock price decline in [PayPal's] history." (*Id.* ¶ 9.) Plaintiffs allege that, prior to the February 1, 2022 earnings call, PayPal's stock traded "at artificially inflated levels," and that the stock price "fell dramatically" in reaction to Defendants' disclosures. (*Id.* ¶¶ 157–59.) As a result, class members suffered economic loss. (*Id.* ¶¶ 161–62.)

Plaintiffs also discuss certain developments that occurred after the Class Period. On April 27, 2022, during PayPal's first quarter 2022 earnings call, Defendant Schulman explained that NNAs only grew by 2.4 million in the first quarter and that PayPal now only expected 10 million NNAs for the year. (*Id.* ¶ 65.) He further explained that the expected "roll off" of 20 million accounts was beginning to occur. (*Id.*) Ultimately, PayPal only added 8.6 million NNAs in all of 2022. (*Id.* ¶ 65 n.2.)[23]

---

[23] Other allegations from the SAC, including factual allegations related to scienter, are not necessary to resolution of the current Motion and are not repeated here. (*See* SAC ¶¶ 93–156.)

### E.    PROCEDURAL HISTORY

On October 4, 2022, Plaintiff Defined Benefit Plan of the Mid-Jersey Trucking Industry and Teamsters Local 701 Pension and Annuity Fund filed a putative class action complaint. (ECF No. 1.) The initial complaint consisted of twenty-three pages and seventy-nine paragraphs (*See generally id.*) Successor counsel filed the FAC on March 13, 2023, which consisted of more than 140 pages with 413 paragraphs. (*See generally* FAC). The FAC asserted one claim for violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against all Defendants (Count One), one violation of Section 20(a) of the Exchange Act against the Individual Defendants (Count Two), and one violation of Section 20A of the Exchange Act against the Individual Defendants (Count Three). (*Id.* ¶¶ 387–411.)

Thereafter, Defendants moved to dismiss the FAC. (ECF Nos. 67, 76.) The Court granted the motion. The Court dismissed Count One because the FAC failed to adequately plead "a material misrepresentation or omission." *PayPal I*, 2025 WL 325603, at *11, *21 (quoting *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014)). The Court dismissed Counts Two and Three because those claims were "contingent upon sufficiently pleading an underlying violation of Section 10(b) by the controlled person." *Id.* at *21 (quoting *In re Newell Brands, Inc. Sec. Litig.*, No. 18-10878, 2019 WL 6715055, at *14 (D.N.J. Dec. 10, 2019), *aff'd*, 837 F. App'x 869 (3d Cir. 2020)). The Court granted Plaintiffs leave to file an amended complaint. *Id.* at *21–22. The subject Complaint, the Second Amended Complaint, which was filed on March 17, 2025, spans eighty pages with more than two hundred paragraphs. (*See generally* SAC.) The subject Complaint sets forth the same three Counts as the FAC and constitutes the third operative pleads. (*See id.* ¶¶ 176–200; *see generally id.*) Defendants again moved to dismiss, and that Motion is now ripe. (*See generally* Mot.)

11

## II.    LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), the court may dismiss a complaint for "failure to state a claim upon which relief can be granted." For a complaint to survive dismissal under this rule, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In evaluating the sufficiency of a complaint, "[a]ll allegations in the complaint must be accepted as true, and the plaintiff must be given the benefit of every favorable inference to be drawn therefrom." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011) (alteration in original) (internal quotation marks omitted). A pleading that "offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (cleaned up). In short, the pleading's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

For fraud claims, a complaint is subject to Rule 9(b)'s heightened pleading standard "[i]ndependent of the standard applicable to Rule 12(b)(6) motions." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). A party alleging fraud must therefore support its allegations with "the who, what, when, where and how of the events at issue." *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) (quoting *In re Rockefeller Ctr.*, 311 F.3d at 216); *see also Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) ("[T]he plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into

12

a fraud allegation."). Rule 9(b)'s heightened pleading standard "ensure[s] that defendants are placed on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of fraud." *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) (internal quotation marks omitted). Rule 9(b)'s requirements are "rigorously applied in securities fraud cases," including those brought under the Exchange Act. *Cal. Pub. Emps' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144 (3d Cir. 2004) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997)).

In addition to satisfying Rule 9(b), plaintiffs alleging securities fraud pursuant to the Exchange Act must also comply with the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4 *et seq.* The PSLRA "imposes another layer of factual particularity to allegations of securities fraud." *In re Rockefeller Ctr.*, 311 F.3d at 217. To allege fraud under the PSLRA, the plaintiff must "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.'"[24] *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 & n.12 (1976)).

## III.    **DISCUSSION**

Defendants move to dismiss the SAC in its entirety and with prejudice. Defendants argue that Plaintiffs fail to allege a Section 10(b) and Rule 10b-5 claim because Plaintiffs fail to plead an actionable misstatement or omission or the requisite strong inference of scienter. (*See* Mot. at 8–39.) Defendants further contend that the Section 20(a) and Section 20A claims must be dismissed based on the failure of Plaintiffs' Section 10(b) claim. (*Id.* at 40.) Prior to addressing

---

[24] Because the Court grants Defendants' Motion based on Plaintiffs' failure to adequately plead that the statements at issue were materially false or misleading, determining whether Plaintiffs adequately pleaded scienter is not necessary for the resolution of the Motion and is therefore not addressed. *See supra* note 23.

13

the merits of Defendants' arguments, the Court first turns to the parties' dispute regarding whether the Court should take judicial notice of certain documents.

### A.    JUDICIALLY NOTICEABLE DOCUMENTS

Defendants ask the Court to take judicial notice of nine exhibits that were submitted with their Motion. (*See* Exs. to Decl. of Lyle Roberts, ECF Nos. 104-3 to 104-11.)[25] These exhibits include SEC filings and conference call transcripts. (*See id.*) "Plaintiffs do not object to the Court taking judicial notice of Exhibits 1–4 and 9 . . . with the understanding that the Court will not consider them 'to prove the truth of their contents but only to determine what [was] stated.'" (Opp. at 8 n.2 (brackets in original) (quoting *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000)).) Accordingly, the Court takes judicial notice of these documents.[26] Plaintiffs, however, oppose the Court taking judicial notice of Exhibits 5–8. (*Id.* at 8 n.2, 35.) This is despite the fact that the Court has already taken judicial notice of these exact documents. *See PayPal I*, 2025 WL 325603, at *10; (*compare* ECF Nos. 104-7 to 104-10, *with* ECF Nos. 76-33, 76-34, 76-35, 76-37 (the exact same documents).) Of course, the result is the same here and the Court will take judicial notice of these documents.

"As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings. However, an exception to the general rule is that a 'document *integral to or explicitly relied* upon in the complaint' may be considered." *In re Burlington Coat Factory*, 114 F.3d at 1426 (citation omitted) (quoting *Shaw v. Digit. Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)). What matters for this exception is "whether the claims in the complaint are based on

---

[25] In this Opinion, all references to "Exhibit" or "Ex." refers to the Exhibits to Lyle Roberts's Declaration.

[26] In fact, the Court previously took judicial notice of the documents now labeled Exhibits 1–4. *See PayPal I*, 2025 WL 325603, at *9, *9 n.11; (*compare* ECF Nos. 104-3 to 104-6, *with* ECF Nos. 76-6, 76-20, 76-24, 76-25 (the exact same documents).)

an extrinsic document and not merely whether the extrinsic document was explicitly cited." *Id.* at 1426 (internal quotation marks omitted).

Additionally, the Court may take judicial notice of documents containing facts that are "not subject to reasonable dispute in that [they are] either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002) (alteration in original) (quoting Fed. R. Evid. 201(b)). The Court may take judicial notice of such documents regardless of whether they were relied upon in the complaint. *Id.* Taking judicial notice of documents "should be done sparingly at the pleadings stage." *Victaulic Co. v. Tieman*, 499 F.3d 227, 236 (3d Cir. 2007), *as amended*, (Nov. 20, 2007). "Only in the clearest of cases should a district court reach outside the pleadings for facts necessary to resolve a case" at the motion to dismiss stage. *Id.*

The disputed exhibits are SEC Form 4 plans filed by or on behalf of the Individual Defendants at various dates from 2019 to 2022. (*See* ECF Nos. 104-7 to 104-10.) "[A] 'Form 4' filed with the Commission [] sets forth the insider's name, the date of the transaction, the number of shares sold or bought and the price per share." *Payne v. DeLuca*, 433 F. Supp. 2d 547, 565 n.11 (W.D. Pa. 2006) (citing *Tristar Corp. v. Freitas,* 84 F.3d 550, 552–53 (2d Cir. 1996)). A court may "tak[e] judicial notice of properly-authenticated public disclosure documents filed with SEC." *In re NAHC*, 306 F.3d at 1331 (citing *Oran*, 226 F.3d at 289). These documents were filed with the SEC. *See In re Merck Co., Inc., Sec., Derivative & "ERISA" Litig.*, No. 05-1151, 2006 WL 8460903, at *4 (D.N.J. Jan. 20, 2006) ("It is . . . without dispute that SEC Forms 4 and 5 are in fact SEC filings contemplated by *Oran*."). Accordingly, the Court may take judicial notice of them. *See Oran*, 226 F.3d at 289 (taking judicial notice of Form 4s filed with the SEC). However, these

15

documents may not be offered "to prove the truth of their contents but only to determine what the documents stated." *Id.* (quoting *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)). In fact, it seems that Plaintiffs' discussion of judicial notice simply seeks to have the Court impose this limitation. (*See* Opp. at 35 ("[T]he Court can only take judicial notice of the Forms 4 'to determine what the documents stated,' 'not to prove the truth of their contents.'" (quoting *Oran*, 226 F.3d at 289)).) Therefore, as it did previously, the Court will take judicial notice of these documents. *See PayPal I*, 2025 WL 325603, at *10.

### B.    LAW OF THE CASE

While a cursory review of the SAC may create an initial impression of some arguably significant revisions from the FAC, a closer look reveals that those changes are, in reality, modest and more stylistic than substantive. (*See* ECF No. 90 (redline comparison of FAC and SAC).) The SAC is significantly streamlined from the far more unwieldy FAC: the FAC consisted of 413 paragraphs over 140 pages, and the SAC has been condensed to 201 paragraphs over 77 pages. (*Compare* FAC, *with* SAC.) Yet, despite this overhaul in structure, the central allegations remain the same. Indeed, the overwhelming majority of allegedly false or misleading statements in the SAC are repeated verbatim from the FAC. *See supra* Section I.C; (*compare* FAC ¶¶ 209–308, *with* SAC ¶¶ 29–49.) The following chart illustrates which statements have been repeated and where they were addressed in the Court's previous Opinion:

| Statement | FAC | SAC | Addressed in *PayPal I*, 2025 WL 325603, at |
|---|---|---|---|
| 1 | ¶¶ 217, 219 | ¶ 30 | *19 |
| 2 | ¶ 225 | ¶ 31 | *19 |
| 3 | ¶¶ 229, 231 | ¶ 32 | *18–19 |
| 4 | ¶ 235 | ¶ 33 | *13 |
| 5 | ¶ 237 | ¶ 34 | *19 |
| 6 | Partially pleaded at ¶¶ 251, 253 | ¶ 38 | *19 |
| 7 | ¶ 263 | ¶ 39 | *19–20 |
| 8 | ¶ 265 | ¶ 40 | *20 |
| 9 | ¶ 269 | ¶ 41 | *18 |
| 10 | Not previously pleaded | ¶ 44 | N/A |
| 11 | ¶¶ 289,[27] 297, 299 | ¶¶ 46–47 | *13, *18–19 |
| 12 | ¶ 301 | ¶ 48 | *20–21 |

Accordingly, because Plaintiffs' allegations and arguments remain essentially the same, so too do the Court's analysis and findings. The parties dispute whether the "law of the case" doctrine applies in circumstances such as this. (*See* Mot. at 6–8; Opp. at 10–12; Reply at 2–5.) Under this doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *In re Cont'l Airlines*, 279 F.3d 226, 233 (3d Cir. 2002) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988)). Where the law of the case doctrine applies, a court "can reconsider previously decided issues under 'extraordinary circumstances,' such as if new evidence becomes available, a supervening law has been introduced, or the prior decision was 'clearly erroneous and would create manifest injustice.'" *Walker v. Coffey*, 956 F.3d 163, 170 (3d Cir. 2020) (quoting *In re City of Phila. Litig.*, 158 F.3d 711, 718 (3d Cir. 1998)). Plaintiffs do not argue that any of these circumstances are present.

---

[27] As mentioned above, while not the exact same statement as the one in the FAC, the newly plead statement is substantively identical.

Instead, they argue that the doctrine does not apply at all. (Opp. at 10–12.) Defendants argue that the doctrine does apply. (Mot. at 6–8.)

Defendants have the better argument. Courts in this District frequently apply the law of the case doctrine to successive motions to dismiss, as in this case. *See, e.g.*, *Palmieri v. Intervet Inc.*, No. 19-22024, 2025 WL 1811271, at *4–5 (D.N.J. June 30, 2025); *Wu v. GSX Techedu Inc.*, 738 F. Supp. 3d 527, 567 n.44 (D.N.J. 2024); *Takata v. Riot Blockchain, Inc.*, No. 18-2293, 2023 WL 7133219, at *11 (D.N.J. Aug. 25, 2023) ("[T]he previous disposition of a motion to dismiss may constitute the law of the case . . . . Because Plaintiff's scheme liability claim against Honig is premised on conduct and a legal theory that the Court has already ruled unactionable, Plaintiff's Rule 10b-5 . . . claim against Honig is dismissed with prejudice." (cleaned up)); *Blackbook Cap., Inc. v. Fin. Indus. Reg. Auth., Inc.*, No. 19-21772, 2021 WL 1827268, at *3 (D.N.J. May 5, 2021) ("Here, Plaintiffs assert the same claims in the SAC as in the Amended Complaint and provide no new factual allegations. . . . This is precisely what the law of the case doctrine is intended to prevent."). *But see Aksins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1043 (9th Cir. 2018) (holding that the district court abused its discretion in applying law of the case to an amended complaint). Applying law of the case here comports with the doctrine's purpose of "maintain[ing] consistency and avoid[ing] reconsideration of matters once decided during the course of a single continuing lawsuit." *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 493 (3d Cir. 2017) (internal quotation marks omitted).

Plaintiffs' arguments against applying law of the case are unavailing. (*See* Opp. at 10–12.) The doctrine applies here because, as discussed in the subsequent sections, many of the issues in this case "were actually decided in [the] prior proceeding[]." *Home Depot USA, Inc. v. Lafarge N. Am., Inc.*, 59 F.4th 55, 62 (3d Cir. 2023) (quoting *Farina v. Nokia Inc.*, 625 F.3d 97, 117 n.21 (3d

18

Cir. 2010)). Moreover, the parties had a "full and fair opportunity to litigate" those issues. *Speeney v. Rutgers*, 369 F. App'x 357, 360 (3d Cir. 2010). Plaintiffs contend that "[a] court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance." (Opp. at 11 (quoting *Pub. Int. Rsch. Grp. of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116 (3d Cir. 1997)).) That may be true, but that is because "[t]he law of the case doctrine does not limit a federal court's *power*; rather, it directs its exercise of *discretion*." *Pub. Int. Rsch. Grp. of N.J.*, 123 F.3d at 116 (emphasis added). Indeed, the full context of the quote relied on by Plaintiffs reveals how a court should exercise that discretion: While "[a] court has the power to revisit prior decisions . . . [it] should be loathe to do so in the absence of extraordinary circumstances" such as those discussed above. *Id.* (quoting *Christianson*, 486 U.S. at 817). Finally, Plaintiffs' attempt to conflate a grant of leave to amend with an order of dismissal fails. The fact that the law of the case doctrine does not apply to "the grant of a leave to amend" is irrelevant. (Opp. at 10 (quoting *United States ex rel. Petratos*, 855 F.3d at 493).) The Court is applying law of the case to its previous dismissal decision, *not* the accompanying decision to grant leave to amend.

In any event, whether law of the case applies here as a technical matter is ultimately irrelevant. Where an amended complaint does not adequately address the grounds for a court's dismissal of the previous complaint, the result will remain the same whether due to the law of the case doctrine or the simple fact that the court's reasons for dismissal still apply. *Cf. Transcon. Gas Pipe Line Co., LLC v. Beckman*, Nos. 24-1099 & 24-1142, 2024 WL 4661593, at *3 (3d Cir. Nov. 4, 2024) ("[Appellants] raise the same . . . arguments that we rejected [previously], and for the reasons we articulated in our previous decision, we again find these arguments unpersuasive."). Accordingly, even assuming, *arguendo*, that the law of the case doctrine does not apply, the SAC

19

does not adequately address the shortcomings identified previously by the Court and, as such, the result will remain unchanged.

### C.   MOTION TO DISMISS SECTION 10(B) CLAIM

In Count One, Plaintiffs assert a claim under Section 10(b) and Rule 10b-5. Section 10(b) of the Exchange Act creates a private cause of action for the "use or employ, in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5, which implements § 10(b), prohibits, in connection with the purchase or sale of any security:

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

17 C.F.R. § 240.10b-5. In asserting a claim for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff "must allege (1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." *City of Edinburgh Council*, 754 F.3d at 167. In a securities fraud case, "[a] corporation is liable for statements by employees who have apparent authority to make them." *Inst. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009) (alteration in original) (quoting *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 708 (7th Cir. 2008)).

All elements are required, and a failure to plead even one is fatal to Plaintiffs' claim. Consequently, as was the case in the Court's prior Opinion, the Court's analysis begins and ends with the first element. *See PayPal I*, 2025 WL 325603, at *11. To adequately plead a Section 10(b)

claim, a plaintiff must "identify a false representation of material fact or omission that makes a disclosed statement materially misleading." *In re NAHC*, 306 F.3d at 1330 (citing *In re Burlington Coat Factory*, 114 F.3d at 1419). A statement or omission of fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (internal quotation marks omitted) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)); *see also Fan v. StoneMor Partners LP*, 927 F.3d 710, 715 (3d Cir. 2019) (explaining that statements or omissions must be "read in light of all the information then available to the market" (internal quotation marks omitted)). Further, a statement or omission only gives rise to liability if it was "misleading at the time it was made; liability cannot be imposed on the basis of subsequent events." *In re NAHC*, 306 F.3d at 1330.

The contours of what qualifies as an actionable misstatement are well articulated. First, "[o]pinions are only actionable under the securities laws if they are not honestly believed and lack a reasonable basis." *City of Edinburgh Council*, 754 F.3d at 170. Next, the PSLRA creates a "safe harbor for forward-looking statements." *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 274 (3d Cir. 2010). The safe harbor applies to forward-looking statements "provided that they are (1) identified as [forward-looking], and accompanied by meaningful cautionary statements; or (2) immaterial; or (3) made without actual knowledge that the statement was false or misleading." *Id.* at 278–79. Finally, the Court must distinguish material representations from subjective statements of optimism that "constitute no more than puffery and are understood by reasonable investors as such." *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 872 (3d Cir. 2000) (internal quotation marks omitted) (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999),

21

*abrogated on other grounds by Tellabs, Inc.*, 551 U.S. 308)). The former are actionable while the latter are not.

In addition, while omissions may lead to liability, "Section 10(b) and Rule 10b-5 'do not create an affirmative duty to disclose any and all material information.'" *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, No. 16-6509, 2018 WL 3772675, at *15 (D.N.J. Aug. 8, 2018) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)). "Disclosure is required only when necessary to make statements made, in the light of the circumstances under which they were made, not misleading." *Id.* (cleaned up); *see also In re Walmart Inc. Sec. Litig.*, 151 F.4th 103, 113 (3d Cir. 2025) ("Omissions are actionable only when they render some other affirmative statement misleading." (citing *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 264 (2024))). If a defendant "makes an affirmative statement or characterization about its business, it puts that subject 'in play' and assumes a duty, under the securities laws, to speak truthfully about that subject." *In re Merck & Co., Inc. Sec., Derivative, & "ERISA" Litig.*, No. 05-1151, 2011 WL 3444199, at *9 (D.N.J. Aug. 8, 2011) (quoting *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992)).

The first element is subject to the PSLRA's "[e]xacting pleading requirements." *City of Edinburgh Council*, 754 F.3d at 168 (alteration in original) (quoting *Tellabs*, 551 U.S. at 313). Thus, "[a] complaint involving securities fraud must 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation . . . is made on information and belief . . . all facts on which that belief is formed.'" *In re Newell Brands, Inc. Sec. Litig.*, 837 F. App'x 869, 874 (3d Cir. 2020) (omissions in original) (quoting 15 U.S.C. § 78u-4(b)(1)). "The purpose of the heightened pleading requirements is to ensure that private securities actions do not become 'a partial downside insurance policy' against the vicissitudes of the market."

22

*Id.* (quoting *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 880 (3d Cir. 2018)).

In the FAC, Plaintiffs grouped the alleged misstatements into five categories. (FAC ¶ 207); *see also PayPal I*, 2025 WL 325603, at *13–21 (analyzing the five categories of misstatements in three sections). Plaintiffs have now abandoned that taxonomy in their SAC and focus on only two categories: (1) NNA results statements and (2) NNA acquisition statements. (Opp. at 8–22; *see also id.* at 9 n.3 (disclaiming certain previously pleaded categories).) Despite the new organization, as stated, the statements at issue are almost entirely repeated and in verbatim from those previously pleaded, and the few newly added statements do not meaningfully differ in substance from those previously pleaded and found to be insufficient. The Court will follow Plaintiffs' approach and utilize their designated two categories. The Court begins with NNA results.[28]

### 1.    NNA Results Statements

The Court's previous Opinion comprehensively analyzed the alleged misstatements related to NNA results. *See PayPal I*, 2025 WL 325603, at *13–18. It divided the NNA results misstatements into two time periods: prior to and after October 2021. *Id.* at *13. This was because Plaintiffs alleged that Defendants were only aware of the *risk* of illegitimate accounts prior to October 2021, and it was not until after October 2021 that they were aware of the *actual presence* of illegitimate accounts. *Id.* The Court held that the statements prior to October 2021 were not actionable because "Defendants 'had no duty to disclose the alleged, unmaterialized risks.'" *Id.* at *14 (quoting *SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*, 499 F. Supp. 3d 49, 64 (D. Del. 2020), *aff'd*, No. 20-3427, 2022 WL 3442353 (3d Cir. Aug. 17, 2022)). As for the statements after

---

[28] As before, the Court will not examine each statement individually. Instead, consistent with the approach of the parties, the Court will address the two categories of allegedly false and misleading statements and identify specific statements as examples, where necessary.

October 2021, the Court held they were inactionable because "Plaintiffs fail[ed] to plead with particularity that Defendants knew the statements concerning NNA results made in November 2021 were misleading." *Id.* at \*18.

Plaintiffs have now abandoned any argument related to NNA results statements made prior to October 2021 and focus entirely on those made after. (*See* Opp. at 21–22.) Specifically, Plaintiffs focus on Defendants' eleventh statement, i.e., the statement made on November 8, 2021 that PayPal added 13.3 million NNAs in the third quarter of 2021 and ended the quarter with 416 million active accounts. (SAC ¶¶ 46–47, 49; Opp. at 21–22.) Plaintiffs' argument is much the same as it was before, and statement eleven is a repeat of the statements previously relied on by Plaintiffs. *See PayPal I*, 2025 WL 325603, at \*15–18; (*compare* FAC ¶¶ 289, 297, 299, *with* SAC ¶¶ 46–47 (pleading the same statements related to NNA growth).)[29] Accordingly, the Court's analysis and conclusion remain the same.

Plaintiffs allege that the NNA results statements "were false and misleading because Defendants failed to disclose that it had already been discovered that their incentive programs had generated millions of illegitimately created accounts." (Opp. at 21–22.) However, as explained in the Court's previous opinion, whether these statements are actionable turns on whether Defendants knew or should have known that the statements were misleading.[30] Specifically, "for a statement

---

[29] As discussed above, these statements are largely verbatim repeats of the statements in the FAC. The sole exception is that the SAC quotes Defendants' November 8, 2021 press release, which stated, "13.3 million Net New Active Accounts (NNAs) added; ended the quarter with 416 million active accounts." (SAC ¶ 46.) The FAC, on the other hand, quoted an "Investor Updated presentation" that stated "13.3M net new accounts (NNAs); 15% growth in active accounts to 416M" and a statement by Defendant Schulman where he explained that "[o]ur active accounts were up 15% year-over-year, reaching 416 million. We added 13.3 million net new active accounts in the quarter." (FAC ¶¶ 287, 289.) These statements are, of course, substantively identical.

[30] As the Court previously noted, "the lack of sufficient allegations concerning a Defendant's knowledge could also be disposed of in [a discussion of] scienter." *PayPal I*, 2025 WL 325603, at \*16 n.16 (alteration in original) (quoting *In re Celgene Corp. Sec. Litig.*, No. 18-4772, at \*18 n.24 (D.N.J. Dec. 19, 2019)).

24

to constitute a material misrepresentation or omission, the plaintiff must show that the speaker was in possession of some contrary information at the time the statement was made – making it so that either the speaker was aware, or at least should have been aware, that his statement was false or misleading." *Tanaskovic v. Realogy Holdings Corp.*, No. 19-15053, 2021 WL 211049, at *6 (D.N.J. Jan. 21, 2021) (citing *In re NAHC*, 306 F.3d at 1330). "Indeed, a purported claim of securities fraud based merely on information that became apparent after the fact, with no indication that the speaker was aware, or at least should have been aware of the information at the time of his earlier statement, is the exact type of 'fraud by hindsight' argument that the Third Circuit has long rejected as improper." *Id.* (quoting *Chubb*, 394 F.3d at 158); *see also City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 693 (3d Cir. 2023) ("The fraud-by-hindsight prohibition has its greatest potency in the context of otherwise deficient allegations of *scienter*, but for purposes of allegations of falsity, it operates as a corollary of the rule that 'to be actionable, a statement or omission must have been misleading at the time it was made.'" (cleaned up) (quoting *In re NAHC*, 306 F.3d at 1330)).

In an attempt to show that Defendants had knowledge of the illegitimate accounts, Plaintiffs, as before, "rely on a parade of confidential witnesses who are alleged to be former PayPal employees in positions of varying degrees of seniority—all of whom were apparently attenuated from the vortex of power." *PayPal I*, 2025 WL 325603, at *15; (*see also* SAC ¶¶ 106–41.) The SAC alleges that CW-1[31] "recalled lots of fraud issues with the referral programs (where PayPal users received money for getting another account signed up as a member), and many fraudulent accounts came from overseas 'click farms.'" (SAC ¶ 112.) It also alleges that CW-2 recalled that illegitimate accounts were detected and their existence was disclosed. (*Id.* ¶ 117.)

---

[31] Consistent with the SAC, the Court refers to confidential witnesses as "CW-#." (SAC ¶¶ 107–41.)

These statements provide no information about when the fraudulent accounts were discovered or to whom their existence was disclosed. Therefore, they again fall far short of showing that Defendants had or should have had knowledge of the illegitimate accounts when the November 8, 2021 statements were made. *See In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 362 (D.N.J. 2007) ("[C]onfidential witnesses' conclusory allegations of what senior management knew, without particularity or specificity indicate that the witnesses' knowledge is not averred." (cleaned up)). Moreover, as the Court previously held, CW-1 and CW-2 were two to three reporting levels below the Individual Defendants, and thus not "'in a position to possess' information about when and whether Defendants Schulman and Rainey actually learned about the alleged fake accounts." *PayPal I*, 2025 WL 325603, at *16 (quoting *In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d 367, 400 (D.N.J. 2010)); (*see* SAC ¶¶ 107, 115). Plaintiffs plead nothing to the contrary.

Plaintiffs next identify statements by CW-3. CW-3 allegedly identified "about a million fake accounts" and these findings were discussed at a meeting with "approximately 400 attendees" "including the Global Seller Risk and Strategy teams" and "senior directors, who were two level below Schulman." (SAC ¶ 124.) While CW-3 advocated for shutting down the accounts, "his boss ultimately approved . . . 'limiting' the[] accounts." (*Id.* ¶ 126.) "CW-3 believes that the information about the fake accounts was escalated to the executive level because they would have needed executive approval to limit that many accounts." (*Id.*) Similarly, "CW-4 explained that if PayPal had identified that a large number of bot accounts were being created, that information would have immediately been made known to Schulman and Rainey." (*Id.* ¶ 132.) Additionally, "CW-6 explained that pursuant to PayPal's internal policies and requirements of regulatory agencies, any amount of loss or fraud above $50,000 was a 'concern' and there was 'always a roll up' to Schulman and Rainey." (*Id.* ¶ 139.)

These statements are the identical ones that the Court previously found insufficient to establish Defendants' knowledge of the fake accounts. *PayPal I*, 2025 WL 325603, at *17; (*see also* FAC ¶¶ 81, 98, 110 (listing these statements).) As the Court explained then:

> None of the above representative allegations—o[r] any similar allegations in the Complaint—contains details about actual meetings or communications where Defendants learned information that contradicted their public statements. Although multiple confidential witness hypothecated that there *might have* or *would have* been occasions for Defendants to receive information that would render their statements false, none can point to a date, time, or location.

*PayPal I*, 2025 WL 325603, at *17 (citing *In re Hertz Glob. Holdings, Inc. Sec. Litig.*, No. 13-7050, 2015 WL 4469143, at *20 (D.N.J. July 22, 2015)). In other words, Plaintiffs have again failed to adequately plead "the who, what, when, where and how of the information [the confidential witnesses] convey." *Avaya*, 564 F.3d at 253; *see PayPal I*, 2025 WL 325603, at *17. For the same reasons, Plaintiffs have failed to plead that Defendants "had access to . . . this information" when they made the alleged misstatements. (Opp. at 29 n.14); *see Chubb*, 394 F.3d at 154 ("Plaintiffs fail to allege with any particularity, however, that Defendants knew of the [allegedly withheld information]. The conclusory assertion that . . . defendants had access to these financial results far in advance of when they were announced . . . is patently insufficient . . . ." (cleaned up)).  Accordingly, for the reasons articulated in the Court's previous Opinion, Plaintiffs fail to plead with particularity that Defendants knew the statements concerning NNA results made in November 2021 were misleading.

### 2. NNA Acquisition Statements

Plaintiffs also argue that Defendants' "NNA acquisition" statements were materially false or misleading. (Opp. at 8–10.) These include Defendants' statements "that they were not 'chasing a low-value, net new active,' were 'bring[ing] in high-value net new actives at the top of the funnel,' and that, as a result, '[they were] seeing engagement levels increase dramatically

throughout [their] base.'" (*Id.* at 8–9 (first alteration in original) (quoting SAC ¶¶ 31, 41, 64); *see also* SAC ¶¶ 30–34, 38–41, 44, 48 (NNA acquisition statements).) Plaintiffs contend that these statements were misleading because PayPal was instead "chasing low engaged customers" throughout the Class Period. (*Id.* at 9 (quoting SAC ¶¶ 35, 42, 45, 49).)

These statements again primarily repeat statements the Court has already analyzed, just with a new label. What Plaintiffs now call "NNA acquisition statements" were previously considered by the Court, primarily under the subheading of "statements regarding the quality of PayPal's users."[32] The content remains the same—the specific statements essentially identical. *PayPal I*, 2025 WL 325603, at *19. The Court previously held that such statements were inactionable as puffery or opinions. *Id.* at *19–21. Indeed, Plaintiffs admit that "[t]he Court did previously hold that certain of the statements regarding NNA acquisitions, as previously pleaded, were 'immaterial puffery.'" (Opp. at 12 (quoting *PayPal I*, 2025 WL 325603, at *20).) The conclusion remains the same today.

"Certain vague and general statements of optimism have been held not actionable as a matter of law because they constitute no more than 'puffery' and are understood by reasonable investors as such." *In re Burlington Coat Factory*, 114 F.3d at 1428 n.14. This includes "statements concerning [a] [c]ompany's 'dramatic deposit growth,' 'strong performance,' and 'unique business model.'" *Galati v. Com. Bancorp, Inc.*, 220 F. App'x 97, 102 (3d Cir. 2007). Moreover,

---

[32] A small portion of these statements, specifically statements four and nine and parts of statements three and eleven, were previously analyzed as "NNA [r]esults" or "NNA and TPV [g]rowth and [g]uidance." *PayPal I*, 2025 WL 325603, at *13, *18. The Court has already discussed NNA results. *See supra* Section III.C.1. Additionally, the Plaintiffs have disclaimed making any arguments related to "TPV growth, TPV guidance, or NNA guidance." (Opp. at 9 n.3.) To the extent that any of these statements were intended to be pleaded as statements about what the Court previously referred to as "NNA growth," the Court's prior analysis that "projections related to NNA growth fall within the PSLRA's safe harbor for forward-looking statements" remains the same. *PayPal I*, 2025 WL 325603, at *19. To the extent that they are pleaded simply as other NNA acquisition statements, the following analysis applies.

"[o]pinions are only actionable under the securities laws if they are not honestly believed and lack a reasonable basis." *City of Edinburgh Council*, 754 F.3d at 170. In other words, "in the context of a claim alleging falsely-held opinions or beliefs, investors must have sufficient information to suspect that the defendants engaged in culpable activity, i.e., that they did not hold those opinions or beliefs in earnest." *In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*, 543 F.3d 150, 166 (3d Cir. 2008).

> As the Court previously explained:
>
> The Court finds that these statements [about the quality of PayPal's users] are inactionable as opinions and immaterial puffery. . . .
>
> . . . When Defendants made the statements, Defendants genuinely believed them to be true based on the earnings that the Company was reporting. Plaintiffs have not alleged that it was clear to PayPal, at this point, that its marketing practices had led to an increase in illegitimate accounts. Rather, PayPal only knew about certain risks associated with its promotions. Further, when PayPal employees did become aware of the fraudulent accounts, it was not clear that Defendants were made aware of these statements prior to disclosing its [fourth quarter 2021] results.
>
> Likewise, statements regarding Defendants' expectations on churn are based on Defendants' opinions regarding what could help lead to reductions in churn. In addition, it is not clear that these statements were false when made. (*See, e.g.*, [FAC] ¶ 283 ("And so as we look forward over the coming years, as we add capabilities into the digital wallet, things like crypto, things like investing, buy now, pay later, all of these things are key drivers that increase in engagement and therefore, decrease churn."); *id.* ¶ 263 ("And I think that's going to come through a number of different ways, but I think very importantly is reducing churn.").)

*PayPal I*, 2025 WL 325603, at *20.

For the same reasons, the Court again finds that the alleged misstatements about the quality of PayPal's NNAs and their focus on securing engaged customers "are inactionable as opinions and immaterial puffery." *Id.* These statements are akin to those about a "[c]ompany's 'dramatic deposit growth,' 'strong performance,' and 'unique business model'" that the Third Circuit has held to be inactionable. *Galati*, 220 F. App'x at 102. Plaintiffs contend that these statements must have been material and consequently could not have been puffery because, when the truth was

29

disclosed, the stock price dropped. (Opp. at 14–16.) However, a drop in stock price does not itself show that statements were material misrepresentations. *See United States v. Schiff*, 538 F. Supp. 2d 818, 835 (D.N.J. 2008) (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 343 (2005)), *aff'd*, 602 F.3d 152 (3d Cir. 2010). Accordingly, Plaintiffs' arguments do not undermine the Court's previous conclusion that certain statements were immaterial puffery "as a matter of law." *In re Burlington Coat Factory*, 114 F.3d at 1428 n.14.

Plaintiffs further argue that "the statements Plaintiffs now plead are not opinions, they are specific statements about PayPal's purported NNA acquisition strategy and the results of that strategy – statements that can be proven to be demonstrably false." (Opp. at 16.) Specifically, Plaintiffs allege that Defendants (1) said they were not "chasing . . . low-value" NNAs when they, in fact, were, (*id.* (quoting SAC ¶ 40)), and (2) said they were seeing increased engagement levels when they, in fact, were not, (*id.* at 17 (citing SAC ¶¶ 31, 38–39)). In other words, Plaintiffs argue that these statements are not puffery or opinion when viewed as statements of acquisition strategy. Putting this new gloss and label on old statements does not change this Court's conclusion.

The problem with Plaintiffs' attempt to recharacterize these statements is that, even if these and similar statements about PayPal's acquisition strategy were not opinions or puffery, Plaintiffs have failed to adequately plead that Defendants were "aware[] or at least should have been aware" that the statements were false or misleading when made. *Tanaskovic*, 2021 WL 211049, at *6 (citing *In re NAHC*, 306 F.3d at 1330).[33] As with the NNA results statements—and as previously explained by this Court—Plaintiffs have not adequately pleaded that Defendants knew or should have known their acquisition strategies were attracting unengaged users. *See PayPal I*, 2025 WL

---

[33] This also defeats Plaintiffs' other arguments for materiality, including those related to the reactions of analysts. (*See* Opp. at 12–16.)

325603, at *20. Plaintiffs similarly have not adequately pleaded that Defendants' statements about the engagement level of certain cohorts of NNAs were knowingly false or should have been known to be false when made. *Tanaskovic*, 2021 WL 211049, at *6  ("[T]he plaintiff must show that the speaker was in possession of some contrary information at the time the statement was made . . . ."). Instead, Plaintiffs' arguments rely entirely on Defendants' post-Class-Period statements that the NNAs PayPal attracted during the class period had "lower engagement and a higher propensity to churn." (Opp. at 17 (quoting SAC ¶ 52); *see also* SAC ¶¶ 35, 42, 45, 49 (relying on similar post-Class-Period admissions to show that statements were false or misleading).) This "is the exact type of 'fraud by hindsight' argument that the Third Circuit has long rejected as improper." *Tanaskovic*, 2021 WL 211049, at *6 (quoting *Chubb*, 394 F.3d at 158); *see also City of Warren Police & Fire Ret. Sys.*, 70 F.4th at 693. Defendants knew that PayPal was "lean[ing] into incentivized customer acquisition tactics," but there is no indication that, *at the time* Defendants made the challenged statements, they knew or should have known that the result of that approach would be unengaged NNAs. (Opp. at 17 (quoting SAC ¶ 52).)

The same analysis applies to the few "new" allegedly misleading statements pleaded by Plaintiffs that fall within this category. The first arguably new statement consists of the parts of statement six where Defendant Schulman stated "I think about what's going on inside the base, our engagement levels are going up substantially. . . . And that is really a result of our daily active users coming on" and Defendant Rainey stated "these have been our most engaged cohorts that we've ever seen. And we're continuing to see those trends." (SAC ¶ 38.) The second "new" statement is statement ten where Defendant Schulman stated that the new NNAs are "performing better than cohorts that we previously had historically, their churn is lower." (*Id.* ¶ 44.)

As an initial matter, the substance of these statements is, in fact, not new. The first new

statement is simply a different excerpt of the transcript of the May 5, 2021 conference call previously pleaded by Plaintiffs and addressed by the Court. (*Compare id.* ¶ 38, *with* FAC ¶¶ 249–53); *see PayPal I*, 2025 WL 325603, at *18, *19. Plaintiffs previously pleaded nearly identical statements from that call to those now pleaded, such as Defendant Schulman's statement that PayPal was "really strong on the engagement front" with its NNA acquisitions. (FAC ¶ 253.) Similarly, the second new statement is a different excerpt from a July 28, 2021 conference call also previously pleaded and addressed by the Court. (*Compare* SAC ¶ 44, *with* FAC ¶¶ 277–79); *see PayPal I*, 2025 WL 325603, at *13, *18, *20.

Even if these statements were entirely new, they provide nothing new of substance. As Plaintiffs themselves indicate, these statements were part of a series of statements discussing PayPal's "strategy to grow NNAs and the engagement levels of those accounts." (Opp. at 14 (citing SAC ¶¶ 30, 32–34, 38–41, 44, 47–48).) Plaintiffs do not indicate in any way that these are a unique category of statements that were somehow just uncovered. Instead, they seem to be much the same: that is, simply additional statements addressing Defendants' NNA acquisition strategy and the results of that strategy. Statements making the same point about the increased engagement levels were previously addressed by the Court and found to be immaterial puffery or opinion. *See PayPal I*, 2025 WL 325603, at *19–20 ("Plaintiffs allege that Defendants misled investors when claiming that its new users were highly engaged . . . . The Court finds that these statements are inactionable as opinions and immaterial puffery." (citing FAC ¶¶ 225, 263)); (*compare* SAC ¶¶ 31, 39, *with* FAC ¶¶ 225, 263 (pleading the same statements).)[34] The same conclusion holds here.

Moreover, as with the repleaded statements, Plaintiffs have failed to adequately plead that

---

[34] As mentioned in the previous Opinion, these are just "examples of statements which the Court viewed as typical." *PayPal I*, 2025 WL 325603, at *21 n.21.

Defendants were "aware[] or at least should have been aware" that the statements were false or misleading when made. *Tanaskovic*, 2021 WL 211049, at *6 (citing *In re NAHC*, 306 F.3d at 1330). In fact, even putting aside Defendants' *knowledge* of any falsity, it is not even clear from the face of the SAC that these new statements *were* false or misleading when made in May and July of 2021 respectively. *See In re NAHC, Inc.*, 306 F.3d at 1330 ("To be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events."). While Defendant Rainey admitted in February of 2022 that the customers acquired by the incentive programs at issue had "lower engagement and a higher propensity to churn," nothing in the SAC suggests that these lower engagement levels and higher churn rate were present in May or July of 2021. (SAC ¶ 52.) By July of 2021, accounts created or reactivated by the 2021 incentive programs had, at most, been active for seven months. Plaintiffs have not provided any indication that engagement levels were not elevated as Defendants claimed when these newly pleaded statements were made in May or June 2021, or that Defendants were aware of such levels. Perhaps the full picture of engagement level was not clear to Defendants— or, perhaps, did not decline *at all*—until one year out when engagement was discussed by Defendant Rainey. (*Id.* ¶ 52; *see also id.* ¶ 54 (Defendant Rainey stating as part of the February 2022 disclosure that the 4.5 million illegitimate accounts were not identified *until the fourth quarter of 2021*).) Accordingly, Plaintiffs have failed to plead with particularity that the new statements were false or misleading when made. *Chubb*, 394 F.3d at 145.

Plaintiffs have also failed to plead falsity or knowledge thereof because they have not adequately pleaded that the new statements were about the cohorts of new accounts at issue. As Plaintiffs themselves define it, "churn" refers to accounts "that went 12 months without a transaction." (SAC ¶ 23.) Thus, both sets of new statements, which were made in mid-2021 and

33

refer to the relative "churn" of a cohort of new accounts, are discussing the turnover of at least year-old accounts *from 2020*, not the 2021 accounts that are the subject of this lawsuit. This discrepancy is most obvious with the second new statement. There, in addition to mentioning churn, Defendant Schulman made it clear that he was speaking about NNAs created "a year" before the statement was made, *e.g.*, the second quarter of *2020*. (*Id.* ¶ 44.) Similarly, the first new statement was primarily about accounts predating the 2021 incentive program. Defendant Schulman's statement was about "what's going on inside the base," not the 2021 cohort of NNAs at issue, and it was made in response to a question about "last year's [2020] record NNAs" and "incremental users coming on." (*Id.* ¶ 38.) Defendant Rainey's statement at that same May 5, 2021 press conference was also about year-old accounts because he talked about the reduced level of "churn" for those accounts, which implies that those accounts were already a year old, as accounts must be that old to even have the chance to churn. (*Id.* ¶¶ 23, 38.)

Plaintiffs claim that their contrary characterization—that these referenced "cohorts" included those from 2021—must be accepted because "the Complaint's allegations are to be taken as true." (Opp. at 20 (citing *zCap Equity Fund LLC v. LuxUrban Hotels Inc.,* 792 F. Supp. 3d 407, 437 (S.D.N.Y. 2025)).) Not so. "[T]he fact that we must accept the plaintiffs' version of the facts as true does not mean that we must accept plaintiffs' *characterization* of those facts." *Fisher Bros. Sales, Inc. v. United States*, 46 F.3d 279, 286 (3d Cir. 1995). The Court accepts that Defendants Schulman and Rainey made the statements at issue, but it need not, and does not, accept Plaintiffs' "*characterization*" of those statements—particularly where it is inconsistent with Plaintiffs' own definition of "churn." *Id.*; (SAC ¶ 23.)

Specifically, Plaintiffs argue that Defendant Rainey's statement "[a]nd we're continuing to see those trends" expanded the scope to accounts created in 2021. (Opp. at 21 (quoting SAC ¶

34

38).) This reading strains credulity. The "trends" Defendant Rainey was referring to were trends in "churn" and "engage[ment]," and churn can only be measured backwards-looking on accounts that are twelve months old or older. (SAC ¶¶ 23, 38.) Thus, he could not have been speaking, in 2021, about accounts created in 2021. Additionally, immediately after this statement Defendant Rainey clarified what he was saying by noting "[t]hey haven't waned like what you might expect related to people returning to the physical world." (*Id.* ¶ 38.) In this context, "[t]hey" clearly refers to the 2020 cohorts that Defendant Rainey had just mentioned, not unmentioned 2021 cohorts.

Plaintiffs also argue that, even if this statement applied only to NNAs from 2020, it is still false. (Opp. at 21.) This argument is even less supported than the argument that Defendants knew that the 2021 cohorts were not especially engaged or that they were in fact not especially engaged. Plaintiffs point to post-Class-Period statements from the Defendants indicating that discontinuing incentives could cause accounts "from the 'last two years'" to churn and that the 20 million estimated roll off included accounts from 2020 and 2021. (*Id.*) However, these statements fail to indicate what percentage of potentially churning accounts were from 2020 or otherwise indicate that the newly pleaded statements about the 2020 cohort as a whole were knowingly false or even false as a matter of fact. *See In re NAHC, Inc.*, 306 F.3d at 1330; *cf. In re Maiden Holdings, Ltd. Sec. Litig.*, 153 F.4th 354, 363 (3d Cir. 2025) ("We deemed the complaint in [*City of Warren Police & Fire Ret. Sys.*] deficient because it alleged that one segment within a larger insurance portfolio 'had a consistently negative mortality experience' but alleged nothing about the significance of that adverse data relative to the 'many factors Prudential considered in setting its reserves.'" (quoting *City of Warren Police & Fire Ret. Sys.*, 70 F.4th at 686–87)).

Therefore, for many of the same reasons as before, the Court again dismisses Count I of the SAC. In short, the at-issue statements almost entirely replicate the already dismissed statements

included within the FAC, and the few "new" statements fail to change the Court's conclusion.  As before, because "the Court finds that Plaintiffs fail to allege with particularity misstatements or omissions of material facts made by Defendants, the Court does not address Defendants' arguments regarding the remaining pleading requirements of Plaintiffs' Section 10(b) claim." *PayPal I*, 2025 WL 325603, at *21 (citing *In re BioLineRx Ltd. Sec. Litig.*, No. 23-041, 2024 WL 3409800, at *11 (D.N.J. July 15, 2024)).

### D.    COUNTS II AND III – SECTIONS 20(A) AND 20A

In Counts Two and Three, Plaintiffs asserts claims for control person liability and insider trading against the Individual Defendants under Sections 20(a) and 20A. (SAC ¶¶ 184–200.) These claims require a "predicate Exchange Act violation." *City of Edinburgh Council*, 754 F.3d at 177. Accordingly, because the Section 10(b) claims are dismissed for the reasons stated above, the Court dismisses Counts Two and Three of the SAC. *See id.*

### E.    DISMISSAL SHALL BE WITH PREJUDICE

Defendants ask that the Court dismiss the SAC with prejudice. (Mot. at 40.) When a court dismisses a complaint, leave to amend should be granted "unless amendment would be inequitable or futile." *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002). This is Plaintiffs' third operative complaint. The Court has already dismissed the complaint, and, in so doing, in the Court's the view, painstakingly documented the reasons for dismissing Plaintiffs' 413-paragraphed FAC and granted leave to amend. *See PayPal I*, 2025 WL 325603, at *22. Despite being granted such leave and explicit instructions regarding what a subsequent complaint required, Plaintiffs have not meaningfully addressed the Court's identified deficiencies, and the SAC is being dismissed for many of the same reasons as the FAC. In fact, the overwhelming majority of the alleged misstatements simply repeat verbatim the previously alleged misstatements, and the

36

few "new" statements overlap significantly in substance with those statements previously pleaded, rendering them surplusage. This repetition and failure to remedy suggests that Plaintiffs *cannot* remedy the previously identified deficiencies, and any further amendment would be futile. *See Krantz v. Prudential Invs.*, 305 F.3d 140, 144 (3d Cir. 2002) ("A District Court has discretion to deny a plaintiff leave to amend where the plaintiff was put on notice as to the deficiencies in his complaint, but chose not to resolve them.").

The Third Circuit's decision in *Chubb* is informative. There, the Third Circuit held that a district court did not abuse its discretion in dismissing a securities fraud case with prejudice where, as here, it was the third operative complaint, "the District Court's decision to dismiss the Amended Complaint . . . provided Plaintiffs with a detailed blueprint of how to remedy the defects in their claims," "Plaintiffs neglected to supplement the existing allegations of the Amended Complaint with sufficiently particularized confidential source descriptions," and "Plaintiffs . . . proffered no additional facts that would cure the pleading deficiencies of the Second Amended Complaint." *Chubb*, 394 F.3d at 163–64. The Court also concluded, as is true here, that "there is a stark absence of any suggestion by the plaintiffs that they have developed any facts since the action was commenced, which would, if true, cure the defects in the pleadings under the heightened requirements of the PSLRA" and that allowing further amendment in such a scenario "would frustrate Congress's objective in enacting this statute of providing a filter at the earliest stage (the pleading stage) to screen out lawsuits that have no factual basis." *Id.* at 164 (cleaned up) (quoting *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 246 (3d Cir. 2004)).

The Court's conclusion is further bolstered by the sophistication of the parties and counsel in this action. *See Eiber Radiology, Inc. v. Toshiba Am. Med. Sys., Inc.*, 673 F. App'x 925, 929–30 (11th Cir. 2016) ("We do not . . . require . . . leniency where a plaintiff has been represented by

37

counsel. We have never required district courts to grant counseled plaintiffs more than one opportunity to amend a deficient complaint, nor have we concluded that dismissal with prejudice is inappropriate where a counseled plaintiff has failed to cure a deficient pleading after having been offered ample opportunity to do so." (citation omitted)); *cf., e.g.*, *Gambrell v. Arias*, No. 14-6758, 2015 WL 13647384, at *1 (D.N.J. May 5, 2015). The highly sophisticated Plaintiffs here failed to cure the deficiencies clearly identified by the Court, and instead parrot substantially the same allegations as were made in their FAC. This suggests that they are unable to. *See Chubb*, 394 F.3d at 163–66; *Blackbook Cap., Inc.*, 2021 WL 1827268, at *3 ("Because Plaintiffs have seemingly made no effort to address in the SAC the shortcomings noted in the Court's prior Opinion, the Court infers that Plaintiffs are unable to do so. As a result, any potential amendment would be futile."). Accordingly, the SAC is **DISMISSED WITH PREJUDICE**.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is **GRANTED**. An appropriate

Order will accompany this Opinion.

**ROBERT KIRSCH**
**UNITED STATES DISTRICT JUDGE**

Dated: March 31, 2026